**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------x

In re:                                          :
                                                :  Chapter 11
CALPINE CORPORATION, <u>et al.</u>,              :  Case No. 05-60200 (BRL)
                                                :
                      Debtors.                  :
                                                :
---------------------------------------------------------x
ARISTEIA CAPITAL, L.L.C.,                        :
AURELIUS CAPITAL MANAGEMENT,                     :
LP, DRAWBRIDGE SPECIAL                           :
OPPORTUNITIES ADVISORS LLC, ORE                  :
HILL HUB FUND LTD., NISSWA                        :
MASTER FUND LTD., PINES EDGE                      :
VALUE INVESTORS LTD., PINES EDGE                 :  Civil Case No. 07-07830 (JGK)
VALUE INVESTORS L.P., SILVER                      :
SANDS FUND LLC, STARK MASTER                      :
FUND LTD. AND 3V CAPITAL                          :
MANAGEMENT, LLC,                                 :
                                                :
                      Appellants,               :  **ORAL ARGUMENT REQUESTED**
                                                :
              -against-                          :
                                                :
CALPINE CORPORATION AND ITS                      :
AFFILIATED DEBTORS AND DEBTORS                   :
IN POSSESSION, OFFICIAL                          :
COMMITTEE OF UNSECURED                            :
CREDITORS OF CALPINE                             :
CORPORATION, OFFICIAL                            :
COMMITTEE OF EQUITY SECURITY                     :
HOLDERS,                                         :
                                                :
                      Appellees.                :
---------------------------------------------------------x

<u>**OPENING BRIEF OF APPELLANT HOLDERS OF 6% CONVERTIBLE
NOTES**</u>

## <u>TABLE OF CONTENTS</u>

**<u>Page(s)</u>**

JURISDICTION ........................................................................................ 2

ISSUES PRESENTED............................................................................... 2

STANDARD OF REVIEW ....................................................................... 3

PRELIMINARY STATEMENT ................................................................ 4

STATEMENT OF THE CASE.................................................................... 9

STATEMENT OF THE FACTS ............................................................... 14

ARGUMENT .......................................................................................... 15

    A.    The Bankruptcy Court Erred as a Matter of Law in Concluding that the Broadly-Worded Proof of Claim Did Not Encompass a Claim for Breach of the Conversion Right Under the Attached Indenture. .........15

    B.    Even If the Supplements Are Treated as "Amendments" to the Proof of Claim, the Bankruptcy Court Committed Legal Error and Abused Its Discretion by Denying Leave to Amend. ...............................20

        1.    The Bankruptcy Court Misapplied the "Relation Back" Standard in Denying Leave to Amend..........................................20

        2.    The Bankruptcy Court's Finding of "Prejudice" Was Based on a Factually Unfounded Assumption and Disregarded the Impact of the Bankruptcy Court's Subordination Ruling..............22

    C.    The Bankruptcy Court Erred as a Matter of Law in Holding that Calpine Could Unilaterally Abrogate the Conversion Right After Defaulting Under the Indenture, Without Being Liable for Damages...................................................................................................28

        1.    Applicable State Law Supports the Allowance of a Claim for Damages for Improper Termination of an "Out of the Money" Conversion Option. .........................................................28

        2.    The Indenture Did Not Empower Calpine to Abrogate the Conversion Right Unilaterally by Creating an Event of Default..........................................................................................30

        3.    The Bankruptcy Court's Theories Improperly Conflate the Two Distinct Economic Components of Value Under a

Convertible Note and Would Allow Issuers of Convertible
Notes to Profit from Their Own Defaults. ....................................34

4.    The Bankruptcy Court Misapplied Bankruptcy Law in
Holding that the Contingent or Unmatured Nature of the
Conversion Right on the Petition Date Precluded the
Allowance of the Conversion Right Claims. ...............................38

D.    The Bankruptcy Court Misapplied Section 510(b) in Subordinating
the Conversion Right Claims Under a Debt Instrument to the Level
of Parity with Equity. ................................................................................40

1.    Section 510(b) Does Not Apply to the Conversion Right
Claims. ..........................................................................................40

2.    Any Conversion Right Claims Subordinated Under Section
510(b) Must Remain Senior to Equity. .........................................44

E.    The Bankruptcy Court's Order Improperly Adjudicated Issues Not
Before It. ...................................................................................................47

CONCLUSION............................................................................................................ 50

# TABLE OF AUTHORITIES

## CASES

*Aetna Cas. & Sur. Co. v. LTV Steel Co. (In re Chateaugay Corp.)*,
    94 F.3d 772 (2d Cir. 1996)...............................................................................17, 18

*Allen v. Geneva Steel Co. (In re Geneva Steel Co.)*,
    260 B.R. 517 (B.A.P. 10th Cir. 2001), *aff'd*, 281 F.3d 1173 (10th Cir. 2002) ......................45

*Am. Broad. Sys. v. Nugent (In re Betacom of Phoenix, Inc.)*,
    240 F.3d 823 (9th Cir. 2001) ................................................................................42

*In re Asia Global Crossing, Ltd.*,
    324 B.R. 503 (Bankr. S.D.N.Y. 2005)..............................................................19, 20

*Barrow v. Lawrence United Corp.*,
    146 A.D.2d 15 (N.Y. App. Div. 1989) ....................................................................33

*In re Bloomingdale Partners*,
    160 B.R. 101 (Bankr. N.D. Ill. 1993) ..........................................................16, 17, 18

*Butner v. United States*,
    440 U.S. 48 (1979)............................................................................................28

*In re Calpine Corp.*,
    365 B.R. 392 (Bankr. S.D.N.Y. 2007).........................................................7, 37, 38

*Castle Creek Tech. Partners, LLC v. CellPoint Inc.*,
    No. 02 Civ. 6662, 2002 U.S. Dist. LEXIS 23760 (S.D.N.Y. Dec. 6, 2002)...........................37

*Chock Full O'Nuts v. United States*,
    453 F.2d 300 (2d Cir. 1971)...........................................................................35, 36

*In re Commonwealth Corp.*,
    617 F.2d 415 (5th Cir. 1980) .........................................................................19, 23

*Corzin v. Fordu (In re Fordu)*,
    201 F.3d 693 (6th Cir. 1999) ...............................................................................49

*Deutsch v. Health Ins. Plan of Greater N.Y.*,
    751 F.2d 59 (2d Cir. 1984)..................................................................................37

*Devilla v. Schriver*,
    245 F.3d 192 (2d Cir. 2001)..................................................................................4

*In re Earth Rock, Inc.*,
    153 B.R. 61 (Bankr. D. Idaho 1993)..................................................................23, 26

*In re Einstein/Noah Bagel Corp.*,
    257 B.R. 499 (Bankr. D. Ariz. 2000) ................................................................40

*FDIC v. Knostman*,
    966 F.2d 1133 (7th Cir. 1992) .........................................................................21

*Galli v. Metz*,
    973 F.2d 145 (2d Cir. 1992) ............................................................................32

*GenCorp, Inc. v. Am. Int'l Underwriters*,
    178 F.3d 804 (6th Cir. 1999) ...........................................................................37

*Hilton Hotels Corp. v. Dunnet*,
    275 F. Supp. 2d 954 (W.D. Tenn. 2003) ..........................................................30

*In re Infiltrator Sys., Inc.*,
    241 B.R. 278 (Bankr. D. Conn. 1999) ........................................................23, 26

*Int'l Chem. Workers Union v. Mobay Chem. Corp.*,
    755 F.2d 1107 (4th Cir. 1985) .........................................................................21

*In re Integrated Res., Inc.*,
    157 B.R. 66 (S.D.N.Y. 1993) ................................................................3, 18, 19

*Kaplan v. Vornado, Inc.*,
    341 F. Supp. 212 (N.D. Ill. 1971) ....................................................................34

*Lipper Holdings, LLC v. Trident Holdings, LLC*,
    1 A.D.3d 170 (N.Y. App. Div. 2003) ...............................................................31

*LTV Aerospace & Def. Co. v. Iles (In re Chateaugay Corp.)*,
    930 F.2d 245 (2d Cir. 1991) ..............................................................................2

*Liddle v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert
    Group, Inc.)*,
    159 B.R. 420 (S.D.N.Y. 1993) .........................................................................21

*Lillis v. AT&T Corp.*,
    No. 717-N, 2007 Del. Ch. LEXIS 102 (Del. Ch. July 20, 2007) ..................29, 30

*Manley v. AmBase Corp.*,
    337 F.3d 237 (2d Cir. 2003) ............................................................................32

*Masters v. Wilhelmina Model Agency, Inc.*,
    473 F.3d 423 (2d Cir. 2007) ..............................................................................3

*Mazzeo v. Lenhart (In re Mazzeo)*,
    167 F.3d 139 (2d Cir. 1999) .......................................................................49, 50

*Midland Cogeneration Venture Ltd. P'ship v. Enron Corp. (In re Enron Corp.)*,
     419 F.3d 115 (2d Cir. 2005)................................................................. *passim*

*Mkt St. Assocs. Ltd. P'ship v. Frey*,
     941 F.2d 588 (7th Cir. 1991) ................................................................37

*In re New Power Co.*,
     313 B.R. 496 (Bankr. N.D. Ga. 2004) ..................................................40

*Ngan Gung Rest., Inc. v. Official Comm. of Unsecured Creditors (In re Ngan
     Gung Rest., Inc.)*,
     195 B.R. 593 (S.D.N.Y. 1996)................................................................3

*Peckarsky v. Am. Broad. Co.*,
     603 F. Supp. 688 (D.D.C. 1984) ...........................................................21

*R.A. Mackie & Co. v. PetroCorp Inc.*,
     329 F. Supp. 2d 477 (S.D.N.Y. 2004) ...................................................29

*In re R.H. Macy & Co.*,
     166 B.R. 799 (S.D.N.Y. 1994)...............................................................27

*Racusin v. Am. Wagering, Inc. (In re Am. Wagering, Inc.)*,
     No. 05-15969, 2007 U.S. App. LEXIS 15344 (9th Cir. June 28, 2007)...........................42, 43

*Raleigh v. Ill. Dep't of Revenue*,
     530 U.S. 15 (2000)..................................................................................28

*Raven Media Invs. LLC v. DirecTV Latin Am., LLC (In re DirecTV Latin Am.,
     LLC)*,
     No. 03-981, 2004 U.S. Dist. LEXIS 2425 (D. Del. Feb. 4, 2004).........................................43

*Rombro v. Dufrayne (In re Med Diversified, Inc.)*,
     461 F.3d 251 (2d Cir. 2006)................................................................. *passim*

*Rosewood Apartments Corp. v. Perpignano*,
     200 F. Supp. 2d 269 (S.D.N.Y. 2002)...................................................31

*Seabury Constr. Corp. v. Jeffrey Chain Corp.*,
     289 F.3d 63 (2d Cir. 2002)....................................................................33

*Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*,
     691 F.2d 1039 (2d Cir. 1982), *cert. denied*, 460 U.S. 1012 (1983)..........................7, 36, 37

*In re Skyler Ridge*,
     80 B.R. 500 (Bankr. C.D. Cal. 1987)....................................................38

*Stevelman v. Alias Research Inc.*,
    174 F.3d 79 (2d Cir. 1999)...................................................................................21

*In re Stirling Homex Corp.*,
    579 F.2d 206 (2d Cir. 1978), *cert. denied sub nom. Jezarian v. Raichle*, 439
    U.S. 1074 (1979).....................................................................................46, 47

*In re Stoecker*,
    5 F.3d 1022 (7th Cir. 1993) ...............................................................................26

*Travelers Cas. & Sur. Co. v. Pac. Gas & Elec. Co.*,
    549 U.S. ___, 127 S. Ct. 1199 (2007)................................................................39

*Travelers Ins. Co. v. 633 Third Assocs.*,
    14 F.3d 114 (2d Cir. 1994)..................................................................................21

*UPS Capital Bus. Credit v. Gencarelli (In re Gencarelli)*,
    No. 06-2700, 2007 U.S. App. LEXIS 20751 (1st Cir. Aug. 30, 2007)..................28

*United States v. Gerth*,
    991 F.2d 1428 (8th Cir. 1993) ............................................................................40

*United States v. Kolstad (In re Kolstad)*,
    928 F.2d 171 (5th Cir. 1991), *cert. denied*, 502 U.S. 958 (1991)...................26, 27

*Vista Eyecare, Inc. v. Neumann (In re Vista Eyecare, Inc.)*,
    283 B.R. 613 (Bankr. N.D. Ga. 2002) ................................................................44

## STATUTES AND RULES

11 U.S.C. § 101(5)..................................................................................................7, 39

11 U.S.C. § 101(16)..............................................................................................45, 46

11 U.S.C. § 501(a) ....................................................................................................16

11 U.S.C. § 502(b) ....................................................................................................39

11 U.S.C. § 502(b)(1)............................................................................................7, 39

11 U.S.C. § 502(c)................................................................................................7, 40

11 U.S.C. § 510(b) ...............................................................................................*passim*

11 U.S.C. § 726(a) ...................................................................................................6, 28

28 U.S.C. § 158(a)(1)...................................................................................................2

FED. R. BANKR. P. 3001(a) ...............................................................................16

FED. R. BANKR. P. 7052 ...................................................................................49

FED. R. BANKR. P. 9014(c) ...............................................................................49

FED. R. CIV. P. 15(a) ........................................................................................22

FED. R. CIV. P. 15(c) ........................................................................................21

FED. R. CIV. P. 52(a) ........................................................................................49

## **OTHER AUTHORITIES**

H.R. Rep. No. 95-595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963 ...................................45, 46

AMERICAN BAR FOUNDATION, COMMENTARIES ON INDENTURES (1971) ......................................34

4 COLLIER ON BANKRUPTCY ¶ 510.04 (15th ed. rev. 2007) ...........................................45

11 WILLISTON ON CONTRACTS § 32:5 (4th ed. 2007) ...................................................32

William W. Bratton, Jr., *The Economics and Jurisprudence of Convertible Bonds*, 1984 WIS. L. REV. 667 (1984) ........................................................................34, 35

**TO THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK:**

Aristeia Capital, L.L.C., Aurelius Capital Management, LP, Drawbridge Special Opportunities Advisors LLC, Ore Hill Hub Fund Ltd., Nisswa Master Fund Ltd., Pines Edge Value Investors Ltd., Pines Edge Value Investors L.P., Silver Sands Fund LLC, Stark Master Fund Ltd. and 3V Capital Management, LLC (collectively, the "Appellant Holders"), as beneficial owners, or managers of entities or accounts that are beneficial owners, of certain 6% Convertible Notes Due 2014 (the "6% Convertible Notes") issued under the Indenture, dated as of August 10, 2000 (the "Original Indenture"), between Calpine Corporation ("Calpine"), as issuer, and Wilmington Trust Company, as predecessor indenture trustee (collectively with HSBC Bank USA, N.A. ("HSBC"), as successor indenture trustee, the "Indenture Trustee"), as supplemented by the Second Supplemental Indenture, dated as of September 30, 2004 (the "Second Supplemental Indenture" and together with the Original Indenture, the "Indenture") respectfully submit, by and through their undersigned counsel, this Opening Brief in support of their appeal from the Order Granting Debtors' Limited Objection to Convertible Noteholder Claim Nos. 2404, 2821, 2823, 6247, 6249, 6280, 6299 and 6300, dated August 10, 2007 [Docket 5595] (the "Order") entered by the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

1

## JURISDICTION

This Court has jurisdiction over this appeal from an order disallowing a claim pursuant to 28 U.S.C. § 158(a)(1).[1] *See, e.g., LTV Aerospace & Def. Co. v. Iles (In re Chateaugay Corp.)*, 930 F.2d 245, 246-47 (2d Cir. 1991).

## ISSUES PRESENTED

1.      Did the Bankruptcy Court err as a matter of law in holding that the Indenture Trustee's timely-filed proof of claim (the "Proof of Claim") for claims under the Indenture and the 6% Convertible Notes, which expressly included (without limitation) all unliquidated damages under the Indenture, did not include claims for breach of the conversion right under the Indenture ("Conversion Right Claims")?

2.      Did the Bankruptcy Court err as a matter of law in determining that supplementation of the Proof of Claim, which clarified that the claims for unliquidated damages under the Indenture asserted therein included Conversion Right Claims, constituted an amendment that did not "relate back" to the Proof of Claim and was therefore time-barred?

3.      Did the Bankruptcy Court abuse its discretion by refusing to permit an amendment to the Proof of Claim to assert the Conversion Right Claims (if such an amendment were even necessary) on equitable grounds?

4.      Did the Bankruptcy Court err as a matter of law in holding that the Debtors will have no liability if their plan of reorganization eliminates the conversion right provided under the Indenture (the "Conversion Right")?

---

[1]     For the Court's convenience, the Appellant Holders have included an "Authorities Appendix" with this Opening Brief.  The tabbed Authorities Appendix includes copies of the following groups of material that are cited herein: (1) statutes and rules; (2) legislative history; (3) unpublished decisions; and (4) reference materials and articles.

5.    Did the Bankruptcy Court err as a matter of law in holding that the Conversion Right Claims would be subject to mandatory subordination to the level of equity under 11 U.S.C. § 510(b)?

6.    Did the Bankruptcy Court err as a matter of law in disallowing claims under the Indenture, other than those based on the Conversion Right, when the only claims addressed in the Debtors' objection were Conversion Right Claims, and the Bankruptcy Court made no findings regarding the basis for such broad disallowance?

## STANDARD OF REVIEW

This Court "reviews the bankruptcy court's conclusions of law de novo and findings of fact under a clearly erroneous standard." *Ngan Gung Rest., Inc. v. Official Comm. of Unsecured Creditors (In re Ngan Gung Rest., Inc.)*, 195 B.R. 593, 596 (S.D.N.Y. 1996). The Bankruptcy Court received no evidence and made no factual findings regarding the Debtors' liability for breach of the Conversion Right or the priority of the Conversion Right Claims under 11 U.S.C. § 510(b). Accordingly, this Court reviews the Bankruptcy Court's conclusions about those issues de novo.

The Bankruptcy Court's denial of leave to amend the Proof of Claim is reviewed for abuse of discretion. *See, e.g.*, *In re Integrated Res., Inc.*, 157 B.R. 66, 69-70 (S.D.N.Y. 1993). A "court abuses its discretion when (1) its decision rests on an error of law (such as application of the wrong legal principles) or a clearly erroneous factual finding, or (2) its decision – though not necessarily the product of a legal error or a clearly erroneous factual finding – cannot be located within the range of permissible decisions." *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 435 (2d Cir. 2007) (citation and quotations omitted). An abuse of discretion has also been found where a

court makes inconsistent rulings within the same case. *See Devilla v. Schriver*, 245 F.3d 192, 197-98 (2d Cir. 2001) (abuse of discretion standard implicated by violation of law of the case doctrine); *see generally* pp. 27-28, *infra* (inconsistency between (i) finding of prejudice to creditors in "late filing" of claim, and (ii) ruling that Conversion Right Claims would be subordinated to other creditor claims under section 510(b) if allowed).

## PRELIMINARY STATEMENT

This appeal arises out of an Order disallowing the claims of holders of the 6% Convertible Notes (the "Noteholders") for the wrongful termination of their Conversion Right, which will occur under Calpine's reorganization plan. If affirmed, this Order would confer a windfall on Calpine's equity holders, who are expected to receive hundreds of millions of dollars in value under a plan while the Noteholders remain uncompensated for Calpine's breach of a valuable contractual right.

Convertible bonds are hardly unusual. What is unusual is the confluence of circumstances that makes the Conversion Right Claims quite valuable – a case involving sizeable projected distributions to equity, together with convertible bonds that have a very low conversion price and many years remaining in the agreed duration of the conversion option. While meaningful disputes over conversion claims will, thus, be rare events in bankruptcy cases, the allowability of such claims is compelled by the application of basic legal principles and straightforward textual interpretation. In disallowing such claims here, the Bankruptcy Court committed multiple reversible errors.

The Bankruptcy Court first held that the Conversion Right Claims were time-barred, notwithstanding that the timely-filed Proof of Claim: (i) asserted, in addition to liquidated claims, claims "for any and all other amounts due or to become due under the Indenture and the Notes . . ., which amounts may, presently, be unliquidated or

4

contingent . . . including, but not limited to, amounts as or for . . . compensatory . . . damages"; (ii) attached the Second Supplemental Indenture (a full third of which is devoted to the Conversion Right) and "expressly incorporated" its provisions "whether or not summarized or identified specifically in this Proof of Claim"; and (iii) specifically and repeatedly identified the 6% Convertible Notes as "convertible."  (*See* Proof of Claim [App. 1], at cover sheet; Attachment ¶¶ 1, 2(f) & 3; Ex. "C" at 16-26.)[2]  In holding that this broadly-worded claim under the Indenture did not encompass the Conversion Right, the Bankruptcy Court imposed a standard of specificity for proofs of claim that finds no support in the law.

The Bankruptcy Court then denied leave to amend the Proof of Claim after the Bar Date, by way of a supplement filed in March 2007 to clarify that the Proof of Claim included the Conversion Right Claims.  In so doing, the Bankruptcy Court made two errors.  First, it held that even though the Conversion Right Claims *arise out of the very Indenture on which the Proof of Claim was based*, the supplement could not "relate back" to the timely-filed Proof of Claim.  This ruling, however, reflected too narrow a view, both of the Proof of Claim and of "relation back."

Second, where an amendment "relates back," leave to amend must generally be granted absent a showing of prejudice to the debtor and creditors.  The Bankruptcy Court found the requisite "prejudice" by positing a causal link between (i) the "delay" in filing the supplement; and (ii) the Debtors being required to deal with the Conversion Right Claims during the plan process, and reserve for them under a plan.

---

[2]    A copy of the Proof of Claim, as well as copies of all other documents in the record referenced herein, is included in the accompanying "Record Appendix."  Copies of items in the Record Appendix that were given a docket identification number by the Bankruptcy Court are generally referenced by that

There is no reason to believe, however, that had the Proof of Claim used the magic words "conversion right claims" or the like, the Debtors would have litigated those claims to conclusion any sooner.  To the contrary, the Debtors waited until *June* of this year – *ten months after* the Bar Date, and immediately before filing their first reorganization plan – before objecting to *timely-filed* unliquidated claims, in the magnitude of hundreds of millions of dollars, asserted under many other indentures (the 6% Convertible Notes being expressly excluded), and objected to those *timely-filed* unliquidated claims *less than thirty days before* objecting to the allegedly "late-filed" Conversion Right Claims. Thus, the supposed "late filing" made no meaningful difference.

Moreover, in finding prejudice to other *creditors*, the Bankruptcy Court simply disregarded (i) the fact that, according to the Debtors, the value in these chapter 11 cases will enable a substantial distribution to equity holders; and (ii) its own ruling that the Conversion Right Claims would be *subordinated* to other creditor claims under 11 U.S.C. § 510(b), which ruling, if sustained, would preclude any prejudice to creditors. Thus, the contest here may be, at worst, one between allegedly "late-filed" creditor claims and equity interests, in which case the Bankruptcy Code's priority scheme favors the creditors.  *See* 11 U.S.C. § 726(a)(3), (5)-(6).

Next, the Bankruptcy Court summarily disallowed the Conversion Right Claims on the merits.  The Court invoked a theory of "alternative performance" that essentially disregarded the fact that conversion rights have value separate and distinct from the right to principal and interest, and that the issuer does not have the unilateral power to abrogate those rights prematurely (and misappropriate the attendant value), over

---

number.  Documents without a docket number are generally cited herein as "App. __," and the attendant numerical reference is to one of the Record Appendix's numbered tabs.

a noteholder's objection, by electing the "alternative performance" of paying the note before its scheduled maturity.

Calpine cannot use an "acceleration" of the 6% Convertible Notes – resulting from an Event of Default that Calpine itself committed when it filed its chapter 11 case – as a pretext to circumvent this limitation and eviscerate the Conversion Right, by making a distribution on account of principal and interest on the 6% Convertible Notes under a plan of reorganization that wipes out the Conversion Right without compensating the Noteholders. The Bankruptcy Court's adoption of such a flawed construct is contrary to the Second Circuit's decision in *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039 (2d Cir. 1982), *cert. denied*, 460 U.S. 1012 (1983), and is inconsistent with the Bankruptcy Court's own prior ruling in *In re Calpine Corp.*, 365 B.R. 392 (Bankr. S.D.N.Y. 2007).

The Bankruptcy Court also based its disallowance of the Conversion Right Claims on the fact that the Conversion Right was not yet exercisable and had not matured as of the Petition Date. This ruling, however, simply flies in the face of the Bankruptcy Code's provisions that (i) *expressly exclude* the character of a claim as "contingent" or "unmatured" as grounds for disallowing the claim (*see* 11 U.S.C. § 502(b)(1)); (ii) define the term "claim" to *include* claims which are "contingent" and "unmatured" (*see* 11 U.S.C. § 101(5)(A)); and (iii) contemplate the allowance of "contingent" claims (*see* 11 U.S.C. § 502(c)). Moreover, case law from the Supreme Court on down recognizes that even if a claim under a prepetition contract depends on a postpetition event, that fact does not prevent the claim's allowance.

The Bankruptcy Court further held that the Conversion Right Claims would be subject to subordination down to the level of parity with equity under section 510(b) of the Bankruptcy Code, 11 U.S.C. § 510(b). This ruling was erroneous as a matter of law, because the Conversion Right Claims satisfy *neither* of the two alternative conditions to subordination under section 510(b) that are required under Second Circuit authority: (1) the Noteholders did not assume the *risk*, as well as return, expectations of a shareholder, since they were never under a binding *commitment* to acquire any stock; and (2) the Noteholders are not seeking to recover a contribution to the equity pool presumably relied upon by other creditors. *See Rombro v. Dufrayne (In re Med Diversified, Inc.)*, 461 F.3d 251, 256 (2d Cir. 2006).

Even if section 510(b) applies here, the Bankruptcy Court also erred in subordinating the Conversion Right Claims all the way down to the level of equity: The Bankruptcy Court simply failed to identify the correct reference "security" to be used for purposes of applying section 510(b). The applicable "security" would be the 6% Convertible Notes, because the Conversion Right arises from the right to tender those notes to Calpine in exchange for "Conversion Value." As such, the Conversion Right Claims should have been subordinated only "to all claims or interests that are senior to or equal the claim or interest represented by such security [the 6% Convertible Notes]" (*see* 11 U.S.C. § 510(b)) – not down to the level of equity. Allowing equity holders to dilute the Noteholders' contract damage claims would pervert the normal priority between creditors and equity holders, and is not required by section 510(b).

Finally, although the Debtors' Limited Objection was directed *only* to the Conversion Right Claims, the Bankruptcy Court's Order disallowed *all* claims under the

Indenture – other than claims for principal, interest and Indenture Trustee fees – and provided no basis for doing so. The summary disallowance of these claims violated Federal Rule of Civil Procedure 52 and the Noteholders' fundamental procedural rights.

For these and other reasons set forth below, the Order should be reversed.

## STATEMENT OF THE CASE

**Chapter 11 Petition.** On December 20, 2005 (the "Petition Date"), Calpine and certain affiliates (collectively, the "Debtors") filed petitions under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), thus commencing cases under chapter 11 (the "Chapter 11 Cases").

**Claims Bar Date.** On April 26, 2006, the Bankruptcy Court entered an order [Docket 1348] (the "Bar Date Order") establishing August 1, 2006 (the "Bar Date") as the deadline to file proofs of claim on account of claims arising before the Petition Date. The Debtors granted the Indenture Trustee a 30-day extension of the Bar Date to August 31, 2006.

**Timely Filing of Proof of Claim Under the 6% Convertible Notes and the Indenture.** On July 26, 2006, HSBC timely submitted the Proof of Claim. The Proof of Claim expressly described the 6% Convertible Notes as "convertible" on the face page and in the attachment and stated, in bold-faced type, that, in addition to a liquidated claim for principal and interest under the 6% Convertible Notes and other convertible notes issued under the Indenture, the claim included "**all other amounts due under the Indenture, the Notes, at law or in equity. (See Attachment.)**" (*see id.* [App. 1] at cover sheet (bold in original)). The referenced "Attachment" included, under the category of "Other Unliquidated Amounts," the following broad statement of claims:

9

The Company is obligated to HSBC, as Indenture Trustee, for any and all other amounts due or to become due under the Indenture and the Notes, whether now due or hereafter arising, which amounts may, presently, *be unliquidated* or *contingent*, but may become fixed and liquidated *in the future*, including, *but not limited to*, . . . *compensatory . . . damages* . . . .

. . . .

This Proof of Claim serves, and is intended to serve, as notice of a claim for *any amount due or to become due* under the Notes or the Indenture, *the provisions each of which are expressly incorporated herein by reference, whether or not summarized or identified specifically in this Proof of Claim*, and all interested parties are on notice of, and advised to examine the provisions of, the Notes and the Indenture.

(*Id.*, Attachment ¶¶ 2(f) & 3 (emphasis added).)  The Indenture "provisions" that were "expressly incorporated" into the Proof of Claim, and that parties clearly were cautioned "to examine," included Article 10 of the Second Supplemental Indenture, entitled "CONVERSION," which details the Conversion Right.  (*See id.*, Ex. "C," Art. 10.)

**The Claims Resolution Stipulation.**  In January 2007, over five months after the Proof of Claim was filed, the Debtors and HSBC entered into a Stipulation [Docket 3501] (the "Claims Resolution Stipulation"), which covered the 6% Convertible Notes, other debt securities that were the subject of the Proof of Claim and debt securities that were the subject of other proofs of claim filed by HSBC as Indenture Trustee.  That Stipulation allowed principal and interest in specified amounts on the covered debt securities (*see id.* ¶¶ 1-6), and provided that "[t]he Debtors and the Indenture Trustee shall resolve the unliquidated claims asserted in" the subject proofs of claim at some unspecified future date, i.e., "pursuant to the plan of reorganization confirmed in these Chapter 11 Cases, or, in the absence of such a plan . . . through the claims reconciliation

10

process" (*id.* ¶ 9).  The Claims Resolution Stipulation made no attempt to identify or delineate the nature of any such "unliquidated claims."

**The Supplements to the Proof of Claim.**  On March 27, 2007, HSBC filed its Notice of Filing of Supplement to Proof of Claim [Docket 4127] (the "Original Supplement"), clarifying that the Proof of Claim encompassed any and all claims regarding the Conversion Right.  The Original Supplement was filed as a precautionary measure as a result of, and shortly following, the Appellant Holders' retention of counsel in mid-February.  On May 23, 2007, at the Debtors' request to clean-up their claims register, HSBC filed an Amended Supplement [Docket 4679] (the "Amended Supplement"), which replaced the Original Supplement (together, the "Supplements").

**The First Unliquidated Indenture Claims Objection.**  The Debtors waited until June 8, 2007 – *ten months* after the Bar Date and immediately before filing their plan of reorganization – before objecting to *timely-filed* unliquidated claims asserted under many other indentures (the 6% Convertible Notes being expressly excluded), and objected to these *timely-filed* unliquidated claims less than thirty days before objecting to the allegedly "late-filed" Conversion Right Claims.  On June 8, 2007, the Debtors filed the "Debtors' Motion for Entry of an Order Allowing Limited Objections to Claims and Determining the Value of Claims" [Docket 4880] (the "First Unliquidated Indenture Claims Objection"), which sought to disallow all claims in excess of outstanding principal and accrued interest on public debt issued under a variety of indentures, other than the Indenture.  This Objection was directed to the hundreds of millions of dollars in "make whole" claims asserted under other indentures and expressly excluded the Indenture and the 6% Convertible Notes.  (*See id.* at 5 n.3.)

11

**Plan and Disclosure Statement.**  On June 20, 2007, the Debtors filed a Joint Plan of Reorganization [Docket 5015] (the "Plan") and proposed Disclosure Statement [Docket 5016] (the "Disclosure Statement").  The Plan was a pure "waterfall" plan that was agnostic about claim amounts and built in maximum flexibility to deal with claims disputes.  Specifically, shares of reorganized Calpine would be set aside for numerous classes of unsecured creditors and interest holders, with each class to receive shares only if more-senior classes had received a full recovery.  By the time of the hearing on the Limited Objection, however, the Debtors were considering an alternative plan (since abandoned) based on a third-party cash investment.  (*See* Reporter's Transcript of Proceedings, August 8, 2007 [Docket 5599] (hereinafter "Tr.") at 11:17-12:4.)  Since then, the Debtors have continued the hearing on their Disclosure Statement to pursue a still different approach that would permit the Official Committee of Equity Holders (the "Equity Committee") to propose a rights offering.

**The Debtors' Limited Objection to the Conversion Right Claims.**  On July 6, 2007, the Debtors filed their "Limited Objection to Convertible Noteholder Claim Nos. 2404, 2821, 2823, 6247, 6249, 6280, 6299 and 6300" [Docket 5206] (the "Limited Objection").  Substantively, the Limited Objection was addressed *solely* to alleged deficiencies in the Conversion Right Claims.  (*See, e.g.*, *id.* at 3.)  The Appellant Holders and other parties filed oppositions to, and the Official Committee of Unsecured Creditors and the Equity Committee filed pleadings in support of, the Limited Objection [Docket 5427-29, 5431, 5449, 5538, 5540-41].

**The Bankruptcy Court's Ruling.**  On August 8, 2007, the Bankruptcy

Court held a non-evidentiary hearing on the Limited Objection, and then summarily

disallowed the Conversion Right Claims.  The Bankruptcy Court held, in substance, that:

> (i)     The Conversion Right Claims were "new claims"
> which were filed only when the Supplements were filed,
> and were not "amendments" that could "relate back" to the
> filing of the Proof of Claim.  (*See* Tr. 97:1–99:3.)
>
> (ii)    These "new claims" were filed during the "debtors'
> formulation of the plan," and the timing of the "new
> claims" would "force[] the debtors" to "deal with them
> when they should be focusing on the approval of the
> disclosure statement and the confirmation of the plan."  (*Id.*
> at 99:9-13.)  Moreover, the debtors might have to reserve
> large amounts for the "new claims," "thereby delaying
> distributions to other stakeholders."  (*Id.* at 99:18-100:1.)
>
> (iii)   Calpine's chapter 11 filing constituted a default
> under the Indenture that made the 6% Convertible Notes
> "immediately due and payable."  (*Id.* at 95:2-7.)  The issuer
> of a convertible debenture can never be required both to
> repay the debenture in full and to allow conversion.  (*See
> id.* at 100:14-21.)  Thus, according to the Bankruptcy
> Court, the Noteholders were entitled only to whatever
> distribution the confirmed plan may provide on account of
> principal, interest and fees, and nothing more for the value
> of the Conversion Right.  (*See id.* at 100:19-25.)  In effect,
> Calpine could abrogate the Conversion Right by defaulting
> and thereby causing an acceleration of the 6% Convertible
> Notes, and thus limit the Noteholders to a claim for
> principal and interest, without any compensation for the
> abrogated Conversion Right.  Furthermore, "the conversion
> rights were not exercisable as of the petition date when the
> Notes were accelerated and matured. . . .  At the time the
> case was filed the right to receive cash would not have yet
> matured because the put right itself had not yet become
> exercisable."  (*Id.* at 100:25-101:9.)
>
> (iv)    Even if the Conversion Right Claims were
> allowable, "they would be susceptible to subordination
> pursuant to Section 510(b) of the bankruptcy code as
> claims arising from the purchase or sale of a security if
> [sic] the debtors," with the result that the Conversion Right
> Claims would be subordinated to the claims of creditors

and reduced to parity with the interests of common stockholders.  (*See id.* at 101:10-13.)

Thereafter, over the Appellant Holders' objection, the Bankruptcy Court entered the Order, in the form proposed by the Debtors, which disallowed not only the Conversion Right Claims that had been the sole subject of the Limited Objection and the Bankruptcy Court's oral ruling, but also *any* claims under the Indenture beyond principal, interest and "reasonable prepetition indenture trustee fees," including "any actual or potential claims, premiums or penalties related to any contract defaults or damages." (Order [Docket 5595] ¶ 3.)  The Bankruptcy Court did not explain the basis for this broad, summary disallowance.  On August 14, 2007, the Appellant Holders filed a timely Notice of Appeal from the Order [Docket 5614].

## STATEMENT OF THE FACTS

On August 10, 2000, Calpine and Wilmington Trust Company entered into the Original Indenture.  (*See* App. 1, Ex. "A.")  Thereafter, Calpine issued the 6% Convertible Notes pursuant to the Second Supplemental Indenture.  (*Id.*, Ex. "C.")  The scheduled maturity date for the 6% Convertible Notes is "September 30, 2014."  (*See id.*, Ex. "C," at A-2.)

The 6% Convertible Notes were issued in the original principal amount of $839 per $1000 in principal amount at maturity and bear interest at 6% per annum on the full principal face amount of each note.  Beginning on September 30, 2006, however, and in lieu of cash interest, the original principal amount of $839 per $1000 increases daily until September 30, 2009 to reach $1000 in principal amount per note, following which date payments of cash interest resume.  (*See id.*, Ex. "C," § 1.01(b) (definitions of "Principal Amount" and "Principal Amount at Maturity")).)

14

The Second Supplemental Indenture provides that the 6% Convertible Notes are convertible, at the option of the Noteholders, into cash and shares of common stock upon the satisfaction of certain conditions precedent, at an initial conversion price of $3.85 per share, subject to certain adjustments in the event of certain transactions, distributions or occurrences.  (*See id.*, Ex. "C," §§ 1.01(b) (definition of "Conversion Price"); 10.01(a); 10.05.)  The Conversion Right may be exercised: (i) "at any time following September 30, 2013" (*id.* § 10.01(a)(2)); and (ii) prior to that date, upon various contingencies not presently applicable (*see id.* §§ 10.1(a)(1), (3)-(5)).  Although "Conversion Value," the value to be obtained by the Noteholders upon conversion, is determined using conventional metrics – i.e., face amount of the notes divided by conversion price, multiplied by the stock's trading price – this value is to be provided to the Noteholders through a combination of cash up to the Principal Amount, and stock for the excess Conversion Value.[3]  (*See id.* § 10.15(a)-(b).)

The Second Supplemental Indenture never empowers Calpine to terminate the Conversion Right unilaterally by prepaying the 6% Convertible Notes before their scheduled maturity on September 30, 2014.

## ARGUMENT

A.    **The Bankruptcy Court Erred as a Matter of Law in Concluding that the Broadly-Worded Proof of Claim Did Not Encompass a Claim for Breach of the Conversion Right Under the Attached Indenture.**

The Bankruptcy Court characterized the Conversion Right Claims as entirely "new claims" that had not been asserted in the Proof of Claim.  (*See* Tr. at 98:1-

---

[3]    During (and only during) an Event of Default, Calpine may provide the Conversion Value only through the delivery of shares of common stock.  (*See id.* § 10.15(d).)

15.)  This characterization flatly disregards the Proof of Claim's broad language and imposes a standard of specificity in pleading that finds no support in the Bankruptcy Code, the Bankruptcy Rules, or the case law.

   The Bankruptcy Code does not prescribe the level of specificity required in a proof of claim.  *See* 11 U.S.C. § 501(a).  Bankruptcy Rule 3001 provides, in relevant part, that a "proof of claim is a written statement setting forth a creditor's claim" which "shall conform substantially to the appropriate Official Form."  Fed. R. Bankr. P. 3001(a).[4]  Plainly, "the Rules do not demand that a creditor plead its proof of claim with specificity or precision."  *In re Bloomingdale Partners*, 160 B.R. 101, 107 (Bankr. N.D. Ill. 1993).  Similarly, the Bar Date Order did not impose any specificity requirement on proofs of claim.  Rather, it simply required that they conform substantially to Official Form No. 10; be signed, in English, and denominated in United States dollars; and include supporting documentation (with certain exceptions).  (*See* Docket 1348 at 2.)

   The Proof of Claim plainly satisfied all requirements of the Code, the Rules, Official Form No. 10, and the Bar Date Order to encompass the Conversion Right Claims.  The Proof of Claim asserted that the aggregate claims under the various series of notes issued under the Indenture was a liquidated amount of roughly $1.7 billion, "**[p]lus additional interest, Trustee Expenses** *and all other amounts due under the Indenture, the Notes, at law or in equity.* **(See Attachment.)**"  (Proof of Claim [App. 1] at cover sheet (bold in original; italicized emphasis added).)

---

[4] The applicable official form is Official Form No. 10.  There is no dispute that the Proof of Claim complied with Official Form 10.

The referenced attachment (the "Attachment") asserted, under the category of "Other Unliquidated Amounts," claims "for any and all other amounts due or to become due under the Indenture and the Notes . . ., which amounts may, presently, be unliquidated or contingent, but may become fixed and liquidated in the future, including, but not limited to, . . . compensatory . . . damages." (*Id.*, Attachment ¶ 2(f).) The Attachment further stated its intent to serve "as notice of a claim for *any* amount due or to become due under the Notes or the Indenture, *the provisions each of which are expressly incorporated herein by reference, whether or not summarized or identified specifically in this Proof of Claim, and all interested parties are on notice of, and advised to examine the provisions of, the Notes and the Indenture*." (*Id.*, Attachment ¶ 3 (emphasis added).) The Indenture "provisions" that were "expressly incorporated" into the Proof of Claim included the Second Supplemental Indenture, a full *third* of which is devoted to setting forth the Conversion Right's terms. (*See id.*, Ex. "C," Art. 10.) The Proof of Claim also repeatedly identified the 6% Convertible Notes as "convertible," both on its cover sheet and in the Attachment's text.[5] (*See id.*)

In holding that this broadly-worded Proof of Claim under the Indenture did not encompass a claim for wrongful termination of the Conversion Right under that Indenture, on the basis that the Proof of Claim did not *also* use the words "conversion right claims" or the like, the Bankruptcy Court imposed an unprecedented level of specificity in pleading on proofs of claim. *Aetna Casualty & Surety Co. v. LTV Steel Co. (In re Chateaugay Corp.)*, 94 F.3d 772 (2d Cir. 1996), and *In re Bloomingdale Partners*,

---

[5]    The Debtors' own petition and schedules also use the term "convertible." (*See* Voluntary Petition [Docket 1], Ex. "A" at 1; Schedules of Assets & Liabilities [Docket 1259], Schedule "F2".)

160 B.R. 101 (Bankr. N.D. Ill. 1993), highlight the point that the Proof of Claim did not have to add the words "conversion right claims" or the like to be sufficient.

In *Chateauguay*, the court held that a statement in a proof of claim filed by the United States Department of Labor (the "DOL") – "this claim is subject to the United States' right to withhold subject to offset amounts due from another Federal entity" (*id.* at 776) – was sufficiently specific to include a claim to set off the DOL's claim against a tax refund owed to the debtor, even though the proof of claim did not specifically reference a right to offset the DOL's claim against a "tax refund." *See id.* at 777.

In *Bloomingdale Partners*, creditors filed an unliquidated claim to which they attached a prepetition, administrative agency's opinion in their favor finding that the debtor had violated certain state noise pollution statutes and regulations. *See id.*, 160 B.R. at 104, 107. At the hearing on the debtor's claim objection, the creditors' counsel first clarified that the creditors were asserting a claim for common law private nuisance. The court rejected the debtor's objection that the nuisance claim was not expressly referenced in the proof of claim, reasoning that the proof of claim "complies with the lenient requirements established by the Code and the Rules," and "[t]he fact that the [creditors'] proof of claim does not explicitly allege a common law private nuisance cause of action is not a fatal defect." *Id.* at 107.

The case law cited by the Bankruptcy Court does not support its narrow reading of the Proof of Claim. Indeed, *Integrated Resources, Inc. v. Ameritrust Co. (In re Integrated Resources, Inc.)*, 157 B.R. 66 (S.D.N.Y. 1993) (quoted at Tr. at 98:7-13), *supports* the adequacy of the Proof of Claim. There, the debtor filed a fraudulent transfer action to avoid contractual guarantees asserted in the defendants' original proof of claim.

18

The defendants filed, as amendments to their claims, counterclaims alleging that, if the

guarantees were avoided, the defendants had damage claims for wrongful

misrepresentation.  *See id.* at 68-69.  Affirming the bankruptcy court's *denial* of the

debtor's motion to dismiss the counterclaims as time-barred, the District Court concluded

that the original proof of claim – which referred only to *contractual* guaranty claims – did

not need to assert the wrongful misrepresentation *tort* claims specifically.  *See id.* at 71.[6]

Nor do *Midland Cogeneration Venture Limited Partnership v. Enron

Corp. (In re Enron Corp.)*, 419 F.3d 115 (2d Cir. 2005), and *In re Asia Global Crossing,

Ltd.*, 324 B.R. 503 (Bankr. S.D.N.Y. 2005), support the Bankruptcy Court's constrained

reading of the Proof of Claim (*see* Tr. at 98:14-22).  In *Enron*, a creditor filed a claim

against Enron North America Corp. ("ENA"), but failed to file a timely claim against

Enron Corp., an affiliated chapter 11 debtor that had guaranteed ENA's debt.  The bar

date notice *required* that a proof of claim identify the debtor or debtors against which it

was asserted.  *See Enron*, 419 F.3d at 119.  *Enron* did not, however, involve the issue

present here, i.e., whether a timely-filed proof of claim against the correct debtor

encompassed a particular claim against that debtor.

In *Asia Global Crossing*, the bankruptcy court held that a timely-filed

claim for damages arising from the debtor's alleged misallocation of revenues and

expenses and improper retention of payments belonging to its majority-owned subsidiary

could not be amended after the bar date to assert fraudulent transfer and preference

---

[6]    The District Court relied on *In re Commonwealth Corp.*, 617 F.2d 415 (5th Cir. 1980) (*see* 157 B.R. at
71-72), in which the Fifth Circuit reversed an order denying an amendment submitted three years and
four months late, holding that a claim for breach of an oral take-out commitment was a permissible
amendment to a claim arising out of the transaction described in the original claim, and rejecting the
trial court's limited view of the original claim as a claim on a dishonored check.  *See id.* at 421.

claims ("Avoidance Claims") under the Bankruptcy Code. *See id.*, 324 B.R. at 505, 508. The two categories of claims were, however, very different: Whereas the original claim identified instances where the debtor "prevented [the subsidiary] from *receiving* what it was entitled to get," the new Avoidance Claims alleged specific transfers "from its [the subsidiary's] bank accounts to [the debtor]," and depended on allegations about the debtor's financial condition that were *not* alleged in the original claim. *See id.* at 508 (emphasis in original). No such disconnect exists here; the Conversion Right Claims arise under the very Indenture that is the subject of the broadly-worded Proof of Claim.

**B.      Even If the Supplements Are Treated as "Amendments" to the Proof of Claim, the Bankruptcy Court Committed Legal Error and Abused Its Discretion by Denying Leave to Amend.**

Courts apply a two-part test in determining whether to permit a post-bar date amendment to timely-filed proofs of claim. First, courts determine "whether there was a timely assertion of a similar claim or demand evidencing an intention to hold the estate liable." *Enron*, *supra*, 419 F.3d at 133 (citations and quotations omitted). Second, courts consider whether it would be "equitable" to permit the amendment. *See id.* Here, the Bankruptcy Court erred in applying each part of the test.

**1.      The Bankruptcy Court Misapplied the "Relation Back" Standard in Denying Leave to Amend.**

An amendment meets the test for "relation back" if it "describes the original claim with greater particularity; or . . . pleads a new theory of recovery on the facts set forth in the original claim." *Enron*, *supra*, 419 F.3d at 133 (citations and quotations omitted). This standard is akin to the "relation back" test for amending

20

pleadings set forth in FRCP 15(c).  *See, e.g.*, *Liddle v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 159 B.R. 420, 425 (S.D.N.Y. 1993).

Under FRCP 15(c), "the central inquiry is whether adequate notice of the matters raised in the amended pleading has been given to the opposing party within the statute of limitations by the general fact situation alleged in the original pleading." *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 86 (2d Cir. 1999) (citations and quotations omitted).  "Relation back" under Rule 15(c) has been applied liberally.  *See, e.g.*, *Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d 114, 125 (2d Cir. 1994) (amendment to add claims for equitable waste and breach of contract where original complaint alleged claims for fraudulent conveyances based on same transactions and occurrences); *Int'l Chem. Workers Union v. Mobay Chem. Corp.*, 755 F.2d 1107, 1110 (4th Cir. 1985).

Here, the Supplements clearly "describe the [Proof of Claim] with greater particularity" (*Enron*, 419 F.3d at 133) and assert claims arising from the "general fact situation alleged in the original pleading" (*Stevelman*, 174 F.3d at 86).  The Conversion Right Claims arise under the Indenture.  The Proof of Claim broadly asserted claims (both liquidated and unliquidated) under that same Indenture.  Plainly, a claim for breach of a contract "relates back" to a prior claim for breach, even a different breach, of the same contract.  *See, e.g.*, *FDIC v. Knostman*, 966 F.2d 1133, 1138-39 (7th Cir. 1992) (action filed nearly 8 years later and based on "different theory" of breach "related back" to original complaint because both claims involved the same contracts, and the defendant "should have been prepared to defend the action against all claims which could have arisen pursuant to the [] contracts"); *Peckarsky v. Am. Broad. Co.*, 603 F. Supp. 688, 693 (D.D.C. 1984) (claim for "a different breach" of contract "related back" to original

21

complaint because "[t]he crux of all these claims is the proper construction of one agreement, which is now asserted to have been violated basically in two respects rather than in one"). The Bankruptcy Court erred in finding that the Indenture-based Conversion Right Claims did not "relate back" to a Proof of Claim based on the very same Indenture.

> ### 2.    The Bankruptcy Court's Finding of "Prejudice" Was Based on a Factually Unfounded Assumption and Disregarded the Impact of the Bankruptcy Court's Subordination Ruling.

In determining whether it would be equitable to allow a post-bar date amendment, courts consider "whether the debtor, or other creditors, would be unduly prejudiced by the amendment, or whether, instead, other creditors would 'receive a windfall' from the disallowance of the amendment, and whether the late claimant acted in good faith and the delay was justified." *Enron*, *supra*, 419 F.3d at 133. Importantly, however, "the critical consideration is whether the opposing party will be *unduly prejudiced* by the amendment." *Id.* (emphasis added) (citations and quotations omitted). Indeed, "belated *amendments* will ordinarily be 'freely allowed' where other parties will not be prejudiced." *See id.* at 133-34 (emphasis in original).

In refusing to permit the Supplements as "amendments" to the Proof of Claim, the Bankruptcy Court first complained that "[n]o application was ever made to this Court" for permission to amend. (*See* Tr. at 97:23-25.) However, assuming that Fed. R. Civ. P. 15(a) applied, leave to amend was not required, because the Original Supplement was filed before any objection was made to the Proof of Claim. *See* Fed. R. Civ. P. 15(a) ("A party may amend the party's pleading once as a matter of course at any

time before a responsive pleading is served . . . ."). The Bankruptcy Court should not have held this "failure" against the Noteholders.

The Bankruptcy Court then observed that "the noteholders waited nearly eight and in some cases ten months after the bar date to file the new claims" and offered no excuse for this delay. (Tr. 98:25-99:7.) In fact, the Original Supplement was filed six and one-half months after the extended Bar Date to which the Debtors had agreed. This "delay" alone hardly warranted disallowing the amendment, as even greater "delays" have not precluded claim amendments. *See In re Commonwealth Corp.*, 617 F.2d 415 (5th Cir. 1980) (reversing order denying amendment filed three years and four months after the bar date); *see also, e.g.*, *In re Infiltrator Sys., Inc.*, 241 B.R. 278, 280 (Bankr. D. Conn. 1999) (permitting *new* claim filed one year late); *In re Earth Rock, Inc.*, 153 B.R. 61, 63 (Bankr. D. Idaho 1993) (permitting eight-month late claim).

Moreover, in contrast to the "excusable neglect" standard that applies when a party seeks leave to file a new, late claim (rather than to amend a timely-filed claim), the "reason for the delay" it is *not* the primary factor in determining whether to permit the amendment of a timely-filed claim. *See Enron*, F.3d 419 at 133-34 ("While belated *amendments* will ordinarily be 'freely allowed' where other parties will not be prejudiced, belated *new* claims will ordinarily be denied, even absent prejudice, unless the reason for the delay is compelling." (emphasis in original)). Rather, in the leave-to-amend context, the primary factor is prejudice to the debtor and creditors. *See id.* at 133. The Bankruptcy Court erred badly in applying *this* factor.

The proponents of the Limited Objection introduced no evidence of prejudice. Nonetheless, the Bankruptcy Court identified two categories of "prejudice"

23

supposedly *caused* by the "delay" in asserting the Conversion Right Claims.  <u>First</u>, the Bankruptcy Court found that the "new claims" (i.e., the Supplements) were filed during "the debtors' formulation of the plan," and their timing "forces the debtors to deal with them when they should be focusing on the approval of the disclosure statement and confirmation of the plan" (Tr. at 98:25-99:13).  <u>Second</u>, noting that the Conversion Right Claims could be "in the hundreds of millions of dollars" (*id.* at 98:19-21), the Bankruptcy Court found that, "[t]o the extent the new claims remain unresolved and unliquidated as of confirmation the reorganized debtors may have to maintain large reserves thereby delaying distributions to other stakeholders who've timely-filed proofs of claims and interests" (*id.* at 99:23-100:1).

Critically, however, *both* elements of the "prejudice" found by the Bankruptcy Court rise and fall on the implicit premise that there was a *causal link* between (i) the supposed 6½ month "delay" in asserting the Conversion Right Claims and (ii) the Debtors being "forced" to deal with those claims during the plan process and reserve for them under a plan.  The unspoken premise was that, were the Conversion Right Claims spelled out more specifically in the Proof of Claim, the Debtors would have resolved those claims in time to avoid dealing with them during the plan process or reserving for them in the Plan.  This premise, however, has no foundation in fact and is belied by the leisurely manner in which the Debtors have prosecuted challenges to *several hundred million dollars* of "make whole" claims under other indentures.

Although holders of Calpine's first lien notes initiated an adversary proceeding in May *2006* to assert more than $100 million of "make whole" claims, those claims remain unresolved.  (*See* "Plaintiffs' Reply Memorandum of Law [etc.]" [Docket

77 in Adv. Proc. 06-01461-BRL] at 1 n.2; Disclosure Statement [Docket 5016] at 68.)
Meanwhile, the Debtors waited until June of this year – *ten months* after the Bar Date,
just before filing their first plan, and only twenty-eight days before objecting to the
Conversion Right Claims – before objecting to almost $500 million of "make whole"
claims asserted by the holders of Calpine's second lien debt and unsecured non-
convertible bonds[7] (*see* Docket 4880).  In light of this record, it is clear that the alleged
"delay" in asserting the Conversion Right Claims made no meaningful difference and
should not have served as a pretext for the forfeiture of the Conversion Right Claims.

What is more, the Bankruptcy Court's finding of "disruption" was based
on yet another unsupported premise, i.e., that: (i) the "formulation of the plan" and
"focusing on the approval of the disclosure statement"; and (ii) attempting to resolve the
Conversion Right Claims in accordance with the Claims Resolution Stipulation, are
somehow mutually exclusive propositions, or that the Debtors cannot do both
concurrently without undue prejudice.  (*See* Tr. at 98:25-99:17.)  The Debtors are,
however, represented and advised by phalanxes of legal and financial professionals.  For
example, from the beginning of this case through March 2007 (i.e., less than sixteen
months), the Debtors' primary counsel alone has requested approximately ***$50 million*** in
fees and expenses; and, in just the first three months of 2007, employed ***148*** different
attorneys on this case.  (*See* "Fifth Interim Application of Kirkland & Ellis [etc.]"

---

[7]    The holders of second lien notes asserted "make whole" damage and premium claims of nearly
$390,000,000.  (*See* "Debtors' Motion for Authorization to Enter into Stipulation with Second Lien
Committee [etc.]" [Docket 5344] at 8-9.)  Holders of unsecured non-convertible bonds have asserted
"make whole" claims of over $100 million.  (*See* Stipulation Regarding Certain Calculations Under the
Indenture and Related Documents to the Unsecured Debt [Docket 5240] at 2-3.)  Although the "make
whole" claims of the second lien noteholders were subsequently settled by the allowance of $100
million in claims (*see* Docket 5344 at 8-9), the litigation over the other unsecured bondholders' "make
whole" claims has not been resolved.

[Docket 4981] at cover sheet & Ex. "D.")  The Debtors and their advisors are certainly capable of multitasking.  Consequently, any incremental burden on the Debtors of having to litigate the Conversion Right Claims while also working on a plan hardly justifies the forfeiture of those claims.  *See Earth Rock*, 153 B.R. at 63; *Infiltrator Sys.*, 241 B.R. at 282 (rejecting debtor's arguments that it was prejudiced because of the filing of a proof of claim during the period in which the debtor was negotiating with other creditors).

In addition, the theory that the Conversion Right Claims would somehow "disrupt" the plan "process" is belied by the "waterfall" construct of the Plan:  The Plan does not guarantee unsecured creditors or equity holders any fixed recovery, and is based on the concept of reserving for disputed claims and distributing only the balance until such disputes are resolved.  In this context, the Conversion Right Claims are no more "disruptive" to the Plan than are the hundreds of millions of dollars in "make whole" claims to which the Debtors objected mere days before objecting to the Conversion Right Claims, or the one hundred million dollars of the first lien noteholders' "make whole" claims on which suit has been pending since May *2006*.

The fact that other creditors may be prejudiced by a smaller distribution if the Conversion Right Claims are allowed is not the kind of prejudice that warrants the disallowance of a claim amendment.  *See United States v. Kolstad (In re Kolstad)*, 928 F.2d 171, 176 (5th Cir. 1991) (no unfairness to other creditors if amendment allowed because otherwise they receive undeserved windfall), *cert. denied*, 502 U.S. 958 (1991); *see also In re Stoecker*, 5 F.3d 1022, 1028 (7th Cir. 1993).  "[P]rejudice to the debtor is a more flexible and complex concept than a simple dollar-for-dollar depletion of assets otherwise available for timely filed claims.  Were it otherwise, virtually all late filings

26

would be condemned by this factor . . . ."  *In re R.H. Macy & Co.*, 166 B.R. 799, 802 (S.D.N.Y. 1994) (reversing denial of motion to enlarge time to file claim under stringent "excusable neglect" standard).

Indeed, the windfall to other stakeholders from the disallowance of the Conversion Right Claims, where the Debtors established no causal link between the alleged "delay" and the supposed "prejudice," highlights the Bankruptcy Court's error. *See Enron, supra*, 419 F.3d at 133.  Further, although the Conversion Right Claims may be large in absolute dollars, they are not out of proportion in the context of a Proof of Claim that included liquidated claims of over $1.7 billion.  (*See* App. 1.)  *Cf. Kolstad*, 928 F.2d 171 (amendment to assert claim over four times amount of original permitted).

Finally, the Bankruptcy Court's finding of "prejudice" to other *creditors* disregarded two critical points.  First, equity holders stand to receive substantial distributions under a plan that would wipe out the Conversion Right.  (*See* Disclosure Statement [Docket 5016] at 94 (projecting a distribution to equity valued at approximately $835 million).[8])  Second, the finding of prejudice to creditors disregarded the impact of the Bankruptcy Court's own substantive ruling that the Conversion Right Claims would be subordinated to other creditor claims under section 510(b) of the Bankruptcy Code.  If this challenged ruling (*see* § D.1, *infra*) is upheld, then the assertion of the Conversion Right Claims would have *no impact whatsoever on the distribution to other unsecured creditors*, because it would not change their distribution.  The contest then becomes one between a late filing creditor and equity holders, in which case the

---

[8]    This anticipated distribution was subsequently increased to $982 million.  (*See* First Amended Disclosure Statement [Docket 5702] at 101.)  Irrespective of the precise amount, a significant component of the substantial value projected to be extracted by the equity holders stems from the Debtors' uncompensated abrogation of the Noteholders' Conversion Right via a reorganization plan.

Bankruptcy Code presumptively favors the creditor. *See* 11 U.S.C. § 726(a)(3), (5)-(6) (in a chapter 7 liquidation, late-filed creditor claims are paid in full with interest before any payments may be made to a debtor); *cf. UPS Capital Bus. Credit v. Gencarelli (In re Gencarelli)*, No. 06-2700, 2007 U.S. App. LEXIS 20751, at *14-15 (1st Cir. Aug. 30, 2007) (discussing how in "a solvent debtor case . . . the equities strongly favor holding the debtor to his contractual obligations as long as those obligations are legally enforceable under applicable non-bankruptcy law," which obligations may include "prepayment penalties"). By failing to consider the implications of the distributions to equity and its own "subordination" ruling, the Bankruptcy Court conferred an unwarranted windfall on the Debtors' equity holders.

### C. The Bankruptcy Court Erred as a Matter of Law in Holding that Calpine Could Unilaterally Abrogate the Conversion Right After Defaulting Under the Indenture, Without Being Liable for Damages.

#### 1. Applicable State Law Supports the Allowance of a Claim for Damages for Improper Termination of an "Out of the Money" Conversion Option.

In bankruptcy, the scope of a creditor's claim for contract damages is generally governed by state law. *See, e.g.*, *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 20 (2000) (although allowance of a claim is subject to federal bankruptcy law, validity of a claim is determined by applicable state law); *Butner v. United States*, 440 U.S. 48, 55 (1979). Various courts – including this Court – have recognized that, under state contract law, contract parties are entitled to compensation through a damage award for the present loss of potential future gains, in cases involving the improper termination of financial instruments with an embedded option value, even if the option is "out of the money" at the time of the breach.

28

For example, in *R.A. Mackie & Co. v. PetroCorp Inc.*, 329 F. Supp. 2d 477 (S.D.N.Y. 2004) (Koeltl, J.), holders of "perpetual warrants" sued the successor entities in a corporate merger whereby the issuer of the warrants was eliminated.  The merger agreement required the plaintiffs to choose between (i) presently exercising their warrants to receive the target's stock, which would be exchanged for the merger consideration; or (ii) retaining their warrants, which would be redeemable for $.50/warrant.  The Court found that this arrangement improperly violated the plaintiffs' rights to *perpetual* warrants.  *See id.* at 505.  Addressing the damages issue, the Court found prior case law awarding damages equal to "the difference between the market value of the stock on the date that options were exercised and the strike price of the options" inapposite, because such decisions were crafted in the context of cases where a conversion right was exercised but the counterparty failed to deliver.  *See id.* at 512.  In contrast, the plaintiffs in *R.A. Mackie* had never exercised their warrants, and the cognizable harm they suffered was the elimination of their perpetual feature.  *See id.*[9]  In assessing damages for this harm, the Court relied on expert testimony about the full value of the perpetual warrants based on the Black-Scholes model.  *See id.* at 512-15.

More recently, in *Lillis v. AT&T Corp.*, No. 717-N, 2007 Del. Ch. LEXIS 102 (Del. Ch. July 20, 2007), employees who sought damages for the improper elimination of their stock options' value under a merger alleged that "'out-of-the-money' options having years remaining but with a strike price equal to or higher than the merger price were rendered worthless."  *Id.* at *2.  As in *R.A. Mackie* (cited in *Lillis*), the gravamen of the plaintiffs' complaint was that embedded option value was improperly

---

[9]    Although the underlying contract in *R.A. Mackie* was governed by Texas law, the Court recognized that Texas state courts have relied on New York decisions when formulating an appropriate rule.  *See,*

truncated on the date of the merger, in violation of their contractual rights.  The court

agreed and awarded plaintiffs damages equal to the difference between (1) the full value

of their options determined based on expert testimony using the Black-Scholes model and

(2) the amount of consideration they already received in the merger.  *See id.* at *62-75;

*see also, e.g.*, *Hilton Hotels Corp. v. Dunnet*, 275 F. Supp. 2d 954, 963 n.4 (W.D. Tenn.

2003) ("[U]nder water options have measurable value based on the likelihood that they

may move into the money at some point prior to their expiration. . . .  [T]he under water

options themselves had inherent value because they could be exercised in the future.").[10]

### 2.    The Indenture Did Not Empower Calpine to Abrogate the Conversion Right Unilaterally by Creating an Event of Default.

In their Limited Objection, the Debtors came up with the theory that the

Indenture permitted Calpine to cause the Conversion Right to expire prematurely, without

compensating the Noteholders, by defaulting and triggering an acceleration of the 6%

Convertible Notes.  (*See, e.g.*, Limited Objection [Docket 5206] at 3, 8-9; Debtors'

Omnibus Reply [Docket 5540] at 13-15.)  Observing that the form of 6% Convertible

Note provides that the Conversion Right "shall . . . expire at the close of business on the

Business Day immediately preceding the date of Maturity" (Second Supplemental

Indenture [App. 1, Ex. "C"] at A-5), the Debtors theorized that the term "Maturity"

(which is capitalized but not defined) means, not the maturity date of "September 30,

2014" that is *expressly* set forth in the form of Note (*see id.* at A-2), but rather *any* date

upon which the principal amount of the 6% Convertible Notes becomes due upon an

---

*e.g.*, *id.* at 511-12.  Accordingly, the analysis in *R.A. Mackie* is applicable here.

[10]    Although the Conversion Right is presently "out of the money," the market price of Calpine's stock has exceeded the conversion price at times during the last several months, and the Conversion Right would still have about seven years left to run if not terminated prematurely under a plan of reorganization.

Event of Default and acceleration.  Because section 5.2 of the Original Indenture made Calpine's chapter 11 filing an Event of Default that triggered an acceleration and made the 6% Convertible Notes immediately due and payable (*see* Original Indenture [App. 1, Ex. "A"] § 5.2), the Debtors argued that "Maturity" occurred on the Petition Date and caused the Conversion Right to expire retroactively on the prior day.  This novel theory appears to have influenced the Bankruptcy Court.  (*See* Tr. 94:13-95:10.)

The notion that any reasonable investor would contract to forfeit its Conversion Right, no matter how valuable, as a result of *Calpine's default* is commercially preposterous.  Any reading of the Indenture producing such a result should be avoided.  *See, e.g.*, *Lipper Holdings, LLC v. Trident Holdings, LLC*, 1 A.D.3d 170, 171 (N.Y. App. Div. 2003) ("A contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties." (citations omitted)); *Rosewood Apartments Corp. v. Perpignano*, 200 F. Supp. 2d 269, 274-75 (S.D.N.Y. 2002) (explaining how when a particular contractual "reading defies business logic, a more plausible one must be discerned").[11]

A plain reading of the Indenture easily avoids such an absurd and manifestly unfair result.  The theory that "maturity," as used in the Indenture (of which the form of Note is a part), subsumes "acceleration" is belied by the fact that the Second Supplemental Indenture uses the two terms *in the disjunctive*.  Section 6.01(4) of the Second Supplemental Indenture specifies, as an Event of Default, a default by Calpine in the payment of other indebtedness of at least $50 million, "which . . . becomes due and

---

[11]  The absurdity of the Debtors' construct is reinforced by the fact that it results in the Conversion Right having expired without anyone ever knowing it, i.e., "at the close of business the Business Day *immediately preceding*" the Petition Date.  (*See* Second Supplemental Indenture [App. 1, Ex. "C"] at A-5 (emphasis added).)

payable (*whether at maturity, upon redemption or acceleration, or otherwise*)."  (*Id.*
§6.01(4) (emphasis added).)  If "maturity" meant *any* date on which principal becomes
"due and payable" – rather than the fixed maturity date specified in the form of Note –
then the additional references to "redemption," "acceleration," and "otherwise" would be
superfluous.  (*See also* Original Indenture [App. 1, Ex. "A"] § 5.1(b) ("Event of Default"
includes a "default in the payment of the principal of any Security of such Series when
the same becomes due and payable *at maturity or otherwise*" (emphasis added)).)

      The Court should not adopt an interpretation of the Indenture that would
render the terms "redemption," "acceleration," and "otherwise" in the quoted provisions
superfluous.  *See* 11 WILLISTON ON CONTRACTS § 32:5 (4th ed. 2007) ("An interpretation
which gives effect to all provisions of the contract is preferred to one which renders a
portion of the writing superfluous, useless or inexplicable.").  "Under New York law an
interpretation of a contract that has the effect of rendering at least one clause superfluous
or meaningless is not preferred and will be avoided if possible."  *Galli v. Metz*, 973 F.2d
145, 149 (2d Cir. 1992) (citation and quotations omitted); *see also, e.g.*, *Manley v.
AmBase Corp.*, 337 F.3d 237, 250 (2d Cir. 2003) ("New York law . . . disfavors
interpretations that render contract provisions meaningless or superfluous.").

      The Debtors' interpretative theory also turns the definition of "Principal
Amount at Maturity" in the Second Supplemental Indenture into gibberish.  That defined
phrase "means, with respect to a Note, the principal amount at maturity set forth on the
face of such Note."  (Second Supplemental Indenture [App. 1, Ex. "C"] § 1.01(b).)  If, as
Calpine contends, "maturity" is a variable date (rather than a fixed date), this definition
becomes unintelligible, because the original principal amount of each Note ($839) was

*less* than the amount "set forth on the face of such Note" ($1000), and the principal amount will not reach the $1000 face amount until *2009*. (*See* p. 14, *supra*.) Any interpretation that could cause "maturity" to occur before 2009 *cannot* be squared with the use of that term in the definition of "Principal Amount at Maturity."

The Debtors' theory also produces other inconsistencies in the Indenture. First, the Second Supplemental Indenture *expressly contemplates* conversion during the continuance of an "Event of Default" and provides for the "Conversion Value" to be delivered in stock – rather than a combination of cash and stock – if the Conversion Right is exercised during that period. (*See id.* [App. 1, Ex. "C"] § 10.15(d).) Second, section 10.01(2) of the Second Supplemental Indenture provides that a Noteholder may exercise the Conversion Right "*at any time following* September 30, 2013," without any qualification for an Event of Default or acceleration. (*See id.* § 10.01(2) (emphasis added).) Indeed, absent certain contingencies, the Conversion Right would never become exercisable before then. (*See id.* § 10.01.) Section 10.01(2) was designed to ensure that Noteholders would in any event have an opportunity to convert after 2013 if no condition to conversion occurred before then. The Debtors' theory would eviscerate this guarantee.

Interpreting the Indenture to avoid such inconsistency is preferred. *See, e.g.*, *Seabury Constr. Corp. v. Jeffrey Chain Corp.*, 289 F.3d 63, 69 (2d Cir. 2002); *Barrow v. Lawrence United Corp.*, 146 A.D.2d 15, 18 (N.Y. App. Div. 1989) ("Contracts are also to be interpreted to avoid inconsistencies and to give meaning to all of its terms."). Plus, inconsistencies between the form of Note and the Indenture are resolved in favor of the Indenture. (*See* Second Supplemental Indenture [App. 1, Ex. "C"] at A-5.)

In sum, Calpine's astonishing theory that it could abrogate the Conversion Right by defaulting is untenable and should not have swayed the Bankruptcy Court.

3.     **The Bankruptcy Court's Theories Improperly Conflate the Two Distinct Economic Components of Value Under a Convertible Note and Would Allow Issuers of Convertible Notes to Profit from Their Own Defaults.**

The Bankruptcy Court found that the Noteholders were seeking a "double recovery" (Tr. at 98:5-7) by asserting the Conversion Right Claims in addition to claims for unpaid principal and interest. This "double recovery" theory reflects a fundamental misunderstanding of two distinct and non-overlapping components of economic value for which purchasers of convertible debt instruments bargain – a misunderstanding that skewed the Bankruptcy Court's analysis.

As noted in a prominent commentary on indentures, a "conversion right, although set forth in the debenture and the indenture, *is separate and distinct from the debt* evidenced by the debenture. As a separate right *it has its own ascertainable value*." AMERICAN BAR FOUNDATION, COMMENTARIES ON INDENTURES 522-23 (1971) (emphasis added) (footnote omitted); *see also, e.g., Kaplan v. Vornado, Inc.*, 341 F. Supp. 212, 214 (N.D. Ill. 1971) (explaining how it "is undoubtedly true" that a "right of conversion is a substantive right and an important inducement for the purchase of" convertible debentures). Indeed, a conversion right is a fundamental part of the bundle of consideration exchanged by the parties; in exchange for the right to convert, the issuer may receive many offsetting benefits, such as lower interest rates, more lenient covenants, or a longer term. *See, e.g.*, William W. Bratton, Jr., *The Economics and Jurisprudence of Convertible Bonds*, 1984 WIS. L. REV. 667, 673 (1984). Thus, a convertible note provides "two imperfectly correlated elements of value – debt value and

34

conversion value – combined in the same security." *Id.* at 677.  There simply is no "double recovery" in asserting claims for: (1) unpaid principal and interest (i.e., the "debt value") and (2) the value of the upside potential embedded in a conversion right that still has many years left to run (i.e., the "conversion value").

The mechanics of the Conversion Right here underscore this point.  Upon conversion, Calpine is required to satisfy its obligation in *cash* up to the Principal Amount of the converted note, with any excess payable in shares of stock.  The Bankruptcy Court's ruling allowed Calpine to use its own default to eliminate the second important piece of the Noteholders' bargained-for consideration – the option to benefit from this excess through the Conversion Right until September 2014 – without ever compensating the Noteholders for the abrogation of this right.

To achieve this result, the Bankruptcy Court utilized a corollary of its flawed "double recovery" theory – the "alternative performance" theory.  Relying solely on language in an older tax case, the Bankruptcy Court reasoned that:

> A convertible debenture is an indivisible unit.  The issuer has but one obligation to meet either redemption or conversion, it can never be required to do both.  [citing *Chock Full O'Nuts v. United States*, 453 F.2d 300 (2d Cir. 1971)] . . .  Accordingly, the convertible noteholders cannot possibly be entitled to receive payment of their debt and damages on account of a conversion right. . . .  By repaying the noteholders principal accrued interest in full the debtors are rendering the alternative performance as provided in the indenture.

(Tr. at 100:3-21.)

As stated, this theory clearly proves too much; it would permit the issuer of a convertible note to abrogate the conversion right at any time simply by electing to render the "alternative performance" of paying off the note in full.  It is precisely to *avoid*

35

such an evisceration of bargained-for conversion rights, however, that the Indenture does not allow Calpine to redeem the 6% Convertible Notes before the Conversion Right expires.  (*See* Second Supplemental Indenture [App. 1, Ex. "C"] §§ 3.01 & 3.02.) Nothing in *Chock Full O'Nuts*, *supra*, 453 F.2d 300, suggests that an issuer can abrogate a bargained-for conversion right unilaterally before its scheduled expiration by offering to satisfy the outstanding principal and interest under the convertible debt.

　　　　　The Bankruptcy Court tried to circumvent this problem on the basis that the filing of the Chapter 11 Cases "constituted an event of default under the notes indentures thus rendering the notes due and payable immediately."  (Tr. at 95:4-7.)  Thus, under the Bankruptcy Court's construct, the issuer of convertible notes may default; force acceleration; and, by paying the defaulted notes, render "alternative performance" and eliminate the conversion right *through its own default*, without paying damages for the value of the lost conversion right.  Under this approach, what should have been the Noteholders' long-term option would be perversely transformed into the issuer's option.

　　　　　This construct, however, mirrors that which the Second Circuit *rejected* in *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039 (2d Cir. 1982), *cert. denied*, 460 U.S. 1012 (1983).  There, a corporation ("UV") triggered a default under its indentures by purporting to assign the underlying debt to a purchaser in connection with a sale of a portion of its assets.  The indenture trustees then exercised their contractual right to accelerate the debt upon this default.  *See id.* at 1047.  The district court "held that the redemption premium under the indentures need not be paid by UV" on the grounds "that UV defaulted under the indenture agreement and that the default provisions provide for acceleration rather than a redemption premium."  *See id.* at 1053.  The Second Circuit

*reversed*, stating that "where the debtor causes the debentures to become due and payable by its voluntary actions," it would be inappropriate "to allow a liquidating debtor to avoid their terms simply by failing to take the steps necessary to redeem the debentures, thereby creating a default." *Id.* Thus, an issuer cannot use an acceleration triggered by its own default to deprive noteholders of a right that they would otherwise have retained absent the acceleration, at least not without fully compensating them.

The Bankruptcy Court's construct also contravenes black-letter law that a party to a contract cannot benefit from its own breach at the other party's expense. *See, e.g.*, *Deutsch v. Health Ins. Plan of Greater N.Y.*, 751 F.2d 59, 65 (2d Cir. 1984) (discussing how "New York law would not permit" a party "to profit by its own breach" of contract); *GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 817 (6th Cir. 1999) ("it is also axiomatic that a party cannot benefit from its own breach"); *Mkt St. Assocs. Ltd. P'ship v. Frey*, 941 F.2d 588, 592 (7th Cir. 1991). This precept has been applied to prevent issuers of convertible notes from using their own breach to limit noteholders' conversion rights. *See Castle Creek Tech. Partners, LLC v. CellPoint Inc.*, No. 02 Civ. 6662, 2002 U.S. Dist. LEXIS 23760, at *20-23 (S.D.N.Y. Dec. 6, 2002) (refusing to let issuer of convertible notes rely on a breach that could preclude a condition to conversion "in its attempt to avoid its conversion obligations," since a party that voluntarily breached "may not later rely on that breach to its advantage" under New York contract law).

The Bankruptcy Court's "acceleration" theory here also conflicts with its prior decision in *In re Calpine Corp.*, 365 B.R. 392 (Bankr. S.D.N.Y. 2007). There, the Debtors attempted to avoid paying "prepayment" or "make-whole" amounts in connection with a refinancing of outstanding secured debt arguing, as here, that the

Chapter 11 Cases triggered an automatic acceleration that made all the debt immediately due and payable.  *See id.* at 399.  The Bankruptcy Court *rejected* the Debtors' "preclusive argument for a total foreclosure of any damage recovery," reasoning that the creditors' "expectation of an uninterrupted payment stream has been dashed giving rise to damages . . . .  [W]hile the agreements do not provide a premium or liquidated damages for repayment during the period the Debtors propose, the [creditors] ***still have an unsecured claim for damages for the Debtors' breach*** of the agreements."  *Id.* (emphasis added); *see also, e.g.*, *In re Skyler Ridge*, 80 B.R. 500, 507 (Bankr. C.D. Cal. 1987) (rejecting notion that "automatic acceleration of a debt defeats a prepayment premium clause," because "under such a rule, [a debtor] could always avoid the effect of a prepayment premium clause by filing a bankruptcy case").

Finally, the "alternative performance" to which the Bankruptcy Court referred *has never been, and will never be, rendered.*  Calpine did not pay off the 6% Convertible Notes upon their "acceleration" and does not propose full cash payment under the Plan.  Instead, it proposes to distribute "reorganization value" on account of principal and interest on the 6% Convertible Notes, while eliminating the Conversion Right for nothing.  This is not "alternative performance" under the Indenture in any normally understood sense of the term.

### 4. The Bankruptcy Court Misapplied Bankruptcy Law in Holding that the Contingent or Unmatured Nature of the Conversion Right on the Petition Date Precluded the Allowance of the Conversion Right Claims.

The Bankruptcy Court held that "the noteholders do not have allowable claims with respect to conversion rights" because those "rights were not exercisable as of the petition date. . . .  At the time the case was filed the option to receive cash would not

have yet *matured* because the put right itself had not yet become exercisable." (*See* Tr. at 100: 25-101:9 (emphasis added) (citations omitted).) In support of its theory, the Bankruptcy Court cited 11 U.S.C. § 502(b), under which a court shall determine the amount of a claim "as of the date of the filing of the petition." (*See id.* at 101:3-5.)

The Bankruptcy Court's first mistake was to disregard the very next clause of section 502(b), which provides for the disallowance of a claim that "is unenforceable against the debtor . . . under any agreement or applicable law *for a reason other than because such claim is contingent or unmatured.*" 11 U.S.C. § 502(b)(1) (emphasis added). Here, the very reason for the Bankruptcy Court's disallowance of the Conversion Right Claims was that they were "contingent" or "unmatured," because the Conversion Right was not yet exercisable on the Petition Date.

Under the Bankruptcy Court's construct, a claim that flows from a prepetition agreement but depends on a postpetition event could never be allowed. This clearly is not the law. *See, e.g.*, *Travelers Cas. & Sur. Co. v. Pac. Gas & Elec. Co.*, 549 U.S. ___, 127 S. Ct. 1199 (2007) (considering "whether federal bankruptcy law precludes an unsecured creditor from recovering attorney's fees authorized by a prepetition contract and incurred in postpetition litigation," and holding that a categorical rule disallowing such fees was inappropriate).

It further is *not* the law that inchoate or contingent rights existing on the Petition Date are simply ignored and disallowed in bankruptcy. The Bankruptcy Code specifically defines the term "claim" to include any "right to payment" that is "*unliquidated*, . . . *contingent*, . . . [or] *unmatured*" (11 U.S.C. § 101(5)(A) (emphasis added)), and expressly contemplates the allowance of "contingent" as well as

39

"unliquidated" claims.  *See* 11 U.S.C. § 502(c) ("There shall be estimated for purposes of allowance under this section – (1) any *contingent* or *unliquidated* claim, the fixing or liquidation of which . . . would unduly delay the administration of the case"); *see also, e.g.*, *United States v. Gerth*, 991 F.2d 1428, 1433-34 (8th Cir. 1993) (observing how "dependency on a postpetition event does not prevent a debt from arising prepetition," since "debt can be absolutely owing prepetition even though that debt would never have come into existence except for postpetition events"); *In re New Power Co.*, 313 B.R. 496, 507 (Bankr. N.D. Ga. 2004) ("[T]he fact that a claim is contingent or unmatured is not grounds to disallow a claim unless that claim is for unmatured interest.").

The *sole* case law the Bankruptcy Court cited for its holding on this point (*see* Tr. at 101:5-9) is a wrongly-decided ruling of a bankruptcy court in another circuit, which held that a claim based on a "put right" would be disallowed because "at the time the case was filed, the right to receive the cash would not have *matured* because the Put Right itself had not yet become exercisable." *In re Einstein/Noah Bagel Corp.*, 257 B.R. 499, 507 (Bankr. D. Ariz. 2000) (emphasis added).  This non-binding decision plainly conflicts with section 502(b)(1), other provisions of the Bankruptcy Code, and case law from the Supreme Court on down; it should not be followed here.

D.    **The Bankruptcy Court Misapplied Section 510(b) in Subordinating the Conversion Right Claims Under a Debt Instrument to the Level of Parity with Equity.**

1.    **Section 510(b) Does Not Apply to the Conversion Right Claims.**

The Bankruptcy Court concluded that, even if allowable, the Conversion Right Claims should be subordinated to the level of equity pursuant to 11 U.S.C. § 510(b) as "claims arising from the purchase or sale of a security."  (*See* Tr. at 100:11-13.)  This

ruling misapplied section 510(b), because the Conversion Right Claims do not satisfy *either* of the two alternative preconditions to subordination under section 510(b) established by the Second Circuit in *Rombro v. Dufrayne (In re Med Diversified, Inc.)*, 461 F.3d 251 (2d Cir. 2006).

*Med Diversified* involved a former executive's claim for the debtor's breach of a termination agreement whereby the executive was to exchange 905,500 shares of PrimeRx stock for 905,500 shares of the debtor's stock by a date certain. In finding that subordination of the executive's claim under section 510(b) was appropriate, the Second Circuit posited the following limitation on section 510(b):

> we conform our interpretation of the statute to require subordination here ***only if*** [the executive] (1) took on the risk and return expectations of a shareholder, rather than a creditor, or (2) seeks to recover a contribution to the equity pool presumably relied upon by creditors in deciding whether to extend credit to the debtor.

*Id.*, 461 F.3d at 256 (emphasis added). The court concluded that the executive had taken on the *risk <u>and</u> return* expectations of a shareholder by "enter[ing] a *binding agreement obligating* him to purchase shares of the debtor in return for his shares of PrimeRx." *See id.* (emphasis added). The executive's "binding agreement" to become an equity holder meant that his "situation fits within the risk-allocation rationale for subordination" under section 510(b). *See id.* at 259.

Here, in contrast, the Noteholders undertook *no* binding obligation to become equity holders at any time; hence, this case falls outside the *Med Diversified* court's "risk-allocation" rationale for subordination.[12] Rather, the facts here more closely

---

[12] Obviously, the "equity-cushion" rationale of *Med Diversified* is completely absent here as well. The Noteholders never contributed *any* equity to the Debtors; the Debtors cannot claim that other creditors relied upon this non-existent equity contribution in deciding to extend credit.

resemble those addressed by the Ninth Circuit in *Racusin v. American Wagering, Inc. (In re American Wagering, Inc.)*, No. 05-15969, 2007 U.S. App. LEXIS 15344 (9th Cir. June 28, 2007), where the court, employing an approach like that adopted by the Second Circuit in *Med Diversified*,[13] held that a claim measured with reference to the debtor's common stock that was payable in a combination of cash and common stock was *not* subject to subordination under section 510(b).

American Wagering involved a debtor's attempt to subordinate, under section 510(b), the claim of a former employee ("Racusin") for damages caused by the debtor's breach of an agreement under which Racusin would be paid a fixed percentage of the value of a stock IPO – $150,000 of which would be paid in cash, and the remainder of which would be paid in the debtor's common stock. *See id.*, 2007 U.S. App. LEXIS 15344, at *3-4. Like the Second Circuit, the Ninth Circuit also broadly interpreted section 510(b). *See id.* at *9-10. Nevertheless, the court refused to subordinate Racusin's claim since, as here, neither of the two rationales posited in *Med Diversified* was present. *See id.* at *11. Even though Racusin's claim was *valued* by reference to the debtor's stock price, such indexing did not alter the fact that Racusin "did not attempt to recover stock, and he never became a shareholder." *See id.* at *11-12. Hence, Racusin did not bear "the risk/return position of an equity investor," and his claim was not subject to mandatory subordination. *See id.* at *14.

This case is plainly far more akin to *American Wagering* than to *Med Diversified*. The Noteholders do not hold any equity interest in the Debtors; nor have

---

[13]  In *Med Diversified*, the Second Circuit grounded its analytic framework, in part, on the Ninth Circuit's opinion in *American Broadcasting Systems v. Nugent (In re Betacom of Phoenix, Inc.)*, 240 F.3d 823 (9th Cir. 2001). *See* 461 F.3d at 254-58. The Ninth Circuit similarly relied on *Betacom of Phoenix* in *American Wagering*. *See* 2007 U.S. App. LEXIS 15344, at *10-11.

they *committed **ever*** to take any such interest.  Although the conversion feature of the 6%

Convertible Notes created the *potential* to receive Conversion Value greater than the

principal amount of the debt – and such excess would be payable in stock – that fact

simply means that the Noteholders held rights valued by reference to Calpine's stock, like

Racusin's claim in *American Wagering.*

      Of particular importance is the fact that, unlike the executive in *Med*

*Diversified*, the Noteholders bear *no* downside risk if the value of Calpine's stock

declines, because they are under no obligation to acquire that stock.  In that sense, this

case is analogous to *Raven Media Investments LLC v. DirecTV Latin American, LLC (In*

*re DirecTV Latin America, LLC)*, No. 03-981, 2004 U.S. Dist. LEXIS 2425 (D. Del. Feb.

4, 2004).  In *DirecTV*, the Delaware District Court *reversed* a bankruptcy court's ruling

that claims of a creditor ("Raven") for the debtor's breach of a "put agreement," whereby

Raven could require the debtor to repurchase membership interests of the debtor that

were held by Raven, were subject to subordination under section 510(b).  In so doing, the

Delaware District Court reasoned that:

> While participation in profits is a critical aspect of an
> equity interest, ***participation in the risk of loss is similarly***
> ***crucial***.  In the present case, [the debtor] can not reasonably
> assert that the transaction, as structured, was intended to
> expose Raven to any risk of loss.  Consequently, § 510(b)
> should not subordinate Raven's claim for payment under
> the Put Agreement.

*Id.* at *12-13 (emphasis added) (citation omitted).

      The Delaware District Court's conclusion that "the purpose of § 510(b) is

not served by imposing the risk of business failure upon a party that unequivocally did

not contract for it," *id.* at *13, is consistent with the Second Circuit's emphasis on the

*binding* nature of the agreement in *Med Diversified*.  This element of downside risk is

43

wholly absent here as well, because the Noteholders never *agreed* to become stockholders.  The Bankruptcy Court erred in applying section 510(b) absent *either* of the rationales articulated by the Second Circuit in *Med Diversified* as the "only" bases for subordination under section 510(b) (i.e., risk-allocation and creditor reliance).

### 2.    Any Conversion Right Claims Subordinated Under Section 510(b) Must Remain Senior to Equity.

Even if section 510(b) applies here, the Bankruptcy Court misapplied the statute in determining the appropriate level of subordination of the Conversion Right Claims.  Under section 510(b):

> a claim . . . for damages arising from the purchase or sale of [a security of the debtor] . . . shall be subordinated to all claims or interests ***that are <u>senior to or equal</u>*** the claim or ***interest represented by <u>such security</u>***, except that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C. § 510(b) (emphasis added).  Thus, to determine the proper level of statutory subordination, it is critical to pinpoint the "security" that gives rise to the Conversion Right Claims.

The Conversion Right Claims arise under the Indenture pursuant to which the 6% Convertible Notes – debt securities – were issued.  Moreover, the claim for damages under the Conversion Right arises from the "sale of a security of the debtor," because the claim arises from the right to tender the 6% Convertible Notes back to Calpine in exchange for "Conversion Value."  Thus, the Conversion Right Claims are, if subject to section 510(b) at all, claims "for damages arising from the . . . sale" *of the 6% Convertible Notes* – i.e., the de facto sale of those notes that would be accomplished by a completed tender for conversion.  *Cf. Vista Eyecare, Inc. v. Neumann (In re Vista Eyecare, Inc.)*, 283 B.R. 613, 628 (Bankr. N.D. Ga. 2002) (damage claim for debtor's

breach of agreement allowing stockholder to "put" his shares back to debtor "arose from" the stockholder's original purchase of shares, thus making those shares the reference "security" for purposes of section 510(b)).

Because the 6% Convertible Notes are the relevant reference "security" for purposes of applying section 510(b), the Conversion Right Claims should have been subordinated only "to all claims or interests that are senior to or equal the claim or interest represented by" the 6% Convertible Notes, i.e., to other general unsecured obligations of the Debtors, and no further. Importantly, the Conversion Right Claims should not have been demoted further to parity with equity interests. *See* H.R. Rep. No. 95-595, at 196 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6157 ("[A] rescission claim resulting from the purchase of a subordinated debenture would share in the proceeds of the estate ***before equity security holders*** but after general unsecured creditors." (emphasis added)); 4 COLLIER ON BANKRUPTCY ¶ 510.04[1] (15th ed. rev. 2007) ("If the security is an unsecured debt instrument, the claim that is represented by that security is a general, unsecured claim. . . . [A]ny [510(b) claim] will be subordinated until the claims of the general unsecured creditors have been satisfied."). Instead, the Conversion Right Claims would become part of a new "tranche" or "class" of debt – one junior to other debts, but still senior to equity – as in the debtor's plan in *Allen v. Geneva Steel Co. (In re Geneva Steel Co.)*, 260 B.R. 517 (B.A.P. 10th Cir. 2001), *aff'd*, 281 F.3d 1173 (10th Cir. 2002).

This conclusion is reinforced by the fact that the Bankruptcy Code makes clear that rights to convert to an equity "share, security, or interest" *are not* to be classified as "equity securities" under the Bankruptcy Code. *See* 11 U.S.C. § 101(16) ("equity security" means, *inter alia*, "warrant or right, ***other than a right to convert***, to

purchase, sell, or subscribe to a share, security, or interest" of a specified kind (emphasis added)).[14]  Thus, under section 101(16), the Conversion Right forming the basis for the Conversion Right Claims is not an "equity security."

Subordinating the Conversion Right Claims to other creditor claims, without demoting them to parity with equity, fully serves any policy underlying the application of section 510(b) here, without destroying the priority over equity to which claims under the Indenture are entitled.  As explained in the Second Circuit's seminal case articulating the precepts that led to the enactment of section 510(b), those precepts are intended primarily to protect distributions to creditors from being diluted by claims of shareholders whose investment in the corporation provided the "equity cushion" on which creditors extending credit rely.  *See In re Stirling Homex Corp.*, 579 F.2d 206, 213-14 (2d Cir. 1978), *cert. denied sub nom. Jezarian v. Raichle*, 439 U.S. 1074 (1979). The core consideration of protecting *creditors* from dilution by the claims of those who elected the risks and rewards of equity would in no way be advanced by subordinating the Conversion Right Claims all the way down to the level of equity.

Indeed, allowing equity holders to dilute the Noteholders' valid damage *claims* would pervert the *Stirling Homex* construct.  The Debtors and their equity holders benefited from the Debtors' ability to obtain debt financing on more favorable terms in

---

14    The Debtors have suggested that this language evidences only Congressional intent to prevent debtors from improperly classifying the holders of convertible debt instruments as equity holders.  Yet this is not what the text of the statute says; Congress could have written "other than a convertible debt instrument," rather than "other than a right to convert," but Congress chose to use the broader language.  The legislative history on which the Debtors rely cites convertible debentures as *an example* of an instrument that is not an "equity security," but does not intimate that this example exhausts the scope of the exclusion from the definition of "equity security" under section 101(16).  *See* H.R. Rep. No. 95-595, at 311 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6268 ("The term [equity security] does not include securities, *such as* convertible debentures, that are convertible into equity securities, but that have not been converted." (emphasis added)).

exchange for the Conversion Right.  In exchange, the Debtors – and their stakeholders, operating through elected directors – agreed to provide the Conversion Right.  Like all other claims under the Indenture, a damage claim for the unlawful termination of that right would have priority over the interests of equity holders.  Destroying that priority contravenes the basic precept of creditor seniority reflected in *Stirling Homex*, and would not promote any policy or purpose underlying section 510(b).

### E.    The Bankruptcy Court's Order Improperly Adjudicated Issues Not Before It.

The Debtors' Limited Objection, the briefing and oral argument thereon, and the Bankruptcy Court's oral ruling were all directed towards the Conversion Right Claims.  Nevertheless, over the Appellant Holders' objection, the Bankruptcy Court entered the Order, in the precise form submitted by the Debtors, which by its terms disallowed not only the Conversion Right Claims, but also all the Noteholders' claims beyond principal, interest and Indenture Trustee fees.  (*See* Order ¶ 3.)  Among the unliquidated claims not addressed in the Limited Objection or the Bankruptcy Court's ruling that were thus summarily disallowed were claims for "make whole" damages to which the Noteholders, like all similarly situated bondholders of the Debtors, are entitled – or at least are entitled to have their day in court with respect to these claims.[15]

The Debtors' Limited Objection [Docket 5206] challenged only the Conversion Right Claims.  The Limited Objection stated, under "Relief Requested," that the Debtors were objecting to the "New Claims"; defined the "New Claims" as "damages for any 'breach' of the Conversion Right"; and sought no relief with respect to any other,

---

[15]    HSBC, as Indenture Trustee for the Noteholders, is presenting to this Court the basis for the Noteholders' entitlement to damages for such make whole claims.  Accordingly, the Appellant Holders join in HSBC's arguments and will not repeat them here.

unliquidated claim.  (*See id.* at 12-13.)  Similarly, the oral argument before the

Bankruptcy Court dealt exclusively with the Conversion Right Claims, as did the

Bankruptcy Court's oral ruling.  (*See* Tr. at 93-102.[16])  The Bankruptcy Court then

directed the Debtors to "[s]ettle an order consistent with this decision."  (Tr. at 103:8-9.)

        Instead of submitting an order "consistent with this decision," i.e., one that

dealt solely with the Conversion Right Claims, the Debtors submitted an overly-broad

order that purported to extinguish other substantial claims.[17]  (*Compare* Tr. 96:4-9 *with*

Ltr. from E. Sassower to Hon. Burton R. Lifland, Aug. 10, 2007, attaching Debtors'

proposed order [App. 28].)  The Appellant Holders objected by letter and requested a

chambers' conference to resolve the dispute.  (*See* Ltr. from M. Barr & K. Hansen to the

Hon. Burton R. Lifland, Aug. 10, 2007 [App. 29] at 1-3.)  Without any conference or

otherwise hearing from the Appellant Holders, the Bankruptcy Court entered the Order

less than two hours after that letter was sent.

        The fact that the Noteholders' "make whole" claims were not properly

before the Bankruptcy Court on the Limited Objection is underscored by the procedural

history of this case.  On June 8, 2007, the Debtors filed the First Unliquidated Indenture

Claims Objection, wherein they objected to the "make whole" claims under several other

series of bonds.  (*See id.* [Docket 4880].)  That Objection expressly *carved out* the 6%

Convertible Notes from its scope.  (*See id.* at 5 n.3.)  Had the Debtors intended to join

issue with the Noteholders on "make whole" claims, or any unliquidated claims other

---

[16]    Specifically, the Court disallowed the "new claims," which the Court described as follows:  "On March, April and May of 2007 the indenture[] trustees for the convertible notes filed 'supplemental' proofs of claims seeking in addition to repayment of outstanding principal and accrued interest damages for 'any breach' of the conversion right, collectively the new claims."  (Tr. at 96:4-9.)

than the Conversion Right Claims, the Debtors could and should either have included the 6% Convertible Notes in the First Unliquidated Indenture Claims Objection, or restated the points in the Limited Objection.

The Debtors may attempt to rationalize their gamesmanship by noting that: (i) in their response to the Limited Objection, the Appellant Holders made reference in a five-line footnote to a "make whole" claim (*see id.* [Docket 5427] at 22-23, n.10); and (ii) the Debtors' Omnibus Reply included a half-page request that this "new" claim be disallowed as untimely (*see id.* [Docket 5540] at 8-9). None of the parties, however, addressed this issue at the hearing,[18] and the Bankruptcy Court made *no* findings or ruling at the hearing with respect to the Noteholders' "make whole" claims, whether as to timeliness, or otherwise.

Nor does the Order explain the basis for summarily disallowing the Noteholders' "make whole" claims. There is simply no indication – either in the Order or in the hearing transcript – of what facts or law possibly could justify or explain the disallowance of any unliquidated claims other than the Conversion Right Claims. In summarily disallowing these other claims without explanation, the Bankruptcy Court violated Fed. R. Civ. P. 52(a), made applicable here by Fed. R. Bankr. P. 9014(c) and 7052. *See Mazzeo v. Lenhart (In re Mazzeo)*, 167 F.3d 139, 142 (2d Cir. 1999); *see also, e.g.*, *Corzin v. Fordu (In re Fordu)*, 201 F.3d 693, 710 (6th Cir. 1999). In the absence of

---

[17]  The proposed order submitted by the Debtors was the same form of order that the Debtors attached to the Limited Objection and to which the parties objected, notwithstanding that the form of the order did not reflect the Bankruptcy Court's decision.

[18]  It is not surprising the Debtors did not press this issue. When they objected to the "make whole" claims under other indentures in the First Unliquidated Indenture Claims Objection, the Debtors did not contend those claims were not timely or had not been properly asserted in the original proofs of claim filed for those indentures. (*See* Docket 4880.) The proofs of claim filed by the indenture trustees under those other indentures are materially identical to the Proof of Claim. (*See* App. 30-33.)

"sufficient information to determine what facts and circumstances specific to the present case the court believed made" the granted relief appropriate, an appellate court should vacate and remand the associated order. *See Mazzeo*, 167 F.3d at 143.

## **CONCLUSION**

For the reasons and based on the authorities presented above, the Bankruptcy Court's Order should be reversed in its entirety.

Respectfully submitted,

Dated:  September 7, 2007
New York, New York

/s/ *Matthew S. Barr*
MILBANK, TWEED, HADLEY & M$^C$CLOY LLP
Dennis F. Dunne (DD-7543)
Matthew S. Barr (MB-9170)
Andrew M. Leblanc (*pro hac vice*)
One Chase Manhattan Plaza
New York, New York 10005
Telephone:  (212) 530-5000
Facsimile:  (212) 530-5219

-and-

STUTMAN, TREISTER & GLATT, P.C.
Isaac M. Pachulski (*pro hac vice*)
Eric D. Winston (*pro hac vice*)
Whitman L. Holt (*pro hac vice*)
1901 Avenue of the Stars, 12th Floor
Los Angeles, California 90067
Telephone:  (310) 228-5600
Facsimile:  (310) 228-5788

Attorneys for Aristeia Capital, L.L.C., Aurelius Capital Management, LP, Drawbridge Special Opportunities Advisors LLC, Ore Hill Hub Fund Ltd., Nisswa Master Fund Ltd., Pines Edge Value Investors Ltd., Pines Edge Value Investors L.P., Silver Sands Fund LLC, Stark Master Fund Ltd. and 3V Capital Management, LLC

50