Michael S. Stamer (MS-4900)
Lisa G. Beckerman (LB-9655)
Philip C. Dublin (PD-4919)
Abid Qureshi (AQ-4882)
Shaya Rochester (SR-5559)
AKIN GUMP STRAUSS HAUER & FELD LLP
590 Madison Avenue
New York, New York 10022-2524
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)

Counsel to the Official Committee of Unsecured
Creditors of Calpine Corporation, et al.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

| | |
|---|---|
| | : Chapter 11 |
| In re: | : |
| | : Case No. 05-60200 (BRL) |
| CALPINE CORPORATION, ET AL., | : |
| | : (Jointly Administered) |
| Debtors. | : |

---------------------------------------------------------------x

| | |
|---|---|
| ARISTEIA CAPITAL, L.L.C., | : |
| AURELIUS CAPITAL MANAGEMENT, L.P., | : |
| DRAWBRIDGE SPECIAL OPPORTUNITIES | : |
| ADVISORS LLC, ORE HILL HUB FUND LTD., | : |
| NISSWA MASTER FUND LTD., PINES EDGE | : |
| VALUE INVESTORS LTD., PINES EDGE | : |
| VALUE INVESTORS L.P., SILVER SANDS | : |
| FUND LLC , STARK MASTER FUND LTD. | : |
| AND 3V CAPITAL MANAGEMENT, LLC, | : |
| | : |
| Appellants, | : |
| | : Civil Case No.07-7830 |
| vs. | : |
| | : |
| CALPINE CORPORATION AND ITS | : |
| AFFILIATED DEBTORS AND DEBTORS | : |
| IN POSSESSION, OFFICIAL COMMITTEE | : |
| OF UNSECURED CREDITORS OF | : |
| CALPINE CORPORATION, | : |
| OFFICIAL COMMITTEE OF EQUITY | : |
| SECURITY HOLDERS, | : |
| | : |
| Appellees. | : |

---------------------------------------------------------------x

```
---------------------------------------------------------x
BRENCOURT CREDIT OPPORTUNITIES        :
MASTER, LTD., BRENCOURT MULTI-        :
STRATEGY ENHANCED DEDICATED           :
FUND, LP, DILLON READ U.S. FINANCE    :
L.P., DILLON READ FINANCIAL PRODUCTS  :
TRADING LTD., LINDEN CAPITAL L.P.,    :
AND ORE HILL HUB FUND, LTD.,          :
                                      :
                    Appellants,       :
                                      :     Civil Case No. 07-7831
vs.                                   :
                                      :
CALPINE CORPORATION AND ITS           :
AFFILIATED DEBTORS AND DEBTORS IN     :
POSSESSION, OFFICIAL COMMITTEE OF     :
UNSECURED CREDITORS OF CALPINE        :
CORPORATION, OFFICIAL COMMITTEE       :
OF EQUITY SECURITY HOLDERS,           :
                                      :
                    Appellees.        :
---------------------------------------------------------x
---------------------------------------------------------x
HSBC BANK USA, N.A., AS SUCCESSOR     :
INDENTURE TRUSTEE FOR THE 6% AND      :
4.75% CONTINGENT CONVERTIBLE          :
NOTEHOLDERS,                          :
                                      :
                    Appellant,        :
                                      :
vs.                                   :     Civil Case No. 07-7832
                                      :
CALPINE CORPORATION AND ITS           :
AFFILIATED DEBTORS AND DEBTORS        :
IN POSSESSION, OFFICIAL COMMITTEE     :
OF UNSECURED CREDITORS OF             :
CALPINE CORPORATION, OFFICIAL         :
COMMITTEE OF EQUITY SECURITY          :
HOLDERS,                              :
                                      :
                    Appellees.        :
---------------------------------------------------------x
```

```
-----------------------------------------------------------------x
MANUFACTURERS AND TRADERS            :
TRUST COMPANY, AS SUCCESSOR          :
INDENTURE TRUSTEE,                   :
                                     :
                    Appellant,       :
                                     :
vs.                                  :      Civil Case No. 07-7867
                                     :
CALPINE CORPORATION AND ITS          :
AFFILIATED DEBTORS AND DEBTORS       :
IN POSSESSION, OFFICIAL COMMITTEE    :
OF UNSECURED CREDITORS OF            :
CALPINE CORPORATION, OFFICIAL        :
COMMITTEE OF EQUITY SECURITY         :
HOLDERS,                             :
                                     :
                    Appellees.       :
-----------------------------------------------------------------x
```

**BRIEF OF APPELLEE OFFICIAL COMMITTEE
OF UNSECURED CREDITORS OF CALPINE CORPORATION, ET AL.**

# TABLE OF CONTENTS

Page

COUNTER-STATEMENT OF ISSUES PRESENTED ..................................................2

STATEMENT OF RELEVANT FACTS ..........................................................................4

    A.    The Convertible Notes ................................................................................4

    B.    Commencement of the Chapter 11 Cases ..................................................5

    C.    The Initial Proofs of Claim .......................................................................5

    D.    The CalGen Decision .................................................................................6

    E.    The New Proofs of Claim ..........................................................................7

    F.    The Exit Financing .....................................................................................7

    G.    The Disposition in the Bankruptcy Court ..................................................8

ARGUMENT ..................................................................................................................10

I.    THE BANKRUPTCY COURT DID NOT ERR IN DISALLOWING THE CONVERSION CLAIMS ON THE GROUNDS THAT THEY WERE UNTIMELY ..................................................................................................10

    A.    The Conversion Claims Are Entirely New Claims that Were Not Included Within the Initial Proofs of Claim...............................................10

    B.    The New Proofs of Claim Did Not Relate Back to and Thereby Amend the Initial Proofs of Claim. ..........................................................13

    C.    The Bankruptcy Court Did Not Abuse Its Discretion In Expunging the New Proofs of Claim on Equitable Grounds. ...........................................16

        1.    Prejudice ........................................................................................17

        2.    Justification for the Delay ..............................................................19

        3.    Length of Delay and Impact on Judicial Proceedings ..................20

Page

II.    THE BANKRUPTCY COURT CORRECTLY HELD THAT THE NEW PROOFS
       OF CLAIM ARE WITHOUT LEGAL MERIT .................................................................21

       A.    The Conversion Rights Terminated Upon the Commencement of the
             Chapter 11 Cases and Are Thus Incapable of Being Breached............................22

       B.    The Governing Documents Do Not Provide that the Conversion Rights
             Survived the Debtors' Bankruptcy Filing. .............................................26

       C.    The Conversion Claims are Not Allowable under the Bankruptcy Code
             and Applicable Case Law......................................................................29

       D.    The Appellants Misapply the Law in Support of their Damages Argument..........31

       E.    The CalGen Decision Neither Supports the Appellants' Damage Claims
             Nor Constitutes the Law of the Case. ...................................................33

III.   THE BANKRUPTCY COURT CORRECTLY HELD THAT, EVEN IF THE
       CONVERSION CLAIMS WERE ALLOWABLE, THEY WOULD
       NONETHELESS BE SUBJECT TO SUBORDINATION UNDER SECTION
       510(B) OF THE BANKRUPTCY CODE.........................................................................35

IV.    THE BANKRUPTCY COURT DID NOT ERR BY ENTERING THE
       PROPOSED FORM OF ORDER SUBMITTED BY THE DEBTORS
       GRANTING THE DEBTORS' OBJECTION ..................................................................36

       A.    The Relief Sought in the Debtors' Objection Is Identical to the Relief
             Granted in the Bankruptcy Court's Order. ............................................37

       B.    The Order Is Consistent With the Issues Presented at the Hearing and the
             Court's Opinion Adjudicating those Issues..........................................38

CONCLUSION.............................................................................................................40

# TABLE OF AUTHORITIES

## CASES

Aetna Casualty & Surety Co. v. LTV Steel Co. (In re Chateaugay Corp.),
    94 F.3d 772 (2d. Cir. 1996)....................................................................13

In re Asia Global Crossing, Ltd.,
    324  B.R. 503 (Bankr. S.D.N.Y. 2005)....................................................14

In re Best Prods. Co., Inc.,
    140 B.R. 353 (Bankr. S.D.N.Y. 1992).....................................................11

In re Bloomingdale Partners,
    160 B.R. 101 (Bankr. N.D. Ill. 1993) ....................................................13

In re Calpine Corp.,
    365 B.R. 392 (Bankr. S.D.N.Y. 2007).........................................6, 23, 34

In re Carmelo Bambace, Inc.,
    134 B.R. 125 (Bankr. S.D.N.Y. 1991).............................................13, 14

In re Commonwealth Corp.,
    617 F.2d  415 (5th Cir. 1980) ................................................................13

In re Drexel Burnham Lambert Group, Inc.,
    129 B.R. 22 (Bankr. S.D.N.Y. 1991)......................................................12

In re Drexel Burnham Lambert Group, Inc.,
    151 B.R. 684 (Bankr. S.D.N.Y. 1993).....................................................13

In re Einstein/Noah Bagel Corp.,
    257 B.R. 499 (Bankr. D. Ariz. 2000).......................................................30

In re Enron Creditors Recovery Corp.,
    No. 01-16034, 2007 WL1705653 (Bankr. S.D.N.Y. Jun 13, 2007) ...............17, 18

In re Enron Corp.,
    341 B.R. 141 (Bankr. S.D.N.Y. 2006).....................................................35

Finanz AG Zurich v. Banco Economico S.A.,
    192 F.3d 240 (2d. Cir. 1999)..................................................................29

In re First Amer. Healthcare of Georgia, Inc.,
    No. 96-20188, 1997 WL 33477665 (Bankr. S.D. Ga. Apr. 28, 1997)..................30

In re First Connecticut Small Bus. Inv. Co.,
    118 B.R. 179 (Bankr. D. Conn. 1990) ...........................................................23

First Fid. Bank, N.A. v. Hooker Invs., Inc. (In re Hooker Invs., Inc.),
    937 F.2d 833 (2d Cir. 1991)............................................................................11

Galli v. Metz,
    973 F.2d 145 (2d Cir. 1992)............................................................................24

Gens v. Resolution Trust Corp.,
    112 F.3d 569 (1st Cir. 1997).............................................................................12

Hauser v. Western Group Nurseries, Inc.,
    767 F. Supp. 475 (S.D.N.Y. 1991).................................................................24

Hilton Hotels Corp. v. Dunnet,
    275 F. Supp. 2d 954 (W.D. Tenn. 2002)........................................................30

In re Homesteads Community at Newtown, LLC,
    339 B.R. 532 (Bankr. D. Conn. 2006) ...........................................................23

In re Infiltrator Sys., Inc.,
    241 B.R. 278 (Bankr. D. Conn. 1999) ...........................................................20

In re Jobs.com, Inc.,
    283 B.R. 209 (Bankr. N.D. Tex. 2002).............................................................30

In re Keene Corp.,
    188 B.R. 903 (Bankr. S.D.N.Y. 1995) ...........................................................17

In re Kmart Corp.,
    381 F.3d 709, 714 (7th Cir. 2004) ..................................................................17

In re LHD Realty Corp.,
    726 F.2d 327 (7th Cir. 1984) ..........................................................................23

Lillis v. AT&T Corp.,
    No. 717-N, 2007 Del. Ch. LEXIS 102 (Del. Ch. July 20, 2007)...........................30

In re Lynn,
    173 B.R. 894 (Bankr. M.D. Tenn. 1994) .......................................................25

In re Med Diversified, Inc.,
    461 F.3d 251 (2d Cir. 2006)............................................................................36

(iv)

<u>Midland Cogeneration Venture Ltd. P'ship v. Enron Corp. (In re Enron Corp.),</u>
419 F.3d 115 (2d Cir. 2005)..........................................................14, 15, 16, 17, 20

<u>Mutual Omaha Ins. Co. v. United States (I.R.S.),</u>
317 F. Supp. 2d 1117 (D. Neb. 2004)...................................................25

<u>In re Norris Grain Co.,</u>
81 B.R. 103 (Bankr. M.D. Fla. 1987), <u>aff'd</u>, 131 B.R. 747 (M.D. Fla.
1990) ........................................................................................15

<u>In re O'Brien Envt'l Energy Inc.,</u>
188 F.3d 116 (3d Cir. 1999)........................................................17, 20

<u>In re PCH Assocs.,</u>
949 F.2d 585 (2d Cir. 1991)..............................................................34

<u>In re PT-1 Communc'ns, Inc.,</u>
292 B.R. 482 (Bankr. E.D.N.Y. 2003)...................................................17

<u>Pioneer Inv. Servc's Co. v. Brunswick Assoc's L.P.,</u>
507 U.S. 380 (1993)........................................................................16

<u>R.A. Mackie & Co. v. PetroCorp Inc.,</u>
329 F. Supp. 2d 477 (S.D.N.Y. 2004)...................................................30

<u>In re Robert Stone Cut Off Equip., Inc.,</u>
98 B.R. 158 (Bankr. N.D.N.Y. 1989) ..............................................13, 17

<u>In re Search Fin. Servc's Acceptances Corp.,</u>
No. 39832129RCM11, 2000 WL 256889 (N.D. Tex. March 7, 2000) .................30

<u>Sharon Steel Corp. v. Chase Manhattan Bank,</u>
691 F.2d 1039 (2d Cir. 1982), <u>cert denied</u>, 460 U.S. 1012 (1983) .......................32

<u>In re Skyler Ridge Corp.,</u>
80 B.R. 500 (Bankr. C.D. Cal. 1987)....................................................32

<u>In re Tricycle Enters, Inc.,</u>
No. 06-30096, 2007 WL 1246593 (Bankr. N.D.N.Y. Apr. 27, 2007)...................13

<u>U.S. v. Birney,</u>
686 F.2d 102 (2d Cir. 1982)..............................................................34

<u>U.S. v. Martinez,</u>
987 F.2d 920 (2d Cir. 1993)..............................................................34

U.S. v. Williams,
    205 F.3d 23 (2d Cir. 2000), cert denied, 531 U.S. 885 (2000) .............................33

In re WorldCom, Inc.,
    No. 02-13533, 2006 WL 3782712 (Bankr. S.D.N.Y., Dec. 21, 2006) .................35

In re Worldwide Direct, Inc.,
    268 B.R. 69 (Bankr. D. Del. 2001) .......................................................................35

## STATUTES AND RULES

11 U.S.C. § 101(5)(A).........................................................................................31

11 U.S.C. § 502(b) ..........................................................................29, 30, 31, 34

Fed. R. Bankr. P. 9006(b)(1)...............................................................................16

11 U.S.C. § 510..........................................................................................35, 36

## MISCELLANEOUS

Dictionary of Finance and Investment Terms 413-14 (2003)............................................25

The Official Committee of Unsecured Creditors (the "Creditors' Committee") of Calpine Corporation ("Calpine") and its affiliated debtors and debtors in possession (collectively with Calpine, the "Debtors"), as appellee, files this brief in opposition to the four briefs submitted by the Appellants (defined below) in these appeals. The four briefs to which the Creditors' Committee responds are:

(i)      "Opening Brief of Appellant Holders of 6% Convertible Notes" (the "6% Brief") filed by Aristeia Capital, L.L.C., Aurelius Capital Management, LP, Drawbridge Special Opportunities Advisors LLC, Ore Hill Hub Fund Ltd., Nisswa Master Fund Ltd., Pines Edge Value Investors Ltd., Pines Edge Value Investors L.P., Silver Sands Fund LLC, Stark Master Fund Ltd. and 3V Capital Management, LLC; (collectively, the "6% Noteholders"), as beneficial owners, of the 6% Notes (defined below);

(ii)      "Opening Brief of Appellant Holders of the 7.75% Convertible Notes" (the "7.75% Brief") filed by Brencourt Credit Opportunities Master, Ltd., Brencourt Multi-Strategy Enhanced Dedicated Fund, LP, Dillon Read U.S. Finance L.P., Dillon Read Financial Products Trading Ltd., Linden Capital L.P., and Ore Hill Hub Fund, Ltd. (collectively, the "7.75% Noteholders" and together with the 6% Noteholders, the "Noteholders"), as the holders and/or investment advisors to certain holders of the 7.75% Notes (defined below);

(ii)      "Opening Brief of Appellant HSBC Bank USA, N.A., ("HSBC") as Successor Indenture Trustee for the 4.75% and 6.00% Contingent Convertible Notes" (the "HSBC Brief"); and

(iv)      "Appellant, Manufacturers & Traders Trust Company's ("M&T" and together with the Noteholders and HSBC, the "Appellants") (I) Opening Brief and (II) Joinder to Opening Brief of Appellants, Holders of the 7.75% Convertible Notes" (the "M&T Brief").

## COUNTER-STATEMENT OF ISSUES PRESENTED

The Appellants submitted six issues on appeal, which the Creditors' Committee believes can be summarized as follows:[1]

1.     Whether the Bankruptcy Court abused its discretion in holding that the timely-filed Initial Proofs of Claim (defined below), which only asserted claims for principal, interest and other unliquidated amounts owing under the Indentures (defined below), failed to include damage claims (the "Conversion Claims") for purported breaches of the Noteholders' rights (the "Conversion Rights") to convert their notes into common stock of Calpine (Appellants' briefs issue no. 1)?  The Creditors' Committee contends that the answer is "no;" the Initial Proofs of Claim failed to make any reference to the Conversion Claims.

2.     Whether the Bankruptcy Court abused its discretion in holding that the New Proofs of Claim (defined below) do not assert similar claims or demands as the Initial Proofs of Claim and, therefore, do not relate back to and amend the Initial Proofs of Claim (Appellants' briefs no. issue 2)?  The Creditors' Committee contends that the answer is "no;" the New Proofs of Claim assert entitlements never before requested in any reported bankruptcy case and, therefore, the New Proofs of Claim are separate and distinct from the garden variety amounts sought for principal, interest and other generic amounts asserted in the Initial Proofs of Claim.

3.     Whether the Bankruptcy Court abused its discretion in holding that the New Proofs of Claim, which were filed long after the Bar Date (defined below) had passed and without authorization from the Bankruptcy Court, could be expunged on equitable grounds

---

[1] M&T submitted seven issues on appeal; however, as recognized by the other Appellants, the seventh issue is subsumed within the other six issues on appeal and therefore does not need to be addressed separately.

(Appellants' briefs issue no. 3)?  The Creditors' Committee contends that the answer is "no;" the Appellants have failed to provide any justification for the late filing of the New Proofs of Claim, and allowing the New Proofs of Claim now would prejudice the Debtors, their estates and the judicial administration of the Debtors' chapter 11 cases.

4.      Whether the Bankruptcy Court erred as a matter of law in holding that, even if the New Proofs of Claim had been timely filed, they are nonetheless without legal merit (Appellants' briefs issue no. 4)?  The Creditors' Committee contends that the answer is "no;" the Conversion Rights terminated at the Petition Date pursuant to both the plain language of the Governing Documents and by operation of law; the Governing Documents do not provide that the Conversion Rights survived the Debtors' bankruptcy filing or that the Appellants have a claim on account of the Conversion Rights under section 502(b) of the Bankruptcy Code and supporting case law.

5.      Whether the Bankruptcy Court erred as a matter of law in holding that the Conversion Claims, even if allowable, would be subject to subordination under section 510(b) of the Bankruptcy Code (Appellants' briefs issue no. 5)?  The Creditors' Committee contends that the answer is "no;" the Conversion Claims fall well within the broad scope of section 510(b) of the Bankruptcy Code.

6.      Whether the Bankruptcy Court erred as a matter of law in entering the proposed form of order submitted by the Debtors, which disallowed not only the Conversion Claims but all of the Appellants' claims beyond principal, interest and indenture trustee fees (Appellants' briefs issue 6)?  The Creditors' Committee contends that the answer is "no;" the order entered by the Bankruptcy Court was virtually identical to the relief sought in the Debtors' Objection and was consistent with the Bankruptcy Court's opinion adjudicating the Appellants' claims.

<u>**STATEMENT OF RELEVANT FACTS**</u>

A.    **The Convertible Notes**

Between 2000 and 2006, Calpine issued four series of unsecured convertible notes (the "<u>Notes</u>").  As of the Petition Date (defined below), the Notes were outstanding in the aggregate principal amount of approximately $1.8 billion, as set forth below:

- $1,311,000 4.00% Convertible Senior Notes Dues December 26, 2006 (the "<u>4% Notes</u>") issued by Calpine under that certain Indenture dated as of August 10, 2000, between Calpine and Wilmington Trust Company ("<u>WTC</u>"), as predecessor indenture trustee (the "<u>Original Indenture</u>"), as supplemented by the First Supplemental Indenture dated as of September 28, 2000 (the "<u>First Supplemental Indenture</u>");[2]

- $547,370,000 6.00% Contingent Convertible Notes Due 2014 (the "<u>6% Notes</u>") issued by Calpine under the Original Indenture, as supplemented by the Second Supplemental Indenture dated as of September 30, 2004 (the "<u>Second Supplemental Indenture</u>");[3]

- $650,000,000 7.75% Contingent Convertible Notes Due 2015 (the "<u>7.75% Notes</u>") issued by Calpine under the Original Indenture, as supplemented by the Third Supplemental Indenture dated as of June 23, 2005 (the "<u>Third Supplemental Indenture</u>" and together with the Original Indenture, the First Supplemental Indenture and the Second Supplemental Indenture, the "<u>Indenture</u>");[4] and

- $633,775,000 4.75% Contingent Convertible Notes Due 2023 (the "<u>4.75% Notes</u>") issued by Calpine under the Original Indenture, as superseded by that certain Amended and Restated Indenture dated as of March 12, 2004, between Calpine and WTC, as predecessor trustee (the "<u>4.75% Indenture</u>" and together with the Indenture, the "<u>Indentures</u>" and together with the notes and other agreements accompanying the Indentures, the "<u>Governing Documents</u>").[5]

---

[2] The 4% Notes are not subject to this appeal because the 4% Notes have already matured by their own terms.

[3] HSBC is the successor indenture trustee for the 6% Notes.

[4] M&T is the successor indenture trustee for the 7.75% Notes.

[5] HSBC is the successor indenture trustee for the 4.75% Notes.

### B.    Commencement of the Chapter 11 Cases

Beginning on or about December 20, 2005 (the "Petition Date"), each of the Debtors filed with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") commencing the Debtors' chapter 11 cases (collectively, the "Chapter 11 Cases").  On January 6, 2006, pursuant to section 1102 of the Bankruptcy Code, the United States Trustee appointed the Creditors' Committee.  The Creditors' Committee currently consists of six members.[6]

### C.    The Initial Proofs of Claim

The Bankruptcy Court entered an order dated April 26, 2006, establishing August 1, 2006 as the bar date (the "Bar Date") for filing proofs of claim.  Prior to the Bar Date, WTC, as predecessor indenture trustee for the 7.75% Notes, filed a proof of claim ("Claim 2404") asserting claims for (a) principal and interest and (b) other unliquidated charges.  Also prior to the Bar Date, HSBC, as successor indenture trustee for the 4% Notes, the 6% Notes and the 4.75% Notes, filed two proofs of claim asserting similar claims, including "[o]ther unliquidated amounts" in connection with the 4% Notes and the 6% Notes ("Claim 2821"), and the 4.75% Notes ("Claim 2823" and together with Claim 2404 and Claim 2821, the "Initial Proofs of Claim").  The Initial Proofs of Claim make no mention of any claims on account of the Conversion Rights.

On January 5, 2007, the Debtors and HSBC entered into a stipulation and order (the "Claims Stipulation"), which the Bankruptcy Court approved on January 30, 2007 [Docket No.

---

[6]    The Creditors' Committee is comprised of the following entities: Wilmington Trust Co., as indenture trustee; HSBC Bank USA, National Association, as indenture trustee; Franklin Advisers, Inc.; SPO Partners & Co.; Hess Corporation; and TransCanada Pipelines Limited.

3501], pursuant to which the parties agreed to the allowed amount of principal and pre-petition accrued interest on account the 4% Notes, the 6% Notes and the 4.75% Notes.   Like the Initial Proofs of Claim, the Claims Stipulation makes no mention of <u>any</u> claims on account of the Conversion Rights.

> **D.     The CalGen Decision**

In January 2007, the Debtors sought Bankruptcy Court authorization to refinance oversecured pre-petition debt at Calpine Generating Company, LLC ("<u>CalGen</u>"), one of the Debtors' largest operating subsidiaries, by repaying such debt in full (principal and accrued interest) in cash.   The holders of this debt (the "<u>CalGen Secured Lenders</u>") objected to the proposed refinancing on the grounds that "no call" clauses barred repayment of such debt and, in the alternative, repayment would entitle the CalGen Secured Lenders to secured claims for "makewhole" premiums to compensate the CalGen Secured Lenders for discontinued future interest payments.

The Bankruptcy Court rejected both arguments, holding that no call provisions are generally unenforceable in bankruptcy, and that the proposed repayment did not give rise to secured damage claims for makewhole premiums because the governing agreements did not expressly require a prepayment premium upon the repayment of accelerated debt prior to April 1, 2007.   <u>In re Calpine Corp.</u>, 365 B.R. 392, 398-99 (Bankr. S.D.N.Y. 2007) (appeal pending) (the "<u>CalGen Decision</u>").   However, the Bankruptcy Court went on to find that, as a result of the Debtors' repayment, the CalGen Secured Lenders' "expectation of an uninterrupted payment stream has been dashed giving rise to damages" and, therefore, "the CalGen Secured Lenders still have an unsecured claim for damages for the Debtors' breach of the agreements." <u>Id.</u> at 399. The CalGen Decision is currently on appeal before this Court.

### E.    The New Proofs of Claim

Soon after the Bankruptcy Court issued its CalGen Decision, and nearly <u>eight</u> months after the Bar Date had passed, the respective indenture trustees for the Notes (collectively, the "<u>Indenture Trustees</u>") filed so-called "supplemental" proofs of claim (the "<u>New Proofs of Claim</u>"),[7] seeking claims on account of the Conversion Rights in addition to repayment of principal and accrued interest.  Despite the fact that the Bar Date had long since passed and that proper procedure requires a creditor to seek leave of the Bankruptcy Court to file a claim after the bar date has passed, the Indenture Trustees did not seek authorization from the Bankruptcy Court to file the New Proofs of Claim.

### F.    The Exit Financing

On July 11, 2007, the Bankruptcy Court entered an Order Granting Debtors' Motion for Entry of an Order Pursuant to Sections 105 and 363 of the Bankruptcy Code Authorizing the Debtors to (A) Enter into Commitment Papers; (B) Pay Certain Fees and Expenses Relating Thereto; and (C) Enter into an Amendment to the DIP Facility (the "<u>Exit Financing Order</u>"). Pursuant to the Exit Financing Order, the Debtors secured commitments for exit financing (the "<u>Exit Financing</u>") which is on terms substantially better than can be obtained in the current market.  However, pursuant to the commitment papers approved by the Exit Financing Order, the commitments of the Exit Financing lenders to provide the Exit Financing will expire if the Debtors do not emerge from bankruptcy on or before January 31, 2008  (the "<u>Exit Financing Deadline</u>").  Accordingly, the Debtors are trying to emerge from chapter 11 as soon as possible

---

[7] The New Proofs of Claim consist of the following:  (a) Claim 6247 filed by HSBC on or about March 23, 2007 purporting to supplement Claim 2821; (b) Claim 6249 filed by HSBC on or about March 29, 2007 purporting to supplement Claim 2823 and (c) Claim 6280 filed by M&T on or about April 23, 2007 purporting to supplement Claim 2404.  In addition, on or about May 22, 2007, HSBC filed proofs of claim amending and replacing Claim 6247 and Claim 6249.

and no later than January 31, 2008 in order to preserve the Exit Financing, one of the Debtors'
most significant assets.

G.    **The Disposition in the Bankruptcy Court**

On July 6, 2007, the Debtors filed their Limited Objection to Convertible Noteholder
Claim Nos. 2404, 2821, 2823, 6247, 6249, 6280, 6299 and 6300 (the "Objection") requesting
that the Bankruptcy Court disallow the "Noteholders' claims to the extent they seek amounts
beyond Principal and Interest." See Objection at 14; see also Objection, Ex. A, ¶¶ 1-3 (proposed
form of order requesting same relief).  The Creditors' Committee and the Official Committee of
Equity Security Holders filed pleadings in support of the Objection [Docket Nos. 5431, 5538,
5541].  Each of the four Appellants filed responses (collectively, the "Responses") in opposition
to the Objection [Docket Nos. 5427, 5428, 5429, 5449].

On August 8, 2007, the Bankruptcy Court conducted a hearing (the "Hearing") to
consider the Objection.  At the conclusion of oral argument, the Bankruptcy Court issued an
opinion from the bench (the "Opinion") granting the Objection in its entirety.  The Bankruptcy
Court held, in substance, that:

- The Conversion Claims were new claims that were not included within the Initial
  Proofs of Claim.  Specifically, the Bankruptcy Court found that the Initial Proofs
  of Claim "did not make any meaningful reference to the [Conversion Claims]."
  (See Transcript of Proceedings, August 8, 2007 [Docket No. 5599] (hereinafter
  "Hr'g Tr. Aug 8, 2007") at 98).

- The New Proofs of Claim were not amendments to the Initial Proofs of Claim
  because the New Proofs of Claim did not "relate back to" the Initial Proofs of
  Claim.  Specifically, the Bankruptcy Court found that, under the heightened test
  for adjudicating post-bar date amendments, the New Proofs of Claim did not (a)
  correct a form defect in the Initial Proofs of Claim, (b) describe the Initial Proofs
  of Claim with more particularity nor (c) plead a new theory of recovery on the
  facts set forth in Initial Proofs of Claim. (Hr'g Tr. Aug 8, 2007 at 97-98).

- Even if the New Proofs of Claim did relate back to the Initial Proofs of Claim, it
  would be inequitable to allow the late filing of the New Proofs of Claim.
  Specifically, the Bankruptcy Court found that (a) the Appellants "waited nearly

eight and in some cases ten months after the bar date to file the [New Proofs of Claim]," even though the Appellants were aware of the Conversion Claims "on the petition date"; (b) the Appellants "offer[ed] no excuse" for the late filing, and never sought Court approval to file the "alleged amendments"; and (c) the late filing had disrupted the judicial administration of the Chapter 11 Cases in multiple respects. (Hr'g Tr. Aug 8, 2007 at 97-99).

- With respect to the disruption caused by the New Proofs of Claim, the Bankruptcy Court found that (a) the Indenture Trustees filed the New Proofs of Claim during the period in which the Debtors were formulating their chapter 11 plan of reorganization; (b) "the timing of [the New Proofs of Claim] forces the Debtors to deal with [New Proofs of Claim] when they should have been focusing on the approval of the disclosure statement and confirmation of the plan"; (c) the Appellants "led the parties to believe without specifically setting it forth that the amount sought under the [New Proofs of Claim] would be substantial and in the hundreds of millions of dollars" and, therefore, "[t]o the extent that the [New Proofs of Claim] remain unresolved and unliquidated as of confirmation, the reorganized debtors may have to maintain large reserves thereby delaying distributions to other stakeholders who've timely filed proofs of claim and interest." (Hr'g Tr. Aug 8, 2007 at 99-100).

- Even if the New Proofs of Claim had been timely filed, they were nonetheless without merit. (Hr'g Tr. Aug 8, 2007 at 100). Specifically, the Bankruptcy Court found that (a) the Indentures "do not provide for recovery on account of both debt and equity interest"; (b) "the convertible noteholders cannot possibly be entitled to receive payment of their debt and damages on the account of the conversion right" and (c) "the conversion rights were not exercisable as of the petition date when the notes accelerated and matured [a]nd thus the noteholders do not have allowable claims with respect to the conversion rights" under section 502(b) of the Bankruptcy Code. (Hr'g Tr. Aug 8, 2007 at 100-101).

- Even if the Conversion Claims were allowable, they would nonetheless be subject to subordination under section 510(b) of the Bankruptcy Code as claims arising from the purchase or sale of a security of the Debtors. (Hr'g Tr. Aug 8, 2007 at 101).

At the conclusion of its Opinion, the Bankruptcy Court stated: "Accordingly, the debtors' limited objection to the new claims is granted. Settle an order consistent with this decision." (Hr'g Tr. Aug 8, 2007 at 102). After the Debtors circulated a proposed form of order that was virtually identical to the proposed form of order that was attached to the Debtors' Objection, counsel for the Noteholders sent a letter to the Bankruptcy Court's chambers, arguing that the order proposed by the Debtors went beyond the scope of the relief sought in the Debtors'

Objection as well as the matters addressed at the Hearing and determined in the Bankruptcy

Court's Opinion.  See Record Appendix of Opening Brief of Appellant Holders of 6% Notes

(hereinafter, "App.") Ex. "29", Ltr from M. Barr & K. Hansen to the Hon. Burton R. Lifland

Aug. 10, 2007, at 1-3.  Counsel for the Noteholders also submitted to chambers an alternative

form of order with respect to the Opinion.  See id.  Later that same day, the Bankruptcy Court

entered the proposed form of order submitted by the Debtors.

## ARGUMENT

### I.

### THE BANKRUPTCY COURT DID NOT ERR IN DISALLOWING THE CONVERSION CLAIMS ON THE GROUNDS THAT THEY WERE UNTIMELY

In their Responses, the Appellants argued, as they do now, that the Initial Proofs of Claim

included the Conversion Claims and, in the alternative, that the New Proofs of Claim related

back to and permissibly amended the Initial Proofs of Claim.  See 6% Brief at 15-28; 7.75% Brief

at 13-24.  The Bankruptcy Court, however, rejected the Appellants' arguments and found that the

Conversion Claims are entirely new claims.  (Hr'g Tr. Aug 8, 2007 at 97-98).  In addition, the

Bankruptcy Court found that it would be inequitable to allow the late filing of the New Proofs of

Claims.  (Hr'g Tr. Aug 8, 2007 at 98-99).

     **A.**    **The Conversion Claims Are Entirely New Claims that Were Not Included Within the Initial Proofs of Claim.**

The Initial Proofs of Claim filed in July 2006 did not mention or even hint at the

Conversion Claims.  The Claims Stipulation filed approximately six months later did not make

any reference to the Conversion Claims.  Indeed, there was no reference to the Conversion

Claims until March 2007, shortly after the Bankruptcy Court issued its CalGen Decision and

nearly eight months after the Bar Date had passed.[8]  The failure of the Appellants to make a single reference to the Conversion Claims in the Initial Proofs of Claim or the Claims Stipulation corroborates the Bankruptcy Court's finding that the Conversion Claims were filed as entirely new claims of which no party had notice.

In response, the Appellants assert that the Initial Proofs of Claim "encompassed" the Conversion Claims since (a) the Initial Proofs of Claims were "broadly worded, deliberately so, in order to capture as wide a range of claims under the Indenture as possible;" (b) the Initial Proofs of Claims asserted  "unliquidated" claims, "other amounts," "reservations of rights," and numerous other generic placeholders; (c) the Initial Proofs of Claims attached copies of the respective Indentures and/or included language stating that "all provisions of [the Governing Documents] are expressly incorporated herein by reference"; and (d) the Debtors should have been aware of the Conversion Claims because the Debtors drafted and are parties to the Governing Documents.  See, e.g., 6% Brief at 16-17; 7.75% Brief at 13-15.

These strained arguments, however, only support the Bankruptcy Court's finding that the Initial Proofs of Claim failed to make any references to the Conversion Claims.  (Hr'g Tr. Aug 8, 2007 at 98).  As even the Appellants acknowledge, courts in this jurisdiction have consistently held that the "purpose of a claims bar date is to put a debtor on notice as to the universe of claims."  7.75% Brief at 13 (citing In re Best Prods. Co., Inc., 140 B.R. 353, 357 (Bankr. S.D.N.Y. 1992) (citing First Fid. Bank, N.A. v. Hooker Invs., Inc. (In re Hooker Invs., Inc.), 937 F.2d 833, 840 (2d Cir. 1991)) (emphasis added).  The generalities employed by the Appellants, could not possibly have put the Debtors or the Creditors' Committee on notice of the Conversion Claims, particularly given the novelty of the Conversion Claims.  Indeed, the New Proofs of

---

[8] Indeed, two of the New Proofs of Claim  (i.e., Claim 6299 and Claim 6300) were filed nearly ten months after the Bar Date.

Claim, which assert entitlements never before requested, let alone adjudicated, in any reported bankruptcy case of which the Debtors and the Creditors' Committee are aware (and apparently the Appellants as well in light of the absence of any cases directly addressing their novel legal theory), clearly are separate and distinct from the grounds of liability on which the Initial Proofs of Claim for principal, interest and other amounts were based.

Furthermore, if the Appellants' arguments were correct, then bar date orders would be meaningless and could always be circumvented by claimants who simply asserted generic amounts in their proofs of claim and attached copies of the applicable documents, as the Appellants did here.  See In re Hooker Invs., Inc., 937 F.2d at 840 (2d Cir. 1991) ("[A] bar order does not function merely as a procedural gauntlet, but as an integral part of the reorganization process.  If individual creditors were permitted to postpone indefinitely the effect of a bar order . . . the institutional means of ensuring the sound administration of the bankruptcy estate would be undermined.") (citation and internal quotations omitted); In re Drexel Burnham Lambert Group, Inc., 129 B.R. 22, 24 (Bankr. S.D.N.Y. 1991).  To the extent claims were objected to because they were lacking sufficient particularity, then claimants could simply file "supplemental" claims – at any point in the bankruptcy proceeding – and argue that the debtor should have been aware of the claims insofar as the debtor drafted and/or signed the applicable agreement.

The Appellants misapply the law in an attempt to find case law support for their position.  For example, in Gens v. Resolution Trust Corp., 112 F.3d 569 (1st Cir. 1997), a case cited by the 7.75% Noteholders, see 7.75% Brief at 14, the First Circuit clearly did not – contrary to the assertion of the 7.75 Noteholders – assign any significance to the fact that a copy of the promissory note was attached to the challenged proof of claim.  See Gens, 112 F.3d at 575.

Moreover, the alleged defect in the proof of claim was merely that the claimant had not stated that he was filing the claim on behalf of the Resolution Trust Corp. Here, by contrast, the defect in the Initial Proofs of Claim is far more significant – i.e., the Initial Proofs of Claim altogether omitted the Conversion Claims.

Similarly, the two leading cases cited by the 6% Noteholders – Chateaugay and Bloomingdale Partners – are inapposite. In both cases, the initial proof of claim included the challenged claim. See Aetna Casualty & Surety Co. v. LTV Steel Co. (In re Chateaugay Corp.), 94 F.3d 772, 776 (2d. Cir. 1996) (initial proof of claim included right to "setoff"); In re Bloomingdale Partners, 160 B.R. 101, 107 (Bankr. N.D. Ill. 1993) (initial proof of claim included claim for "nuisance"). Moreover, the claims at issue in those two cases (setoff and nuisance) were garden variety claims about which the debtors could have had notice, unlike the Conversion Claims which assert entirely novel claims.

### B.    The New Proofs of Claim Did Not Relate Back to and Thereby Amend the Initial Proofs of Claim.

As a threshold matter, courts in this and other jurisdictions have routinely held that courts "must subject post bar date amendments to careful scrutiny to assure that there [is] no attempt to file a new claim under the guise of an amendment." In re Carmelo Bambace, Inc., 134 B.R. 125, 129 (Bankr. S.D.N.Y. 1991); see also In re Commonwealth Corp., 617 F.2d 415, 420 (5th Cir. 1980) (same); In re Drexel Burnham Lambert Group, Inc., 151 B.R. 684, 694 (Bankr. S.D.N.Y. 1993) (same); In re Robert Stone Cut Off Equip., Inc., 98 B.R. 158, 160 (Bankr. N.D.N.Y. 1989) (same).[9]

---

[9] Consistent with the foregoing cases, the court in In re Tricycle Enters., Inc., No. 06-30096, 2007 WL 1246593 (Bankr. N.D.N.Y. Apr. 27, 2007), which is cited by the 7.75% Noteholders, see 7.75% Brief at 17, stated that courts must consider whether an amendment "is merely a disguised attempt to file a new claim after the bar date has passed." Id. at *4.

Under this heightened level of scrutiny, the Bankruptcy Court did not abuse its discretion in finding that the New Proofs of Claim were new claims filed under the guise of an amendment. (Hr'g Tr. Aug 8, 2007 at 97). The Bankruptcy Court properly relied upon the test articulated in Midland Cogeneration Venture Ltd. P'ship v. Enron Corp. (In re Enron Corp.), 419 F.3d 115 (2d Cir. 2005), the Second Circuit's most recent decision on untimely claims. Under the Enron test, courts should analyze a claim as a late-amended claim only where "there was [a] timely assertion of a similar claim or demand evidencing an intention to hold the estate liable. An amendment will meet this threshold if it (1) corrects a defect of form in the original claim; (2) describes the original claim with greater particularity; or (3) pleads a new theory of recovery on the facts set forth in the original claims." Id. at 133 (internal quotations and citations omitted).

The New Proofs of Claim fail to meet this threshold. (Hr'g Tr. Aug 8, 2007 at 98). The New Proofs of Claim, which are based on a novel, unsupported legal theory, plainly assert new grounds of liability that are separate and distinct from the plain vanilla grounds of liability on which the Initial Proofs of Claims for principal and interest were based. The New Proofs of Claim do not "assert similar claims or demands" as the Initial Proofs of Claims and, therefore, the Bankruptcy Court was well within its discretion to find that the New Proofs of Claim did not relate back to and amend the Initial Proofs of Claim. See In re Asia Global Crossing, Ltd., 324 B.R. 503, 508-09 (Bankr. S.D.N.Y. 2005) (disallowing late-amended claim because, among other things, the initial claim asserted only a general damage claim and did not provide adequate notice of the amended claim); In re Carmelo Bambace, Inc., 134 B.R. 125, 130 (Bankr. S.D.N.Y. 1991) (holding that creditor's initial claim was based upon one theory of liability and the purported amended claim arose from a completely different theory of liability, so it was not a modification

of the original claim, but rather was an untimely attempt to interpose a new claim); In re Norris Grain Co., 81 B.R. 103, 107 (Bankr. M.D. Fla. 1987), aff'd, 131 B.R. 747 (M.D. Fla. 1990).[10]

The arguments asserted by the Appellants in support of their position are without merit. First, the Appellants improperly rely upon the test for amending pleadings under Rule 15(c) of the Federal Rules of Civil Procedure, which generally provides that an amendment to a claim will be permitted if it arises out of the same operative facts as the first claim.  See 6% Brief at 21-22; 7.75% Brief at 18-19.  However, this test was not used or adopted by the Second Circuit in Enron, which, as noted, is the Second Circuit's most recent decision on untimely claims and, therefore, the governing law in this District.  Second, the argument advanced by the 7.75% Noteholders that the "Indenture Trustee took extra measures to make clear that the [New Proof of Claim] was intended to simply clarify the nature of the unliquidated amounts previously asserted in the original Proof of Claim" is irrelevant.  See 7.75% Brief at 17-18.  As described above, the Second Circuit's test in Enron does not consider the guise of the putative amendment but rather properly focuses on substance and considers whether it "assert[s] similar claims or demands" as the initial proof of claim.  See id. at 133.[11]

In reaching this finding, the Bankruptcy Court also found that the New Proofs of Claim failed to satisfy the test for adjudicating belated new claims, which is "essentially the same

---

[10] The Appellants also argue that the Initial Proofs of Claim and the New Proofs of Claim included not only the Conversion Claims, but also claims for makewhole premiums and/or expectation damage claims relating to unarticulated breaches of the Indentures (collectively, the "Additional Claims").  See 6% Brief at 47-49; 7.75% Brief at 30-31; HSBC Brief at 14-16; M&T Brief at 17.  The Initial Proofs of Claim do not, however, make any express reference to these Additional Claims and, indeed, even the New Proofs of Claim fail to make any express reference to these Additional Claims, despite the Appellants' contentions that they took extra measures to "clarify" or "supplement" the language of the Initial Proofs of Claim by filing the New Proofs of Claim.

[11] The 6% Noteholders also incorrectly state that the Bankruptcy Court "denied leave to amend" the Initial Proofs of Claim.  See 6% Brief at 5, 20.  As noted above and by the Bankruptcy Court, the Appellants never sought leave to amend the Initial Proofs of Claim or otherwise sought approval of the Bankruptcy Court to file the New Proofs of Claim after the Bar Date had passed.  (Hr'g Tr. Aug 8, 2007 at 97).

analysis" used for adjudicating late-filed amendments.  See Enron, 419 F.3d at 133.[12]  Under the

test for belated new claims, a bankruptcy court may allow the late filing where the movant

establishes that its failure to comply with an earlier deadline "was the result of excusable

neglect."  Fed. R. Bankr. P. 9006(b)(1).  In making that determination, courts consider essentially

the same factors:  "the danger of prejudice to the debtor, the length of the delay and its potential

impact on judicial proceedings, the reason for the delay, including whether it was within the

reasonable control of the movant, and whether the movant acted in good faith."  Pioneer Inv.

Servc's Co. v. Brunswick Assoc's L.P., 507 U.S. 380, 395 (1993) (citations omitted).  According

to the Second Circuit, the most important factor is the third factor – whether there was a

justification for the delay, including whether it was in the reasonable control of the movant.  See

Enron, 419 F.3d at 122 (citing Pioneer, 507 U.S. at 395).  Here, the Appellants cannot and do not

provide a single reason for the delay in filing the New Proofs of Claims, as the Bankruptcy Court

properly noted.  (Hr'g Tr. Aug 8, 2007 at 99).  Accordingly, the New Proofs of Claim were

properly disallowed by the Bankruptcy Court as belated new claims.

### C.    The Bankruptcy Court Did Not Abuse Its Discretion In Expunging the New Proofs of Claim on Equitable Grounds.

As acknowledged by the Appellants, a late-filed amendment can be allowed only if both

(1) it relates back to the initial proof of claim and (2) it would be equitable to allow the late

filing.  See Enron, 419 F.3d at 133; see also 6% Brief at 20; 7.75% Brief at 16-17.[13]  Since the

Bankruptcy Court found that the New Proofs of Claim did not relate back to the Initial Proofs of

---

[12] The 6% Noteholders, therefore, are entirely mistaken in their argument that the test for adjudicating belated new claims is not applicable here.  See 6% Brief at 23.

[13] Despite properly reciting this test, the 7.75% Noteholders mistakenly collapse the two prongs in their brief.  See 7.75% Brief at 15 ("The Bankruptcy Court determined that the [New Proofs of Claim] did not relate back to the Initial Proofs of Claim, primarily because it found that allowing the [New Proofs of Claim] would unduly prejudice the Debtors' estates . . . .") (emphasis added).  This statement is wrong.

Claim, the Bankruptcy Court was not required to adjudicate whether the New Proofs of Claim were allowable on equitable grounds. Nonetheless, the Bankruptcy Court addressed this question and found that it would be inequitable to allow the late filing of the New Proofs of Claim. (Hr'g Tr. Aug 8, 2007 at 98-100).

In adjudicating whether a late-filed claim should be expunged on equitable grounds, courts consider a number a factors, including (1) prejudice to the debtor and its creditors, (2) whether the delay was justified and (3) the length of the delay and its impact on judicial proceedings. See, e.g. Enron, 419 F.3d at 133-34; In re Enron Creditors Recovery Corp., No. 01-16034, 2007 WL 1705653 at *3 (Bankr. S.D.N.Y. Jun 13, 2007); In re PT-1 Communc'ns, Inc., 292 B.R. 482, 487 (Bankr. E.D.N.Y. 2003); In re Robert Stone Cut Off Equip. Inc., 98 B.R. 158, 162-63 (Bankr. N.D.N.Y. 1989) (citing cases). As set forth below, the Bankruptcy Court properly applied these factors and, therefore, was well within its discretion in expunging the New Proofs of Claim on equitable grounds.

### 1.    Prejudice

Courts within the Second Circuit consider a number of factors to determine what constitutes prejudice when adjudicating late-filed claims, including, among other things, (a) whether the debtor had advance knowledge of the claim, see, e.g., Enron, 419 F.3d at 130 (citing In re O'Brien Envt'l Energy, Inc., 188 F.3d 116, 128 (3d Cir. 1999)); In re Keene Corp., 188 B.R. 903, 910 (Bankr. S.D.N.Y. 1995); (b) the size of the late claim in relation to the estate, see, e.g., In re Enron Creditors Recovery Corp., No. 01-16034, 2007 WL 1705653 at *9 (Bankr. S.D.N.Y. June 13, 2007) (citing Keene, 188 B.R. at 910); and (c) whether allowing a claim would be likely to precipitate a flood of similar claims, see, e.g., Enron, 419 F.3d at 130 (citing In re Kmart Corp., 381 F.3d 709, 714 (7th Cir. 2004)). Indeed, in cases of this size with tens of thousands of

filed claims, "it can be presumed . . . there are other similarly-situated potential claimants" and that "[a]ny deluge of motions seeking similar relief would prejudice the Debtors' reorganization process." In re Enron Creditors Recovery Corp., 2007 WL 1705653 at *11 (citation and internal quotations omitted).

The Bankruptcy Court correctly found that prejudice would occur by allowing the New Proofs of Claim since (a) the Debtors had no advance knowledge of the Conversion Claims because, as noted above, there was no mention of the Conversion Claims until March 2007 – nearly eight months after the Bar Date had passed; (b) despite numerous requests by the Debtors and the Creditors' Committee, the Appellants have refused to disclose publicly their calculation of the additional amount sought under the New Proofs of Claim, stating only that the Conversion Claims could amount to hundreds of millions of dollars and up to half a billion dollars (Hr'g Tr. Aug 8, 2007 at 49-50); and (c) allowing the New Proofs of Claim would prejudice other unsecured creditors and, potentially, equity security holders[14] who timely filed their proofs of claim and interest and would likely precipitate a flood of unjustifiable claims for any purported violation of an indenture or other contract that gave rise to alleged "dashed expectations." See infra Part I.C.3 at 20-21.

---

[14] As set forth in the Second Amended Disclosure Statement for Debtors' Second Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code filed September 18, 2007 (the "Plan"), the Creditors' Committee believes that since the Debtors' financial advisor, Miller Buckerfire, prepared its valuation analysis for the Debtors' June 20, 2007 initial Disclosure Statement, the value of the Debtors' enterprise has declined as a result of deteriorating market and operating conditions. Among other things, the Creditors' Committee believes that the market values of the companies that Miller Buckfire included in its comparable companies analysis in its Valuation Analysis (as defined in the Plan) have declined significantly. The Creditors' Committee believes that, to the extent an updated estimate of the New Calpine Total Enterprise Value (as defined in the Plan) were prepared as of the close of business on September 13, 2007 to reflect current market conditions (but not including any change in the Debtors' business plan or projections, which may also impact value), the New Calpine Total Enterprise Value would be reduced by between $1.2 billion and $1.3 billion, which would have a negative impact on the projected recoveries to the Holders of Claims and Interests (as such terms are defined in the Plan).

In their brief, the 6% Noteholders argue that the Bankruptcy Court's findings regarding prejudice were erroneous since (a) the Bankruptcy Court held that the Conversion Claims were subject to subordination under section 510(a) of the Bankruptcy Code and (b) under section 726(a) of the Bankruptcy Code, late-filed claims must be paid in full before equity holders receive any recovery.  See 6% Brief at 6, 27 ("Thus, the contest here may be, at worst, one between allegedly 'late-filed' creditor claims and equity interest, in which case the Bankruptcy Code's priority scheme favors creditors.").  This argument should be rejected, however, because the priority scheme set forth under section 726(a) applies only to claims that are otherwise valid and allowable on the merits.  Here, the Bankruptcy Court found that the New Proofs of Claim had no legal merit.

### 2.    Justification for the Delay

The Bankruptcy Court correctly held that the Appellants failed to offer any excuse – let alone a compelling excuse – for their delay in filing the New Proofs of Claim.  (Hr'g Tr. Aug 8, 2007 at 99) ("The noteholders offer no excuse of this delay.").  Indeed, after months of litigation, the Appellants have yet to provide any justification for their delay in filing the New Proofs of Claim.  The fact that the Indenture Trustees decided to forego seeking authorization from the Bankruptcy Court for the late filing of the New Proofs of Claim, even though the Bar Date had long passed, is further evidence that the Indenture Trustees were unable to articulate any legitimate justification for their delay.  The provisions of the Indentures on which the Appellants rely have not changed since they were drafted.  Accordingly, the Appellants were, or should have been, aware of the purported Conversion Claims far in advance of the Bar Date, if not on the Petition Date or even earlier.  The filing of the New Proofs of Claim certainly "was in the

reasonable control" of the Appellants and, therefore, they could have, and most definitely should have, filed the New Proofs of Claim prior to the Bar Date.

### 3.    Length of Delay and Impact on Judicial Proceedings

In applying this factor, courts "generally consider the degree to which, in the context of a particular proceeding, the delay [in filing a claim] 'may disrupt the judicial administration of the case.'"  Enron, 419 F.3d at 115 (quoting In re Infiltrator Sys., Inc. 241 B.R. 278, 281 (Bankr. D. Conn. 1999); In re O'Brien Envt'l Energy Inc., 188 F.3d at 130 (same).  Here, the Bankruptcy Court correctly found that the late filing of the New Proofs of Claim has disrupted the judicial administration of the Chapter 11 Cases in multiple respects.  (Hr'g Tr. Aug 8, 2007 at 99-100). First, the New Proofs of Claim were filed in the midst of a critical period in which the Debtors were formulating their chapter 11 plan of reorganization.  Second, to the extent that the New Proofs of Claim remain unresolved and unliquidated as of confirmation, the reorganized Debtors may have to maintain large reserves for an unknown period of time, which could delay distributions to other stakeholders in the Chapter 11 Cases for years.  Third, the late filing has forced the Debtors to deal with the New Proofs of Claim now, when the Debtors should be focusing on other matters.  Indeed, at this stage of the Chapter 11 Cases, the Debtors' focus should be on negotiating consensual resolutions to disputed provisions in their proposed plan of reorganization, obtaining approval of an appropriate disclosure statement in order to move toward confirmation of a confirmable plan of reorganization and resolving legitimate disputed claims.  In particular, the Debtors need to resolve the foregoing issues in an expedited manner so that they can emerge from chapter 11 prior to the Exit Financing Deadline.

In addition, allowing the New Proofs of Claim could, as noted above, motivate other creditors of the Debtors' estates to assert a wide array of unsupportable claims for any purported

violation of an indenture or loan agreement that arguably could give rise to alleged "dashed expectations," which in turn would further delay and impact the Chapter 11 Cases. For example, other debt holders (either secured or unsecured) would be incentivized to assert that, in addition to satisfaction of principal and interest due, they should also be awarded damages for their "dashed expectations" of future interest income and other fees payable over the life of their debt facility since their debt would be satisfied prior to the stated maturity notwithstanding the acceleration and maturity of such debt under the express terms of their governing documents and applicable law. Creditors of the Debtors' estates might also attempt unjustifiably to seek "dashed expectation" damages in situations relating to executory contracts, employment agreements, intellectual property licenses, option agreements, and numerous other breached contracts, none of which should give rise to such types of claims. Such additional claims could further delay the Debtors' emergence from chapter 11 and disrupt the judicial administration of the Chapter 11 Cases.

## II.

### THE BANKRUPTCY COURT CORRECTLY HELD THAT THE NEW PROOFS OF CLAIM ARE WITHOUT LEGAL MERIT

Outside of a Calpine chapter 11 filing, pursuant to the Governing Documents, the Noteholders are to be treated as holders of debt, receiving regular interest payments, until the Conversion Rights ripen (i.e., when one or more of the conditions precedent required to be able to exercise the Conversion Rights actually occurs and such rights are exercised). If such conditions precedent occur, a Noteholder can then choose between exercising its Conversion Right and receiving cash and/or equity or continuing to remain as a creditor and be paid principal and interest when such payments come due. As the Bankruptcy Court correctly held, if a Noteholder elects to convert, it exchanges its Notes for cash and/or shares of common stock and

is no longer a creditor.  (Hr'g Tr. Aug 8, 2007 at 100) ("Once the noteholders have converted

their notes, however, they no longer hold debt interest to the notes that have been converted.").

As discussed in more detail below, after the occurrence of a bankruptcy event of default,

the Noteholders are entitled only to principal and interest, which is what a holder of debt is

typically entitled to in a bankruptcy.  Upon a bankruptcy filing, the Indentures expressly treat the

Noteholders as creditors who have claims for principal and interest, rather than forcing the

Noteholders to convert the Notes into equity and being treated as holders of interests.  This

treatment is appropriate since, pursuant to the terms of the Governing Documents and applicable

law, the bankruptcy filing accelerates and matures the Notes and terminates, by the express terms

of the Notes, any right of the Noteholders to exchange their Notes for Calpine common stock.

Indeed, as the Bankruptcy Court correctly found, there are <u>no</u> provisions in any of the Governing

Documents that entitle the Noteholders to principal, interest <u>and</u> a monetary payment to

compensate them for their unripe Conversion Rights.  (Hr'g Tr. Aug 8, 2007 at 100) ("The

convertible noteholders cannot possibly be entitled to receive payment of debt and damages on

account of a conversion right.").

  **A.**  **The Conversion Rights Terminated Upon the**
       **Commencement of the Chapter 11 Cases and**
       **Are Thus Incapable of Being Breached.**

The Bankruptcy Court correctly held that the Governing Documents expressly provide

that the commencement of a chapter 11 bankruptcy case constitutes an event of default,[15] which

accelerates the Notes to the date of the bankruptcy filing and renders "the principal of and

interest" on the Notes "immediately due and payable without any declaration or other act on the

---

[15] <u>See</u> Indenture § 5.1(e); 4.75% Notes Indenture § 6.01(8).

part of the Trustee or any [Noteholders]."[16]  (Hr'g Tr. Aug 8, 2007 at 100-101) ("[T]he

conversion rights were not exercisable as of the petition date when the notes were accelerated

and matured").  In addition, courts have routinely held that the commencement of a bankruptcy

case, even in the absence of a contractual acceleration provision, automatically operates to

accelerate and mature all of a debtor's debt obligations.  See, e.g., In re LHD Realty Corp., 726

F.2d 327, 330-31 (7th Cir. 1984) ("[A]cceleration, by definition, advances the maturity date of

the debt so that payment thereafter is not prepayment but instead is payment made after

maturity"); In re Calpine Corp., 365 B.R. 392, 397 (Bankr. S.D.N.Y. 2007)  ("It should be noted

that the Secured Debt is now matured by the occurrence of an Event of Default, i.e., the filing of

the chapter 11 petitions."); In re Homesteads Community at Newtown, LLC, 339 B.R. 532, 541

(Bankr. D. Conn. 2006) ("Even assuming the debt was not mature prior to the petition, the filing

of a petition accelerates the principal amounts due on all claims against the debtor."); In re First

Connecticut Small Bus. Inv. Co., 118 B.R. 179, 184 (Bankr. D. Conn. 1990) (same).  Thus, both

pursuant to the plain language of the Governing Documents and by operation of law, the filing of

the Debtors' Chapter 11 Cases accelerated the maturity of the Notes to the Petition Date.

    The acceleration and maturity of the Notes are fatal for the New Proofs of Claim because

the Governing Documents uniformly provide that the Conversion Rights terminate upon the

acceleration and maturity of the Notes.  See Second Supplemental Indenture at A-5 (The

"conversion right shall commence on the initial issuance date of the Notes and expire at the close

of business on the Business Date immediately preceding the date of Maturity . . . ."); Third

Supplemental Indenture at A-5 (same); 4.75% Notes Indenture at A-4 (same); see also 4% Note

---

[16] See Indenture § 5.2(e).  The 4.75% Notes are similarly accelerated upon a bankruptcy default.  See
4.75% Notes Indenture § 6.02(a) ("In the case of [a bankruptcy default] the issue price plus accrued and unpaid
interest (and Liquidated Damages, if any) on the Notes will become immediately due and payable without any
action on the part of the Trustee or any Holder.").

at 3 ("Holders may surrender Securities for conversion into shares of Common Stock at any time prior to 5:00 p.m., New York City time, on the date that is two Business Days prior to the maturity of the Securities."). Thus, the proposed satisfaction and cancellation of the Notes pursuant to a plan of reorganization cannot possibly constitute a breach of the Conversion Rights because such rights terminated at the Petition Date pursuant to both the plain language of the Governing Documents and by operation of law.

In response, the Appellants attempt to extricate themselves from the plain language of the Governing Documents by rewriting their terms. Specifically, the Appellants argue that the phrase "date of Maturity" refers only to the stated maturity of the Notes and not maturity brought on by any other event. See 6% Brief at 30-32; 7.75% Brief at 29. This reading cannot be accepted, however, because the Governing Documents already have a defined term for "Stated Maturity", which is used throughout the Governing Documents. See, e.g., Original Indenture at 10, §§ 5.1(d), 8.2(c), 9.1 The law is well-settled that "[i]t is a cardinal rule of contractual interpretation that a court shall not interpret an agreement in a way which leaves a part meaningless or ineffectual." Hauser v. Western Group Nurseries, Inc., 767 F. Supp. 475, 488 (S.D.N.Y. 1991); Galli v. Metz, 973 F.2d 145, 149 (2d Cir. 1992) ("Under New York law an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible."). Indeed, the Appellants expressly acknowledge – but do not follow – the foregoing legal principles in their respective pleadings. See, e.g., 6% Brief at 32; 7.75 Brief at 28.

The Appellants' strained interpretation of "Maturity" should also be rejected because it does not fit with the corresponding language found in the Governing Documents for the 4% Notes. The 4% Notes provide, in pertinent part, that "Holders may surrender Securities for

conversion into shares of Common Stock at any time prior to 5:00 p.m., New York City time, on the date that is two Business Days prior to the maturity of the Securities."  App. Ex. "1.E.", Directors' Certificate, dated December 26, 2001, at 2.  The use of the undefined term "maturity" in the 4% Notes demonstrates that the drafters intended that the term have a generic, dictionary meaning – i.e., "the date at which a debt instrument is due and payable," <u>Dictionary of Finance and Investment Terms</u> 413-14 (2003) – and, therefore, the use of the term "Maturity" in the subsequent issues of Notes was likewise intended to have a generic meaning and not, as the Appellants argue, a narrow meaning to refer only to the stated maturity of the Notes (for which there is a defined term already).  <u>See</u> <u>also</u> <u>Mutual Omaha Ins. Co. v. United States (I.R.S.)</u>, 317 F. Supp. 2d 1117, 1125-1126 (D. Neb. 2004) (holding that "'maturity date' means the date on which the principal amount of a note, draft, acceptance, bond, or other debt instrument becomes due and payable") (internal citations and quotations omitted); <u>In re Lynn</u>, 173 B.R. 894, 900 (Bankr. M.D. Tenn. 1994) (holding that maturity of a loan was intended to mean "when the loan become due, be it by default and acceleration or by the arrival of the due date as given on the face of the agreement.").

Notwithstanding the plain language of the Governing Documents, the 6% Noteholders argue that the Notes did not mature upon the acceleration caused by the Debtors' bankruptcy filing since one provision in the Indenture uses the terms "maturity" and "acceleration" in the disjunctive.  <u>See</u> 6% Brief at 31-32 (citing section 6.01(4) of the Indenture, which provides that that an Event of Default occurs if Calpine defaults  "in the payment of any bond, debenture, note or <u>other evidence of [Calpine's] Indebtedness</u>" in an amount exceeding $50 million "when such indebtedness becomes due and payable (whether at maturity, upon redemption or acceleration, or otherwise").  This argument should be rejected, however, because section 6.01(4) is a cross-

default provision that relates only to payment defaults under the terms of <u>other debt instruments</u>, not the terms of the Governing Documents which are at issue here.  In addition, since section 6.01(4) relates to defaults under other debt instruments, including future debt instruments not yet in existence, it is understandable that the drafters would employ broad, all-inclusive language.  For example, section 6.01(4) would apply in circumstances where there is another debt instrument which (unlike the Governing Documents) used only the term "acceleration" but not "maturity" or vice-versa.

> **B.      The Governing Documents Do Not Provide that the Conversion Rights Survived the Debtors' Bankruptcy Filing.**

The Appellants also mistakenly argue that the Governing Documents – including, in particular, section 10.15(d) of the Indenture[17] – provide for the survival of the Conversion Rights, even after the Notes have been accelerated, matured and thereby terminated as a result of a bankruptcy filing, as set forth in the preceding section.  <u>See</u>, <u>e.g.</u>, 7.75% Brief at 27 ("All doubt on this point is put to rest by the clear language of Section 10.15(d)"); <u>see</u> <u>also</u> 6% Brief at 33.  Section 10.15(d) does not, however, grant a Noteholder an affirmative right to convert, let alone a right to convert post-bankruptcy.  Similarly, section 10.15(d) does not preserve Conversion Rights that were not exercisable as of the date of the bankruptcy filing.  To the contrary, and as the Appellants acknowledge, the Noteholders' rights to convert are governed by a completely different section of the Indenture – section 10.01, which is aptly titled "Conversion Privilege." <u>See</u> 6% Brief at 15; 7.75% Brief at 11, 29; M&T Brief at 12.

---

[17] The applicable provision in the 4.75% Notes Indenture is section 10.14(d).  Unless otherwise stated, all references hereinafter to section 10.15(d) of the Indenture shall include section 10.14(d) of the 4.75% Notes Indenture.

Section 10.15(d) governs only the form and value of consideration to which a Noteholder may be entitled to receive after an event of default.  Section 10.15(d) provides:

> If an Event of Default has occurred and is continuing (other than a Default in a cash payment upon conversion of the Notes), the Company may not pay cash upon conversion of any Notes (other than cash in lieu of fractional shares) and instead will make payment only through the delivery of shares of Common Stock. The number of shares of Common Stock to be delivered will be equal to (A) the aggregate Principal Amount at Maturity of the Notes to be converted divided by 1,000 multiplied by (B) the Conversion Rate.

Second Supplemental Indenture § 10.15(d); 4.75% Notes Indenture § 10.14(d).  This provision neither addresses what happens in a bankruptcy nor provides the Noteholders with any right to convert.

Upon an event of default, other than a bankruptcy-related event of default, there is no automatic acceleration and maturity of the Notes.  See Indenture § 5.2 (stating that if a non-bankruptcy-related event of default occurs and is continuing, then "the Trustee by notice to the Company, or the Holders of at least 25% in principal amount of the Securities of such Series by notice to the Company and the Trustee, may declare the principal of and accrued interest on all the Securities of such Series to be due and payable.  Upon such declaration, the principal and interest shall be due and payable immediately.").  Thus, it is logical that the Indenture would contain a provision which addresses the form and value of consideration that a Noteholder would be entitled to receive if such Noteholder were permitted to and did convert its Notes after the occurrence of an event of default unrelated to a bankruptcy filing and prior to the acceleration of the Notes in accordance with the terms of the Indenture.

Even section 10.15(d) of the Third Supplemental Indenture, which specifically mentions a bankruptcy-related event of default, governs only the form and value of consideration to which

a Noteholder is entitled to receive.  It does not, however, provide the Noteholder with any right

to convert:

> If an Event of Default set forth in Section 5.1(e) or (f) of the
> Original Indenture [i.e., a bankruptcy-related event of default] has
> occurred and is continuing, the Company may not pay cash upon
> conversion of any Notes (other than cash in lieu of fractional
> shares) and instead will make payment only through the delivery of
> shares of Common Stock, provided that Holders shall receive an
> amount in cash in lieu of any fractional shares.  The number of
> shares of Common Stock to be delivered will be equal to (A) the
> aggregate principal amount of Notes to be converted divided by
> 1,000 multiplied by (B) the Conversion Rate.

Third Supplemental Indenture § 10.15(d).

The Appellants have thus confused two distinct concepts in their reading of the

Indentures: (a) the right to convert, which is governed by section 10.01, not section 10.15(d); and

(b) the form and value of consideration a Noteholder may be entitled to receive after a

bankruptcy-related event of default has occurred, assuming that such Noteholder had the right to

convert its Notes as of the Petition Date.  Since the Conversion Rights under section 10.01 of the

Indentures were not exercisable as of the Petition Date – a fact which has not been disputed in

any of the pleadings filed by the Appellants – section 10.15(d) by its plain terms does not

apply.[18]

In addition, the Appellants mistakenly argue that the Conversion Rights did not terminate

at the Petition Date because the "Conversion Privilege" under section 10.01(a) of the Indentures

---

[18]  Under the interpretation of the Governing Documents most favorable to the Appellants, if one or more
of the conditions precedent set forth in section 10.01 had occurred prior to the Petition Date, this Court might
interpret section 10.15(d) as permitting the Noteholders to exchange their Notes for shares of the Debtors' common
stock, but not cash (other than cash in lieu of fractional shares), in lieu of retaining the Notes and receiving principal
and interest as set forth in the Indentures.  In order to reach such an interpretation, this Court would have to
determine that section 10.15(d) is applicable, notwithstanding the express language in the Notes providing that the
conversion rights cannot be exercised after maturity.  There would also be potential legal impediments to
effectuating such an exchange post-petition, such as the need to obtain Bankruptcy Court approval to modify the
automatic stay and to allow Calpine to issue such common stock in exchange for the Notes.

is not expressly limited by the occurrence of an Event of Default, including a bankruptcy filing. The Appellants argue, therefore, that the Conversion Privilege was not impaired by the Debtors' bankruptcy filing.  <u>See</u> 6% Brief at 33; 7.75% Brief at 29-30.  This argument should be rejected because it wrongly assumes that a contractual provision – or, in this case, the absence of a contractual provision – can supersede the Bankruptcy Code and the effects of a bankruptcy filing.

> **C.    The Conversion Claims are Not Allowable under the Bankruptcy Code and Applicable Case Law.**

Even if the Conversion Rights somehow did not terminate by virtue of the acceleration and maturity of the Notes caused by the Debtors' bankruptcy filing, the Conversion Claims are nonetheless expressly prohibited under the Bankruptcy Code, as the Bankruptcy Court correctly found.  (Hr'g Tr. Aug 8, 2007 at 100-101) ("[T]he conversion rights were not exercisable as of the petition date when the notes accelerated and matured [a]nd thus the noteholders do not have allowable claims with respect to the conversion rights" under section 502(b) of the Bankruptcy Code.).  Specifically, section 502(b) of the Bankruptcy Code expressly provides that a claim filed in a bankruptcy case must be determined "as of the date of the filing of the petition."  11 U.S.C. § 502(b); <u>Finanz AG Zurich v. Banco Economico S.A.</u>, 192 F.3d 240, 250 (2d. Cir. 1999).  Here, it is undisputed that, as of the Petition Date, the Conversion Rights were not ripe since the conditions precedent for exercising the Conversion Rights had not occurred.[19]

---

[19] Specifically, pursuant to section 10.01 of the respective indentures, the holders of the 4.75%, 6%, and 7.75% Notes may convert their Notes during specified periods in the following circumstances, as applicable, and upon the satisfaction of certain other additional conditions: (i) if the trading price of Calpine's common stock is at least 20% higher than the conversion price; (ii) in the case of the 6% and 7.75% Notes, after a given date that has yet to occur, irrespective of the trading price; (iii) during a five trading-day period if the trading price of the Notes during the previous five consecutive trading days was less than 95% of an amount roughly equal to what the Noteholders would receive upon conversion; (iv) if Calpine distributes rights, warrants, or options to all or substantially all of its common stock holders entitling them to purchase common stock for less than its trading price; (v) if Calpine issues debt, rights, or warrants to all or substantially all of its common stock holders with a per share

The Appellants allege a number of different ways that the Conversion Claims had value on the Petition Date, each based upon the theory that the Conversion Rights may have been exercisable at some indeterminate point in the future, had such rights not been terminated by the Debtors' bankruptcy filing.  See 6% Brief at 38-40; 7.75% Brief at 37-39.  These arguments should be rejected because any such speculative future value is irrelevant under section 502(b) of the Bankruptcy Code since the conversion rights were not exercisable as of the Petition Date. See, e.g., In re Einstein/Noah Bagel Corp., 257 B.R. 499, 507 (Bankr. D. Ariz. 2000) (disallowing claim based on a put right which was not exercisable as of the petition date); In re Search Fin. Servc's Acceptances Corp., No. 39832129RCM11, 2000 WL 256889 at *3 (N.D. Tex. March 7, 2000) (holding that claim based on warrants which were not redeemable for cash as of the petition date should be treated as an equity interest rather than a claim); cf. In re Jobs.com, Inc., 283 B.R. 209, 212-14 (Bankr. N.D. Tex. 2002) (disallowing contingent, unmatured claim for breach of a stock redemption provision because such claim was not enforceable as of the petition date);  In re First Amer. Healthcare of Georgia, Inc., No. 96-20188, 1997 WL 33477665 (Bankr. S.D. Ga., Apr. 28, 1997) (disallowing claim based on stock option that was unenforceable as of the petition date).

Furthermore, the three main cases cited by the Appellants in support of their arguments regarding section 502(b) are inapposite.  See 6% Brief at 29; 7.75% Brief at 37 (citing R.A. Mackie & Co. v. PetroCorp Inc., 329 F. Supp. 2d 477 (S.D.N.Y. 2004) (Koeltl, J.); Lillis v. AT&T Corp., No. 717-N, 2007 Del. Ch. LEXIS 102 (Del. Ch. July 20, 2007); Hilton Hotels Corp. v. Dunnet, 275 F. Supp. 2d 954, 963, n.4 (W.D. Tenn. 2002)).  As a threshold matter, none of those

---

value exceeding 12.5% of the common stock price; (vi) if Calpine is party to a consolidation, merger, share exchange, sale of all or substantially all of its assets or other similar transaction; or (vii) in the case of the 4.75% Notes, Calpine calls the notes for redemption.

cases involved a bankruptcy and, therefore, the application of section 502(b) of the Bankruptcy Code was not even at issue. Second, in each of the three cases, there existed a valid, ripe right to exercise the option at issue, even if the holder would not have chosen to do so because it was uneconomic. Here, in contrast, the Conversion Rights were not ripe and exercisable as of the Petition Date when they were terminated as a result of the Debtors' bankruptcy filing. Third, even if the Conversion Rights had been ripe as of the Petition Date, section 10.15(d) of the Indentures would have, at most, only given the Noteholders a right to convert their Notes into stock, but not a right to payment. See supra Part II.B, at 28, n. 18.[20] Without a right to payment, the Appellants did not and could not have held any claims on account of their Conversion Rights as of the Petition Date because a "claim," as defined under section 101(5)(A) of the Bankruptcy Code, requires a "right to payment." See 11 U.S.C. § 101(5)(A). Therefore, as of the Petition Date, the Conversion Claims simply did not exist and, thus, the Bankruptcy Court correctly determined that the New Proofs of Claim should not be allowed under section 502(b). Nevertheless, contrary to the plain language of the Bankruptcy Code and the foregoing case law, the Appellants argue that their unripe Conversion Rights should simply ride through the Chapter 11 Cases and be unaffected by the Debtors' bankruptcy filing.

### D. The Appellants Misapply the Law in Support of their Damages Argument.

The Appellants rely upon a number of cases to argue that, under applicable law, damages are due despite the automatic acceleration of the debt. See 6% Brief at 36, 38; 7.75% Brief at 31.

---

[20] Indeed, the 6% Noteholders concede that, during an Event of Default, "Calpine may provide the Conversion Value only through the delivery of shares of common stock." See 6% Brief at 15, n.3 (citing section 10.15(d) of the Indenture). In this regard, the 7.75% Noteholders are entirely mistaken when they argue that, upon a bankruptcy-related event of default, "Calpine may elect to tender the Conversion Value in the form of shares." See 7.75% Brief at 11 (citing section 10.15(d) of the Indenture) (emphasis added). The plain language of section 10.15(d) clearly provides, as the 6% Noteholders acknowledge, that the delivery of Conversion Value under section 10.15(d) can only occur in the form of stock.

As a threshold matter, each of the cases relied on by the Appellants involved requests for prepayment premiums as opposed to conversion rights.  Moreover, as set forth below, these cases do not hold that a party is entitled to a premium and/or penalty – let alone a damage claim for lost conversion rights upon a bankruptcy-caused acceleration and maturity – where the party failed to bargain specifically for the inclusion of such provisions, as the Appellants failed to do here.

For example, the Appellants improperly rely upon In re Skyler Ridge Corp., 80 B.R. 500 (Bankr. C.D. Cal. 1987) for the proposition that that the automatic acceleration of debt as a result of a bankruptcy filing does not foreclose the possibility that additional amounts beyond principal and interest may be due.  See 7.75% Brief at 32.  While the Skyler Ridge court noted in dicta that if "automatic acceleration of a debt defeats a prepayment premium clause, such a clause could never be enforced in a bankruptcy case," the court nonetheless held that the secured lender's purported entitlement to a premium was not enforceable on the grounds that the provision in the lender's contract was "not a reasonable estimate of the damages that would result from premature prepayment."  Skyler Ridge, 80 B.R. 507 & 511-12.  Thus, the Appellants' reliance on the court's observation regarding the enforceability of prepayment premiums is misplaced as it was mere dicta.  Similarly, the Appellants' reliance upon Sharon Steel is misplaced.  See 6% Brief at 7, 36; 7.75% Brief at 32.  In that case, the acceleration provisions in the indentures at issue were permissive, as opposed to automatic as is the case here.  See Sharon Steel Corp. v. Chase Manhattan Bank, 691 F.2d 1039, 1053 (2d Cir. 1982), cert denied, 460 U.S. 1012 (1983).  Under those specific circumstances, the Sharon Steel court determined that the indenture trustees were not precluded from seeking specific performance of the redemption provisions upon the debtor's default as opposed to accelerating the underlying debt.  Id.  A distinction of even greater

significance, however, is the fact that <u>Sharon Steel</u> did not involve a bankruptcy cas*e*.  <u>Id.</u> at

1045.  Consequently, the issue of whether the automatic acceleration arising as a result of a

bankruptcy filing renders ineffective a prepayment premium – let alone a conversion right – was

not before the court.

Ultimately, <u>Skyler Ridge</u>, <u>Sharon Steel</u> and all of the other cases touching on the issue of

a debtholder's entitlement to a premium upon payment have one unifying element:  if the

bargained for language between the parties is explicit and reasonable, it will be enforced.  Here,

however, the Governing Documents do not contain <u>any</u> language which preserves the

Conversion Rights after the Debtors commenced their bankruptcy cases or provides the

Appellants with a right to payment on account of the termination of the Conversion Rights.

  **E.**  **The CalGen Decision Neither Supports the Appellants'**
     **Damage Claims Nor Constitutes the Law of the Case.**

The Appellants attempt to rely upon the CalGen Decision to argue that they are entitled to

damage claims for "dashed expectations" arising from the purported loss of their conversion

rights.  <u>See</u> 6% Brief at 7, 37-38; HSBC Brief at 15-16; M&T Brief at 5.  The 7.75% Noteholders

go so far as to argue that the CalGen Decision is the law of the case and, therefore, bars any

further litigation of the issues raised by the Objection.  <u>See</u> 7.75% Brief at 33-34.  These

arguments, however, are not supported by the facts or the well-established law in the Second

Circuit.

Courts within the Second Circuit, including cases cited in the Appellants' own pleadings,

consistently hold that the law of the case doctrine is a discretionary doctrine that applies only

where litigants seek to reopen issues that have already been decided.  <u>See</u>, <u>e.g.</u>, <u>U.S. v. Williams</u>,

205 F.3d 23, 34 (2d Cir. 2000), <u>cert denied</u>, 531 U.S. 885 (2000) (holding that the doctrine is "at

best, a discretionary doctrine which does not constitute a limitation on the court's power but

merely expresses the general practice of refusing to reopen what has been decided."); <u>U.S. v. Martinez</u>, 987 F.2d 920, 923 (2d Cir. 1993) (same); <u>U.S. v. Birney</u>, 686 F.2d 102, 107 (2d Cir. 1982) (same); <u>see also</u> <u>In re PCH Assocs.</u>, 949 F.2d 585, 592 (2d Cir. 1991) (same and cited in the 7.75% Brief).[21]  The CalGen Decision did not decide, and could not have decided, the issues raised by the Objection because the CalGen Decision concerned an entirely different set of claims arising under totally different agreements with completely different terms.  Indeed, at the Hearing, the Bankruptcy Court expressly warned that its CalGen Decision may prove to have limited application. (Hr'g Tr. Aug 8, 2007 at 31) ("And there is a very strong risk that the [dashed] expectation theory may be nothing more than balderdash in the view of some people that are sitting here and possibly even on appeal.").

Under the Appellants' interpretation of the CalGen Decision, the Appellants must prove that, under the terms of the Governing Documents, they reasonably expected that the right to convert would continue until the stated maturity of the Notes regardless of whether Calpine filed for bankruptcy prior thereto, notwithstanding that (a) under section 502(b) of the Bankruptcy Code, claims are fixed as of the petition date, (b) the conditions precedent in section 10.01 of the Indentures had not occurred as of the Petition Date and may never occur prior to substantial consummation of a plan of reorganization for the Debtors,[22] (c) the Indentures provide for the automatic acceleration of the Notes upon a bankruptcy filing, (d) in such circumstances, the Indentures provide only for the Noteholders' entitlement to principal and interest and not for any

---

[21] In the unlikely event that this Court concludes that the law of the case doctrine is applicable to the facts and circumstances present here, the Court can and should exercise its discretionary power to not invoke the doctrine so as to prevent creditors from continuing further along the slippery slope described above.  <u>See</u> <u>supra</u> Part I.C.3 at 20-21.

[22] In the CalGen Decision, the Bankruptcy Court held that the CalGen Secured Lenders were entitled to damages because they had an expectation of an "<u>uninterrupted payment stream</u> [that] ha[d] been dashed."  <u>Calpine</u>, 365 B.R. at 399 (emphasis added).  Here, by contrast, the Appellants' loss involves, at most, a right to convert to equity that, in any event, was entirely contingent and which may never have materialized.  Indeed, the Notes are explicitly labeled "<u>Contingent</u> Convertible Notes."

other monetary payment to the Noteholders, (e) applicable case law provides that, upon a

bankruptcy filing, the Notes automatically accelerate and mature, (f) the Notes provide that the

Conversion Rights cannot be exercised after maturity, and (g) section 1141 of the Bankruptcy

Code provides that confirmation of a plan of reorganization discharges a debtor from any debt

that arose before the date of such confirmation.  The Appellants cannot assert a legitimate claim

for damages due to "dashed expectations" because the Debtors' filed plan of reorganization

proposes to pay them exactly what they are entitled to under the Governing Documents.

### III.

### THE BANKRUPTCY COURT CORRECTLY HELD THAT, EVEN IF THE CONVERSION CLAIMS WERE ALLOWABLE, THEY WOULD NONETHELESS BE SUBJECT TO SUBORDINATION UNDER SECTION 510(B) OF THE BANKRUPTCY CODE

As a threshold matter, the Bankruptcy Court noted that courts in this and other

jurisdictions broadly apply section 510(b) of the Bankruptcy Code.  (Hr'g Tr. Aug 8, 2007 at

101); see also In re Enron Corp., 341 B.R. 141, 162-63 (Bankr. S.D.N.Y. 2006) (holding that "the

broad applicability of section 510(b) is now quite settled"); In re WorldCom, Inc., No. 02-13533,

2006 WL 3782712, at *6 (Bankr. S.D.N.Y., Dec. 21, 2006) (holding that claims for damages

related to unexercised stock options should be subordinated pursuant to section 510(b)); In re

Worldwide Direct, Inc., 268 B.R. 69, 73 (Bankr. D. Del. 2001) (holding that a claim for breach of

contract arising from the debtor's failure to issue stock pursuant to a severance agreement should

be subordinated pursuant to section 510(b)).  The Conversion Claims fall well within the broad

purview of section 510(b), as the Conversion Rights entitled the Appellants to participate in the

success of the Debtors' enterprise upon the occurrence of certain conditions.  See In re

Worldcom, 2006 WL 3782712, at *6 (holding that unexercised common stock options were

stock-related claims subject to subordination under section 510(b) because the options enabled the claimant to participate in the success of the enterprise).

In addition, the Appellants wrongly interpret In re Med Diversified, Inc., 461 F.3d 251, 257 (2d Cir. 2006) as limiting the broad applicability of section 510(b). See 6% Brief at 41; 7.75% Brief at 40.  In that case, the Second Circuit subordinated a claim for damages based on the debtor's failure to issue common stock to an employee executive pursuant to the terms of a prepetition agreement.  Med Diversified was not a limitation on the broad application of section 510(b).  To the contrary, after reviewing the decisions of other courts as well as the Congressional purpose in enacting section 510(b), the Second Circuit held that the statute should be applied broadly and found, in particular, that the claimant at issue had the "potential benefit" of the proceeds of the enterprise and, therefore, his claim should be subordinated under section 510(b).  Id. at 257.  Here, the Appellants likewise enjoyed the "potential benefit" described in Med Diversified and, therefore, the Conversion Claims are subject to subordination under section 510(b).

**IV.**

**THE BANKRUPTCY COURT DID NOT ERR BY ENTERING THE PROPOSED FORM OF ORDER SUBMITTED BY THE DEBTORS GRANTING THE DEBTORS' OBJECTION**

The Appellants argue that the order entered by the Bankruptcy Court (the "Order") went "far beyond the relief sought" in the Debtors' Objection by disallowing not only the Conversion Claims but all of the Noteholders' claims beyond principal, interest and indenture trustee fees. In addition, the Appellants argue that the Bankruptcy Court ignored its own Opinion by entering a proposed form of order that was inconsistent with the issues presented at the Hearing and the Bankruptcy Court's Opinion adjudicating those issues.  See, e.g., 6% Brief at 47-48 ("The [Objection] challenged only the Conversion Right Claims . . . and sought no relief with respect to

36

any other, unliquidated claim.") (emphasis added); 7.75% Brief at 46 ("The order submitted by the Debtors and entered by the Bankruptcy Court . . . improperly attempts to extinguish claims not briefed or argued by the parties in their papers or at the Hearing."); HSBC Brief at 5 ("The Debtors only objected to the [Conversion Claims] . . . . At the [Hearing], all the parties addressed the [Conversion Claims] and nothing else.") (emphasis added).[23]  As set forth below, both of these arguments are without merit and should be rejected.

> **A.    The Relief Sought in the Debtors' Objection Is Identical to the Relief Granted in the Bankruptcy Court's Order.**

The Debtors' Objection, by its plain terms, sought precisely the relief granted in the Bankruptcy Court's Order.  Specifically, the Objection expressly states:  "Accordingly, the Debtors respectfully request that the [Bankruptcy] Court, pursuant to section 502 of the Bankruptcy Code and Bankruptcy Rule 3007, grant the Debtors' Objection and disallow the Convertible Noteholders' claims to the extent they seek amounts beyond Principal and Interest." See Objection at 14.  To ensure that this request would be conspicuous, it was set forth under a caption labeled, "**RELIEF REQUESTED**," set in bold face, underline and all caps.

To make the request even more obvious, both the opening and concluding sections of the Objection expressly state that the Debtors were seeking entry of a specific form of order, which the Debtors attached to the Objection.  See Objection at 1, 31.  The attached proposed form of

---

[23] By contrast, in its brief, M&T recognizes that the Objection sought to limit all of the Noteholders' claims beyond principal, interest and indenture trustee fees.  See, e.g., M&T Brief at 16-17.  Unlike the Appellants, therefore, M&T acknowledges that the Appellants had notice of the requested relief but argues that the notice was not adequate.  While this argument is, at least, consistent with the facts, the Appellants did indeed have adequate notice of the full measure of relief requested in the Objection, as set forth in the following section.  See infra Part IV.A.

order – which is virtually identical to the Order entered by the Bankruptcy Court –[24] states that each of the Initial Proofs of Claim and New Proofs of Claim "are disallowed to the extent that such claims request amounts beyond the Repayment Amounts."  <u>See</u> Objection, Ex. A. ¶ 2.  "Repayment Amounts" is defined in the very next paragraph as "the amount of outstanding principal, plus interest at a rate to be determined by the Court as the end of the Chapter 11 Cases and reasonable prepetition indenture fees as provided under the Indentures."  <u>See</u> Objection, Ex. A. ¶ 3.

To make the request even more clear, the form of order then states that "<u>[f]or the purpose of clarity, Repayment Amounts shall not include any actual or potential claims, premiums or penalties related to any contract defaults or damages</u>."  <u>See</u> Objection, Ex. A. ¶ 3 (emphasis added).  Thus, by specifically limiting the Appellants' claims to the "Repayment Amounts," the Debtors put the Appellants on notice that, except with respect to principal, interest and indenture trustee fees, the Objection applied to all amounts asserted by the Noteholders, including the Additional Claims.  And if the foregoing were not already sufficient, the Debtors then included a considerable discussion in their Omnibus Reply arguing that the Appellants were not entitled to the Additional Claims.  <u>See</u> Debtors' Omnibus Reply in Support of the Objection [Docket No. 5540], at 8-9.

**B.    The Order Is Consistent With the Issues Presented at the Hearing and the Court's Opinion Adjudicating those Issues.**

On several occasions at the Hearing, counsel for the Appellees made it very clear that the issues before the Bankruptcy Court included whether the Appellants' claims should be limited to

---

[24] Indeed, the only difference between the form of order attached to the Objection and the Order entered by the Bankruptcy Court is that the latter includes, at the request of the Indenture Trustees, a proviso which states that nothing in the Order "shall conflict with any treatment of indenture trustee fees under a plan of reorganization for the Debtors."  <u>See</u> Order at ¶ 3.

principal and interest.  For example, the Debtors' counsel argued that the Appellants' "conversion

privilege claims are subsumed and consumed by the P&I claims previously filed by the holders."

(Hr'g Tr. Aug 8, 2007 at 55).  Similarly, counsel for the Creditors' Committee argued that "the

document itself limits itself to the principal and interest becoming due.  It doesn't suggest that

there's anything else that comes due." (Hr'g Tr. Aug 8, 2007 at 63).  Moreover, at the Hearing,

the Appellees specifically refuted the Appellants' claims for "dashed expectation" damages.

(Hr'g Tr. Aug 8, 2007 at 67) ("[T]he CalGen decision [does not] support [the Appellants']

entitlement to a claim under expectation damages.").

Thus, when the Bankruptcy Court issued its Opinion at the conclusion of the Hearing, it

was well aware – based on both the pleadings filed by the respective parties as well as the oral

arguments advanced at the Hearing – of the issues before it.  The Opinion reflects this

recognition.  See, e.g., Hr'g Tr. Aug 8, 2007 at 96 (Bankruptcy Court noting that the Debtors

were objecting to the Appellants' new claims to the extent they sought "payment beyond

principal and interest"); id. at 98 (Bankruptcy Court holding that the Appellants' claims should

be disallowed because they asserted "entirely new claims seeking in addition to 100 percent of

the principal and interest due under the notes a double recovery based on conversion rights"); id.

at 100 (Bankruptcy Court holding that the Appellants' claims should be disallowed because "[b]y

repaying the noteholders principal [and] accrued interest in full, the debtors are rendering the

alternative performance as provided in the indenture.").

Furthermore, not only was the Order consistent with the Bankruptcy Court's Opinion, but

the alternative form of order submitted by the Appellants (the "Alternative Order") was clearly

inconsistent with the Opinion.  See App. Ex. "29", Ltr from M. Barr & K. Hansen to the Hon.

Burton R. Lifland Aug. 10, 2007.  Specifically, the Alternative Order states: "Claim numbers

39

2404, 2821, 2823, 6247, 6249, 6280, 6299 and 6300 are disallowed solely to the extent that such claims request amounts for breach of conversion rights."  See Alternative Order at ¶ 2.  The Alternative Order expressly contravenes the Bankruptcy Court's holding that all but three of the foregoing proofs of claim were disallowable in their entirety as untimely (Hr'g Tr. Aug 8, 2007 at 69, 96-102); see also supra Part I.  Accordingly, the Bankruptcy Court properly rejected the Alternative Order and entered the Order.

## <u>CONCLUSION</u>

For all of the foregoing reasons, the Creditors' Committee respectfully submits that the decision of the Bankruptcy Court should be affirmed in its entirety.

Dated: September 24, 2007

**AKIN GUMP STRAUSS HAUER & FELD LLP**

By: ____/s/Lisa G. Beckerman_____
     Michael S. Stamer (MS-4900)
     Lisa G. Beckerman (LB-9655)
     Philip C. Dublin (PD-4919)
     Abid Qureshi (AQ-4882)
     Shaya Rochester (SR-5559)
     Akin Gump Strauss Hauer & Feld LLP
     590 Madison Avenue
     New York, New York 10022-2524
     (212) 872-1000 (Telephone)
     (212) 872-1002 (Facsimile)
     mstamer@akingump.com
     lbeckerman@akingump.com
     pdublin@akingump.com
     aqureshi@akingump.com
     srochester@akingump.com

     Counsel to the Official Committee of Unsecured
     Creditors of Calpine Corporation, et al.