UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

In re:                                              :        Chapter 11
                                                    :
CALPINE CORPORATION, ET AL.,                        :        Case No. 05-60200 (BRL)
                                                    :
                          Debtors.                  :        (Jointly Administered)
------------------------------------------------------------------------x
                                                    :
ARISTEIA CAPITAL, L.L.C., AURELIUS CAPITAL          :
MANAGEMENT, LP, DRAWBRIDGE SPECIAL                  :
OPPORTUNITIES ADVISORS LLC, ORE HILL HUB            :        Civil Case No. 1:07-cv-07830
FUND LTD., NISSWA MASTER FUND LTD., PINES           :        (JGK)
EDGE VALUE INVESTORS LTD., PINES EDGE               :
VALUE INVESTORS L.P., SILVER SANDS FUND             :
LLC, STARK MASTER FUND LTD. AND 3V                  :
CAPITAL MANAGEMENT, LLC,                            :
                                                    :
                                                    :
                          Appellants,               :
                                                    :
                     - against -                    :
                                                    :
CALPINE CORPORATION AND ITS AFFILIATED              :
DEBTORS AND DEBTORS IN POSSESSION,                  :
OFFICIAL COMMITTEE OF UNSECURED                     :
CREDITORS OF CALPINE CORPORATION,                   :
OFFICIAL COMMITTEE OF EQUITY SECURITY               :
HOLDERS,                                            :
                          Appellees.                :
------------------------------------------------------------------------x
                                                    :
BRENCOURT CREDIT OPPORTUNITIES MASTER,              :
LTD., BRENCOURT MULTI-STRATEGY ENHANCED             :
DEDICATED FUND, LP, DILLON READ U.S.                :        Civil Case No. 1:07-cv-07831
FINANCE L.P., DILLON READ FINANCIAL                 :        (JGK)
PRODUCTS TRADING LTD., LINDEN CAPITAL L.P.          :
AND ORE HILL HUB FUND, LTD.,                        :
                                                    :
                          Appellants,               :
                                                    :
                     - against -                    :
                                                    :
CALPINE CORPORATION AND ITS AFFILIATED              :
DEBTORS AND DEBTORS IN POSSESSION,                  :
OFFICIAL COMMITTEE OF UNSECURED                     :

CREDITORS OF CALPINE CORPORATION,                     :
OFFICIAL COMMITTEE OF EQUITY SECURITY                 :
HOLDERS ,                                             :
                                                      :
                    Appellees.                        :
------------------------------------------------------------------------x
                                                      :
HSBC BANK USA, N.A., AS SUCCESSOR                     :
INDENTURE TRUSTEE FOR THE 6% CONTINGENT              :    Civil Case No. 1:07-cv-07832
CONVERTIBLE NOTES DUE 2014 AND THE 4.75%             :    (JGK)
CONTINGENT CONVERTIBLE NOTES DUE 2023,               :
                                                      :
                    Appellant,                        :
                                                      :
                  - against -                         :
                                                      :
CALPINE CORPORATION AND ITS AFFILIATED               :
DEBTORS AND DEBTORS IN POSSESSION,                   :
OFFICIAL COMMITTEE OF UNSECURED                      :
CREDITORS OF CALPINE CORPORATION,                    :
OFFICIAL COMMITTEE OF EQUITY SECURITY                :
HOLDERS,                                              :
                                                      :
                    Appellees.                        :
                                                      :
------------------------------------------------------------------------x
                                                      :
MANUFACTURERS & TRADERS TRUST                        :
COMPANY, AS SUCCESSOR INDENTURE TRUSTEE             :    Civil Case No. 1:07-cv-07867
FOR THE 7.75% CONVERTIBLE, NOTES,                   :    (JGK)
                                                      :
                    Appellant,                        :
                                                      :
                  - against -                         :
                                                      :
CALPINE CORPORATION AND ITS AFFILIATED               :
DEBTORS AND DEBTORS IN POSSESSION,                   :
OFFICIAL COMMITTEE OF UNSECURED                      :
CREDITORS OF CALPINE CORPORATION,                    :
OFFICIAL COMMITTEE OF EQUITY SECURITY                :
HOLDERS,                                              :
                                                      :
                    Appellees.                        :
                                                      :
------------------------------------------------------------------------x

---

## OPPOSITION BRIEF OF APPELLEES
## THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS

---

**FRIED, FRANK, HARRIS, SHRIVER**
    **& JACOBSON LLP**
Brad Eric Scheler (BS-8019)
Gary Kaplan (GK-4542)
Michael de Leeuw (MD-8479)
Susanna J. Gray (SG-7464)
One New York Plaza
New York, NY 10004
Telephone:  (212) 859-8000
Facsimile:   (212) 859-4000

Counsel to the Official Committee of Equity Security Holders

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

BASIS OF APPELLATE JURISDICTION ...............................................................4

ISSUE PRESENTED...................................................................................................4

STANDARD OF APPELLATE REVIEW...................................................................4

STATEMENT OF THE CASE.....................................................................................5

ARGUMENT...............................................................................................................11

    I.    THE BANKRUPTCY COURT CORRECTLY HELD
    THAT THE NEW CLAIMS WERE TIME-BARRED .......................................11

        A.    The New Claims Do Not "Relate Back" to the
        Original Claims...........................................................................11

        B.    Permitting the New Claims Would Prejudice the
        Debtors, the Debtors' Other Creditors and the
        Debtors' Interest Holders at this Late Stage in the
        Debtors' Reorganization ............................................................15

        C.    Appellants Never Sought Leave to Amend the
        Original Claims...........................................................................19

    II.    THE BANKRUPTCY COURT CORRECTLY HELD
    THAT THE APPELLANTS DO NOT HAVE A
    COGNIZABLE CLAIM FOR BREACH OF THE
    INDENTURES ....................................................................................21

        A.    The Conversion Rights Did Not Continue Beyond
        the Petition Date..........................................................................21

        B.    Payment of the Repayment Amounts Does Not
        Give Rise to Conversion Damages .............................................26

        C.    Payment of the Claims, Beyond the Repayment
        Amounts, Would Violate the Absolute Priority Rule ................30

        D.    The Conversion Damages are not Contingent or
        Unmatured Claims Enforceable Against the Debtors................32

III.    THE BANKRUPTCY COURT CORRECTLY HELD
        THAT EVEN IF THE APPELLANTS HAVE A
        COGNIZABLE CLAIM FOR BREACH OF THE
        INDENTURES, SUCH CLAIM MUST BE
        SUBORDINATED ................................................................................................33

        A.      Conversion Damages Claims, to the Extent
                Allowed, Must Be Subordinated Pursuant to
                Bankruptcy Code Section 510(b).................................................................33

        B.      To The Extent Appellants are Entitled to
                Conversion Damages, Such Claims Should Be
                Subordinated to Common Stock ...................................................................35

IV.     THE BANKRUPTCY COURT'S ORDER, WHICH
        DENIED THE CLAIMS TO THE EXTENT THEY
        SOUGHT AMOUNTS OVER AND ABOVE THE
        REPAYMENT AMOUNTS, WAS PROPER AND
        SHOULD BE AFFIRMED ...................................................................................36

CONCLUSION.............................................................................................................40

## TABLE OF AUTHORITIES

**Cases**

*In re Adelphia Commc'ns. Corp.*, 342 B.R. 142 (Bankr. S.D.N.Y. 2006)........................25

*Aetna Casualty & Surety Co. v. LTV Steel Co. (In re Chateaugay Corp.)*, 94 F.3d 772 (2d Cir. 1996)..........................................................................................................14

*Allianz Insurance Co. v. Lerner*, 416 F.3d 109 (2d Cir. 2005)....................................21, 24

*America Broad. System, Inc. v. F. Patrick Nugent, et al. (In re Betacom of Phoenix, Inc.)*, 240 F.3d 823 (9th Cir. 2001)............................................................36

*In re Asia Global Crossing, Ltd.*, 324 B.R. 503 (Bankr. S.D.N.Y. 2005) ..................15, 16

*Babitt v. Vebeliunas  (In re Vebeliunas)*, 332 F.3d 85 (2d Cir. 2003) ................................4

*In re Bagnato*, 80 B.R. 655 (S.D.N.Y. 1987) ....................................................................39

*In re Balco Equities Ltd., Inc.*, 312 B.R. 734 (S.D.N.Y. 2004) ........................................40

*In re Baldwin-United Corp.*, 52 B.R. 549 (Bankr. S.D. Ohio 1985) ................................29

*Bank Brussels Lambert v. Coan (In re AroChem Corp.)*, 176 F.3d 610 (2d Cir. 1999) ...........................................................................................................................4

*In re Best Products Co.*, 140 B.R. 353 (Bankr. S.D.N.Y. 1992) ......................................17

*In re Bloomingdale Partners*, 160 B.R. 101 (Bankr. N.D. Ill. 1993) ...............................14

*Broad v. Rockwell International Corp.*, 642 F.2d 929 (5th Cir. 1981).................26, 29, 31

*C.E.H. McDonnell v. America Leduc Petroleums, Ltd.*, 456 F.2d 1170 (2d Cir. 1972) .........................................................................................................................41

*C-TC 9th Avenue P'ship v. Norton Co. (In re C-TC 9th Avenue P'ship)*, 113 F.3d 1304 (2d Cir. 1997).................................................................................................39, 40

*In re Calpine Corp.*, 365 B.R. 392 (Bankr. S.D.N.Y. 2007) ......................................17, 23

*Chock Full O' Nuts Corp. v. U.S.*, 453 F.2d 300 (2d Cir. 1971).......................................30

*Corzin v. Fordu (In re Fordu)*, 201 F.3d 693 (6th Cir. 1999) ..........................................41

*Diesel v. Town of Lewisboro*, 232 F.3d 92 (2d Cir. 2000).................................................21

*In re Einstein/Noah Bagel Corp.*, 257 B.R. 499 (Bankr. D. Ariz. 2000)..........................29

*In re Enron*, 419 F.3d 115 (2d Cir. 2005)...........................................................................19

*In re Enron Creditors Recovery Corp.*, 370 B.R. 90 (Bankr. S.D.N.Y. 2007)12, 15, 16, 21

*In re Exide Tech.*, 303 B.R. 48 (Bankr. D. Del. 2003).......................................................32

*Generals v. Resolution Trust Corp.*, 112 F.3d 569 (1st Cir. 1997)...................................14

*Glidden Co. v. FV Steel and Wire Co.*, 350 B.R. 96 (E.D. Wis. 2006) ............................34

*In re Granite Broad. Corp. et. al.*, 369 B.R. 120 (Bankr. S.D.N.Y. 2007)......................32

*Hilton Hotels Corp. v. Dunnet*, 275 F. Supp. 2d 954 (W.D. Tenn. 2003) ........................30

*In re Hooker Investments, Inc., L.J.*, 122 B.R. 659 (Bankr. S.D.N.Y. 1991) ...................21

*Integrated Resources v. Ameritrust Co. National Association (In re Integrated
  Resources, Inc.)*, 157 B.R. 66 (S.D.N.Y. 1993).........................................................5, 12

*In re JSJF Corp.*, 344 B.R. 94 (9th Cir. B.A.P. 2006).......................................................19

*In re Jobs.com, Inc.*, 283 B.R. 209 (Bankr. N.D. Tex. 2002) ............................................34

*In re King*, 305 B.R. 152 (S.D.N.Y. 2004) ........................................................................39

*In re LHD Realty Corp.*, 726 F.2d 327 (7th Cir. 1984) .....................................................23

*Liddle v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert
  Group, Inc.)*, 159 B.R. 420 (S.D.N.Y. 1993)................................................................15

*In re Manville Forest Products Corp.*, 43 B.R. 293 (Bankr. S.D.N.Y. 1984)...................23

*In re Norris Grain Co.*, 81 B.R. 103 (Bankr. M.D. Fla. 1987)..........................................19

*Norwest Bank Worthington v. Ahlers*, 485 U.S. 197 (1988)..............................................32

*Official Committee Of Unsecured Creditors v. Manufacturers & Traders Trust
  Co. (In re Bennett Funding Group)*, 146 F.3d 136 (2d Cir. 1998) ...............................4

*Palmieri v Allstate Insurance Co.*, 445 F.3d 179 (2d Cir. 2006).......................................25

*R.A. Mackie & Co., L.P. v. Petrocorp Inc.*, 329 F. Supp. 2d 477 (S.D.N.Y. 2004) ..........30

*Riverwood International Corp. v. Olin Corp. (In re Manville Forest Products)*,
    225 B.R. 862 (Bankr. S.D.N.Y. 1998) ........................................................................34

*Rombro v. Dufrayne (In re Medical Diversified, Inc.)*, 461 F.3d 251 (2d Cir.
    2006) ................................................................................................................35, 36, 37

*Taylor v. Taylor (In re Taylor)*, 233 B.R. 639 (S.D.N.Y. 1999).......................................41

*U.S. v. Kolstad (In re Kolstad)*, 928 F.2d 171 (5th Cir. 1991)..........................................12

*In re Worldwide Direct, Inc.*, 268 B.R. 69 (Bankr. D. Del. 2001)....................................36

## DOCKETED CASES

*Alexandra Global Master Fund, Ltd. v. Ikon Office Solutions, Inc.*, No. 06 Civ.
    5383........................................................................................................................36

*Gem Advisors, Inc. v. Invu, Inc.*, No. 01 Civ. 1340, 2002 WL 483118 (S.D.N.Y.
    Mar. 29, 2002)........................................................................................................14

*Jackson Heights Care Ctr., LLC v. Bloch*, No. 2006-02874, slip op. at 2, 39
    A.D.3d 477 (2d Dept. April 3, 2007)........................................................................25

*Lillis v. AT&T Corp., et al.*, C.A. No. 717-N, 2007 WL 2110587 (Del. Ch. July
    20, 2007) ................................................................................................................30

*In re WorldCom, Inc.*, No. 02-13533 ...............................................................................36

## FEDERAL STATUTES AND RULES

11 U.S.C. § 101(49)........................................................................................................37

11 U.S.C. § 501...............................................................................................................20

11 U.S.C. § 502(b)...........................................................................................................28

11 U.S.C. § 502(b)(2) ......................................................................................................35

11 U.S.C. § 510(b) .............................................................................................35, 37, 38

11 U.S.C. § 1129(b)(2)(B) ...............................................................................................32

28 U.S.C. §157(b) .............................................................................................................4

28 U.S.C. §158(a) ........................................................................................................4

Fed. R. Civ. P. 15(a) ...............................................................................................20

Fed. R. Bankr. P. 3001 ............................................................................................20

Fed. R. Bankr. P. 3003 ............................................................................................20

The Official Committee of Equity Security Holders (the "Equity Committee") of Calpine Corporation ("Calpine") and its affiliated debtors and debtors in possession (collectively, the "Debtors") respectfully submits this opposition brief (the "Opposition Brief") in connection with the appeals of (i) Aristeia Capital, L.L.C., Aurelius Capital Management, LP, Drawbridge Special Opportunities Advisors LLC, Ore Hill Hub Fund Ltd., Nisswa Master Fund Ltd., Pines Edge Value Investors Ltd., Pines Edge Value Investors L.P., Silver Sands Fund LLC, Stark Master Fund Ltd. and 3V Capital Management LLC (collectively, the "6% Notes Committee"), (ii) Brencourt Credit Opportunities Master, Ltd., Brencourt MultiStrategy Enhanced Dedicated Fund, LP, Dillon Read U.S. Finance L.P., Dillon Read Financial Products Trading Ltd., Linden Capital L.P. and Ore Hill Hub Fund, Ltd. (collectively, the "7.75% Notes Committee"), (iii) HSBC Bank USA, N.A. ("HSBC") and (iv) Manufacturers & Traders Trust Company ("M&T," with the 6% Notes Committee, the 7.75% Notes Committee and HSBC, the "Appellants") from an Order [document no. 5595 on the docket for the Debtors' main bankruptcy case, no. 05-60200] (the "Order") entered by the Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") on August 10, 2007 denying the Appellants' claims numbered 2404, 2821, 2823, 6247, 6249, 6280, 6299 and 6300 (the "Claims") to the extent the Claims sought amounts beyond principal, plus accrued interest (at a rate to be determined by the Bankruptcy Court) and reasonable pre-petition indenture trustee fees (the "Repayment Amounts").

## PRELIMINARY STATEMENT

The sole issue for this Court to decide is whether the Bankruptcy Court properly entered the Order, in line with a bench decision rendered following a hearing held on August 8, 2007 (the "Bench Decision"), disallowing the Appellants' time-barred Claims to the extent that the Claims sought amounts over and above the Repayment Amounts.  The Bankruptcy Court

1

properly held that neither the plain language of the Indentures nor case law supports the Appellants' specious assertions that they are entitled to damages (the "Conversion Damages") for breach or termination of their right to convert their debt interests into equity (the "Conversion Rights") on top of the principal amount of the debt plus accrued interest.

Excited by the prospect of a solvent debtor case, Appellants are greedily seeking more than their fair share by reaching well beyond the plain language of the Indentures and inventing legal theories that are wholly unsupported by the facts and the law. Because Appellants' New Claims are clearly time-barred, Appellants have been concocting new arguments – some of which have only been raised on appeal before this Court – in an effort to circumvent the established Bar Date that prohibits them from asserting their claims for Conversion Damages. Appellants filed the New Claims (defined below) nearly ten months late, disguising them as "supplements" to timely filed Original Claims (defined below). The New Claims, however, actually allege wholly new theories of liability that cannot possibly be deemed to "relate back" to the Original Claims (which sought only principal, accrued interest and other "unliquidated" amounts). Moreover, allowing the Conversion Damages – which Appellants, by their own admissions, say could be "millions of dollars" in value – would be inequitable given the critical stage of the Debtors' reorganization process.

Despite the tardiness of the New Claims, Appellants' Conversion Damages claims have no merit in their own right. The Indentures expressly state that, upon the Debtors' bankruptcy (an event of default under the Indentures), the Appellants are entitled to the Repayment Amounts only. The Bankruptcy Code[1] cannot be used to provide the Appellants with benefits that they did not obtain in the negotiations over the terms of the Indentures. Moreover, as of the Petition Date,

---

[1]      References made herein to the Bankruptcy Code pertain to title 11 of the United States Code (the "Bankruptcy Code").

Calpine's stock was well below the conversion price stated in the Indentures and the Conversion Rights were "under water" and valueless.  Had any of the Appellants sought to utilize their Conversion Rights on or just prior to the Petition Date, they would have received less than the full amount of *principal* under the Indentures.  Pursuant to the Second Amended Plan (defined below), Appellants are entitled to receive principal plus accrued interest *plus* indenture trustee fees on the Claims, most of which will be paid in new common stock of the reorganized Debtors.  Thus, Appellants' claims that they are being "cheated" out of their Conversion Rights ring hollow.

Even were this Court to agree with the Appellants that they are entitled to Conversion Damages, the Bankruptcy Court correctly determined that any Conversion Damages awarded to the Appellants should be subordinated pursuant to section 510(b) of the Bankruptcy Code.  Appellants' Conversion Rights entitled them to "purchase" equity in the Debtors by converting their debt into equity.  This is akin to a purchase and sale of a security and, therefore, any damages accruing from a breach or termination of the Conversion Rights must be subordinated.  Although not specifically addressed by the Bankruptcy Court, any Conversion Damages awarded to the Appellants must, under the provisions of the Bankruptcy Code and the circumstances of the case, be subordinated to common stock.

Lastly, Appellants' argument that the Order is beyond the scope of the Bench Decision or the record is wholly without merit.  The relief requested by the Debtors was *expressly* set out in the Debtors' objection to the New Claims and the Appellants had a full and fair opportunity to oppose the Debtors' requested relief in their responses and at a hearing before the Bankruptcy Court.  Appellants are not now entitled to a second chance to argue new theories for additional

damages, such as "make-whole" damages, in an effort to enlarge the Original Claims beyond reason or legal limit, where Appellants failed to assert such claims in the Bankruptcy Court.

For the reasons set forth herein, the Order disallowing the Claims, to the extent they seek amounts over and above the Repayment Amounts, should be affirmed.[2]

## BASIS OF APPELLATE JURISDICTION

This matter is a core proceeding pursuant to 28 U.S.C. §157(b).  The United States District Court for the Southern District of New York (the "Court") has jurisdiction of this appeal pursuant to 28 U.S.C. §158(a), which provides this Court with jurisdiction to hear appeals from final judgments, orders, and decrees of the Bankruptcy Court of the United States.

## ISSUE PRESENTED

Whether the Bankruptcy Court correctly disallowed the Claims to the extent the Claims sought amounts other than the Repayment Amounts and properly ruled that (i) the New Claims were time-barred, (ii) the Indentures and current law preclude the allowance of Conversion Damages, and (iii) even if Conversion Damages claims were allowed, such claims would be in the nature of damages arising from the purchase and sale of stock and would therefore be subordinated.

## STANDARD OF APPELLATE REVIEW

A bankruptcy court's conclusions of law are reviewed de novo and findings of fact are reviewed for clear error.  Fed. R. Bankr. P. 8013; Bank Brussels Lambert v. Coan (In re AroChem Corp.), 176 F.3d 610, 620 (2d Cir. 1999); Official Comm. Of Unsecured Creditors v.

---

[2]     The Equity Committee also joins in the arguments contained in the response briefs filed by the Debtors and the Official Committee of Unsecured Creditors.

Manufacturers & Traders Trust Co. (In re Bennett Funding Group), 146 F.3d 136, 138 (2d Cir. 1998).  Mixed questions of law and fact are subject to de novo review.  See Babitt v. Vebeliunas (In re Vebeliunas), 332 F.3d 85, 90 (2d Cir. 2003).   All of the issues presented in this appeal are questions of law.

A bankruptcy court's decision whether to grant or deny an amendment to a timely filed proof of claim is reviewed upon an "abuse of discretion standard."  Integrated Resources v. Ameritrust Co. Nat'l Ass'n (In re Integrated Resources, Inc.), 157 B.R. 66, 70 (S.D.N.Y. 1993). "Abuse of discretion" will only be found where "(1) the decision was based on an erroneous conclusion of law; (2) where the record contains no evidence on which the judge could have based his decision; or (3) where the supposed facts found are clearly erroneous as found."  Id. at 72 (citation omitted).

## STATEMENT OF THE CASE

Prior to the commencement of these cases, Calpine issued four series of unsecured convertible notes (the "Notes").[3]  On December 20, 2005 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  As of the Petition Date, the Notes were outstanding in the aggregate principal amount of approximately $1.8 billion.

---

[3]     The Notes include: (a) the $1,311,000 4.00% Convertible Senior Notes Due December 26, 2006 (the  "4% Notes"), issued by Calpine pursuant to that certain Indenture, dated as of August 10, 2000 (the "Original Indenture" and, as supplemented by the First Supplemental Indenture, dated as of September 28, 2000, the Second Supplemental Indenture, dated as of September 30, 2004 (the "6% Notes Indenture"), and the Third Supplemental Indenture, dated as of June 23, 2005 (the "7.75% Notes Indenture"), the "Indenture"); (b) the $547,370,000 6.00% Contingent Convertible Senior Notes Due 2014 (the  "6% Notes"), issued by Calpine pursuant to the Indenture; (c) the $650,000,000 7.75% Contingent Convertible Senior Notes Due 2015 (the "7.75% Notes"), issued by Calpine pursuant to the Indenture; and (d) the $633,775,000 4.75% Contingent Convertible Senior Notes Due 2023 (the  "4.75% Notes"), issued by Calpine pursuant to a certain indenture, dated  as of November 14, 2003, which was superseded by that certain Amended  and Restated Indenture dated as of March 12, 2004 (the "4.75% Notes  Indenture" and, together with the Indenture, the "Indentures").  See DA-Tabs 2-5.

By Order (the "Bar Date Order") dated April 26, 2006 [document no. 1348 on the docket for the Debtors' main bankruptcy case, no. 05-60200], the Bankruptcy Court set the date of August 1, 2006 as the last date to file claims in the Debtors' bankruptcy case (the "Bar Date").

Prior to the Bar Date, Wilmington Trust Co. ("Wilmington Trust"), as Indenture Trustee for the holders of the 7.75% Notes, filed Claim 2404 asserting claims for (a) principal and interest and (b) other unliquidated charges on account of the 7.75% Notes.  In addition, prior to the Bar Date, HSBC, as successor Indenture Trustee for the 4% Notes, the 6% Notes and the 4.75% Notes, filed Claims 2821 and 2823 (together with Claim 2404, the "Original Claims") asserting similar claims.  See DA-Tabs 6-8, Original Claims.[4]

On January 30, 2007, the Bankruptcy Court "So Ordered" a stipulation (the "Stipulation") between the Debtors and HSBC pursuant to which Claims 2821 and 2823 were deemed allowed claims on account of principal outstanding and accrued unpaid interest through the Petition Date.  See DA-Tab 13, Stipulation at 6, 7.  The Stipulation also stated that the Debtors and HSBC were to "resolve the unliquidated claims asserted" in Claims 2821 and 2823 "pursuant to the plan of reorganization confirmed in these Chapter 11 Cases, or, in the absence of such a plan of reorganization, through the claims reconciliation process."  DA-Tab 13, Stipulation at 8.

Between seven and ten months after the Bar Date, M&T, as successor to Wilmington Trust, and HSBC filed Claims 6280, 6299 and 6300 (the "New Claims").  Although the New Claims purported to supplement the Original Claims by further describing certain unliquidated amounts sought in the Original Claims, the New Claims asserted a wholly new claim for

---

[4]     The Equity Committee's citations to the record refer to the opening appendix served by the Debtor-Appellees on September 24, 2007 using the format: "DA-Tab___."

damages based on the termination or loss of the Conversion Rights (i.e., the Conversion

Damages).[5]  See DA-Tabs 17-19, New Claims ¶4.

On July 6, 2007, the Debtors filed their Limited Objection to the Claims (the

"Objection").  The Objection specifically requested the following relief:

> The Debtors object to the New Claims on the basis that they were
> not timely filed.  To the extent the Court allows the Noteholders to
> pursue their New Claims, the Debtors object to the New Claims to
> the extent they seek payment beyond Principal and Interest.
> Accordingly, the Debtors respectfully that the Court, pursuant to
> section 502 of the Bankruptcy Code and  Bankruptcy Rule 3007,
> grant the Debtors' Objection and disallow the Convertible
> Noteholders' claims to the extent they seek amounts beyond
> Principal and Interest.

DA-Tab 27, Objection at 13-14.  In addition, the Objection sought entry of an order

"substantially the form attached hereto as Exhibit A" (the "Proposed Order").  DA-Tab 27,

Objection at 1.  The Proposed Order mirrored the language in the Order entered by the

Bankruptcy Court.  See DA-Tab 28, Proposed Order at 2.

Between July 27, 2007 and July 30, 2007, (i) the 6% Notes Committee, (ii) 7.75% Notes

Committee,[6] (iii) M&T, and (iv) HSBC filed responses (the "Responses") to the Objection

asserting entitlement to Conversion Damages based upon an alleged breach of the Conversion

---

[5]     Specifically, each of the New Claims assert claims for: "(i) the rights provided to the holders of the [Notes] in Article 10 of the [applicable] Indenture (the  "[Conversion Right]"), which [Conversion Right], upon information and belief, was an integral  part of the consideration provided in return for the extension of credit to the Debtor evidenced by  the [Notes], (ii) all damages, including any accrued prior to the commencement of the Case,  arising from any breach of the terms of, and covenants set forth in, the Indenture, including the  [Conversion Right], whenever arising, including all damages arising from the loss, whether  pursuant to a plan of reorganization for the Debtor or otherwise, of the [Conversion Right], and (iii) all rights to receive postpetition interest, charges and other amounts due or coming due under  the terms of the Indenture on or after the commencement of the Case to the fullest extent  chargeable or allowable as against the Debtor or its estate under law or equity."  See DA-Tabs 17-19, New Claims ¶4.

[6]     Two parties to the 7.75% Notes Committee, Brencourt Credit Opportunities Master, Ltd. and Brencourt Multistrategy Enhanced Dedicated Fund, LP, were not parties to the Response filed by certain 7.75% Notes holders to the Debtors' Objection.

Rights.  The Responses contended that (i) the New Claims were timely filed, (ii) the New Claims peoperly included amounts for Conversion Damages, and (iii) the New Claims should not be subordinated pursuant to section 510(b) of the Bankruptcy Code.  See 6% Notes Committee Response; 7.75% Notes Committee Response; HSBC Response; and M&T Response [respectively, document nos. 5427, 5428, 5449 and 5429 on the docket for the Debtors' main bankruptcy case, no. 05-60200].

On July 27, 2007, the Official Committee of Unsecured Creditors (the "Creditors' Committee") filed a statement in support of the Debtor's Objection.  On August 6, 2007 the Creditors' Committee and the Debtors filed omnibus replies to the Responses and the Equity Committee filed a response in support of the Debtors' Objection.

On August 8, 2007, the Bankruptcy Court held a hearing on the Objection and Responses (the "Hearing").  At the conclusion of the Hearing, the Bankruptcy Court rendered the Bench Decision and held (i) that the New Claims were "filed after the bar date and accordingly are time barred," (ii) that even if the New Claims were deemed to be timely, the Appellants were not entitled to damages for breach of their Conversion Rights, and (iii) that even if the Appellants were entitled to damages for breach of their Conversion Rights, such damages would be subordinated "at best."  DA-Tab 1, Bench Decision at 101-102.  At the conclusion of the Hearing, the Bankruptcy Court further held that the Debtors' Objection was granted and directed the Debtors to "[s]ettle an order consistent with the decision."  DA-Tab 1, Bench Decision at 102.

On August 10, 2007, the Debtors submitted to the Bankruptcy Court a revised, Proposed Order (the "Revised Proposed Order").  In their letter accompanying the Revised Proposed Order, Debtors' counsel explained to the Bankruptcy Court that the Revised Proposed Order

mirrored the Proposed Order but reflected the Bankruptcy Court's holding at the Hearing and HSBC's request for indenture trustee fees.  See DA-Tab 30, Revised Proposed Order at 2.  The letter accompanying the Revised Proposed Order (the "Debtors' Letter") also noted that the Creditors' Committee and the Equity Committee supported the entry of the Revised Proposed Order.  See DA-Tab 30, Debtors' Letter at 1.

Also on August 10, 2007, the 6% Notes Committee and the 7.75% Notes Committee submitted a counter proposed order (the "Appellants' Proposed Order") which sought the disallowance of the Conversion Damages only, but otherwise permitted the pursuit of the Claims.  See DA-Tab 31, Appellants' Proposed Order at 1.  Counsel for the 6% and 7.75% Notes Committees submitted a letter to the Bankruptcy Court along with the Appellants' Proposed Order.  In their letter, counsel for the 6% and 7.75% Notes Committee first asserted, at the eleventh hour, their argument that the Revised Proposed Order was broader than the Bankruptcy Court's ruling in the Bench Decision and hurriedly requested a chambers conference with the Bankruptcy Court.

On that same day, the Bankruptcy Court entered the Debtors' Order, which granted the Debtors' Objection.  The Order states in relevant part that:

> (i)     Claim numbers 2404, 2821, 2823, 6247, 6249, 6280, 6299 and 6300 are disallowed to the extent that such claims request amounts beyond the Repayment Amounts (as defined below);
>
> (ii)    Pursuant to section 502(c) of the Bankruptcy Code, the value of the New Claims is determined as the amount of outstanding principal, plus accrued interest as a rate to be determined by the Court at the end of the Chapter 11 Cases and reasonable prepetition indenture trustee fees as provided under the Indentures (collectively , the "Repayment Amounts"); *provided, however,* that nothing herein shall conflict with any treatment of indenture trustee fees under a plan or reorganization for the Debtors; and

> (iii) For the purposes of clarity, the Repayment Amounts shall not include any actual or potential claims, premiums or penalties related to any contract defaults or damages.

Order at 2. The term, "New Claims," was defined by reference to the Objection as the "'supplemental' proofs of claim" which sought "in addition to repayment of outstanding principal and accrued interest, damages for any 'breach' of the Conversion Rights." DA-Tab 27, Objection at 12.

On or about August 14, 2007 through August 16, 2007, Appellants each filed a notice of appeal of the Order with the Court on the respective dockets for their appeals (collectively, the "Appellate Dockets").[7] On or about August 16, 2007, the 6% Notes Committee filed an Emergency Motion for Expedited Appeal (the "Emergency Appeal Motion"), HSBC filed a joinder and memorandum in support of the Emergency Appeal Motion and the 7.75% Notes Committee filed a joinder of the Emergency Appeal Motion on August 21, 2007. On August 22, 2007, a hearing on the Emergency Appeal Motion was held before the Court, and by Order dated August 22, 2007, the Court granted the Emergency Appeal Motion. On or about August 27, 2007, the 7.75% Notes Committee submitted a stipulation, signed as between the 6% and 7.75% Notes Committee, HSBC, M&T, the Debtors, the Creditors' Committee and the Equity Committee (the "Consolidation Stipulation"), to this Court. The Consolidation Stipulation proposes to consolidate the Appellate Dockets onto one Appellate Docket. The Consolidation Stipulation has not yet been entered on any of the Appellate Dockets.

Between September 5, 2007 and September 6, 2007, Appellants filed with the Court their Designations of Bankruptcy Record on Appeal and Statements of Issues on each Appellants' respective Appellate Docket. Between September 5, 2007 and September 6, 2007, the Creditors'

---

7    As of the date of this Opposition Brief, the Appellate Dockets, docket nos. 07-07830, 07-07831, 07-07832 and 07-07867, have not been consolidated.

Committee and the Debtors filed with the Court their respective counter-designations of the record on appeal on the Appellate Dockets.

On or about September 7, 2007, the 6% Notes Committee filed their opening brief [document no. 5 on the 6% Appellate Docket] (the "6% Brief"), the 7.75% Notes Committee filed their opening brief [document no. 5 on the 7.75% Appellate Docket] (the "7.75% Brief"), HSBC filed its joinder with the 6% Brief and opening brief [document no. 5 on the HSBC Appellate Docket] (the "HSBC Brief") and M&T filed its joinder with the 7.75% Brief and opening brief [document no. 5 on the M&T Appellate Docket] (the "M&T Brief").

On September 18, 2007, the Debtors filed the Second Amended Joint Plan of Reorganization (the "Second Amended Plan") and the Second Amended Disclosure Statement (the "Second Amended Disclosure Statement").

As of the date of this Opposition Brief, the hearing on the Debtors' Second Amended Disclosure Statement is scheduled for September 25, 2007.

## **ARGUMENT**

I.    THE BANKRUPTCY COURT CORRECTLY HELD THAT THE NEW
      CLAIMS WERE TIME-BARRED

    A.    The New Claims Do Not "Relate Back" to the Original Claims

Appellants erroneously assert that the Bankruptcy Court erred by disallowing the New Claims as time-barred even though the New Claims were filed long after the passage of the Bar Date and without seeking the Bankruptcy Court's approval to file the New Claims at such a late date.  See 6% Brief 15-20; 7.75% Brief 15-24.  As the Bankruptcy Court correctly held in its Bench Decision, the New Claims, which assert the Conversion Damages on behalf of the holders of the Notes (the "Noteholders") *for the first time* in the Debtors' bankruptcy case, were not amendments to the Original Claims because they asserted wholly new claims and clearly

prejudiced the Debtors by raising potentially substantial new claims at a critical point in the Debtors' reorganization.

Although courts will allow a late filed claim to the extent it amends a previously filed, timely claim, they will only do so provided the "amendment" is not otherwise deemed to be a new claim. Specifically, courts only allow late filed "amendments" where (i) the amendments relate back to the original claims they amend, and (ii) allowing a late filed amendment would be equitable. See In re Enron Creditors Recovery Corp., 370 B.R. 90, 95 (Bankr. S.D.N.Y. 2007) (noting that the "'second prong is to be applied only if the first prong is satisfied and the claim qualifies as an amendment and not simply a new claim'").

Amendments filed to "cure a defect in the claim as originally filed, to describe the claim with greater particularity, or to plead a new theory of recovery on the facts set forth in the original claim," are generally permitted as they, effectively, "relate back" to the original claim. In re Integrated Resources, Inc., 157 B.R. at 70; see also In re Enron Creditors Recovery Corp., 370 B.R. at 96 (noting that the party asserting that an amendment relates back bears the burden of proof). However, a claim relates back only if it arose out of the conduct, transaction, or occurrence set forth in the original claim. See Id. at 96. To hold otherwise would allow all new claims marked as "amendments" to "vitiate the role of bar dates: indeed, courts that authorize amendments must ensure that corrections or adjustments do not set forth wholly new grounds of liability." U.S. v. Kolstad (In re Kolstad), 928 F.2d 171, 175 (5th Cir. 1991).

Despite Appellants' contentions, nothing in the New Claims: (i) cured a defect in the Original Claims, as no defect was alleged, (ii) described the Original Claims with greater particularity, as the New Claims raised for the first time claims for Conversion Damages, or (iii) plead a new theory of recovery on the facts set forth in the Original Claims, as the facts needed

to support a claim for Conversion Damages were not alleged in the Original Claims.  Nor, as

Appellants assert, do the New Claims, or "supplements" as Appellants attempt to veil them, arise

out of the same transaction or occurrence set forth in the Original Claims.  See 6% Brief at 17,

20-22; 7.75% Brief at 13-19.  Although the Original Claims asserted amounts due under the

Indentures, nothing in the Indentures provides for the recovery of Conversion Damages.[8]

Likewise, despite the contentions of the 7.75% Notes Committee, the Conversion Damages are a

completely different kind of breach than that which has been asserted in the Original Claims and

such damages are based upon a wholly new theory of liability.  See 7.75% Brief at 15-19.  As is

clear from the plain text of the Original Claims, the Original Claims made no mention of

Conversion Damages at all.  The only inference that could be made is in their reference to

"unliquidated" amounts.  However, as the Bankruptcy Court correctly noted, this is not a

"meaningful reference" to Conversion Damages and, therefore, the Bankruptcy Court properly

held that the New Claims do not relate back to the Original Claims.  DA-Tab 1, Bench Decision

at 98.

    To compensate for the silence of the Original Claims with respect to Conversion

Damages, Appellants assert that the Indentures, which were attached to the Original Claims,

should have apprised the Debtors of the existence of the Conversion Damages.  See 6% Brief at

21-22; 7.75% Brief at 14-15.  Yet, while the Indentures describe the Conversion Rights, there are

no provisions in any of the Indentures that reference any right to obtain Conversion Damages.

Moreover, the debtors are not charged with searching the Indentures to come up with novel

theories when the Claims themselves do not raise the theory.  To allow such a result would

---

[8]    As an additional note, per the Stipulation, the indenture trustee for the 4% Notes, the 6% Notes and the
4.75% Notes stipulated the allowed amounts of two of the Original Claims at principal plus accrued
interest.  DA-Tab 13, Stipulation at 6-8.  Any claim for Conversion Damages is outside the scope of the
Stipulation, and thus based on a new set of facts not set forth in the Original Claims.

award claimants who "sit and wait" out a debtor's bankruptcy case only to later raise outlandish theories in their amended claims once the debtor's estate appears solvent.  <u>Gem Advisors, Inc. v. Invu, Inc.</u>, No. 01 Civ. 1340, 2002 WL 483118, at *5 (S.D.N.Y. Mar. 29, 2002) (J. Koeltl).

Likewise, Appellants now imply that the Bankruptcy Court erred by improperly applying an "unprecedented level of specificity in pleading" their Claims by refusing to read the Conversion Damages claims into the Original Claims.  <u>See</u> 6% Brief at 17; 7.75% Brief 13-15.  However, as noted <i>supra,</i> the Original Claims failed to mention the Conversion Damages claims at all, or any claims related to Conversion Rights for that matter.  Unlike the cases cited by the 6% and 7.75% Notes Committees, the Original Claims omit <i>any</i> reference to the possibility of Conversion Damages.  <u>See</u> <u>Aetna Casualty & Surety Co. v. LTV Steel Co. (In re Chateaugay Corp.)</u>, 94 F.3d 772, 776-77 (2d Cir. 1996) (original claim specifically asserted a right to set off which did not preclude such a right later asserted); <u>In re Bloomingdale Partners</u>, 160 B.R. 101, 107-08 (Bankr. N.D. Ill. 1993) (claim apprised debtor of a private nuisance cause of action where the claim attached a state pollution control board interim opinion regarding the same complaints which would be alleged in any related cause of action); <u>Gens v. Resolution Trust Corp.</u>, 112 F.3d 569, 575 (1st Cir. 1997) (allowing amendment to original proof of claim to correct an omission in the original proof of claim where the promissory note was otherwise attached to the claim).  The Original Claim failed to properly notify the Debtors of the Conversion Damages claims and, therefore, the Bankruptcy Court was correct to find that the New Claims could not relate back.

Appellants further argue that the Bankruptcy Court should have applied a more lenient "relation back" standard found in Rule 15(c) of the Federal Rules of Civil Procedure (the "Federal Rules").  <u>See</u> 6% Brief at 20-22; 7.75% Brief at 18.  However, this argument fails

because even courts that utilize the "amended pleading" standard of Federal Rule 15(c) require that the original claim provide *notice* of claims later filed in an amended proof of claim.  See Liddle v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.), 159 B.R. 420, 425 (S.D.N.Y. 1993) (citing In re Integrated Resources, Inc., 157 B.R. at 70); see also In re Enron Creditors Recovery Corp., 370 B.R. at 96 (applying Federal Rule 15(c) to find that a new claim, which alleged a guaranty against a parent of the debtor-entity against which the original claim was filed, did not arise out of the same "transaction or occurrence"); In re Asia Global Crossing, Ltd., 324 B.R. 503, 508 (Bankr. S.D.N.Y. 2005) (noting that courts consider whether notice of the claim was provided and whether the claimant will "rely on the same type of evidence to prove" its claims).  Because the Original Claims failed to provide *any* notice of the Conversion Damages claims or even any *mention* of the Conversion Damages, even under a Federal Rule 15(c) standard the Bankruptcy Court correctly held that the New Claims did not relate back or amend the Original Claims.  To hold otherwise would run afoul of precedent and the purpose of the bar date for filing proofs of claims – providing debtors with notice of claims against the estate for purposes of reorganization and addressing those claims.  Therefore, the Bankruptcy Court's holding that the New Claims did not relate back to the Original Claims was clearly proper and should be affirmed.

> B.    Permitting the New Claims Would Prejudice the Debtors, the Debtors'
>        Other Creditors and the Debtors' Interest Holders at this Late Stage in the
>        Debtors' Reorganization

Recognizing that their relation back argument is tenuous at best, Appellants further argue that allowance of the New Claims does not prejudice the Debtors.  See 6% Brief at 22-28; 7% Brief at 20-24.  Nothing could be further from the truth.  Appellants have stated at the Hearing that the Conversion Damages claims could amount to "hundreds of millions" of dollars.  See DA-Tab 1, Bench Decision at 50.  The substantial nature of such claims could stand to

significantly change the planned distribution under the Second Amended Plan or hinder the

Debtors' solvency.  Simply because the Debtors have not reached confirmation of their Second

Amended Plan and are continuing to negotiate with parties in interest with respect to their

Second Amended Plan does not mean that the Debtors or its other creditors and interest holders

will not be significantly impacted if the New Claims are allowed.  Certainly, as the Bankruptcy

Court established, allowing the New Claims would be inequitable as it would force the Debtors

to focus on the substantial amount of the Conversion Damages "when they should be focusing on

the approval of the disclosure statement and confirmation of the plan."  DA-Tab 1, Bench

Decision at 99.  See In re Asia Global Crossing, Ltd., 324 B.R. at 507.  In making a

determination regarding equitability, courts consider five factors:

> (1) undue prejudice to the opposing party; (2) bad faith or dilatory
> behavior on the part of the claimant; (3) whether other creditors
> would receive a windfall were the amendment not allowed; (4)
> whether other claimants might be harmed or prejudiced; and (5)
> the justification for the inability to file the amended claim at the
> time the original claim was filed.

In re Enron Creditors Recovery Corp., 370 B.R. at 95; see also In re Asia Global Crossing, Ltd.,

324 B.R. at 507-08.  Applying these factors to the New Claims precludes their allowance.

### 1.    Allowing the New Claims Would Prejudice the Debtors, Other Creditors and the Debtors' Interest Holders

Appellants' assertions that the Debtors will not face any prejudice if the New Claims are

allowed is incredulous at this stage in the Debtors' bankruptcy cases.  The Debtors have filed

their Second Amended Plan and the Debtors, the two official Committees and other parties in

interest are currently focused on efforts with respect to a chapter 11 plan to conclude these cases.

Not surprisingly, the discussions regarding the Second Amended Plan focus on, among other

things, the Debtors' estimate of the claims pool based upon many months of due diligence,

objections, negotiations and settlements.  Substantially increasing the claims pool during the

16

height of the plan process and on the eve of the Debtors' expiration of exclusivity is the ultimate form of prejudice.  Indeed, it would subvert the very purpose of a bar date – "enabling the parties in interest to ascertain with reasonable promptness the identity of those making claims against the estate and the general amount of the claims, a necessary step in achieving the goal of successful reorganization."  In re Best Products Co., 140 B.R. 353, 357 (Bankr. S.D.N.Y. 1992) (citing First Fidelity Bank, N.A. v. Hooker Investments, Inc. (In re Hooker Investments, Inc.), 937 F.2d 833, 840 (2d Cir. 1991)).

In addition, allowing the New Claims would undoubtedly result in a flood of similarly unjustifiable claims by creditors.  Given the number of claims and theories that have arisen from the Bankruptcy Court's decision regarding certain "make-whole" damage claims, In re Calpine Corp., 365 B.R. 392, 398 (Bankr. S.D.N.Y. 2007) (the "CalGen Decision"), there is no question that allowing the Appellants to pursue Conversion Damages will prompt a host of other creative claims that parties will seek to relate back to and supplement previously filed claims. Accounting for and defending against such claims will be prejudicial to these cases and threaten the Debtors' ability to timely emerge from chapter 11.  Thus, under the circumstances, the Bankruptcy Court had no other choice but to deem the allowance of the New Claims to be highly prejudicial to the Debtors' reorganization.

> 2.    Appellants' Failure to Provide Any Reason for Late Filing Suggests Bad Faith or Dilatory Behavior

Appellants have consistently pushed for allowance of the New Claims without ever providing a plausible reason for filing the New Claims nearly ten months after the Bar Date. There is no explanation for the Appellants' (i) delay in filing the New Claims, (ii) failure to assert Conversion Damages in the Original Claims, and (iii) failure to seek leave from this Court to amend the Original Claims.  Appellants clearly concocted their theory of Conversion Damages

only months after the Bankruptcy Court's CalGen Decision as they filed the New Claims only one to two months after that decision. Even more compelling is the fact that the Stipulation, which they participated in drafting, failed to include amounts for Conversion Damages. If the Appellants had developed their theory of Conversion Damages at the time of the Original Claims, they were obligated to assert such claims in connection with negotiations regarding the size of their claims in order to provide the Debtors with notice of these claims.

3.    Appellants Would Receive a Windfall While Other Claimants Would Be Harmed if the Bankruptcy Court had Allowed the New Claims

Appellants claim that there should be no issue with allowing their "hundreds of millions" of dollars of New Claims because the Debtors are a solvent entity. See 6% Brief at 27-28; 7.75% Brief at 23. Yet, the New Claims allow the Appellants to recover substantially more than what they would receive outside of chapter 11 and would produce a windfall for only a few parties – namely the Appellants' constituents (i.e., the Noteholders). Moreover, as the Bankruptcy Court correctly held, due to the alleged size of the New Claims "to the extent the New Claims remain unresolved and unliquidated as of confirmation," the Debtors would have to establish large reserves which would unduly delay distribution to other claimants or shareholders. DA-Tab 1, Bench Decision at 99. This could jeopardize the Debtors' reorganization and affect distributions to junior interests.

4.    Appellants Provided No Justification for the Inability to File the Amended Claims at the Time the Original Claims Were Filed

The Bankruptcy Court correctly recognized that the Appellants' ten-month delay in filing the New Claims was inexcusable. See DA-Tab 1, Bench Decision at 99. See In re Enron, 419 F.3d 115, 127-28 (2d Cir. 2005) (disallowing claim filed six months after bar date); In re JSJF Corp., 344 B.R. 94, 101-02 (9th Cir. B.A.P. 2006) (disallowing claim filed four months after bar date); In re Norris Grain Co., 81 B.R. 103, 107-08 (Bankr. M.D. Fla. 1987) (disallowing claim

18

filed five months after bar date).  As the Bankruptcy Court noted, Appellants have never

provided any reason as to why they waited ten months to file the New Claims or why they did

not specifically allege such claims in the Original Claims.

    As the Bankruptcy Court correctly stated, the filing of the New Claims has already

disrupted the judicial administration of the Debtors' cases, and allowing the New Claims will

further threaten the reorganization process.  See DA-Tab 1, Bench Decision at 99.  The New

Claims were filed during a critical stage of the plan formulation process and allowing the

Appellants to pursue such claims when they have not even placed a numeric value on alleged

damages poses the risk of delayed emergence from chapter 11.  Simply stated, the New Claims

are too late.  Therefore, the Bankruptcy Court rightly precluded the New Claims as time-barred

and its decision must be affirmed.

## C.    Appellants Never Sought Leave to Amend the Original Claims

    The 6% Notes Committee also briefly asserts the novel argument – never articulated in

the Bankruptcy Court below – that the Bankruptcy Court erred by denying the New Claims

because Appellants had failed to seek leave of the Bankruptcy Court to amend the Original

Claims.  See 6% Brief at 22; DA-Tab 1, Bench Decision at 97.  The 6% Notes Committee strains

legal reasoning by suggesting that Federal Rule 15(a) allowed the Appellants to amend the

Original Claims without leave of the Bankruptcy Court.  See 6% Brief at 22.  This legal theory

has no merit and provides no support for the Appellants' argument.  Federal Rule 15(a) is a

liberal pleading standard which is applicable to amendments of pleadings at trial.  See Fed. R.

Civ. P. 15(a) (providing that a "party may amend a party's *pleading* once as a matter of course at

any time before a responsive pleading is served") (emphasis added).  In the context of a

bankruptcy case, however, the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules") govern the claims process.  Bankruptcy Code section 501 and

Bankruptcy Rules 3001 and 3003, which govern the filing of proofs of claim in a chapter 11 bankruptcy proceeding, do not even mention or reference the Federal Rules, let alone Federal Rule 15. See 11 U.S.C. § 501, Fed. R. Bankr. P. 3001, 3003. In fact, Federal Rule 15(a) is <u>only</u> applicable to adversary proceedings in a bankruptcy case and only with respect to pleadings filed in an adversary proceeding. See Fed. R. Bankr. P. 7015.[9] Since, the Claims are not pleadings that were filed in an adversary proceeding, the 6% Notes Committee cannot attempt to use Federal Rule 15(a) to end-run the Bar Date without having sought Bankruptcy Court approval to file the New Claims. It would be absurd to argue that anyone could amend their claim at any time in a bankruptcy case without bankruptcy court approval, and the 6% Notes Committee fails to cite any cases that would help them on their argument. See 6% Brief at 22-23.

Rather, in a bankruptcy case, the bar date provides a case-specific statute of limitations which limits a claimant's time to file a proof of claim unless the claimant seeks leave of the court to file a late claim. See Fed. R. Bankr. P. 3003(c) (stating that the court may "for cause shown" extend the time within which proofs of claim or interest may be filed). As noted *supra*, the Bar Date Order fixed August 1, 2006 as the last date for filing any proof of claims or interests arising prior to the Petition Date. Bar Date Order at 1. The Bar Date Order specifically states that "all holders of claims that fail to comply with this Order by timely filing a proof of claim in appropriate form shall not be treated as a creditor with respect to such claim for the purposes of voting, allowance, and distribution."[10] Bar Date Order at 5. Appellants were aware of the Bar

---

[9]    To demonstrate the limited applicability of Federal Rule 15(a) in a bankruptcy case, it is explicitly not applicable to contested matters in bankruptcy. See Fed. R. Bankr. P. 9014(c).

[10]    A bar date is intended to furnish the "'debtor and its creditors with finality.'" <u>In re Enron Creditors Recovery Corp.</u>, 370 B.R. 90, 94 (Bankr. S.D.N.Y. 2007) (citation omitted). As such, bar date orders are non-appealable as of right. See <u>In re Hooker Investments, Inc., L.J.</u>, 122 B.R. 659 (Bankr. S.D.N.Y. 1991) (considering the "general policies of judicial efficiency and the avoidance of piecemeal appeals" prior to finding against an appeal as of right).

Date (in fact they filed their Original Claims before the Bar Date) and knew that their right to file a claim was dependant on that date unless they sought leave of the Bankruptcy Court pursuant to the Bankruptcy Rules. Appellants cannot now attempt to argue that Federal Rule 15(a) will allow them a "second bite" at the claims filing process.

In addition to being flawed and unfounded, the Appellants' novel legal argument is precluded because Appellants never bothered to raise it in the Bankruptcy Court, despite having had every opportunity to do so. "It is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal." Diesel v. Town of Lewisboro, 232 F.3d 92, 107-08 (2d Cir. 2000) (deeming defendants to have waived an argument not raised in the lower court) (quoting Green v. U.S., 13 F.3d 577, 586 (2d Cir. 1994)); see also Allianz Ins. Co. v. Lerner, 416 F.3d 109, 115 (2d Cir. 2005) (refusing to hear a new argument on appeal where defendants gave no reason for failing to raise the issue in the court below and would not suffer any injustice if the court refused to hear the argument). Appellants had a full and fair opportunity to raise such an alleged "right" with the Bankruptcy Court and chose not to. Thus, the Equity Committee respectfully maintains that Appellants' new theory should not be considered by this Court.

II.     THE BANKRUPTCY COURT CORRECTLY HELD THAT THE APPELLANTS DO NOT HAVE A COGNIZABLE CLAIM FOR BREACH OF THE INDENTURES

A.     The Conversion Rights Did Not Continue Beyond the Petition Date

Appellants contend that not only were their New Claims timely amendments, but the Bankruptcy Court erred in determining that the New Claims had no merit. See 6% Brief at 28-40; 7.75% Brief at 24-39. Unable to sufficiently support this argument in the Bankruptcy Court, Appellants, on appeal, developed several frivolous theories premised on contract interpretation to

support their claim. Despite Appellants' attempts at creativity, it is a well-established matter of bankruptcy law that upon the filing of a bankruptcy petition, all pre-petition debt automatically accelerates to maturity, thereby rendering the principal and interest due under the Notes. See In re Calpine Corp., 365 B.R. at 398; In re Manville Forest Products Corp., 43 B.R. 293, 297 (Bankr. S.D.N.Y. 1984); In re LHD Realty Corp., 726 F.2d 327, 330-31 (7th Cir. 1984). In addition, the Indentures themselves expressly provide that the commencement of a chapter 11 case by Calpine is an event of default that automatically accelerates the Notes, causing the principal and interest on the Notes to "ipso facto become and be immediately due and payable." DA-Tab 2, Indenture § 5.2(e); DA-Tab 5, 4.75% Notes Indenture § 6.02(a). As such, both under the plain terms of the Indentures and as a matter of bankruptcy law, there is no question that the Debtors' bankruptcy filing accelerated the maturity of the Notes on the Petition Date.

The Indentures further provide that the Conversion Rights expire upon maturity of the Notes. See DA-Tab 3, 6% Notes Indenture; DA-Tab 4, 7.75% Notes Indentures at A-5 (The "conversion right shall commence on the initial date of the Notes and expire at the close of business on the Business Date immediately preceding the date of Maturity."); DA-Tab 5, 4.75% Notes Indentures at A-4 (same). Thus, the Conversion Rights terminated when the Notes matured on the Petition Date.

Although Appellants concede that the Indentures provide for (i) automatic acceleration of the Notes upon commencement of the Debtors' bankruptcy case and (ii) termination of the Conversion Rights upon maturity of the Notes, they put forth a number of ill-founded arguments that the Conversion Rights survived the Debtors' bankruptcy filing. First, they claim that, because "maturity" is not defined in the Indentures, this Court should find that (i) automatic acceleration of the Notes advanced the maturity date for the purpose of causing the Notes to

become immediately due and payable, but not for the purpose of causing the Conversion Rights

to terminate, and (ii) "maturity," with respect to the Conversion Rights, can only mean stated

maturity. See 6% Brief at 31; 7.75% Brief at 30. To buttress these assertions, the 6% Notes

Committee specifically points to certain provisions in the Indentures that they claim support their

strained definition of maturity: (i) the use of "maturity" and "acceleration" in the disjunctive,[11]

(ii) the definition of "Principal Amount at Maturity" to mean the "principal amount at maturity

set forth on the face of such [n]ote," (iii) the existence of a condition precedent to the Conversion

Rights which is a specified future date, and (iv) the fact that the conditions precedent to the

exercise of the Conversion Rights do not require the absence of an event of default. See 6%

Brief at 31-33; 7.75% Brief at 29-34; see also DA-Tab 5, 4.75% Notes Indenture § 6.01(7); DA-

Tab 3, 6% Notes Indenture §§ 6.01(4), 1.01(b), 10.01(a)(1)-(5); DA-Tab 4, 7.75% Notes

Indenture §§ 6.01(4), 10.01(a)(1)-(5).

    Appellants' arguments, however, are contradicted by the terms of the Indentures, which

provide that the Conversion Rights expire upon maturity of the Notes. See DA-Tab 3, 6% Notes

Indenture; DA-Tab 4, 7.75% Notes Indentures at A-5 (The "conversion right shall commence on

the initial date of the Notes and expire at the close of business on the Business Date immediately

preceding the date of Maturity."); DA-Tab 5, 4.75% Notes Indentures at A-4 (same). Moreover,

Appellants' interpretation of "maturity" would allow the Noteholders to "call" the principal and

interest under the Indentures while retaining the Conversion Rights separately. Such an

interpretation would allow the Noteholders to obtain more than they bargained for under the

---

[11]    The Equity Committee notes that this argument is also a new argument, based upon the text of the Indentures, which was raised on appeal but which was not raised before the Bankruptcy Court. As such, this argument should not be considered by the Court on appeal. See Allianz Ins. Co. v. Lerner, 416 F.3d 109, 115 (2d Cir. 2005) (refusing to consider an argument raised for the first time on appeal in which the party arguing sought to set forth a new contract interpretation argument regarding a lease agreement which was the subject of litigation in the court below).

Indentures (i.e., the right to obtain principal plus interest *and* the conversion "up-side") and amounts to an impermissible attempt to use the bankruptcy process to graft into the Indentures a benefit the Appellants failed to obtain through contractual negotiations.  See Jackson Heights Care Ctr., LLC v. Bloch, No. 2006-02874, slip op. at 2, 39 A.D.3d 477, 479 (2d Dept. April 3, 2007) ("When interpreting a contract, a court determines the intent of the parties from within the four corners of the contract ..."); see also In re Adelphia Commc'ns. Corp., 342 B.R. 142, 153 (Bankr. S.D.N.Y. 2006) ("if the bank lenders wished to contract for additional remedies (which likewise was their right, if their contract counterparty was agreeable to providing such), the bank lenders could have done so").  The Appellants obviously bargained for the protection of automatic acceleration but did not bargain for Conversion Rights to survive automatic acceleration.  They cannot have it both ways now by advancing their definition of "maturity." Cf. Palmieri v Allstate Ins. Co., 445 F.3d 179, 187 (2d Cir. 2006) ("In determining … the construction of contractual language, a court should accord that language its plain meaning.").

The Indentures lack any provisions expressly providing that the Conversion Rights were to continue following an event of default.  By contrast, the Indentures include provisions that expressly protect the Conversion Rights under other circumstances (e.g., anti-dilution protections, protections for the Conversion Rights in the case of a merger or similar transaction, and the termination of Calpine's right to redeem the Notes upon an event of default).  Recognizing the effect of this drafting omission on their Conversion Damages claims, the Appellants claim that inclusion of these protections, and the absence of a provision expressly terminating their Conversion Rights upon the Debtors' bankruptcy, evidences the Debtors' inability to eliminate the Conversion Rights.  See 7.75% Brief at 31-32.  On the contrary, such protections actually highlight the fact that the Appellants recognized the potential for elimination

24

and did not take steps to preserve the Conversion Rights during bankruptcy or provide for damages upon termination of the Conversion Rights. The Appellants' failure to include such protections belies their claim for Conversion Damages, as Appellants are only entitled to the bargained-for rights set forth in their Indentures. See Broad v. Rockwell Int'l Corp., 642 F.2d 929, 955 (5th Cir. 1981) (Appellants "have a legitimate interest only in those rights that are accorded them under the[ir] [i]ndenture.").

Appellants also claim that the Indentures contemplate survival of the Conversion Rights after acceleration because section 10.15(d) of the Indenture provides that during a continuing event of default, upon conversion, the Appellants receive payment solely in the form of stock. See 6% Brief at 33, 7.75% Brief at 25-29; DA-Tab 4, 7.75% Notes Indenture § 10.15(d); DA-Tab 3, 6.0% Notes Indenture § 10.15(d); DA-Tab 5, 4.75% Notes Indenture § 10.14(d).[12] Yet, Section 10.15(d) provides that if there is a conversion, Calpine cannot use its cash to pay the Appellants. This provision is intended to limit the rights of the Appellants – by limiting the currency in which they can get paid – and is not intended to expand their rights. The Appellants cannot use a provision intended to limit their recovery as a means to create a post-default right to convert, when the Indentures plainly provide that the Conversion Rights have terminated by virtue of automatic acceleration of the maturity date.

Further, because the Conversion Rights terminate one day prior to maturity, section 10.15(d) only has meaning in the event the Conversion Rights are ripe on the day before the Notes mature. Section 10.01(a) of the indentures governs the conditions precedent to conversion. DA-Tab 3, 6% Notes Indenture § 10.01(a); DA-Tab 4, 7.75% Notes Indenture §

---

[12]     Section 10.15(d) of the 6% Notes Indenture, section 10.15(d) of the 7.75% Notes Indenture, and section 10.14(d) of the 4.75% Notes Indenture are substantially similar. For ease of reference, the Equity Committee refers to each of these sections as "section 10.15(d)."

10.01(a); DA-Tab 5, 4.75% Notes Indenture § 10.01(a).  To the extent any of these conditions are met one day prior to a bankruptcy filing and automatic acceleration of the maturity date, then section 10.15(d) would allow a Convertible Noteholder to swap its claim for principal and accrued interest for common stock in bankruptcy.  Here, because the conditions precedent to conversion had not been met on the day prior to the Petition Date, the Conversion Rights were not ripe.  Thus, despite Appellants' assertions to the contrary, section 10.15(d) is not applicable in this case.

Appellants' last textual argument is that the Conversion Rights survived the Petition Date because the Notes are non-callable.  See 7.75% Brief at 30.  This argument is nothing more than an attempt to recast their claim for breach of Conversion Rights as a claim for breach of no-call provisions.  There can, however, be no breach of the Indentures based upon a reading of the Indentures because (i) the Notes matured on the Petition Date pursuant to the terms of the Indentures and by operation of bankruptcy law, (ii) maturity of the Notes caused the Conversion Rights to terminate under the terms of the Indentures, and (iii) the Indentures did not include any provision for preservation of Conversion Rights in the event of bankruptcy or compensation upon termination of such rights.

> ### B.    Payment of the Repayment Amounts Does Not Give Rise to Conversion Damages

Appellants further argue that payment of the Repayment Amounts alone would breach or prematurely terminate their Conversion Rights because such rights have independent economic value.  See 6% Brief at 28-30, 34-38; 7.75% Brief at 35-39.  In support of this assertion, Appellants suggest that the Conversion Rights were a critical component of their total "consideration" under the Notes, and that they will be deprived of the full extent of such consideration by the payment of only the Repayment Amounts.  See 6% Brief at 36.  However,

the Bankruptcy Court properly found in its Bench Decision that, upon the Petition Date, the Conversion Rights were otherwise unexercisable, and held no independent economic value apart from the debt component of the Notes. DA-Tab 1, Bench Decision at 100.

Elimination of a valueless conversion right is not compensable, especially where, as here, the conversion rights were "under water" and unexercisable at the time of the bankruptcy filing. Pursuant to section 502(b) of the Bankruptcy Code, claims are determined "as of the date of the filing of the petition." 11 USC § 502(b). There is no question that as of the Petition Date, not only was Calpine's stock trading far below the conversion price of the Notes, but the Conversion Rights were not even exercisable because none of the conditions precedent for conversion had been met. See DA-Tab 3, 6% Notes Indenture § 10.01(a); DA-Tab 4, 7.75% Notes Indenture § 10.01(a); DA-Tab 5, 4.75% Notes Indenture § 10.01(a). Thus, there was no value in the Conversion Rights on the Petition Date. See AMERICAN BAR FOUNDATION, COMMENTARIES ON MODEL DEBENTURE INDENTURE PROVISIONS, 527 (1971) (noting that in the event the stock price is lower than the conversion price, the value of the conversion right is "virtually destroyed").

While an unexercisable conversion right may have some value on the open market, it is not sufficient to support a claim. Many investments have a market value yet do not give rise to a claim in bankruptcy. For example, courts have determined that options, such as put rights, stock options and warrants, carry no value for claims purposes unless they are either exercisable or enforceable against the debtor. See In re Einstein/Noah Bagel Corp., 257 B.R. 499, 509 (Bankr. D. Ariz. 2000) (noting that the "rights of holders of claims and interests are fixed as of the date of the petition" and denying claimant damages on account of put right that was unexercisable and unenforceable at the time of the debtor's bankruptcy filing); In re Search Fin. Serv's Acceptances Corp., 2000 WL 256889 at *3 (N.D. Tex. Mar. 7, 2000) (holding that claim based

on warrants with unripe redemption feature as of the petition date should be treated as an equity interest); In re Baldwin-United Corp., 52 B.R. 549, 550 (Bankr. S.D. Ohio 1985) (stating that holders of stock options did not have a claim unless their right to receive a cash payment had matured).

Appellants assumed the risk that the issuer of the notes would engage in activities that preclude exercise of conversion rights and they cannot now make a claim for compensation when they knowingly agreed to the limitations on the Conversion Rights in the Indentures. See Broad, 642 F.2d at 956 (noting that a purchaser of convertible notes "takes the risks inherent in the equity feature of the security"). A "convertible debenture is an indivisible unit; the issuer has but one obligation to meet, either redemption *or* conversion. It can never be required to do both." Chock Full O' Nuts Corp. v. U.S., 453 F.2d 300, 305 (2d Cir. 1971). Rather, "the conversion feature of a bond is not assignable apart from the bond itself." Id. As such, Appellants cannot now argue that the Conversion Rights were a critical component of their consideration under the Notes. Appellants understood the risk at the time of contracting that the Conversion Rights may never ripen.

Nor do the cases cited by the 6% Notes Committee and the 7.75% Notes Committee add weight to their contention that the Conversion Rights held independent value. Each of the cases cited by the 6% and 7.75% Notes Committees for this proposition involve transactions regarding either stock options or warrants in the context of a merger – not a bankruptcy – where, in each case, an anti-destruction/anti-dilution clause was present to protect the stock or warrant option in the event of a merger. See 6% Brief at 29-30; 7.75% Brief at 37. See also R.A. Mackie & Co., L.P. v. Petrocorp Inc., 329 F.Supp. 2d 477, 504 (S.D.N.Y. 2004) (J. Koeltl) (involving the treatment of stock warrants during a merger event where the agreement underlying the warrants

28

specifically provided for certain treatment of the warrants in the event of a merger); Hilton Hotels Corp. v. Dunnet, 275 F.Supp. 2d 954, 964 (W.D. Tenn. 2003) (involving the treatment of stock options during a merger event where the underlying agreement had a provision protecting the options in certain events); Lillis v. AT&T Corp., et al., C.A. No. 717-N, 2007 WL 2110587, at *14-15 (Del. Ch. July 20, 2007) (involving the proposed termination of stock options in the event of a merger where the agreement underlying the options had provided protection to the "economic position" of the options in the event of a merger).  However, warrants and stock options are investment vehicles that can be independently traded, whereas conversion rights are inseparable from convertible bonds.  See Chock Full O' Nuts Corp., 453 F.2d at 304-05.  In fact, in Lillis, the Delaware Chancery actually cited the "general rule" that "under water" options are terminated in mergers or similar corporate events for *no consideration*, and the court awarded damages to under-water option holders purely due to a specific clause in the stock option plan which protected the "economic position" of each stock option participant in the event of a merger.  Lillis, 2007 WL 2110587, at *12-15 (stating that without the "economic position" clause, the economic positions of the options would not have been preserved).  In the present case, Appellants have raised no clause in the Indentures which specifically protects their Conversion Rights in the event of the Debtors' bankruptcy.

Likewise, any assertion by Appellants that mirrors a "dashed expectation" argument must also fail because there is no provision in the Indentures independently protecting the Conversion Rights against termination in bankruptcy.  Appellants "have a legitimate interest only in those rights that are accorded them under the[ir] [i]ndenture."  Broad, 642 F.2d at 955.  To the extent noteholders bargain for protections, such as an anti-dilution provisions or preservation of conversion rights in the event of a merger, the economic position of the right to convert may be

29

maintained.  Unless there exists a "contractual limitation on the corporation's activities" with respect to the existence of Conversion Rights, "there is no common law protection for the debenture holders from whatever steps the corporation might take that could result in the diminution in value or practical extinction of the conversion right."  6A Fletcher Cyc. Corp. § 2649.10 (2006).  As such, Appellants had no expectation of conversion on the Petition Date because the Conversion Rights were not ripe at that time and were not protected in the event of termination.  Likewise, Debtors are not required to pay Appellants for any loss of those Conversion Rights.

C.    Payment of the Claims, Beyond the Repayment Amounts, Would Violate the Absolute Priority Rule

Contrary to the Appellants' contention, the Indentures do not contemplate any circumstance under which they could ever be paid principal plus accrued interest *plus* an additional premium based on the Conversion Rights.  Indeed, any such treatment would be a clear violation of the absolute priority rule, which is embodied in the "fair and equitable" requirement for reorganization plan confirmation under Bankruptcy Code section 1129(b)(2)(B).  Section 1129(b)(2)(B) of the Bankruptcy Code states, in relevant part, that a plan is "fair and equitable" with respect to a class of unsecured claims if:

> (i)  the plan provides that each holder of a claims of such class receive or retain an account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
>
> (ii)  the holder of any claims or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

11 U.S.C. § 1129(b)(2)(B).  The absolute priority rule "provides that a dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property under a reorganization plan."  Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 202

30

(1988). Courts have read into this rule the corollary that "a senior class cannot receive more than full compensation for its claims," such that, after a class of creditors receives 100% on account of its claims, all remaining value must flow down the capital structure, with any "left over" being distributed to equity holders. In re Granite Broad. Corp. et. al., 369 B.R. 120, 140 (Bankr. S.D.N.Y. 2007) (A "corollary of the absolute priority rule is that a senior class cannot receive more than full compensation for its claims.") (citing In re Exide Tech., 303 B.R. 48, 61 (Bankr. D. Del. 2003)).

The Indentures clearly provide that holders of the Notes are entitled to (i) principal, paid in cash, plus the upside difference between the conversion price and the Debtors' stock price, paid in common stock, or, (ii) where the stock price is lower than the conversion price, the conversion value (which will be less than the full repayment of the principal), paid in cash. See DA-Tab 3, 6% Notes Indenture § 10.15(b); DA-Tab 4, 7.75% Notes Indenture § 10.15(b); DA-Tab 5, 4.75% Notes Indenture § 10.14(b). During a continuing event of default, the Appellants may only receive these amounts in the form of stock. See DA-Tab 3, 6% Notes Indenture § 10.15(d); DA-Tab 4, 7.75% Notes Indenture § 10.15(d); DA-Tab 5, 4.75% Notes Indenture § 10.14(d). Thus, by receiving par plus accrued interest under the Debtors' Second Amended Plan, the Appellants are receiving the _**entire**_ benefit of their bargain under the Indentures. To permit the Appellants any additional value in the form of Conversion Damages or otherwise would violate both the terms of the Indentures and section 1129(b) of the Bankruptcy Code.

Accordingly, as the Bankruptcy Court correctly concluded, allowing the Appellants to obtain Conversion Damages would result in a double recovery for Appellants. DA-Tab 1, Bench Decision at 100. To allow such a recovery, would be a clear violation of the absolute priority rule.

D.    <u>The Conversion Damages are not Contingent or Unmatured Claims Enforceable Against the Debtors</u>

Appellants also claim that the Bankruptcy Court misapplied section 502(b) of the Bankruptcy Code by denying Appellants' contingent or unmatured claims for Conversion Damages without estimating these claims.  <u>See</u> 6% Brief at 38-40.  However, this argument is factually unfounded.  First, the Conversion Damages claims were neither contingent nor unmatured on the Petition Date.  As the Bankruptcy Court correctly recognized, as of the Petition Date, none of the conditions precedent to the exercise of the Conversion Rights had occurred and, in accordance with the Indentures, the Debtors' bankruptcy forever terminated any right of the Appellants to exercise their Conversion Rights.  Second, the Conversion Rights as of the Petition Date were not "ripe" and, therefore, were unenforceable against the Debtors as per the Indentures.  Therefore, the Conversion Damages claims were neither contingent nor unmatured on the Petition Date.  Indeed, contrary to Appellants' assertions, the Bankruptcy Court did determine the value of the Conversion Damages as of the Petition Date; it determined their value to be zero.

A court will not allow a claim where it is unenforceable against a debtor.  <u>See</u> <u>Riverwood Int'l Corp. v. Olin Corp. (In re Manville Forest Prods.)</u>, 225 B.R. 862, 866 (Bankr. S.D.N.Y. 1998) (citing <u>U.S. v. LTV Corp. (In re Chateaugay Corp.)</u>, 944 F.2d 997 (2d Cir. 1991)) (emphasis added); <u>see also</u> <u>In re Jobs.com, Inc.</u>, 283 B.R. 209, 214-15 (Bankr. N.D. Tex. 2002) (holding that shareholders' contingent claims were disallowed as unenforceable against the debtor where, pre-petition, the shareholder claimants had demanded the debtor redeem their shares but had failed to comply with the conditions precedent to such redemption under the underlying shareholder agreement and where the debtor was unable to redeem the shares under state law because doing so would have rendered the debtor insolvent); <u>Glidden Co. v. FV Steel</u>

and Wire Co., 350 B.R. 96, 99 (E.D. Wis. 2006) (affirming lower bankruptcy court decision to estimate contingent claim for future environmental cleanup costs at zero where such potential costs were "highly conjectural"). Under the present circumstances, on the Petition Date, the Conversion Rights were un-exercisable and valueless. Accordingly, they were unenforceable against the Debtors. See In re Einstein/Noah Bagel Corp., 257 B.R. at 509.

Moreover, according to Appellants' argument, if the Conversion Rights did not terminate on the Petition Date, the Conversion Damages would be unascertainable until a future date (and their value would be dependant upon the appreciation or depreciation of Calpine stock). This argument suggests that the Conversion Damages claims are actually akin to unmatured interest which is not allowed pursuant to section 502(b)(2) of the Bankruptcy Code. See 11 U.S.C. § 502(b)(2). As such, the Bankruptcy Court was correct in finding, in its Bench Decision, that to the extent the New Claims had been allowed, the Conversion Damages claims had no merit.

III.    THE BANKRUPTCY COURT CORRECTLY HELD THAT EVEN IF THE APPELLANTS HAVE A COGNIZABLE CLAIM FOR BREACH OF THE INDENTURES, SUCH CLAIM MUST BE SUBORDINATED

A.    Conversion Damages Claims, to the Extent Allowed, Must Be Subordinated Pursuant to Bankruptcy Code Section 510(b)

Appellants assert that not only are they entitled to Conversion Damages claims, but any Conversion Damages claims are not susceptible to subordination pursuant to Bankruptcy Code section 510(b). See 6% Brief at 40-44; 7.75% at 40-41. Section 510(b) of the Bankruptcy Code provides in pertinent part:

> For the purpose of distribution under this title, a claim … for damages arising from the purchase or sale of such a security … shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C. § 510(b).  Damages are deemed to "arise from" a security transaction where "'the transaction is part of the causal link leading to the injury.'" Rombro v. Dufrayne (In re Med Diversified, Inc.), 461 F.3d 251, 254 (2d Cir. 2006) (quoting In re PT-1 Commc'ns., 304 B.R. 601, 608 (Bankr. E.D.N.Y. 2004)).

The 6% and 7.75% Notes Committees assert that Conversion Damages are not susceptible to subordination because the Noteholders did not bear the downside risk of becoming a shareholder with respect to the Conversion Rights and, therefore, the Conversion Damages share "no transactional nexus" to the "purchase or sale of stock."  See 6% Brief at 40-44; 7.75% at 40-42.  This argument is misplaced.  Courts have broadly interpreted section 510(b) to apply to the subordination of claims based on breach of a right to receive stock or related transactions. See In re WorldCom, Inc., No. 02-13533, slip copy, 2006 WL 3782712, at * 5 (Bankr. S.D.N.Y. Dec. 21, 2006) (holding that a claimant's "claims for damages related to his unexercised stock options and the common stock held in his [accounts] should be subordinated pursuant to section 510(b) of the Bankruptcy Code"); In re Worldwide Direct, Inc., 268 B.R. 69, 73 (Bankr. D. Del. 2001) (subordinating a claim for breach of contract due to the debtor's failure to issue stock to the creditor pursuant to a severance agreement); In re Med Diversified, 461 F.3d at 259 (subordinating a claim for damages based upon the debtor's failure to issue its common stock to an employee executive as provided by prepetition agreement); Am. Broad. Sys., Inc. v. F. Patrick Nugent, et al. (In re Betacom of Phoenix, Inc.), 240 F.3d 823, 832 (9th Cir. 2001) (affirming the bankruptcy court's subordination of a breach of an agreement to pay stock and cash).  See also Alexandra Global Master Fund, Ltd. v. Ikon Office Solutions, Inc., No. 06 Civ. 5383, slip copy, 2007 WL 2077153, at * 16 (S.D.N.Y. July 20, 2007) (J. Koeltl) (referring to conversion rights as the "equity aspects" of notes).  Certainly the Appellants' claims that their right to "purchase"

stock through the conversion of their debt is a transaction related to the purchase and sale of a stock.

Moreover, Appellants' theory under which they seek Conversion Damages is based upon a lost expectation theory in which they assert that they have lost the right to take on the risks and expectations of a shareholder via their conversion of debt for shares of Calpine stock. See In re Med Diversified, 461 F.3d at 257. Their Conversion Rights entitled them, in effect, to the right to "purchase" Calpine stock where they would otherwise hold onto the debt under the Notes. Thus, Appellants' claims for Conversion Damages are claims directly related to the purchase and sale of a security and must be subordinated "to all claims or interests that are senior or equal to the claim or interest represented by such security." 11 U.S.C. § 510(b).[13]

Accordingly, the Bankruptcy Court correctly held that to the extent the Appellants had been entitled to Conversion Damages, such claims would have been subordinated pursuant to section 510(b).

B.    To The Extent Appellants are Entitled to Conversion Damages, Such Claims Should Be Subordinated to Common Stock

Appellants further contend that their Conversion Damages claims, to the extent subordinated at all, should be subordinated only to other debt and not to common stock. See 6% Brief at 44-47; 7.75% Brief at 43-46. Section 510(b) of the Bankruptcy Code expressly provides that Conversion Damages claims must be "subordinated to all claims or interests that are senior to or equal the *claim or interest represented by such security*." 11 U.S.C. § 510(b). Appellants incorrectly contend that the Conversion Rights are represented by the Notes, debt instruments, and, therefore, any Conversion Damages must be subordinated only to general unsecured claims.

---

[13]    The definition of "equity security" found in Bankruptcy Code section 101(16)(c), which expressly excludes "a right to convert", is irrelevant because section 510(b) refers to the purchase or sale of a *security*, the definition of which does *not* exclude a right to convert. 11 U.S.C. § 101(49).

However, in the present case, the interest is the Conversion Right that, although it arises by execution of a debt instrument (i.e., the Notes), entitles its holder to the *potential* opportunity to purchase a common stock security. As such, the Conversion Rights would ordinarily be *pari passu* with common stock, under section 510(b). Therefore, the damage claim must be subordinated to common stock.[14] See Alexandra Global Master Fund, Ltd. 2007 WL 2077153, at * 14.

Accordingly, the Bankruptcy Court correctly held, in its Bench Decision, that to the extent the Appellants had been entitled to Conversion Damages, such claims would have been subordinated pursuant to section 510(b).

IV.    THE BANKRUPTCY COURT'S ORDER, WHICH DENIED THE CLAIMS TO THE EXTENT THEY SOUGHT AMOUNTS OVER AND ABOVE THE REPAYMENT AMOUNTS, WAS PROPER AND SHOULD BE AFFIRMED

Appellants make a final, last-ditch attempt at avoiding the terms of the Order by asserting that the Order adjudicated matters beyond the scope of Debtors' requested relief and the record before the Bankruptcy Court. See 6% Brief at 47-50; 7.75% Brief at 46-47, HSBC Brief at 12-14, M&T Brief at 13-18. However, the record, as established by the Objection, the Responses and statements made at the Hearing, clearly reflects the fact that all Claims beyond principal and interest were before the Bankruptcy Court.

The Debtors' Objection requested that the Bankruptcy Court "grant the Debtors' Objection and disallow the Convertible Noteholders' claims to the extent they seek amounts beyond Principal and Interest" and attached the Proposed Order which proposed to grant this

---

[14]    Section 510(b) is clear that a damage claim is subordinate to all claims or interests equal to the underlying security "except that if **such security is common stock**, such claim has the same priority as common stock." 11 U.S.C. § 510(b) (emphasis added). Here, the security at issue is not common stock, and therefore the exception is inapplicable.

request.  DA-Tab 27, Objection at 13-14; DA-Tab 28, Proposed Order at 2.  Contrary to the

Appellants' assertions, the Debtors were under no obligation to specifically object to every

*conceivable* claim that could be alleged by the Appellants; that burden remained at all times with

the Appellants.  See HSBC Brief at 14-17.  See In re Bagnato, 80 B.R. 655, 658 (S.D.N.Y. 1987)

(noting that "the burden of persuasion remains at all times with the claimant and at no time does

the objector assume the burden of disproving the claim or the nature of the claim") (citation

omitted); see also In re King, 305 B.R. 152, 164-165 (S.D.N.Y. 2004) (explaining that the once

the presumption of the validity and amount of a filed claim is overcome by an objection, "the

claimant must demonstrate by a preponderance of the evidence the extent and validity of its

claim").  Thus, the Debtors' Objection to all of the Claims, to the extent they included amounts

above principal and interest, addressed even the "make-whole" claims that the Appellants now

seek to assert.

Appellants' assertions that they were denied due process protections, likewise ring

hollow.  Appellants were provided with every opportunity to address and oppose the merits of

the relief requested in the Debtors' Objection in their Responses and at the Hearing.  See M&T

Brief at 13-18; see also HSBC Brief at 12-17.  In fact, all of the Appellants filed Responses and

appeared at the Hearing.  Appellants cannot now state that their due process rights were infringed

if they chose to focus their arguments at the Hearing, and in their Responses, on their Conversion

Damages claims.  See 6% Brief at 47-50; 7.75% Brief at 46-47; M&T Brief at 18-20.  See C-TC

9th Avenue P'ship v. Norton Co. (In re C-TC 9th Avenue P'ship), 113 F.3d 1304, 1312 (2d Cir.

1997) (finding the record sufficiently developed where, despite the absence of a hearing on

defendant's motion to dismiss the debtor's case, defendant's motion was made in its cross

motion to dismiss the debtor's adversary proceeding against it and where plaintiff debtor had

ample opportunity to file opposing papers); see also In re Balco Equities Ltd., Inc., 312 B.R. 734, 754 n.7 (S.D.N.Y. 2004) (citation omitted).  Moreover, some of the Responses raised the issue of possible "make-whole" claims when they asserted that the Notes are non-callable.  See 6% Notes Committee Response at 8 (noting that the "issuer cannot voluntarily redeem any of the 6% Convertible Notes"); 7.75% Notes Committee Response at 17 (stating that the "7.75% Convertible Notes are non-callable").  Thus, the Objection was clear with respect to the relief requested, the Appellants were provided with ample opportunity to fully address the relief requested in the Objection and the Bankruptcy Court provided all interested parties with a full and fair opportunity to be heard at the Hearing.  See In re C-TC 9th Avenue P'ship, 113 F.3d at, 1312.

Nor can the Appellants argue, as they do now, that the Order was beyond the scope of the Bench Decision.  See 6% Brief at 47-50; 7.75% Brief at 46-47; M&T Brief at 18-20.  At the Hearing, all parties in interest discussed and argued the Debtors' requested relief – the disallowance of the Claims to the extent they sought *anything* more than principal and interest. Appellants, furthermore, even raised the issue of  "make-whole" claims when they argued that they "have a no call *just like the lenders in CalGen* to protect our consideration."  DA-Tab 1, Bench Decision at 75 (emphasis added).  The "make-whole" issue was determined by the Bankruptcy Court, along with any other *potential* claims other than principal and interest, which granted the Debtors' Objection and instructed the Debtors to  "[s]ettle an order consistent with the decision."  DA-Tab 1, Bench Decision at 102.  Thus, Appellants cannot now claim that they have other claims, such as "make-whole" claims, potentially assertable under the Claims – that issue was determined at the Hearing.

Moreover, the Bankruptcy Court properly entered the Debtors' Revised Proposed Order as the final Order. The Revised Proposed Order was "consistent with the decision" rendered by the Bankruptcy Court, in that it disallowed the Claims to the extent they sought Conversion Damages and other amounts above principal and interest, and even included terms which were beneficial to Appellants (such as indenture trustee fees and expenses which were included in the Repayment Amounts). Appellants' Proposed Order, by contrast, which sought the disallowance of the Conversion Damages only, but otherwise permitted the allowance of the Claims, failed to follow and actually limited the scope of the Bankruptcy Court's Bench Decision. DA-Tab 30, Revised Proposed Order at 2; DA-Tab 31, Appellants' Proposed Order at 1. Appellants' insinuations that the Bankruptcy Court disregarded their positions and somehow "favored" the Debtors by awarding them with the entry of the Revised Proposed Order is unfounded and disrespectful. See M&T Brief at 13-14, 20.

Lastly, the Bankruptcy Court went well beyond its duty to make "sufficient findings of fact and conclusions of law" to give this Court "a clear understanding of the basis" for the Bankruptcy Court's decision so that this Court may "determine the grounds" on which the Bankruptcy Court made its ruling. Corzin v. Fordu (In re Fordu), 201 F.3d 693, 710 (6th Cir. 1999). Contrary to the M&T's contentions and unlike the courts in C.E.H. McDonnell v. Am. Leduc Petroleums, Ltd., 456 F.2d 1170, 1176-77 (2d Cir. 1972) or in Taylor v. Taylor (In re Taylor), 233 B.R. 639, 643 (S.D.N.Y. 1999), cases cited by M&T, the Bankruptcy Court clearly articulated the basis for its decision and the basis for the relief requested by the Debtors (i.e., that the Debtors were requesting the denial of the New Claims to the extent that they sought more than the Repayment Amounts). DA-Tab 1, Bench Decision at 101-102; Order at 2. The Bankruptcy Court's decision was clear, well-reasoned and fully supported by current law. Thus,

the Bankruptcy Court, by entering the Order, properly adjudicated the matters before it by disallowing the Claims to the extent they sought amounts over and above the Repayment Amounts and the Order was well within the scope of the record before it.

## <u>CONCLUSION</u>

For the foregoing reasons, the Equity Committee respectfully requests that this Court affirm the Bankruptcy Court's Order denying the New Claims to the extent that they include claims for any amounts over and above principal, accrued interest and trustee fees and expenses, and grant such other relief as it deems appropriate.

Dated:  New York, New York
       September 24, 2007

**FRIED, FRANK, HARRIS, SHRIVER**
**& JACOBSON LLP**

 /s/ Gary Kaplan
Brad Eric Scheler (BS-8019)
Gary Kaplan (GK-4542)
Michael de Leeuw (MD-8479)
Susanna J. Gray (SG-7464)
One New York Plaza
New York, NY 10004
Telephone:  (212) 859-8000
Facsimile:   (212) 859-4000

Counsel for the Official Committee of Equity
Security Holders

596551

40