**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------x
In re:                                                :
                                                      : Chapter 11
CALPINE CORPORATION, <u>et</u> <u>al.</u>,            : Case No. 05-60200 (BRL)
                                                      :
                   Debtors.                           :
                                                      :
--------------------------------------------------------x
ARISTEIA CAPITAL, L.L.C.,                             :
AURELIUS CAPITAL MANAGEMENT,                          :
LP, DRAWBRIDGE SPECIAL                                :
OPPORTUNITIES ADVISORS LLC, ORE                       :
HILL HUB FUND LTD., NISSWA                            :
MASTER FUND LTD., PINES EDGE                          :
VALUE INVESTORS LTD., PINES EDGE                      : Civil Case No. 07-07830 (JGK)
VALUE INVESTORS L.P., SILVER                          :
SANDS FUND LLC, STARK MASTER                          :
FUND LTD., 3V CAPITAL                                 :
MANAGEMENT, LLC, BRENCOURT                            :
CREDIT OPPORTUNITIES MASTER,                          : **ORAL ARGUMENT REQUESTED**
LTD., BRENCOURT MULTI-STRATEGY                        :
ENHANCED DEDICATED FUND, LP,                          :
DILLON READ U.S. FINANCE L.P.,                        :
DILLON READ FINANCIAL PRODUCTS                        :
TRADING LTD., LINDEN CAPITAL L.P.                     :
AND ORE HILL HUB FUND, LTD., HSBC                     :
BANK USA, N.A., AS INDENTURE                          :
TRUSTEE FOR THE 6% CONVERTIBLE                        :
NOTES DUE 2014 AND THE 4.75%                          :
CONTINGENT CONVERTIBLE NOTES                          :
DUE 2023, AND MANUFACTURERS &                         :
TRADERS TRUST COMPANY, AS                             :
INDENTURE TRUSTEE FOR THE 7.75%                       :
CONVERTIBLE NOTES,                                    :
                                                      :
                   Appellants,                        :
                                                      :
                   -against-                          :
                                                      :
                                                      :
                                                      :
                                                      :
                                                      :
                                                      :

CALPINE CORPORATION AND ITS           :
AFFILIATED DEBTORS AND DEBTORS        :
IN POSSESSION, OFFICIAL               :
COMMITTEE OF UNSECURED                :
CREDITORS OF CALPINE                  :
CORPORATION, OFFICIAL                 :
COMMITTEE OF EQUITY SECURITY          :
HOLDERS,                              :
                                      :
                   Appellees.         :
-----------------------------------------------------------x

**REPLY BRIEF OF APPELLANT HOLDERS OF 6% CONVERTIBLE NOTES**

# TABLE OF CONTENTS

**Page**

ARGUMENT ............................................................................................................... 1

    A.    The Proof of Claim Sufficiently Stated a Claim for Compensatory Damages for *All* Breaches of the Indenture. ................................................1

    B.    Amended Claims for Breach of Contract "Relate Back" to Proofs of Claim Asserting Claims Under the Same Contract. ...............................3

    C.    The Appellees Have Failed to Show Any Basis in the Record for Connecting Any "Delay" in Filing the Original Supplement and Any Alleged Prejudice...............................................................................4

    D.    The Appellees Have Failed to Justify the Bankruptcy Court's Disallowance of the Conversion Right Claims on the Merits....................9

        1.    The Conversion Right Is a Valuable Contract Right; Its Wrongful Termination Gives Rise to a Damage Claim.................9

        2.    The Indenture Did Not Empower Calpine to Abrogate the Conversion Right By Defaulting. ...................................................12

        3.    The Appellees Have Ignored the Basic Principle that a Contract Party Cannot Use Its Own Breach to Deprive the Other Party of Contract Rights. .....................................................13

        4.    The Conversion Right Claims Are "Contingent," "Unmatured" Claims that Are Allowed Under the Bankruptcy Code. ........................................................................14

        5.    The Conversion Right Is Not "Unmatured Interest."....................17

    E.    The "Absolute Priority" Rule Requires that the Noteholders Be Compensated for Their Entire "Bundle of Rights" – Including the Conversion Right Claims – Before Any Distributions Are Made to Equity........................................................................................................18

    F.    Bankruptcy Code Section 510(b) Is Inapplicable Here and, If Applicable, Requires Subordination Only Below Other *Debt* Claims. ...................................................................................................19

        1.    The Appellant Holders Did Not Waive the Right to Assert the Section 510(b) Issue.................................................................19

2.     Because the Noteholders Simply Do Not Bear the *Downside* Risks of an Equity Position, Neither *Med Diversified* Rationale Exists Here...................................................20

3.     Even If Subordination Is Appropriate, the 6% Convertible Notes Must Be the Reference "Security" Under Section 510(b)........................................................................22

G.     Joinder with HSBC's Reply Brief; Incorporation by Reference. ...............24

CONCLUSION..........................................................................................25

## **TABLE OF AUTHORITIES**

### **CASES**

*Aetna Cas. & Sur. Co. v. LTV Steel Co. (In re Chateaugay Corp.)*,
    94 F.3d 772 (2d Cir. 1996)...................................................................2

*Alexandra Global Master Fund, Ltd. v. IKON Office Solutions, Inc.*,
    No. 06-5383, 2007 WL 2077153 (S.D.N.Y. July 20, 2007).............................23

*Allen v. Geneva Steel Co. (In re Geneva Steel Co.)*,
    281 F.3d 1173 (10th Cir. 2002) ...........................................................20

*In re Andover Togs, Inc.*,
    231 B.R. 521 (Bankr. S.D.N.Y. 1999)....................................................3

*In re Baldwin-United Corp.*,
    52 B.R. 549 (Bankr. S.D. Ohio 1985)....................................................16

*In re Bloomingdale Partners*,
    160 B.R. 101 (Bankr. N.D. Ill. 1993) .....................................................2

*Broad v. Rockwell Int'l Corp.*,
    642 F.2d 929 (5th Cir. 1981), *cert. denied*, 454 U.S. 965 (1981)......................9

*Brown v. Providence Gas Co.*,
    445 F. Supp. 459 (D.R.I. 1976)...........................................................3

*In re Calpine Corp.*,
    365 B.R. 392 (Bankr. S.D.N.Y. 2007)..............................................10, 18

*Carrieri v. Jobs.com, Inc.*,
    393 F.3d 508 (5th Cir. 2004) .............................................................16

*Chock Full O'Nuts Corp. v. United States*,
    453 F.2d 300 (2d Cir. 1971)..............................................................17

*Consol. Rock Prods. Co. v. Du Bois*,
    312 U.S. 510 (1941).......................................................................18

*Cont'l Motors Corp. v. Morris*,
    169 F.2d 315 (10th Cir. 1948) .............................................................3

*Debentureholders Protective Comm. of Cont'l Inv. Corp. v. Cont'l Inv. Corp.*,
    679 F.2d 264 (1st Cir. 1982), *cert. denied sub nom. Glen Corp. v. O. C.*
    *Assocs.*, 459 U.S. 894 (1982)............................................................19

*Duel Glass v. Search Fin. Servs., Inc. (In re Search Fin. Servs. Acceptance*
    *Corp.)*,
    2000 WL 256889 (N.D. Tex. Mar. 7, 2000) ............................................16

*In re Einstein/Noah Bagel Corp.*,
    257 B.R. 499 (Bankr. D. Ariz. 2000)....................................................16

*In re Enron Corp.*,
    298 B.R. 513 (Bankr. S.D.N.Y. 2003), *aff'd*, 419 F.3d 115 (2d Cir. 2005).........3

*In re Enron Corp.*,
    341 B.R. 141 (Bankr. S.D.N.Y. 2006)..................................................................21

*FDIC v. Knostman*,
    966 F.2d 1133 (7th Cir. 1992) ........................................................................3

*In re First Am. Health Care of Ga., Inc.*,
    No. 96-20188, 1997 WL 33477665 (Bankr. S.D. Ga. Apr. 28, 1997)..............16

*In re Hemingway Transp., Inc.*,
    954 F.2d 1 (1st Cir. 1992)................................................................1, 2, 15

*Johnson v. Home State Bank*,
    501 U.S. 78 (1991)..........................................................................................15

*LTV Corp. v. Valley Fid. Bank & Trust Co. (In re Chateaugay Corp.)*,
    961 F.2d 378 (2d Cir. 1992)........................................................................17

*Lake River Corp. v. Carborundum Co.*,
    769 F.2d 1284 (7th Cir. 1985) .......................................................................10

*Mazzeo v. United States (In re Mazzeo)*,
    131 F.3d 295 (2d Cir. 1997)........................................................................14

*Midland Cogeneration Venture Ltd. P'ship v. Enron Corp. (In re Enron Corp.)*,
    419 F.3d 115 (2d Cir. 2005).................................................................. *passim*

*In re O'Brien Envtl. Energy Inc.*,
    188 F.3d 116 (3d Cir. 1999)...........................................................................9

*Official Comm. of Unsecured Creditors v. Dow Corning Corp. (In re Dow
    Corning Corp.)*,
    456 F.3d 668 (6th Cir. 2006), *cert. denied*, 127 S. Ct. 1874 (2007)...........17, 18

*Peckarsky v. Am. Broad. Co.*,
    603 F. Supp. 688 (D.D.C. 1984) ....................................................................3

*Peltz v. Welsh, Carson, Anderson & Stowe VII, L.P. (In re Bridge Info. Sys.)*,
    311 B.R. 781 (Bankr. E.D. Mo. 2004) ...........................................................17

*In re Provincetown-Boston Airlines, Inc.*,
    72 B.R. 307 (Bankr. M.D. Fla. 1987) .............................................................14

*R.A. Mackie & Co. v. PetroCorp Inc.*,
    329 F. Supp. 2d 477 (S.D.N.Y. 2004).............................................................10

*In re R.H. Macy & Co.*,
    166 B.R. 799 (S.D.N.Y. 1994).........................................................................6

*Racusin v. Am. Wagering, Inc. (In re Am. Wagering, Inc.)*,
    493 F.3d 1067 (9th Cir. 2007) .......................................................................21

*Raven Media Invs. LLC v. DirecTV Latin Am., LLC (In re DirecTV Latin Am.,
    LLC)*,
    No. 03-981, 2004 U.S. Dist. LEXIS 2425 (D. Del. Feb. 4, 2004).............22, 23

*Rombro v. Dufrayne (In re Med Diversified, Inc.)*,
    461 F.3d 251 (2d Cir. 2006)....................................................................20, 21, 22

*Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*,
    691 F.2d 1039 (2d Cir. 1982), *cert. denied*, 460 U.S. 1012 (1983)...................14

*Slayton v. Am. Express Co.*,
    460 F.3d 215 (2d Cir. 2006).....................................................................................3

*In re Stirling Homex Corp.*,
    579 F.2d 206 (2d Cir. 1978)...................................................................................21

*Travelers Cas. & Sur. Co. v. Pac. Gas & Elec. Co.*,
    549 U.S. __, 127 S. Ct. 1199 (2007)....................................................................16

*United Merchs. & Mfrs., Inc. v. Equitable Life Assurance Soc'y (In re United*
    *Merchs. & Mfrs., Inc.)*,
    674 F.2d 134 (2d. Cir. 1982).................................................................................16

*United States v. Harrell*,
    268 F.3d 141 (2d Cir. 2001)...................................................................................20

*United States v. Koldstad (In re Koldstad)*,
    928 F.2d 171 (5th Cir. 1991), *cert. denied*, 502 U.S. 958 (1991).......................6

*United States v. Winstar Corp.*,
    518 U.S. 839 (1996)...............................................................................................10

*United States Trust Co. v. Revere Copper & Brass, Inc. (In re Revere Copper &*
    *Brass, Inc.)*,
    60 B.R. 887 (Bankr. S.D.N.Y. 1985).................................................................15, 16

*Vista Eyecare, Inc. v. Neumann (In re Vista Eyecare, Inc.)*,
    283 B.R. 613 (Bankr. N.D. Ga. 2002) .................................................................23

*In re WorldCom, Inc.*,
    No. 02-13533, 2006 WL 3782712 (Bankr. S.D.N.Y. Dec. 21, 2006) ...............21

## STATUTES AND RULES

11 U.S.C. § 101(16) ....................................................................................................23, 24

11 U.S.C. § 502(b) .....................................................................................................*passim*

11 U.S.C. § 510(b) .....................................................................................................*passim*

11 U.S.C. § 726(a) .............................................................................................................19

Fed. R. Bankr. P. 7001(8)...............................................................................................20

Fed. R. Civ. P. 15(c)...........................................................................................................3

Fed. R. Evid. 802 ...............................................................................................................4

## OTHER AUTHORITIES

American Bar Foundation, Commentaries on Indentures (1971) ........................9

The Appellant Holders[1] respectfully submit this Reply Brief in further support of reversal of the Bankruptcy Court's Order and in response to:  (i) the "Brief of Debtors-Appellees" (the "Debtors' Brief," cited as "Dr. Br."); (ii) the "Brief of Appellee Official Committee of Unsecured Creditors [etc.]" (the "Creditors Committee Brief," cited as "Cr. Br."); and (iii) the "Opposition Brief of Appellees the Official Committee of Equity Security Holders" (the "Equity Committee Brief," cited as "Eq. Br.").

## ARGUMENT

### A.     The Proof of Claim Sufficiently Stated a Claim for Compensatory Damages for *All* Breaches of the Indenture.

The Debtors mischaracterize the Appellant Holders' position as being that "merely attaching the Indentures to the Original Claims and referring to the Notes by their names . . . stated a discernable claim for conversion rights."  (Dr. Br. at 16; *see also* Cr. Br. at 10-11.)  The Proof of Claim, however, did far more:  it asserted claims for any and all breaches of the Indenture, and expressly included a claim for "compensatory . . . damages."  (*See id.* [App. 1], Attachment ¶¶ 2(f) & 3; Opening Brief at 9-10, 16-17.)

Indeed, the Proof of Claim provided *more* information about the Noteholders' contract claims than the First Circuit found sufficient in *In re Hemingway Transport, Inc.*, 954 F.2d 1 (1st Cir. 1992).  There, a timely-filed proof of claim based on a note and mortgage executed by one of two affiliated debtors included as an attachment a copy of the mortgage.  The mortgage stated that it was "subject to" the creditor's lease with the other debtor, which included an indemnity clause (*see id.* at 3 n.2), but no claim was expressly asserted under the lease, and it was not attached.  After the claims bar date, the trustee sued the creditor under CERCLA; the creditor counterclaimed for attorneys' fees under the lease's indemnity provision; and the trustee objected to the timeliness of

---

[1]     All capitalized terms used but not otherwise defined in this Reply Brief have the meaning given such terms in the "Opening Brief of Appellant Holders of 6% Convertible Notes" (the "Opening Brief").

1

the attorneys' fees claim.  The First Circuit upheld the lower court's rejection of the trustee's objection to the timeliness of the indemnity claim under the lease, because the mortgage stated that it was "subject to" the lease:  the original proof of claim placed the "estate on reasonable notice of [the creditor's] contingent indemnification claim under the [lease]."  *See id.* at 9.  In contrast to *Hemingway Transport*, the Proof of Claim here attached *all* pertinent agreements, incorporated them by reference and asserted claims for *all* rights thereunder, expressly including compensatory damages for breach.

Moreover, the Appellees' attempts to distinguish the previously-cited cases that further support the Proof of Claim's adequacy (*see* Opening Brief at 17-18) are unavailing.  The Debtors assert that the creditor in *In re Bloomingdale Partners*, 160 B.R. 101 (Bankr. N.D. Ill. 1993), stated its claims "much more specifically than the Original Claims and would have put a reasonable person on notice of what they were seeking." (Dr. Br. at 16 n.35; *see also* Cr. Br. at 13.)  In fact, *nothing* in the *Bloomingdale Partners* proof of claim ever mentioned common law claims for private nuisance, or even that the creditors were seeking monetary damages, yet that proof of claim was sufficient.  The Debtors also try to distinguish *Aetna Casualty & Surety Co. v. LTV Steel Co. (In re Chateaugay Corp.)*, 94 F.3d 772 (2d Cir. 1996), on the basis that there was already a well-developed body of law that the United States is treated as a unitary body for setoff purposes in bankruptcy.  (Dr. Br. at 16 n.35.)  The Second Circuit did not, however, rely on such a theory in reaching its decision.  Finally, the Debtors try to distinguish *In re Integrated Resources, Inc.*, 157 B.R. 66 (S.D.N.Y. 1993), since "the amended proofs of claim did not seek an increase in the amount of the claimant's original claims" and the case "dealt with a counterclaim to a debtor's fraudulent transfer claim."  (*See* Dr. Br. at 17 n.35.)  Whether the amendment increased the claim is irrelevant to the original proof of claim's adequacy, though; and the amendment asserted *tort* claims, whereas the original proof of claim asserted only *contract* claims.  Thus, both the case law and common sense show that the Proof of Claim asserted and preserved **all** rights under the Indenture.

2

**B.      Amended Claims for Breach of Contract "Relate Back" to Proofs of Claim Asserting Claims Under the Same Contract.**

The discrete question of whether an amendment "relates back" under Federal Rule of Civil Procedure 15(c)[2] on the basis of some common conduct, transaction or occurrence is a legal issue subject to *de novo* review. *See Slayton v. Am. Express Co.*, 460 F.3d 215, 227-28 (2d Cir. 2006).[3] Here, the Bankruptcy Court erred as a matter of law in holding that the breach of contract claims asserted in the Original Supplement did not "relate back" to the timely-filed Proof of Claim *based on the very same contract*, of which the Conversion Right was an integral part.

The Appellees have simply ignored the cases cited in the Opening Brief which hold that a breach of contract claim "relates back" to a complaint for a different breach of the same contract. *See* Opening Brief at 21-22 (citing *FDIC v. Knostman*, 966 F.2d 1133, 1138-39 (7th Cir. 1992) & *Peckarsky v. Am. Broad. Co.*, 603 F. Supp. 688, 693 (D.D.C. 1984)); *see also, e.g.*, *Brown v. Providence Gas Co.*, 445 F. Supp. 459, 462-63 (D.R.I. 1976). Indeed, this type of "relation back" has long been applied in the specific context of bankruptcy claims. *See, e.g.*, *Cont'l Motors Corp. v. Morris*, 169 F.2d 315, 316-17 (10th Cir. 1948) (creditor allowed to file amended claim after bar date that asserted "additional items of damages . . . arising from the breach of the same executory contract"; such claim "did not constitute a new claim," but "only additional items of the claim or grounds for recovery on file"); *In re Andover Togs, Inc.*, 231 B.R. 521, 550 (Bankr. S.D.N.Y. 1999) (different claims under same lease). None of the potpourri of

---

[2]     The Creditors Committee asserts that the Appellant Holders' reliance upon the test for amending pleadings under Rule 15(c) is misplaced, and that this was not the test the Second Circuit used in *Midland Cogeneration Venture Ltd. Partnership v. Enron Corp. (In re Enron Corp.)*, 419 F.3d 115 (2d Cir. 2005) (hereinafter "*Enron*"). (*See* Cr. Br. at 15.) This contention is perplexing, since the Second Circuit *began* its discussion of the test for permitting a claim amendment by referring to Rule 15 (*see* 419 F.3d at 133) and affirmed a decision which used Rule 15(c) as the framework for its analysis. *See In re Enron Corp.*, 298 B.R. 513, 521-22 (Bankr. S.D.N.Y. 2003), *aff'd*, 419 F.3d 115 (2d Cir. 2005).

[3]     In light of *Slayton*, the Creditors Committee's contention – without citation of authority – that the standard of review on a "relation back" decision is "abuse of discretion" (*see* Cr. Br. at 14) is wrong.

3

cases the Appellees cite regarding the "relation back" issue involved an amendment that asserted a breach of the *same contract* underlying the original complaint or claim.

> **C.** **The Appellees Have Failed to Show Any Basis in the Record for Connecting Any "Delay" in Filing the Original Supplement and Any Alleged Prejudice.**

The Appellees attempt to conflate: (i) the standard for permitting the amendment of a claim that "relates back" to a timely proof of claim; and (ii) the "excusable neglect" test for late-filed proofs of claim. (*See* Dr. Br. at 27 n.70; *see also* Cr. Br. at 15-16.) In *Enron*, 419 F.3d 115 (2d Cir. 2005), however, the Second Circuit clearly recognized an important distinction between the two tests. "While belated *amendments* will ordinarily be 'freely allowed' where other parties will not be prejudiced, belated *new* claims will ordinarily be denied, even absent prejudice, unless the reason for the delay is compelling." *Id.* at 133-34 (emphasis in original). Because the Original Supplement did, as explained above, "relate back" to the timely Proof of Claim, "the critical consideration is whether the opposing party will be *unduly prejudiced* by the amendment." *Id.* at 133 (emphasis added) (citation and quotations omitted).

The Appellees' arguments about "prejudice" are more illuminating for what they omit than for what they say. Most tellingly, they have essentially ignored the Appellant Holders' point that there was no evidentiary[4] or other basis for the Bankruptcy

---

[4]    Contrary to the Debtors' representations, the Appellant Holders' counsel have not "agreed" that the Debtors were not required to put on evidence of any prejudice they claimed warranted disallowance of an amended claim. (*See* Dr. Br. at 3 n.2.) Rather, counsel agreed only that the evidentiary hearing on *damages* would not occur at this time. (*See* Tr. at 49:9-14 ("We are not disputing that they can make a representation that *we believe* at an evidentiary hearing *we will ultimately be able to prove damages* in the hundreds of millions of dollars. We've also agreed that we are not having *that evidentiary hearing* today." (emphasis added)).)

The Debtors also assert that the Bankruptcy Court "could take judicial notice" that there were plan negotiations to support its determination of undue prejudice. (*See* Dr. Br. at 24 n.59.) The Bankruptcy Court did not, however, purport to take judicial notice of anything but, even if it had, judicially noticing that the Debtors were negotiating cannot, *per se*, support a factual finding of "prejudice." Indeed, the Bankruptcy Court could hardly take "judicial notice" of what was occurring in private, out-of-court discussions to which it was not a party. Moreover, any information the Bankruptcy Court received in other hearings or proceedings to which the Appellant Holders were not a party, and that was not placed on the record in *this* contested matter to which they are a party, could not be considered or used against them here. *See, e.g.*, FED. R. EVID. 802 (hearsay rule).

Court's assumption of a *causal link* between (i) the supposed "delay" in asserting the Conversion Right Claims and (ii) the Debtors being "forced" to deal with those claims during the plan process and reserve for them under a plan.  Similarly, the Appellees fail to address the point that the Debtors waited to file objections to almost $500 million of "make-whole" claims whose timeliness was not challenged until *less than thirty days* before objecting to the Conversion Right Claims.  In light of this delay in objecting to large, unliquidated claims that were timely-filed, there was no basis for the Bankruptcy Court's speculation that the Debtors could have avoided addressing the Conversion Right Claims during the plan process had the words "conversion claims" been inserted into the original Proof of Claim.  (*See* Opening Brief at 23-26.)

Indeed, a recent statement by the Debtors in support of a proposed settlement of certain *timely* make-whole claims reinforces this point:

> The Debtors are currently embroiled in two other disputes regarding makewhole claims . . . that have lasted several months and could continue for several years.  Therefore, it is likely that this litigation could also span for several months (or years) . . . .

("Debtors' Motion for Approval of Stipulation with Calpine Unsecured Noteholders and HSBC Bank USA, N.A., as Indenture Trustee" [Docket 6021] at 12.)  Given that the litigation of *timely-filed* make-whole claims "could continue for several years," the argument that the "delay" in asserting the Conversion Right Claims could disrupt the plan process by forcing the Debtors to address those claims during that process rings hollow.

Significantly, this is not a case where a plan was negotiated without knowledge of the Conversion Right Claims.[5]  The Debtors filed their first plan in June

---

[5]     The Debtors cite *Enron* for the proposition that the fact that a claim was submitted before the filing of a plan is not ordinarily conclusive.  (*See* Dr. Br. at 24.)  *Enron*, however, involved a type of prejudice not present here.  Those claimants sought to "amend" a claim filed against one debtor – ENA – to assert a claim based on a guarantee against another debtor – Enron.  In affirming the denial of leave to amend, the Second Circuit repeatedly cited to the potential prejudice resulting from opening of the "flood gates" to similar late guarantee claims, noting the *undisputed* assertion that 26% of all Enron-related debtors – including ENA – received credit support in the form of Enron guarantees.  *See* 419 F.3d at 121, 125, 131, 132.

2007, three months *after* the Original Supplement was filed, and admit that even now, "the Plan is still the subject of extensive negotiations."  (Dr. Br. at 24.)

The Debtors try to distract the Court from their inability to connect the "prejudice" to the "delay" by focusing on the potential size of the Conversion Right Claims.  But if there is no relationship between the delay and any prejudice, then the size of the claims, the fact that the Debtors will have to reserve for[6] and deal with them, or the fact that the claims may reduce distributions to others, cannot, by themselves, be a basis for denying the amendment, *because the same can be said of any large claim, timely-filed or not* – such as the make-whole claims which were originally presented as "unliquidated" claims, but were ultimately asserted in amounts aggregating approximately half a *billion* dollars.  (*See* Opening Brief at 25 & n.7.)

Prejudice requires something more than "'a simple dollar-for-dollar depletion of assets otherwise available for timely filed claims.'"  *Enron*, 419 F.3d at 130 (quoting *In re R.H. Macy & Co.*, 166 B.R. 799, 802 (S.D.N.Y. 1994)).[7]  Focusing on the size of the claim, divorced from whether the delay resulted in any prejudice, improperly conflates the function of the bar date with that of the claims-allowance process.  *See United States v. Koldstad (In re Koldstad)*, 928 F.2d 171, 173-74 (5th Cir. 1991) (claim filing deadlines "enable a debtor and its creditors to know, reasonably promptly what parties are making claims against the estate and in what general amounts," but "by no means fix in stone the final 'allowed' amounts of claims"; "bar dates establish the universe of participants in the debtor's case, [but] they have little correlation to the final

---

[6]    The Equity Committee's theory that having to reserve for the Conversion Right Claims "could jeopardize the Debtors' reorganization" (Eq. Br. at 18) is baseless hyperbole.  Having to reserve for these – or any other – disputed claims under the Debtors' "waterfall" plan poses no impediment at all to a reorganization, because the Plan does not guarantee unsecured creditors or equity holders any particular level of recovery.

[7]    *Enron* did not suggest, as hinted by the Debtors in footnote 51 of the Debtors' Brief, that the mere size of a claim itself constitutes prejudice, only that it *may* be relevant if allowance would, for example, force the disgorgement of payments already made under a confirmed plan.  *See Enron*, 419 F.3d at 130.  That type of prejudice is not present here.

6

relative amounts in which creditors will share any distribution") (allowing amendment that quadrupled the initial amount of claim), *cert. denied*, 502 U.S. 958 (1991).

The Debtors contend that, because the Noteholders' conversion claims could be as high as $500 million, the conversion claims for all three convertible note issues could be three times that, or $1.5 billion – a baseless extrapolation that the Debtors, armed with financial advisors, could not conceivably believe to be true. (*See* Dr. Br. at 12-13, 21.) For example, the conversion price for the 4.75% notes is about *70% higher* than that for the 6% Convertible Notes ($6.50 versus $3.85), and the 4.75% notes are redeemable five years before the scheduled maturity of the 6% Convertible Notes. (*See* Amended and Restated Indenture, dated as of March 12, 2004, attached as Exhibit A to proof of claim 2823, §§ 1.01 (defining "Conversion Price"); 3.07 (providing right to redeem in November 2009).) Using the Debtors' current estimate that the existing Calpine stock is worth $933 million in the aggregate (*see* Third Amended Disclosure Statement [Docket 6089] at 3), the Appellant Holders estimate that the conversion right claims for all three issues combined would approximate $258 million.

Moreover, for the Noteholders' Conversion Right Claims to reach the neighborhood of $500 million, the value of the existing equity would have to be far *greater* than the $933 million estimated by the Debtors. Even using the high end of the Debtors' range of business valuation and the low end of their range of estimated claims (*see id.* at 8-10, 170-71) the existing stock would be worth an aggregate of $2.5 billion, in which event the Appellant Holders estimate that the conversion right claims for the Noteholders would approximate $544 million, and those for all three convertible issues combined would approximate $1.2 billion. Further, as enthusiastic as the Debtors are about exaggerating the conversion claims in this appeal, they no doubt would energetically argue for vastly lower values if this Court reverses the Order.

The Appellees also accuse the Appellant Holders of "bad faith" and "dilatory behavior." (*See* Dr. Br. at 26; Eq. Br. at 17-18.) The Bankruptcy Court did not,

however, make any finding of "bad faith," and none was warranted.  Moreover, there was no "dilatory behavior."  The original Proof of Claim was sufficiently broadly-worded so as to encompass the Conversion Right Claims, and the Indenture Trustee filed the Original Supplement as a precautionary measure at the Appellant Holders' request shortly after the Appellant Holders engaged special counsel in February 2007.[8]

The fact that the Claims Resolution Stipulation [Docket 3501] "failed to include amounts for Conversion Damages" (Eq. Br. at 18) does not, as the Equity Committee argues, suggest "dilatory behavior" by the Indenture Trustee or the Noteholders.  To the contrary, the fact that this stipulation included no description or quantification of, and was explicitly without prejudice to, *any* unliquidated claims (such as any make-whole claims) (*see id.* ¶ 9) merely reflects that the Debtors *chose* not to address those issues in January 2007 – just as they *chose* to delay until June 2007 in challenging unliquidated make-whole claims of other noteholders and then *chose* to exclude the 6% Convertible Notes from that objection.  (*See* Opening Brief at 24-25.)

The Debtors assert that "despite countless requests," the Noteholders "refused to specify any estimates of the dollar amount of damages they are seeking on account of the 'conversion rights.'"  (Dr. Br. at 12.)  This statement is both irrelevant and false.[9]  Resorting to further fiction, the Creditors Committee makes the baseless assertion that the Bankruptcy Court "found" prejudice on this basis.  (*See* Cr. Br. at 18-19.)  In fact, the transcript portion cited by the Creditors Committee (i.e., Tr. at 49-50) contains no

---

[8]   The Debtors misstate that, "[v]ery soon after the Bankruptcy Court issued the CalGen Refinancing Opinion, certain holders of the Notes engaged special counsel."  (Dr. Br. at 12.)  In fact, the Appellant Holders engaged counsel in February 2007, almost one month *before* the issuance of that opinion.  (*See* "Supplemental Verified Rule 2019 Statement of Milbank, Tweed, Hadley & McCloy LLP" [Docket 5534] at ¶ 3.)  Thus, the Appellant Holders' retention of counsel was unrelated to the CalGen opinion – as was the filing of the Original Supplement as a precautionary measure.

[9]   The only time the Appellant Holders declined a request for a "number" was when the Debtors contacted the Appellant Holders a few days before filing their initial disclosure statement and asked for a "number" to include in it, but refused to allow the Appellant Holders to see how that number would be used.  The Appellant Holders repeatedly expressed their willingness to discuss the "number" in a meeting with the Debtors, but the Debtors declined to have that meeting.

such finding, *and the Creditors Committee has not disclosed to this Court that the Appellant Holders gave that committee a range of numbers in their first settlement discussion.*[10]

> The Appellees also speculate that allowing the Conversion Right Claims would produce "a flood" of similar claims.  (*See, e.g.*, Eq. Br. at 17.)  In fact, the Creditors Committee resorts to misstating that the Bankruptcy Court "found" that allowing the Conversion Right Claims "would likely precipitate a flood" of claims based on "dashed expectations."  (*See* Cr. Br. at 18.)  The Creditors Committee cites nothing in the record to support this non-existent finding, because the Bankruptcy Court never made it.  Moreover, there is nothing in the record to indicate that a group of claims analogous to the conversion claims that are the subject of this appeal are poised to be filed if the Conversion Right Claims are allowed.  *Cf. Enron*, 419 F.3d at 132 ("We are thus mindful of the Third Circuit's caveat that 'prejudice is not an imagined or hypothetical harm; a finding of prejudice should be a conclusion based on facts in evidence.'" (quoting *In re O'Brien Envtl. Energy Inc.*, 188 F.3d 116, 127 (3d Cir. 1999)).

### D.    The Appellees Have Failed to Justify the Bankruptcy Court's Disallowance of the Conversion Right Claims on the Merits.

#### 1.    The Conversion Right Is a Valuable Contract Right; Its Wrongful Termination Gives Rise to a Damage Claim.

> There can be no real dispute that a contractual conversion right has value separate from that of the associated debt:  "The conversion right, although set forth in the debenture and in the indenture, is separate and distinct from the debt evidenced by the debenture.  As a separate right *it has its own ascertainable value*."  *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 942 (5th Cir. 1981) (emphasis added) (quoting AMERICAN BAR

---

[10]    The Debtors and the Creditors Committee also overlook the facts that: (1) the Debtors refused to meet with the Noteholders to review the calculation of the claim amount; (2) the Debtors have retained sophisticated financial advisors who can calculate the amount of the claim by running a Black-Scholes or similar model with various assumptions; and (3) a key variable in determining the amount of the Conversion Right Claims – the value of the Debtors' equity – is better known to the Debtors than the Appellant Holders and, in fact, under the Plan that value will not be determined until confirmation.

FOUNDATION, COMMENTARIES ON INDENTURES 522-23 (1971)), *cert. denied*, 454 U.S. 965 (1981). Nevertheless, the Appellees posit that because the Indenture does not specify damages or penalties in the event of a wrongful termination of the Conversion Right, the Noteholders have no damage remedy. (*See* Dr. Br. at 8; Cr. Br. at 32; Eq. Br. at 25.)

This theory is baseless. Contracts need not specify a remedy for breach in order for a breach to give rise to a damages claim. *See, e.g.*, *United States v. Winstar Corp.*, 518 U.S. 839, 885 (1996) (reciting Court's "conclusion that damages are available for breach even where the parties did not specify a remedy in the contract," because "damages are always the default remedy for breach of contract"); *Lake River Corp. v. Carborundum Co.*, 769 F.2d 1284, 1292 (7th Cir. 1985) ("The parties did not contract explicitly with reference to the measure of damages if the agreed-on damage formula was invalidated, but all this means is that the victim of the breach is entitled to his common law damages."); *In re Calpine Corp.*, 365 B.R. 392, 399 (Bankr. S.D.N.Y. 2007).

Equally baseless is the Equity Committee's argument that, because the Conversion Right was "under water" on the Petition Date[11] and not then exercisable, the right is "valueless." (*See* Eq. Br. at 27.) Previously cited case law, including *R.A. Mackie & Co. v. PetroCorp Inc.*, 329 F. Supp. 2d 477 (S.D.N.Y. 2004), plainly establishes that the wrongful termination of an "out of the money" option gives rise to compensable damages under state law. (*See* Opening Brief at 28-30.) The Appellees' attempt to distinguish these cases on the basis that they did not involve convertible notes or bankruptcy is unavailing; for purposes of measuring damages, a warrant or stock option's "option value" is analogous to that embedded within a conversion right.

The Debtors offer the mantra that the Noteholders "do not have a contractual right to both conversion and repayment" (Dr. Br. at 29), and the Equity

---

[11] The Appellees contend that, for purposes of fixing damages, the Conversion Right Claims should be valued as of the Petition Date. The Appellant Holders contend that the general rule that damages should be determined as of the date of the breach should apply. This issue, however, is not a part of the appeal.

10

Committee chimes in that the Appellant Holders are trying "to obtain more than they bargained for under the Indenture[] (i.e., the right to obtain principal plus interest *and* the conversion 'up-side')"  (Eq. Br. at 23-24 (emphasis in original)).  The fact is, however, that the Noteholders *do* have the contractual right to obtain principal plus interest and the conversion "upside"; specifically, they have the right to obtain periodic payments of interest until the scheduled maturity of the notes in 2014; to have the conversion "upside" for the duration of that term; and, if the "upside" does not materialize during that term, to be repaid their principal at the scheduled maturity.  Nothing in the Indenture gives the *Debtors* the option to extinguish this right by prepaying the 6% Convertible Notes.[12]

Further, the Appellees' arguments ignore that a fundamental element of any option is its duration.  The option holder bargains not only for the right to choose (here, to convert), but also for the right to "wait and see" before choosing.  The Appellees argue that the Noteholders should be forced, without compensation, to make that choice years earlier than they bargained for (while arguing elsewhere that the conversion option magically terminated before it ever became exercisable).

The Appellees' refrain that nothing in the Indenture protects the Conversion Right against termination in bankruptcy (*see, e.g.*, Eq. Br. at 29) has it backwards:  Section 10.01 of the Indenture provides that the Conversion Right may be exercised "at any time following September 30, 2013" and, upon certain contingencies not presently applicable, before then.  (Second Supplemental Indenture [App. 1, Ex. "C"] § 10.01(a)(2).)  The *Appellees* bear the burden of identifying an explicit provision in the Indenture that allows Calpine unilaterally to terminate this bargained-for right with impunity.  The Appellees have not met this burden because ***no such provision exists***.

---

[12]  The reference to the *Noteholders'* option to force Calpine to repurchase the Notes upon a change of control, but only for the amount of principal and accrued interest (Dr. Br. at 8-9), only underscores that termination of the Conversion Right prior to the 6% Convertible Notes' scheduled maturity in 2014 can occur only with the consent, or at the option, of the *Noteholders – not* at Calpine's option.

### 2.    The Indenture Did Not Empower Calpine to Abrogate the Conversion Right By Defaulting.

In their Opening Brief, the Appellant Holders demonstrated that the 6% Convertible Notes' provision that the Conversion Right "shall . . . expire at the close of business on the Business Day immediately preceding the date of Maturity" (Second Supplemental Indenture [App. 1, Ex. "C"] at A-5) simply refers to the expiration of the Conversion Right immediately prior to the scheduled maturity date of the 6% Convertible Notes of September 30, 2014 reflected in the form of Note, and did not empower Calpine to terminate the Conversion Right before then by defaulting.  The Appellant Holders explained why the Appellees' theory that "Maturity," as used in the Note, meant something other than that scheduled maturity date is inconsistent with the Indenture's text and applicable principles of contract interpretation.  (*See* Opening Brief at 30-33.)

In response, the *sole* textual support in the governing documents which the Appellees proffer for their interpretation of "Maturity" in the Note is the fact that the Indenture includes the defined term "Stated Maturity."  (*See* Original Indenture [App. 1, Ex. "A"] § 1.1.)  Based on the existence of this defined term, the Appellees posit that the undefined term "Maturity" could never be used to mean the same thing.

This facile construct is, however, flatly belied by section 6.01(4) of the Second Supplemental Indenture, which refers to debt "which . . . becomes due and payable (whether at *maturity*, *upon redemption or acceleration or otherwise*)."  (Second Supplemental Indenture [App. 1, Ex. "C"] § 6.01(4) (emphasis added).)  Unless the term "maturity" means the scheduled maturity, the further references to "acceleration," "redemption," and "otherwise" become mere surplusage.

The Appellees argue that section 6.01(4) refers to other indebtedness and other debt instruments (*see, e.g.*, Dr. Br. at 31-32), but they do not explain how the *same* word – "maturity" – can mean one thing in the form of Note, and another thing in section 6.01(4).  (*Cf.* Second Supplemental Indenture [App. 1, Ex. "C"] § 2.01 (providing that

"terms and provisions contained in the Notes shall constitute, and are hereby expressly made, a part of this Supplemental Indenture").)  They also conveniently ignore section 5.1(b) of the Original Indenture, which defines an Event of Default to include a "default in the payment of the principal of any Security . . . when the same becomes due and payable *at maturity or otherwise*."  (Original Indenture [App. 1, Ex. "A"] § 5.1(b) (emphasis added).)  This provision applies *only* to "Securities" issued under the Indenture.  (*See id.* § 1.1 (defining "Securities").)  The Appellees' interpretation of "maturity" as *any* date on which any "Security" becomes due and payable (rather than its scheduled maturity) makes the phrase "or otherwise" meaningless.

Nor do Appellees offer any cogent response to the point that an interpretation that would cause "maturity" to occur before 2009 conflicts with the use of "maturity" in the definition of "Principal Amount at Maturity."  That phrase is defined as the *full face amount* of the 6% Convertible Notes – which will not equal their "principal amount" until *2009*.  (*See* Opening Brief at 33; *cf.* Dr. Br. at 32.)  Similarly, the argument that section 10.15(d) of the Second Supplemental Indenture "governs only the form and value of consideration" upon an Event of Default (Cr. Br. at 26-27) misses the point that any attempt to "limit" the Conversion Right on or after a default (*see* Eq. Br. at 25) *must* presuppose and recognize that the Conversion Right continues to exist, in spite of *any* such default, including a Calpine bankruptcy filing.

On top of all this, an interpretation that would give Calpine the unilateral right to trigger a forfeiture of the Conversion Right by opting to default is commercially ludicrous, and not one the Court should stretch to adopt.  (*See* Opening Brief at 31.)

> **3.     The Appellees Have Ignored the Basic Principle that a Contract Party Cannot Use Its Own Breach to Deprive the Other Party of Contract Rights.**

The gist of the "acceleration upon bankruptcy" theory propounded by the Appellees and embraced by the Bankruptcy Court is that Calpine could use its own

default to terminate the contractual Conversion Right, without ever being liable for so doing. Incredibly, however, the Appellees make no meaningful attempt to address *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1053 (2d Cir. 1982), *cert. denied*, 460 U.S. 1012 (1983), which *reversed* a judgment adopting a similar construct. The Creditors Committee is the only Appellee even to *mention Sharon Steel*, and all it offers is a meaningless distinction.[13] Meanwhile, *none* of the Appellees has addressed the black-letter law that a party to a contract cannot benefit from its own breach at the other party's expense. (*See* Opening Brief at 36-37.) This long-standing and far reaching principle should be outcome-determinative here.

### 4.    The Conversion Right Claims Are "Contingent," "Unmatured" Claims that Are Allowed Under the Bankruptcy Code.

Contrary to the Appellees' theories, the fact that conditions precedent to the Conversion Right's exercise were not met on the Petition Date does not mean the Noteholders now have no "claim." To the contrary, the Conversion Right Claims are classic "contingent" or "unmatured" claims – extant on the Petition Date but dependant upon an external, post-petition event occurring first (and, in any event, absolute after September 30, 2013). *See, e.g.*, *Mazzeo v. United States (In re Mazzeo)*, 131 F.3d 295, 303 (2d Cir. 1997) ("Thus, a contingent debt is one which the debtor will be called upon to pay only upon the occurrence or happening of an extrinsic event which will trigger liability." (citation and quotations omitted)); *In re Provincetown-Boston Airlines, Inc*., 72 B.R. 307, 310 (Bankr. M.D. Fla. 1987) ("A contingent claim is by definition a claim which has not yet accrued and which is dependent upon some future event that may never happen."). Various provisions of the Bankruptcy Code, most notably section 502(b)(1),

---

[13]    The Creditors Committee tries to distinguish *Sharon Steel* on the basis that the acceleration provisions in the indentures at issue there "were permissive, as opposed to automatic." (*See* Cr. Br. at 32.) This "distinction" is meaningless, because the Second Circuit's determination that the issuer could not use its own default to circumvent bondholders' rights did not turn on whether the acceleration was "voluntary."

make clear that such "contingent" or "unmatured" claims remain valid "claims" against the Debtors and are not subject to categorical disallowance.  *See* Opening Brief at 38-40; *see also In re Hemingway Transp., Inc.*, 954 F.2d 1, 8 (1st Cir. 1992) (noting how "the term 'claim' is broad enough to encompass an unliquidated, contingent right to payment under a prepetition indemnification agreement executed by the debtor, even though the triggering contingency does not occur until after the filing of the petition").  This result accords with the fact that "Congress intended . . . to adopt the broadest available definition of 'claim.'"  *Johnson v. Home State Bank*, 501 U.S. 78, 83 (1991).  The Appellees' suggestion to the contrary, which the Bankruptcy Court apparently embraced, flies in the face of this plain statutory text and should be rejected by this Court.

United States Trust Co. v. Revere Copper & Brass, Inc. (In re Revere Copper & Brass, Inc.*), 60 B.R. 887 (Bankr. S.D.N.Y. 1985), is particularly instructive. There, the debtor ("Revere") gave the trustees of Harvard College ("Harvard") the right to "put" convertible debentures to Revere after a certain date, and backed Harvard's right with a letter of credit ("LC") issued by Marine Midland Bank ("Marine").  *See id.* at 888-89.  After Harvard exercised its "put" option, Revere soon filed for bankruptcy, and Harvard drew down on the LC post-petition.  *See id.* at 889.  A party in interest then objected to Marine's proof of claim on the theory that "Marine's claim against Revere did not arise until . . . Marine paid the letter of credit."  *Id.* at 891.  The court disagreed: "Revere's obligation to Marine is a classic example of a contingent claim.  It makes no difference to the allowability of Marine's claim that the contingency did not occur until after the petition was filed since Revere's obligation was in effect on the petition date." *Id.*  Moreover, "[t]he same analysis makes it clear that Harvard's [put] rights against Revere did not arise" when the "put" was actually exercised, but rather *at the time the initial agreement was executed*.  *See id.*  Thus, had Revere filed for bankruptcy in the interim, Harvard would have a "contingent" claim based upon the "put" agreement, even though Harvard could not actually exercise its "put" rights until after the petition date.

So too here; the Noteholders have had "contingent" claims based upon the Conversion Right – a right to "put" the 6% Convertible Notes back to Calpine in exchange for "Conversion Value" – ever since the Second Supplemental Indenture was executed.  Although contingent, the Conversion Right Claims existed on the Petition Date, and *Revere Copper*, *Hemingway Transport* and section 502(b)(1) each make clear that such claims' contingency cannot be grounds to disallow them in bankruptcy.[14]

Significantly, *none* of the Appellees ever address the inconsistency between their theories and the Supreme Court's decision in *Travelers Casualty & Surety Co. v. Pacific Gas & Electric Co.*, 549 U.S. __, 127 S. Ct. 1199 (2007), which specifically recognized the allowability of a claim for post-petition attorneys' fees under a pre-petition contract.  *See* Opening Brief at 39-40; *see also United Merchs. & Mfrs., Inc. v. Equitable Life Assurance Soc'y (In re United Merchs. & Mfrs., Inc.)*, 674 F.2d 134, 136-40 (2d. Cir. 1982) (reversing decision disallowing unsecured creditors' claims for post-petition "collection costs").  Under the Appellees' theories, *Travelers* was wrongly decided since, by definition, any claim for post-petition attorneys' fees would *always be zero*, and thus not exist, "as of the Petition Date."  (*See, e.g.*, Cr. Br. at 31; Eq. Br. at 27.)

---

[14]  The "option" cases the Appellees cite are not to the contrary.  Indeed, several of those cases *support* the conclusion that the Noteholders had "contingent" claims on the Petition Date, which cannot be categorically disallowed.  *See In re First Am. Health Care of Ga., Inc.*, No. 96-20188, 1997 WL 33477665, at *5-6 (Bankr. S.D. Ga. Apr. 28, 1997) (employee's stock option rights terminated, *pursuant to the agreement's terms*, when he quit his job *post-petition*; court suggests he would have retained valid claim had he not quit); *In re Baldwin-United Corp.*, 52 B.R. 549, 552 (Bankr. S.D. Ohio 1985) ("cash option" rights, which were contingent and unmatured on the petition date, gave rise to liquidated claims "[a]s these rights mature and are exercised" post-petition, which meant "the option holders . . . hold general unsecured claims against [the debtor] for the amount of the cash payments to which they are entitled").  The other cases turned on the fact that the underlying instruments were "equity securities" under section 101(16), and thus could not *also* be "claims."  *See Carrieri v. Jobs.com, Inc.*, 393 F.3d 508, 523-26 (5th Cir. 2004); *Duel Glass v. Search Fin. Servs., Inc. (In re Search Fin. Servs. Acceptance Corp.)*, 2000 WL 256889, at *2-3 (N.D. Tex. Mar. 7, 2000); *In re Einstein/Noah Bagel Corp.*, 257 B.R. 499, 506-07 (Bankr. D. Ariz. 2000) ("Put Right's" status as an "equity security" on the petition date excluded it from scope of "claims").  Here, the Conversion Right is expressly excluded from the definition of "equity security" by section 101(16)(C), and thus, even under the Appellees' cases, it may still be the basis for an allowable "claim."

**5.      The Conversion Right Is Not "Unmatured Interest."**

The Debtors assert that the Conversion Right is "equivalent to original issue discount ('<u>OID</u>')" and "must be disallowed as unmatured interest."  (*See* Dr. Br. at 38-39; *see also* Eq. Br. at 33.)  The Bankruptcy Court did not so rule, and for good reason.[15]  <u>First</u>, the *Peltz* case cited by the Debtors did not hold that conversion rights are disallowable in bankruptcy as OID.  Rather, the court recognized that conversion rights have significant discrete value that may constitute property which can be transferred for "preference" purposes, and also noted in a footnote that such value may be treated as OID *under the Internal Revenue Code.  See Peltz v. Welsh, Carson, Anderson & Stowe VII, L.P. (In re Bridge Info. Sys.)*, 311 B.R. 781, 792 n.7 (Bankr. E.D. Mo. 2004).  "The tax treatment of a transaction, however, need not determine the bankruptcy treatment."  *LTV Corp. v. Valley Fid. Bank & Trust Co. (In re Chateaugay Corp.)*, 961 F.2d 378, 383 (2d Cir. 1992).[16]  <u>Second</u>, the Debtors do not explain how the Conversion Right Claims can be disallowed as "OID" and "unmatured interest," when "make-whole" claims which represent damages in lieu of interest accruing after the Plan is consummated are being allowed.  <u>Third</u>, the Debtors' theory proves too much, because it would render *anything* that causes a lender to "accept[] lower interest rates" – including a lien – disallowable, which is not the law.  <u>Fourth</u>, the relationship between a conversion right and concessions on interest is not linear; creditors may offer a range of additional concessions (such as weaker covenants or more favorable payment terms) in exchange for a conversion right, and the Debtors offer no principled basis for allocating the value of the Conversion Right

---

[15]     Even had the Bankruptcy Court held that the Conversion Right Claims were treated as OID and disallowed as "unmatured interest" under 11 U.S.C. § 502(b)(2), the "absolute priority" rule would still require that the Noteholders be fully compensated for those contractual claims before any distribution could be made to equity holders.  *See, e.g., Official Comm. of Unsecured Creditors v. Dow Corning Corp. (In re Dow Corning Corp.)*, 456 F.3d 668, 677-80 (6th Cir. 2006) ("fair and equitable" requirement of section 1129(b) creates presumption of awarding unsecured creditors post-petition interest at their contractual "default" rate in a solvent case), *cert. denied*, 127 S. Ct. 1874 (2007).

[16]     It is also worth noting that the Second Circuit tax case on which the Debtors rely for their flawed "double-recovery" or "alternative performance" theory – *Chock Full O'Nuts Corp. v. United States*, 453 F.2d 300, 306 (2d Cir. 1971) – specifically held that a corporation, which had issued convertible bonds at par, cannot deduct the part of the issue price allocable to the conversion feature as OID.

among these various forms of consideration.  <u>Fifth</u>, no evidence exists that the Debtors ever treated the Conversion Right as OID on their financial statements.  Taken individually or together, these flaws doom the Debtors' OID thesis.  Nothing in the Bankruptcy Code or the case law bars allowance of the Conversion Right Claims.

> ### E.    The "Absolute Priority" Rule Requires that the Noteholders Be Compensated for Their Entire "Bundle of Rights" – Including the Conversion Right Claims – Before Any Distributions Are Made to Equity.

The Equity Committee argues that the allowance of the Conversion Right Claims would violate a "corollary" of the "absolute priority rule," i.e., that, "a senior class cannot receive more than full compensation for its claims."  (Eq. Br. at 31.)  The "absolute priority" rule does not, however, limit the *allowance* of claims.  Thus, for example, the allowance – under the Bankruptcy Court's CalGen decision, *In re Calpine*, 365 B.R. 392, and the court-approved stipulations – of "make-whole" claims, in addition to claims for principal and interest, does not violate the "absolute priority" rule.

In fact, the Equity Committee has it backwards.  The "absolute priority" rule *prohibits* any distribution to equity holders until the Noteholders are fully compensated for *all* of their rights under the Indenture, including the Conversion Right. Hence, the Noteholders are entitled to be compensated for the *entire bundle* of their legal entitlements against the Debtors before equity can receive *anything.  See, e.g., Consol. Rock Prods. Co. v. Du Bois*, 312 U.S. 510, 520-21 (1941) ("The full and absolute priority rule . . . would preclude participation by the equity interests in any of [the debtors'] assets until the bondholders had been made whole."); *see also id.* at 528 (whenever "lost rights are of value," full "compensatory provision must be made for the entire bundle of rights which the creditors surrender").

Importantly, the "absolute priority" rule requires that creditors be fully compensated for *all* valid claims before equity participates, even if some of those claims are not strictly "allowable" in bankruptcy.  *See, e.g., Dow Corning*, 456 F.3d at 678-80

(in solvent cases, creditors must get the "full benefit of their bargain with the debtor");
*Debentureholders Protective Comm. of Cont'l Inv. Corp. v. Cont'l Inv. Corp.*, 679 F.2d
264, 268-70 (1st Cir. 1982) (proposed plan for solvent debtor "was not 'fair and equitable'
because it did not compensate [convertible debenture holders] for the *contractual* right of
which they were deprived," even though such right to interest-on-interest does not give
rise to an allowable bankruptcy claim), *cert. denied sub nom. Glen Corp. v. O. C. Assocs.*,
459 U.S. 894 (1982); *see also* p. 17, n.15, *supra*.  Consistent with this requirement, the
Plan provides that unsecured creditors receive a full recovery of post-petition interest
prior to any distribution to equity (*see* Third Amended Disclosure Statement [Docket
6089] at 115-16), even though claims for "unmatured" (i.e., post-petition) interest are not
"allowed" pursuant to 11 U.S.C. § 502(b)(2).  By parity of reasoning, a claim which is
valid under state law but which is not "allowed" against the bankruptcy estate because it
was filed after the claims bar date (even though still within the applicable non-bankruptcy
limitations period) must be satisfied before any distribution to equity.[17]

F.     **Bankruptcy Code Section 510(b) Is Inapplicable Here
       and, If Applicable, Requires Subordination Only Below
       Other *Debt* Claims.**

1.     **The Appellant Holders Did Not Waive the Right to
       Assert the Section 510(b) Issue.**

Rather than respond to the Appellant Holders' arguments on the merits, the
Debtors hide behind the theory that the Appellant Holders somehow "waived" the section
510(b) issue.  (*See* Dr. Br. at 39 n.106.)  This theory is baseless.  Although the Appellant
Holders' briefing on this issue below focused on the patent procedural defects in the

---

[17]   As to late-filed claims, this construct mirrors precisely the result under 11 U.S.C. § 726(a)(3)-(6).
Indeed, in a chapter 7 case, late-filed claims are accorded a *higher* priority in distribution than post-
petition interest.  *See* 11 U.S.C. §§ 726(a)(3), (5).  Thus, if the absolute priority rule requires that valid
state law claims for post-petition interest, which are disallowed only as a matter of bankruptcy law
under section 502(b)(2), be satisfied before distributions to equity, then that rule must also require that
valid state law claims which are "disallowed" only because of a claims bar date be satisfied before any
distribution to equity.

Debtors' request for section 510(b) subordination,[18] the Appellant Holders also objected to the Debtors' position on the merits – both in their briefing *and* at oral argument.[19] Hence, this issue was pressed below and properly preserved for appeal.  *See, e.g.*, *United States v. Harrell*, 268 F.3d 141, 146-48 (2d Cir. 2001) (issues "pressed or passed upon below" may be raised and reviewed on appeal, including those that "fairly appear[] in the record," such as during in-court proceedings, "as having been raised or decided").

> **2.    Because the Noteholders Simply Do Not Bear the *Downside* Risks of an Equity Position, Neither *Med Diversified* Rationale Exists Here.**

All three Appellees recognize that *Rombro v. Dufrayne (In re Med Diversified, Inc.)*, 461 F.3d 251 (2d Cir. 2006), provides the appropriate standard for subordination here, but *none* of their briefs focus on the opinion's actual language.  (*See* Dr. Br. at 41-42; Cr. Br. at 36; Eq. Br. at 34-35.)  In *Med Diversified*, the court found that section 510(b)'s text is somewhat ambiguous and not directly grounded to the policy bases behind its inclusion in the Bankruptcy Code.  *See* 461 F.3d at 255-56; *accord Allen v. Geneva Steel Co. (In re Geneva Steel Co.)*, 281 F.3d 1173, 1179 (10th Cir. 2002) ("We cannot discern the scope of section 510(b) by examining only the text of the statute."). Thus, rather than read the statute literally, the Second Circuit focused on the "***only two*** rationales for mandatory subordination expressly or implicitly adopted by the Congress that enacted section 510(b)" – risk-allocation and creditor-reliance – and held that subordination is permitted "***only if***" one of those two rationales is present.  *See* 461 F.3d

---

[18]    (*See* "Response to Debtors' Objection [etc.]" [Docket 5427] at 24-25.)  The substance of the Appellant Holders' argument – i.e., the need for an adversary proceeding to effect "subordination" – was plainly correct.  *See, e.g.*, FED. R. BANKR. P. 7001(8) (adversary proceeding needed "to subordinate any allowed claim or interest, except when a . . . plan provides for subordination").

[19]    (*See* Response [Docket 5247] at 24 ("Any suggestion that a claim for breach of an indenture governing a debt security should be subordinated to equity is patently absurd."); Tr. at 51:8-17 (colloquy between counsel for the Appellant Holders and the Bankruptcy Court about the section 510(b) issue); Tr. at 85:11-87:12 (counsel for Appellant Holders making several section 510(b) arguments similar to those made in the Opening Brief).)

at 256 (emphasis added).  Because *neither* rationale is present here, subordination under section 510(b) is inappropriate under *Med Diversified*.

No one suggests that the creditor-reliance rationale exists here, which leaves only risk-allocation.  As explained in the Opening Brief, *Med Diversified* requires there to be **_both_** some upside ("return") **_and_** some downside ("risk") potential for subordination to be warranted.  (*See* Opening Brief at 41-44 (discussing the "binding agreement" at issue in *Med Diversified*).)  These *dual* components of risk-allocation were present in the several stock option cases the Appellees cite,[20] but here the **downside** risk is strikingly absent, as two cases discussed in the Opening Brief make clear.  First, in *Racusin v. American Wagering, Inc. (In re American Wagering, Inc.)*, 493 F.3d 1067, 1073 (9th Cir. 2007) – which only the Debtors even try to distinguish[21] – the court logically concluded that a creditor who held a claim *valued by reference* to the debtors' stock but "did not attempt to recover stock, and he never became a shareholder," could not occupy "the risk/return position of an equity investor."  Second, in *Raven Media*

---

[20]  *See In re WorldCom, Inc.*, No. 02-13533, 2006 WL 3782712, at *6 (Bankr. S.D.N.Y. Dec. 21, 2006) (subordinating "claims for damages related to [] unexercised stock options" that "flow directly from the catastrophic decline in the share price of the Debtors' stock"); *In re Enron Corp.*, 341 B.R. 141, 168-69 (Bankr. S.D.N.Y. 2006) (explaining how "the belief that employee stock options do not have substantial negative risk" is "contrary to the nature of the instrument itself," and detailing why this fact places such options within the risk-allocation rationale for subordination).  Indeed, cases such as *WorldCom* and *Enron* fit within the classic framework for subordination detailed in *In re Stirling Homex Corp.*, 579 F.2d 206 (2d Cir. 1978); they involve holders of "equity securities" under section 101(16)(C) attempting to bootstrap themselves up into the creditor pool by asserting claims for the *diminished* value of those securities (i.e., the actual occurrence of the downside risk they always bear).  In contrast, the Noteholders' claims do not arise from a decline in the value of any equity security; rather, their claims are for the unlawful elimination of a right arising from a debt "security," which right never exposed the Noteholders to a risk of loss if the value of Calpine's equity declined.

[21]  The Debtors' purported distinction – that "Racusin merely provides that claims for cash damages valued ***by reference to*** a stock price are not subject to subordination" (Dr. Br. at 42 (emphasis in original)) – fails miserably.  As is the case here, the creditor in *American Wagering* had the right to receive consideration in the form of cash *and* actual stock.  *See* 493 F.3d at 1070 (quoting the underlying agreement, which provided that Racusin "would be paid 4 1/2% of the final evaluation ***in the form of Leroy's common stock*** and $150,000 cash" (emphasis added)).  The creditor subsequently abandoned his effort to get the stock itself, in favor of damages measured "by reference to" the value of the stock he was supposed to receive.  *See id.*  The Noteholders seek a comparable damages award.  *American Wagering* makes crystal clear that such an indexed damages award falls outside the risk-allocation rationale for mandatory subordination under section 510(b), which explains the other two Appellees' deafening silence about the case.

*Investments LLC v. DirecTV Latin American, LLC (In re DirecTV Latin America, LLC)*, No. 03-981, 2004 U.S. Dist. LEXIS 2425 (D. Del. Feb. 4, 2004) – a case **all** the Appellees simply ignore in the hope it will go away – the District Court reversed an order subordinating claims stemming from an equity "put agreement" that, as here, was structured so that the holder bore no risk of loss.  *See id.* at *13.  Notably, the court emphasized that "[w]hile participation in profits is a critical aspect of an equity interest, ***participation in the risk of loss is similarly crucial***."  *Id.* at *12 (emphasis added).  Thus, because the Noteholders – just like the claimant in *DirecTV* – never agreed to *bind* themselves to some risk of loss, "the purpose of § 510(b) is not served by imposing the risk of business failure upon a party that unequivocally did not contract for it."  *Id.* at *13; *accord Med Diversified*, 461 F.3d at 256, 259 (underscoring contract's *binding* nature).

>   **3.   Even If Subordination Is Appropriate, the 6%**
>   **Convertible Notes Must Be the Reference "Security"**
>   **Under Section 510(b).**

The parties agree that the section 510(b) analysis is not complete until the relevant reference "security" is identified.  Unfortunately, the Appellees' position soon runs off the rails.  For instance, the Equity Committee simultaneously maintains that "[h]ere, the security at issue is not common stock" *and* that the 6% Convertible Notes also cannot be the applicable "security."  (*See* Eq. Br. at 35-36, 36 n.14; *see also* Dr. Br. at 45 (suggesting that the Noteholders have some "security" that is "in essence, 'less than stock'").)  But this is metaphysical nonsense – the damages caused by the Debtors' unwarranted termination of the Conversion Right *must* be "a claim arising from . . . a security of the debtor" if section 510(b) is to apply at all, and that "security" must actually exist in reality, not in the theoretical aether.  Only two "securities" could possibly be relevant:  Calpine's stock and the 6% Convertible Notes.

As explained in the Opening Brief, the Conversion Right Claims are claims "arising from" the Debtors' breach of the Indenture.  (*See* Opening Brief at 44.)

Further, the functional effect of conversion is to "put" all the debt arising under the Indenture back to Calpine in return for the "Conversion Value" under the Indenture.  (*See* Second Supplemental Indenture [App. 1, Ex. "C"] § 10.02(a) (describing the mechanics for conversion and making clear that a physical or book-entry transfer of a Note – i.e., a "security" – is one of several preconditions to the "Conversion Date," when Calpine becomes bound to deliver its consideration).)  In such a framework, it is the tender of the 6% Convertible Notes that triggers the conversion, and thus it is *from those securitie*s that the Conversion Right Claims necessarily arise.[22]  Indeed, case law such as *Vista Eyecare, Inc. v. Neumann (In re Vista Eyecare, Inc.)*, 283 B.R. 613 (Bankr. N.D. Ga. 2002), and *DirecTV*, *supra* – decisions that *all* the Appellees simply ignore – makes clear that in such a "put" arrangement, the section 510(b) "security" is the security of the Debtors that can be "put" to the Debtors.

Section 101(16) of the Bankruptcy Code reinforces the point that Calpine's common stock is *not* the relevant "security."  Whereas the text of section 510(b) merely references *any* "security," section 101(16) serves to define a more limited class of "equity securities."  Critically, while that smaller class includes both a "share in a corporation . . . or similar security" and a "warrant," it is expressly defined to ***exclude*** "a right to convert."  *See* 11 U.S.C. § 101(16).[23]  Thus, for the Conversion Right Claims to come

---

[22]   The Equity Committee repeatedly cites this Court's recent opinion in *Alexandra Global Master Fund, Ltd. v. IKON Office Solutions, Inc.*, No. 06-5383, 2007 WL 2077153 (S.D.N.Y. July 20, 2007), suggesting that it supports their contention that the Conversion Right Claims "must be subordinated to common stock."  (*See* Eq. Br. at 34 & 36.)  It is not clear how that decision is relevant here; if anything, it suggests that that the Conversion Right arises from "a contractual relationship governed by the terms of the debt instrument," which (i) does not make the Noteholders akin to shareholders, to whom fiduciary duties are owed, and (ii) means the 6% Convertible Notes are the proper reference "security."  *See* 2007 WL 2077153 at *4-6, *9.  In any case, the Court clearly distinguished *Green*, the unpublished case from which the Equity Committee selectively draws a quote on page 34 of its brief.  *See id.* at *6.

[23]   The Debtors argue that Congress enacted section 101(16)(C) in order to "to ***protect*** convertible debenture holders from" wily debtors seeking to subordinate their whole claim.  (*See* Dr. Br. at 44 (emphasis in original).)  This conjuncture is, however, at odds with the plain text of the statute, as well as its legislative history.  (*See* Opening Brief at 46 n.14.)

23

within section 510(b)'s grasp, they must be claims "arising from" a "security" that is ***not also*** an "equity security."[24]  Only one existing "security" fits within this statutory framework: the 6% Convertible Notes.  As such, they are the proper reference "security."

The Appellant Holders have previously outlined why the underlying purpose of section 510(b) (which is to protect creditors, not equity holders), the legislative history, commentary, and case law all support the conclusion that if any subordination of the Conversion Right Claims is appropriate, they must "become part of a new 'tranche' or 'class' of debt – one junior to other debts, but still senior to equity."  (*See* Opening Brief at 45.)  None of the Appellees has undercut the cogency of this approach.

### G.    Joinder with HSBC's Reply Brief; Incorporation by Reference.

The Appellant Holders join in the arguments made by HSBC in its reply brief regarding the improper overbreadth of the Order in purporting to adjudicate matters not put before, and not ruled on by, the Bankruptcy Court.  As HSBC explains, the Bankruptcy Court should have limited any ruling to the Conversion Right Claims, and should not have purported to deny or disallow any of the Noteholders' other claims, including for "make-whole" amounts.

[Remainder of page intentionally left blank]

---

[24]    Section 101(16)(C)'s text further makes clear that there is a distinction between a "right to purchase" and a "right to convert."  Here, the Noteholders' rights vis-à-vis Calpine stock are of the latter type.  Accordingly, if the Calpine stock is the appropriate reference "security," that fact would ***remove*** the Conversion Right Claims from the gamut of section 510(b) since they are claims "arising from" a "right to convert," not from the distinct right of "purchase or sale of [Calpine stock]."  11 U.S.C. § 510(b).

## CONCLUSION

For the reasons and based on the authorities presented above and in the Opening Brief, the Bankruptcy Court's Order should be reversed in its entirety.

Respectfully submitted,

Dated: October 1, 2007
      New York, New York

                /s/ *Matthew S. Barr*
                MILBANK, TWEED, HADLEY & M$^c$CLOY LLP
                Dennis F. Dunne (DD-7543)
                Matthew S. Barr (MB-9170)
                Andrew M. Leblanc (*pro hac vice*)
                One Chase Manhattan Plaza
                New York, New York 10005
                Telephone:  (212) 530-5000
                Facsimile:  (212) 530-5219

                -and-

                STUTMAN, TREISTER & GLATT, P.C.
                Isaac M. Pachulski (*pro hac vice*)
                Eric D. Winston (*pro hac vice*)
                Whitman L. Holt (*pro hac vice*)
                1901 Avenue of the Stars, 12th Floor
                Los Angeles, California 90067
                Telephone:  (310) 228-5600
                Facsimile:  (310) 228-5788

                Attorneys for Aristeia Capital, L.L.C., Aurelius Capital Management, LP, Drawbridge Special Opportunities Advisors LLC, Ore Hill Hub Fund Ltd., Nisswa Master Fund Ltd., Pines Edge Value Investors Ltd., Pines Edge Value Investors L.P., Silver Sands Fund LLC, Stark Master Fund Ltd. and 3V Capital Management, LLC