# EXHIBIT 1

Hearing Date: July 11, 2007 at 10:00 a.m. (EST)
Objection Deadline: June 29, 2007 at 12:00 p.m. (EST)

KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, NY 10022-4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Richard M. Cieri (RC 6062)
Marc Kieselstein (admitted *pro hac vice*)
David R. Seligman (admitted *pro hac vice*)
Edward O. Sassower (ES 5823)
Jeffrey S. Powell (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)

Counsel for the Debtors

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| Calpine Corporation, <u>et al.</u>, | Case No. 05-60200 (BRL) |
| Debtors. | Jointly Administered |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER ALLOWING LIMITED OBJECTION TO CLAIMS AND DETERMINING VALUE OF CLAIMS

PLEASE TAKE NOTICE that at **10:00 a.m. (EST)** on **July 11, 2007**, the Debtors in the above-captioned chapter 11 cases, by their respective counsel, shall appear before the Honorable Judge Burton R. Lifland, at the United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004-1408, Room 623 (the "<u>Bankruptcy Court</u>"), or soon thereafter as counsel may be heard (the "<u>Hearing</u>"), and present Debtors' Motion for Entry of an Order Allowing Debtors' Limited Objection to Claims and Determining the Value of Claims (the "<u>Motion</u>").

PLEASE TAKE FURTHER NOTICE that the Hearing may be adjourned thereafter from time to time without further notice.

PLEASE TAKE FURTHER NOTICE that objections to the Motion, if any, must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court and shall be filed with the Bankruptcy Court electronically by registered users of the Bankruptcy Court's case filing system (the User's Manual for the Electronic Case Filing System can be found at http://www.nysb.uscourts.gov, the official website for the Bankruptcy Court) and, by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect or any other Windows-based word processing format (in either case, with a hard copy delivered directly to Chambers) and shall be served upon: (a) counsel to the Debtors, Kirkland & Ellis LLP, Citigroup Center, 153 East 53rd Street, New York, New York 10022, Attn.: Edward O. Sassower, Esq.; (b) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn.: Paul Schwartzberg, Esq., (c) counsel to the Unofficial Committee of Second Lien Debtholders, Paul Weiss Rifkind Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, NY 10019-6064, Attn.: Alan W. Kornberg, Andrew N. Rosenberg and Elizabeth R. McColm; (d) counsel to the Official Committee of Unsecured Creditors, Akin Gump Strauss Hauer & Feld LLP, 590 Madison Avenue, New York, New York 10022-2524, Attn.: Michael S. Stamer, Philip C. Dublin and Alexis Freeman; and (e) counsel to the Official Committee of Equity Security Holders, Fried, Frank, Harris, Shriver & Jacobson LLP, One New York Plaza, New York, New York 10004, Attn.: Gary Kaplan; so as to be received no later than **June 29, 2007 at 12:00 p.m.**

Dated:  June 8, 2007
       New York, New York

Respectfully submitted,

 /s/ Richard. M. Cieri
Richard M. Cieri (RC 6062)
Marc Kieselstein (admitted *pro hac vice*)
David R. Seligman (admitted *pro hac vice*)
Edward O. Sassower (ES 5823)
Jeffrey S. Powell (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York  10022-4611
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

Counsel for the Debtors

KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, NY 10022-4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Richard M. Cieri (RC 6062)
Marc Kieselstein (admitted *pro hac vice*)
David R. Seligman (admitted *pro hac vice*)
Edward O. Sassower (ES 5823)
Jeffrey S. Powell (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)

Counsel for the Debtors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) <br> ) <br> ) Chapter 11 <br> ) <br> Calpine Corporation, <u>et al.</u>,  ) <br> ) Case No. 05-60200 (BRL) <br> Debtors.  ) Jointly Administered <br> ) |

---

### DEBTORS' MOTION FOR ENTRY OF AN ORDER ALLOWING LIMITED OBJECTION TO CLAIMS AND DETERMINING VALUE OF CLAIMS

Calpine Corporation ("<u>Calpine</u>") and its affiliated debtors and debtors in possession (the "<u>Debtors</u>") file this motion (the "<u>Motion</u>") seeking entry of an order, in substantially the form attached hereto as **Exhibit A**, allowing the Debtors' limited objection to certain claims and granting the Debtors' motion to determine the value of such claims pursuant to Bankruptcy Rule 3012. In support of this Motion, the Debtors respectfully state as follows.

### INTRODUCTION

On June 20, 2007, after 18 months in Chapter 11 proceedings, the Debtors will file their plan of reorganization (the "<u>Plan</u>"). Since the commencement of these bankruptcy cases (the "<u>Chapter 11 Cases</u>"), the Debtors have made enormous strides towards a successful

reorganization, which is reflected in their improved profitability and cash flow. As a result of these continuing efforts, the Debtors hope to be in a position to repay their prepetition debts in full, including (i) the second priority secured debt at Calpine (the "Second Lien Debt"), and (ii) the general unsecured debt at Calpine (the "Unsecured Debt"). A necessary predicate, of course, to repayment is quantification of the allowed amount of each claim. Therefore, through this Motion, the Debtors are seeking a determination of the value of the claims filed in connection with the Second Lien Debt and the Unsecured Debt (collectively, the "Disputed Claims") and are objecting to these claims to the extent they seek amounts in excess of outstanding principal, plus accrued interest.[1]

Most significantly, the Debtors object to any demands in the Disputed Claims for prepayment premiums allegedly due as compensation for discontinued future interest payments. As was the case with the Debtors' recent repayment of the CalGen Secured Debt, the holders of the Second Lien Debt (the "Second Lien Holders") and the holders of the Unsecured Debt (the "Unsecured Claimants") have indicated that they are entitled to prepayment premiums upon repayment or, in the alternative, unsecured claims for damages related to repayment. But both arguments are unfounded, as the governing indentures do not provide for premiums when repayment is involuntary or when acceleration of the debt was not the product of bad faith. Accordingly, the Debtors respectfully request that the Court disallow the Disputed Claims to the extent they seek amounts beyond outstanding principal and accrued interest.

---

[1]    The Debtors will defer seeking a ruling on the rate of interest that should apply to the Disputed Claims, in accordance with the Court's previous ruling on this issue. See Memorandum Decision and Order Granting, in Part, Debtors' Motion for Order (I) Authorizing Debtors to Obtain Replacement Postpetition Financing to (A) Refinance Existing Postpetition Financing and (B) Repay Prepetition Debt; (II) Allowing Debtors' Limited Objection to Claims; and (III) Determining Value of Secured Claims, entered March 5, 2007 [Docket No. 3875] at 13.

In addition, the Debtors have only a limited period of exclusivity to solicit votes for the Plan. As the Court is well aware, the Debtors' statutory deadline to complete a proper solicitation process is August 20, 2007. Prompt resolution of the issues presented in this Motion will aid the Debtors' ongoing efforts to achieve a consensual plan of reorganization.

Finally, resolution of the Disputed Claims may determine whether equity security holders will receive a distribution in this case. If the Disputed Claims are found to include prepayment premiums or other related charges, the Debtors' payments under the Plan will increase significantly. Given that Calpine has over 520,189,920 shares of stock outstanding, it is important for all parties to have clarity as to the proper provision for these interests in the Plan.

In sum, for the reasons stated herein, the Debtors respectfully request that the Court grant this Motion and allow their limited objection to the Disputed Claims.

## JURISDICTION

This Court has jurisdiction over the Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### 1. Calpine Second Lien Debt

On July 16, 2003, Calpine issued approximately $3.7 billion of debt secured by second priority liens on and security interests in substantially all of the properties and assets directly owned by Calpine (the "Calpine Corp. Collateral").[2] Approximately $3.5 billion of

---

[2] The Calpine Corp. Collateral includes "(a) the stock and equity interests of Calpine's first-tier domestic subsidiaries including, without limitation Calpine International Holdings, Inc., Calpine Operations Management Company, Inc., Calpine Fuels Corporation, Calpine Power Company, Calpine Finance Company, Calpine Administrative Services, Inc., Calpine Energy Holdings, Inc., Calpine Northbrook Corporation of Maine, Inc. and Androscoggin Energy, Inc., (b) certain oil and gas reserves and natural gas assets located in the United (Continued...)

Second Lien Debt will be outstanding as of June 20, 2007, with a weighted average interest rate of 9.576%. More specifically, the Second Lien Debt is comprised of:

- $500,000,000 Second Priority Senior Secured Floating Rate Notes Due 2007, issued by Calpine pursuant to a certain Indenture, dated as of July 16, 2003, between Calpine and Wilmington Trust Company, as trustee (the "$500 million Second Lien Notes due 2007"),

- $1,150,000,000 8.50% Second Priority Senior Secured Notes Due 2010, issued by Calpine pursuant to a certain Indenture, dated as of July 16, 2003, between Calpine and Wilmington Trust Company, as trustee (the "$1.15 billion Second Lien Notes due 2010"),

- $900,000,000 Second Priority 8.75% Senior Secured Notes due 2013, issued by Calpine pursuant to an certain Indenture, dated as of July 16, 2003, between Calpine and Wilmington Trust Company, as trustee (the "$900 million Second Lien Notes due 2013"),

- $400,000,000 9.875% Second Priority Senior Secured Notes due 2011, issued by Calpine pursuant to a certain Indenture, dated as of November 18, 2003, between Calpine and Wilmington Trust Company, as trustee (the "$400 million Second Lien Notes due 2011"), and

- $750,000,000 Senior Secured Term Loans due 2007, issued pursuant to that certain Credit Agreement (the "Second Lien Credit Agreement"), dated as of July 16, 2003, among Calpine, as borrower, Goldman Sachs Credit Partners, L.P., as sole lead arranger, sole bookrunner and administrative agent and the various co-arrangers, managing agents and lenders named therein (the "$750 million Second Lien Term Loans due 2007").

---

States (most of which have been sold in accordance with the Calpine First Lien Indenture) and certain power plant assets, (c) certain intercompany notes issued by Calpine and its subsidiaries, but excluding in each case the Excluded Assets (as defined in the Calpine First Lien Indenture) and (ii) 65% of the stock of Calpine Canada Energy Ltd. ("CCEC"). Other than CCEC, the Calpine Corp. Collateral does not include equity interests of any indirect subsidiaries of Calpine, including, without limitation, the equity interests of Thermal Power Company, Geysers Power I Company and Geysers Power Company II, LLC. In addition, all of the cash and cash equivalents owned by Calpine (other than cash held in deposit accounts up to $50.0 million in the aggregate and borrowings under the DIP Facility)" constitutes Calpine Corp. Collateral. See Second Amended Final Order Authorizing Use of Cash Collateral and Granting Adequate Protection, entered on February 26, 2006 [Docket No. 881] ¶ 2.

2.    **Calpine Unsecured Debt**

From 1996 to 2005, Calpine issued more than $5.0 billion of unsecured debt through a series of financings with various maturity dates and interest rates. Of that principal amount, approximately $3.8 billion is outstanding. More specifically, Calpine's non-convertible unsecured debt consists of:

- $180,000,000 10.5% Senior Notes due 2006, pursuant to that certain Indenture, dated as of May 16, 1996, between Calpine and U.S. Bank National Association, as successor trustee (the "$180 million Unsecured Notes due 2006"),

- $275,000,000 8.75% Senior Notes due 2007, pursuant to that certain Indenture, dated as of July 8, 1997, between Calpine and The Bank of New York, as trustee (the "$275 million Unsecured Notes due 2007"),

- $400,000,000 7.875% Senior Notes due 2008, pursuant to that certain Indenture, dated as of March 31, 1998, between Calpine and The Bank of New York, as trustee (the "$400 million Unsecured Notes due 2008"),

- $250,000,000 7.625% Senior Notes due 2006 (the "$250 million Unsecured Notes due 2006") and $350,000,000 7.75% Senior Notes due 2009 (the "$350 million Unsecured Notes due 2009"), pursuant to that certain Indenture, dated as of March 29, 1999, between Calpine and The Bank of New York, as trustee, and

- $750,000,000 8.625% Senior Notes due 2010 (the "$750 million Unsecured Notes due 2010") and $2.0 billion 8.5% Senior Notes due 2011 (the "$2 billion Unsecured Notes due 2011"), pursuant to that certain Indenture, dated as of August 10, 2000, between Calpine and Wilmington Trust Company, as trustee, as supplemented by the First Supplemental Indenture, dated as of September 28, 2000, the Second Supplemental Indenture, dated as of September 30, 2004, and the Third Supplemental Indenture, dated as of June 23, 2005.[3]

---

[3]    Calpine's unsecured debt also includes four contingent convertible notes: (a) $1,200,000,000 4.0% Convertible Senior Notes Due 2006, (b) $736,000,000 6.0% Contingent Convertible Notes Due 2014, (c) $650,000,000 7.75% Contingent Convertible Notes Due 2015, and (d) $900,000,000 4.75% Contingent Convertible Notes Due 2023 (the "Calpine Unsecured Convertible Debt"). Although the proofs of claims filed in connection with the Calpine Unsecured Convertible Debt are not the subject of this Motion, the Debtors reserve their rights to object to such claims at a later date.

### 3.    Debtors' Adequate Protection Payments to Second Lien Holders

On December 20, 2005, the Debtors commenced their Chapter 11 Cases. On that same day, the Debtors filed a motion to utilize cash collateral and provide adequate protection to certain prepetition lenders.[4] The Court granted the Debtors' motion and, on February 26, 2006, entered the Second Amended Final Order Authorizing Use of Cash Collateral and Granting Adequate Protection [Docket No. 881] (the "Cash Collateral Order").

(a)    2006 Adequate Protection Payments

Under the Cash Collateral Order, the Debtors agreed to provide as adequate protection to the Second Lien Holders, two payments in the amount of $78 million each and liens on substantially all the Debtors' assets. Id. ¶ 16(a)-(b). The Debtors also agreed to pay the reasonable fees and expenses of the Second Lien Holders' counsel and other consultants. Id. ¶ 16(c). In return, the Second Lien Holders waived "any claim for or entitlement to interest at the default rate that they may have accrued during the period from January 1, 2006 through and including June 30, 2006." Id. ¶ 16(b). The Cash Collateral Order further provided that any adequate protection payments beyond December 31, 2006 had to be mutually agreed upon by the Debtors, the Unofficial Committee of Second Lien Debtholders of Calpine (the "Second Lien Committee"), and the Official Committee of Unsecured Creditors (the "Creditors' Committee"), subject to the Court's approval after notice and a hearing. Id. at ¶ 16(b).

---

[4]    Emergency Motion for (I) Interim Orders (A) Authorizing the Debtors to (1) Obtain Postpetition Secured Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), and 364(e), (2) Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, and (3) Provide Adequate Protection to Certain Prepetition Lenders Pursuant to 11 U.S.C. §§ 361, 362 and 363 and (B) Scheduling Final Hearing Pursuant to Fed. R. Bankr. P. 4001(b) and (c) and (II) Final Orders (A) Authorizing the Debtors to (1) Obtain Postpetition Secured Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), and 364(e), (2) Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (3) Provide Adequate Protection to Certain Prepetition Lenders Pursuant to 11 U.S.C. §§ 361, 362 and 363, (3) Assume the Geysers Agreement Pursuant to 11 U.S.C. § 365(a) and Consummate the Transactions Contemplated Thereby Pursuant to § 363(b) and (4) Assume the Agnews Lease Documents Pursuant to 11 U.S.C. § 365(a), entered on December 21, 2005 [Docket No. 18].

(b)     2007 Adequate Protection Order

In December 2006, the Debtors, the Second Lien Committee, the Creditors' Committee, the Official Committee of Equity Security Holders, and the agents under the original DIP Facility reached an agreement on adequate protection payments to the Second Lien Holders in 2007. This agreement is embodied in the Amended Order Modifying Cash Collateral Order to Pay Adequate Protection, which was entered by the Court on January 12, 2007 [Docket No. 3397]. Subject to certain liquidity requirements, the Debtors agreed to pay $100,262,269 to the Second Lien Holders in four equal quarterly installments of $25,065,567 on March 31, June 30, September 30, and December 31, 2007. Id. ¶ 2. Also, the Debtors agreed to pay the amount of interest due under each of the indentures governing the Second Lien Debt (the "Second Lien Indentures") on the dates set forth in Schedule A of the adequate protection order. Id. ¶ 3.

In exchange for these adequate protection payments, the Second Lien Holders waived any claim for or entitlement to interest at the default rate that they may have accrued during the period from January 1, 2006 through and including the last applicable date on Schedule A. Id. ¶ 4. But the holders of the Second Lien Term Loans reserved their rights to assert fifty percent of any claim for default interest that they may have accrued during that time period. Id.

(c)     Second Lien Stipulation

On March 1, 2007, the Second Lien Holders' adequate protection package was further enhanced when the Court approved the Stipulation Regarding Objection of Second Lien Committee [Docket No. 3841] (the "Second Lien Stipulation"),[5] which resolved the Second Lien

---

[5]   The Second Lien Stipulation was amended on May 31, 2007 [Docket No. 4780].

7

Committee's objection to the Debtors' motion for authorization to obtain replacement post-petition financing. Pursuant to the Stipulation, the Second Lien Committee's adequate protection liens are no longer limited to securing diminution in value of the collateral but instead, shall secure the full amount of the Second Lien Debt.[6]  Id. ¶ 3. The Second Lien Stipulation also provides for an increase in the amount of the Second Lien Holders' claims by a fee equal to 1.5% of the non-cash portion of their distribution under a plan of reorganization. But this fee is waived if the Debtors propose to repay the Second Lien Debt in cash under the Plan. Id. ¶ 5.

### 4.    Second Lien Holders' Proofs of Claim

On July 28, 2006, Goldman Sachs Credit Partners, L.P., as administrative agent for the Second Priority Senior Secured Term Loans due 2007, filed a proof of claim ("Claim 3733") against Calpine for approximately $746,229,609.38.[7]  Claim 3733 also includes certain "contingent" amounts for "prepayment fees." Addendum to Claim 3733 ¶ 7.

On July 31, 2006, Wilmington Trust Company filed proofs of claim against Calpine, as indenture trustee for the Second Priority Senior Secured Floating Rate Notes due 2007 ("Claim 4062"), the 8.5% Second Priority Senior Secured Notes due 2010 ("Claim 4060"), the 9.875% Second Priority Senior Secured Notes due 2011 ("Claim 4058"), and the 8.75% Second Priority Senior Secured Notes due 2013 ("Claim 4055") in the total amount of $3.025 billion.[8]  Each claim includes unliquidated amounts for "interest, charges, make whole amounts,

---

[6]    In addition, the Second Lien Stipulation limits the use of proceeds from the replacement financing facility and the granting of liens in respect of commodity hedging agreements.

[7]    Goldman Sachs Credit Partners, L.P. also filed a proof of claim against Quintana Canada Holdings, LLC, as guarantor of the Second Lien Debt. See Claim No. 3732.

[8]    Wilmington Trust Company also filed proofs of claim against Quintana Canada Holdings, LLC, as guarantor of the Second Lien Debt. See Claim Nos. 4056, 4057, 4059 and 4061.

penalties, premiums, and advances which may be due or become due under the Notes and the Indenture." Addendum to Claims 4062, 4060, 4058 and 4055 at 5.

### 5.    Unsecured Claimants' Proofs of Claim

On July 25, 2006, U.S. Bank National Association, as the successor indenture trustee for the 10.5% Senior Notes due 2006, filed a proof of claim ("Claim 2533") against Calpine in the amount of $150,776,705.  Claim 2533 includes "any and all amounts due and owing under the Indenture whether now owing or hereafter accrued and owing." Attachment to Claim 2533 ¶ 7.

On July 27, 2006, HSBC Bank USA, National Association filed proofs of claim against Calpine, as successor indenture trustee for the 7.625% Senior Notes due 2006 ("Claim 2825"), the 8.75% Senior Notes due 2007 ("Claim 2822"), the 7.875% Senior Notes due 2008 ("Claim 2820"), the 7.75% Senior Notes due 2009 ("Claim 2824"), the 8.625% Senior Notes due 2010 and the 8.5% Senior Notes due 2011 ("Claim 2821") in the total amount of approximately $1.8 billion.  Each claim includes an unliquidated amount for "interest, liquidated damages, optional or mandatory redemptions, redemption premiums, redemption prices, expenses, indemnities, compensatory, secondary and/or punitive damages, and all compensation obligations. . . ." Attachment to Claims 2825, 2822, 2820, 2824 and 2821 ¶ 2.

### 6.    Proposed Treatment of the Disputed Claims Under The Plan

The Debtors intend to file on June 20, 2007 their plan of reorganization for the resolution of the outstanding creditor claims against and equity interests in the Debtors. As part of the Plan, the Debtors propose to repay the Second Lien Debt in full on the date of distribution in full satisfaction, settlement, release and discharge of the Second Lien Debt Claims.  The estimated amount of the Second Lien Debt is $3,772,528,200, which includes outstanding

9

principal and accrued interest. Calpine's general unsecured creditors also will be paid in full (principal plus accrued interest) under the Plan.

## RELIEF REQUESTED

The Debtors respectfully request that this Court (I) allow the Debtors' limited objection to the Disputed Claims pursuant to 11 U.S.C. § 502 and Bankruptcy Rule 3007, and (II) determine the value of the Disputed Claims pursuant to Bankruptcy Rule 3012.

## BASIS FOR RELIEF

**I.    The Debtors' Limited Objection to the Disputed Claims Should be Allowed.**

The Debtors object to the Disputed Claims to the extent they seek payment beyond outstanding principal and accrued interest through the date of confirmation of the Plan (the "Confirmation Date"). As stated above, the Disputed Claims include demands for prepayment premiums and related charges. But the Debtors' proposed repayment of these claims as part of the Plan does not entitle the claimants to recover such premiums. Accordingly, these demands are unenforceable against the Debtors' estates and should be disallowed pursuant to section 502(b), which provides that if an objection to a claim is made, the Court "shall determine the amount of such claim . . . and shall allow such claim in such amount" unless it is "unenforceable against the debtor and property of the debtor." See 11 U.S.C. § 502(b)(1). (Please note also that attached hereto as Exhibit B is a chart that summarizes the Disputed Claims and relevant contractual language, and may be a particularly useful resource for the issues addressed in the remainder of this Motion.)

**A.    The Second Lien Holders Are Not Entitled To Prepayment Premiums.**

As set forth above, there are five tranches of Second Lien Debt, none of which requires a premium upon repayment pursuant to the Plan.  More specifically, one of the five tranches does not contain a premium provision of any kind.[9]  Two of the five tranches will have matured prior to the date of repayment.[10]  And although the two remaining tranches of Second Lien Debt contain premium provisions, those provisions only apply in the context of a voluntary prepayment of unaccelerated debt or an acceleration caused by a bad faith default and neither scenario is present here.[11]

Consequently, the Debtors' proposed repayment of the Second Lien Debt does not give rise to a secured claim for a prepayment premium under section 506(b) or an unsecured claim for damages.  Because the Second Lien Holders cannot recover more than they are entitled to under the Indentures, their premium claims must be disallowed pursuant to section 502(b)(1).

---

[9]    The Indenture governing the 9.875% Second Priority Senior Secured Notes due 2011 does not address the repayment of debt prior to maturity.  Section 3.05 of the Indenture, entitled "Optional Redemption," is marked as "Reserved," with no additional references to repayment in the document.  This indenture section (and other relevant indenture sections) are attached as Exhibit B.  Moreover, the Indenture was not supplemented or amended prior to the Chapter 11 Cases.  As a result, there is no basis whatsoever for any premium demand arising from repayment of these notes.

[10]    The $500 million Second Lien Notes due 2007 and the $750 million Second Lien Term Loans due 2007 will mature on July 15, 2007, well before the Debtors' proposed repayment.  Given that prepayment premiums are designed to compensate lenders for discontinued future interest payments, it follows that lenders are not entitled to premiums upon repayment of matured debt.  Therefore, any demand for a premium in connection with the repayment of this debt is without merit.

[11]    See $1.15 Billion Second Lien Notes due 2010; $900 Million Second Lien Notes due 2013.

1.    **The 2010 & 2013 Notes Only Provide For A Premium In Circumstances Not Applicable Here.**

, The $1.15 Billion Second Lien Notes due 2010 and the $900 Million Second Lien Notes due 2013 (the "2010 & 2013 Notes") provide for a premium in only two circumstances: (1) a voluntary or optional prepayment of unaccelerated debt, and (2) an acceleration caused by a bad faith default. Neither circumstance is applicable here. Even if one applied, the premium provided for in the $900 million Second Lien Notes due 2013 does not meet the reasonableness standard under section 506(b). In addition, the Debtors' repayment of the 2010 & 2013 Notes is not a breach of the notes and thus, does not give rise to a damages claim.

(a)    The 2010 & 2013 Notes Only Provide For A Premium In The Event Of A Bad Faith Default.

While the 2010 & 2013 Notes contain premium provisions, these tranches —like all the Second Lien Debt—have been accelerated as a result of Calpine's bankruptcy filing pursuant to the terms of the Second Lien Indentures.[12] The acceleration clauses in the notes explicitly provide that a premium need only be paid in the event Calpine acts in bad faith. More specifically,

- 2010 & 2013 Notes. Section 6.02, entitled "Acceleration," states that "[i]n the case of an Event of Default [due to bankruptcy] . . . all outstanding Notes shall become *due and payable immediately* without further action or notice. . . . If an Event of Default occurs prior to July 15, 2007[13] by reason of any willful action (or inaction) taken (or not taken) by or on behalf of the Company *with the intention of avoiding the prohibition on redemption of the Notes prior to such date*, then, upon acceleration of the Notes, an additional premium *shall also* become and be immediately due and payable in an amount, for each of the years beginning on July 15 of the years set forth below, as set forth below (expressed as percentage of the principal amount of the

---

[12]    See Second Lien Notes § 6.01; Second Lien Credit Agreement § 7.01.

[13]    The applicable date in the 2013 Notes is July 15, 2008.

Notes on the date of payment that would otherwise be due but for the provisions of this sentence)." (Emphasis added).

As these acceleration clauses make clear, a premium is due upon acceleration if (and only if) an Event of Default occurs by purposeful action of Calpine designed to circumvent the prepayment prohibition. Here, the Event of Default was the filing of the Chapter 11 Cases, which plainly was not done with the intention of avoiding prohibitions on redemption of the Second Lien Debt. As the Debtors have explained before in numerous pleadings, and as no party has even disputed, many events led to the commencement of the Chapter 11 Cases.[14] And after 18 months in bankruptcy, it is well past the time for any entity to legitimately allege a bad faith filing. Since the Event of Default was not the result of bad faith on the part of Calpine, no premium became due upon acceleration of the 2010 & 2013 Notes. Accordingly, to the extent the claims filed on behalf of these Notes seek premiums in contravention of the unambiguous language of the Indentures, they must be disallowed. See 11 U.S.C. § 506(b); In re AE Hotel Venture, 321 B.R. 209, 217 (Bankr. N.D. Ill. 2005) (finding that because prepayment premiums are encompassed in the term "charge" in section 506(b), secured creditors can only recover a premium if it is provided for under the loan agreement and it is reasonable); In re Skyler Ridge, 80 B.R. 500, 506 (Bankr. C.D. Cal. 1987).

This Court's recent ruling with respect to the CalGen Claims (as defined below) aptly illustrates why an acceleration clause must specifically include a premium obligation within its terms before such premium can augment a secured creditor's claim.[15]   Described

---

[14]   See Affidavit of Eric. N. Pryor Pursuant to Local Bankruptcy Rule 1007-2, filed on December 21, 2005 [Docket No. 2] at ¶ 89-95 (stating that, among other things, the rising cost of natural gas, excess capacity in the energy markets, and competitive pressures led to the commencement of the Chapter 11 Cases).

[15]   See Memorandum Decision and Order Granting, in Part, Debtors' Motion for an Order (I) Authorizing Debtors to Obtain Replacement Postpetition Financing to (A) Refinance Existing Postpetition Financing and (B) Repay
(Continued...)

13

generally, the Debtors filed a motion seeking replacement postpetition financing to, inter alia, repay secured debt at one of Calpine's largest subsidiaries, Calpine Generating Company, LLC (the "CalGen Secured Debt").[16]  To effectuate the repayment, the Debtors also asked the Court to allow their limited objection to the claims filed in connection with the CalGen Secured Debt (the "CalGen Claims") and determine the value of these claims.  The basis for the Debtors' objection was that the holders of the CalGen Secured Debt (the "CalGen Lenders") were not entitled to a prepayment premium upon the Debtors' repayment.  The Debtors' position was supported by the loan documents governing the CalGen Secured Debt (the "CalGen Indentures"), which did not require a premium if repayment was made prior to April 1, 2007.  In addition, the CalGen Secured Debt had been accelerated under the terms of the CalGen Indentures and the acceleration provisions did not expressly provide for a premium.

In its Memorandum Decision, the Court observed that each of the CalGen Indentures provided for automatic acceleration upon the filing of a bankruptcy petition and as a result the CalGen Secured Debt was "due and payable immediately."  See Memorandum Decision at 8.  But these acceleration provisions were antiquated – "Model T" provisions – because they failed to provide for a premium upon acceleration of the debt.  Thus, the Court held that the CalGen Lenders could not incorporate premiums into their secured claims because such amounts were simply not provided for in the underlying agreements.  See id. at 9 (citing 11 U.S.C. § 506(b)).

---

Prepetition Debt; (II) Allowing Debtors' Limited Objection to Claims; and (III) Determining Value of Secured Claims [Docket No. 3875] (the "Memorandum Decision").

[16]  See Debtors' Motion for Order (I) Authorizing Debtors to Obtain Replacement Postpetition Financing to (A) Refinance Existing Postpetition Financing and (B) Repay Prepetition Debt; (II) Allowing Debtors' Limited Objection to Claims; and (III) Determining Value of Secured Claims, filed on January 26, 2007 [Docket No. 3481] (the "Refinancing Motion").

The Court's reasoning with regard to the acceleration provisions conforms squarely with precedent. In the Chapter 11 cases in this circuit where a creditor was allowed to recover a premium, the underlying loan agreement either provided for a premium upon acceleration or upon default. See In re Vanderveer Estates Holdings, Inc., 283 B.R. 122, 131-33 (Bankr. E.D.N.Y. 2002) (premium due upon acceleration); Financial Ctr. Assocs. of East Meadow, L.P. v. TNE Funding Corp. (In re Financial Ctr. Assocs. of East Meadow, L.P.), 140 B.R. 829, 835 (Bankr. E.D.N.Y. 1992) (premium due upon acceleration); United Merchs. and Mfrs., Inc. v. The Equitable Life Assurance Soc'y of the United States (In re United Merchs. and Mfrs., Inc.), 674 F.2d 134, 141 (2d Cir. 1982) (premium due upon default). In contrast, the 2010 & 2013 Notes only require payment of a premium upon acceleration if that acceleration was triggered by a bad faith default. Because Calpine's default was not the result of bad faith, the repayment of the accelerated debt does not entitle the holders of the 2010 & 2013 Notes (the "2010 & 2013 Noteholders") to a premium.

     (b)    The Debtors' Repayment of the 2010 & 2013 Notes is Involuntary.

As explained above, the 2010 and 2013 Notes have been accelerated and are currently "due and payable." Thus, any subsequent repayment of these notes is involuntary. Because the premium provisions in the 2010 & 2013 Notes only apply in the case of an "optional" or "voluntary" prepayment of unaccelerated debt, the Debtors' repayment does not trigger the premium provisions.[17]

Moreover, the Debtors' repayment of the 2010 & 2013 Notes is required by the Bankruptcy Code. See 11 U.S.C. § 1129(a)(7). Since the 2010 & 2013 Noteholders are fully

---

[17] See Second Lien Notes § 3.07; Second Lien Credit Agreement § 2.10.

secured, the Debtors have two options: they can reinstate the notes or repay the notes in full. <u>See</u> 11 U.S.C. § 1124(2). But a reinstatement of the 2010 & 2013 Notes would put the reorganized Debtors in immediate default because of covenants in the Second Lien Indentures that prohibit the incurrence of additional debt by Calpine and certain of its subsidiaries unless "the Fixed Charge Covered Ratio[18] for the Company's most recently ended four full fiscal quarters . . . would have been at least 2.0 to 1, determined on a pro forma basis (including a pro forma application of the net proceeds therefrom), as if the additional Indebtedness had been incurred . . . at the beginning of such four-quarter period."[19] This covenant would be breached as a result of the Debtors' exit financing facility because the Fixed Charge Covered Ratio would be less than 2.0 to 1.[20] Put simply, the Debtors would be in breach of the 2010 & 2013 Notes immediately following reinstatement. For this reason and others, reinstatement of the 2010 & 2013 Notes is not possible.

Since the Debtors are unable to reinstate the 2010 & 2013 Notes, they *must* repay the notes in full to emerge from bankruptcy and thus, the Debtors are proposing to repay the 2010 & 2013 Notes in cash through the Plan. Given that the proposed repayment is neither voluntary nor optional, but required under the Bankruptcy Code, the Debtors' repayment does not entitle the 2010 & 2013 Noteholders to prepayment premiums.

---

[18] The Fixed Covered Ratio is defined in the Second Lien Indentures as the ratio of Calpine's consolidated cash flow for the most recently ended four fiscal quarters to the fixed charges of Calpine for the same period. <u>See</u> Second Lien Indentures § 1.01. The formula used to calculate the Fixed Covered Ratio is further described in the definition.

[19] <u>See</u> Second Lien Notes § 4.09; Second Lien Credit Agreement § 5.09.

[20] Any exit facility obtained by the Debtors at the end of the Chapter 11 Cases, including the exit facility under the replacement DIP, will result in a Fixed Charge Covered Ratio that is less than 2 to 1.

(c)     The Premium Provided For in the $900 Million Second Lien Notes due 2013 is Unreasonable.

As to the $900 million Second Lien Notes due 2013, yet another reason a premium is not due is that the ostensible amount does not meet the reasonableness standard under section 506(b).   The determination of whether a premium is reasonable has been considered a question of both state and federal law.  See Financial Ctr. Assocs., 140 B.R. at 838 ("In light of the above we need not decide whether the enforceability of a pre-payment charge is subject to a federal standard or a dual state-federal standard.  We note, however, that we are inclined to favor the dual state-federal standard . . . ."); In re Vanderveer Estates Holdings, Inc., 283 B.R. 122 (Bankr. E.D.N.Y. 2002).  A premium is reasonable under section 506(b) if it attempts to compensate a lender for the actual damages incurred upon repayment, rather than presuming a loss.  Id. at 132.  And under New York state law, a "contractually agreed upon sum for liquidated damages" will be enforced when actual damages are difficult to ascertain and the sum is not "plainly disproportionate" to the potential loss.  In re United Merchs. and Mfrs., Inc., 674 F.2d at 142 (citing Walter E. Heller & Co. v. American Flyers Airline Corp., 459 F.2d 896, 899 (2d Cir. 1972)).

The premium provided for under the $900 million Second Lien Notes due 2013 is unreasonable under both tests.  If the Notes are repaid prior to July 15, 2008, as is the Debtors' current intention, the Indenture provides for a premium in the amount of $383 million—*or 43% of the original principal amount of the debt*.  This amount plainly is "disproportionate" to any potential loss that the noteholders might incur.  In a review of the case law on this issue, it appears the highest premium allowed by a bankruptcy court was 24.9% of the principal amount of the debt.  See In re Financial Ctr. Assocs. of East Meadow, L.P., 140 B.R. at 839; see also In re Kroh Bros. Dev. Co., 88 B.R. 997, 1002 (Bankr. W.D. Mo. 1988) (finding a 22.9% premium

17

unreasonable).  But generally, premiums are considered reasonable if they are between 5% to 10% of the principal amount of the underlying debt.  See e.g., Anchor Resolution Corp. v. State Street Bank and Trust Co. of Connecticut, N.A. (In re Anchor Resolution Corp.), 221 B.R. 330, 341 (Bankr. D. Del. 1998) (finding a 6.9% premium reasonable); Connecticut General Life Ins. Co. v. Schaumburg Hotel Owner Ltd. P'ship (In re Schaumburg Hotel Owner Ltd. P'ship), 97 B.R. 943, 954 (Bankr. N.D. Ill.1989) (finding a 10% premium reasonable).  It follows that a premium provision that requires a debtor to pay almost half of the original amount of the debt as damages for repayment is unreasonable.

Moreover, if repayment takes place after July 15, 2008, the 2013 Notes provide for a $39 million premium.  In other words, the premium is $383 million if repayment occurs on July 14, 2008 but if repayment occurs the next day, the premium decreases by $344 million.  As a practical matter, it is absurd to assume that a lender's damages would be so drastically reduced because repayment occurred a day later or even a year later.  Based on the arbitrary nature of this provision, the prepayment premium plainly does not "attempt to compensate" the noteholders for actual damages upon repayment.

In sum, the premium provided for in the $900 million Second Lien Notes due 2013 is unreasonable.  Because section 506(b) requires that a premium must be both reasonable and provided for under the loan agreement, the Second Lien Holders cannot incorporate premiums into their Second Lien Debt Claims.

(d)     The 2010 & 2013 Noteholders Are Not Otherwise Entitled To Damages[21]

Although the Bankruptcy Code prevents the 2010 & 2013 Noteholders from including prepayment premiums in their secured claims, the Debtors anticipate that the Noteholders may still argue that they are entitled to an unsecured damages claim for "dashed expectations," relying on the Court's recent damages award to the CalGen Lenders.  But the Court's reasoning with regard to the CalGen Claims is inapposite here.

As an initial matter, the Debtors' proposed repayment of the 2010 & 2013 Notes does not give rise to any conceivable breach.  Unlike the CalGen Secured Debt, the 2010 & 2013 Notes are not subject to a no-call provision so repayment under the Plan cannot be considered a "breach."[22]  In addition, the premium provisions in the 2010 & 2013 Notes will not be triggered upon repayment because the debt has been accelerated under the terms of the Indentures.[23]  And as explained above, the Debtors' repayment of the accelerated debt in their Plan is not voluntary but required under the Bankruptcy Code. See 11 U.S.C. § 1129(a)(7).

In sum, there is no basis for awarding damages to the 2010 & 2013 Noteholders.  The Indentures explicitly provide that the 2010 & 2013 Notes can be repaid and provide only two circumstances that give rise to a premium in connection with repayment.   Since neither circumstance is present in this instance, the noteholders' expectations cannot include a premium and the Debtors' repayment is not a breach.

---

[21]   The Debtors are focusing on the 2010 & 2013 Notes in this section because they contain unenforceable premium provisions, but the same analysis applies to all the Second Lien Debt.

[22]   The Debtors maintain that the no-call provisions in the CalGen Indentures were unenforceable and thus, did not give rise to damages for breach of contract upon repayment of the CalGen Secured Debt.  Accordingly, this issue is currently on appeal.

[23]   See 2010 & 2013 Indentures § 6.02; Memorandum Decision at 8.

**B.     The Unsecured Claimants Are Not Entitled To Prepayment Premiums.**

As a matter of law, unsecured creditors are not entitled to "charges" in the form of prepayment premiums under the Bankruptcy Code.  Under section 506(b), a creditor can recover "fees, costs and charges" to the extent that creditor is oversecured.  By definition, unsecured creditors are not oversecured and thus, cannot recover "charges."   Even if the Unsecured Claimants were able to recover premiums under the Bankruptcy Code, the indentures governing the Unsecured Debt (the "Unsecured Indentures") do not provide for premiums upon repayment of accelerated debt.

**1.     The Bankruptcy Code Does Not Permit Unsecured Creditors To Recover Premiums.**

Basic principles of statutory construction support the view that unsecured creditors cannot recover premiums.  First, the structure of section 506(b) is: "to the extent that" a creditor is oversecured, such creditor can recover a "charge."  Logic dictates that to the extent a creditor is *not* oversecured, such creditor *cannot* recover a charge.  See In re Woodmere Investors Ltd. P'ship, 178 B.R. 346, 356 (Bankr. S.D.N.Y. 1995) ("[S]ince Congress provided for attorney fees only for over-secured creditors, it did not mean to allow attorney fees for under-secured creditors.").  Second, it is highly unlikely that Congress would impose limitations on the recovery of charges by oversecured creditors (insofar as the charge must be reasonable and provided for under the loan agreement) but allow unsecured creditors to recover any charges asserted in their proofs of claim.  See In re Loewen Group Int'l, Inc., 274 B.R. 427, 445 n.36 (Bankr. D. Del. 2002) ("I think it is more reasonable to interpret the language of § 506(b) limiting the recovery of post-petition fees and costs to oversecured creditors as demonstrative of Congressional intent not to allow the recovery of post-petition fees and costs by creditors whose claims are not oversecured."); In re Hedged-Invs. Assocs., Inc., 293 B.R. 523, 526 ("Congress

could have provided for the recovery of post-petition fees and costs by unsecured and undersecured creditors. . . . However, it did not.").

Finally, any ruling that unsecured creditors can recover charges renders section 506(b) superfluous, as it would be meaningless to specify that oversecured creditors can recover "charges," if section 502(b) already gave secured and unsecured creditors an allowable claim for such amounts. See United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 373 (1988) ("This theory of duplicate protection for oversecured creditors is implausible even in the abstract, but even more so in light of the historical principles of bankruptcy law.").

**2.    The Governing Indentures Do Not Provide For Premiums In These Circumstances.**

Even if unsecured creditors could recover prepayment premiums as part of their allowable claim, the Unsecured Indentures do not provide for such premiums in these circumstances, *i.e.*, where repayment of accelerated debt will occur pursuant to a Plan. Accordingly, the Unsecured Claimants have no contractual right to the premium demands that are incorporated into their proofs of claim.

Of the seven unsecured notes at issue in this Motion, two notes have matured during the pendency of the Chapter 11 Cases and another note will mature on July 8, 2007.[24] The remaining four unsecured notes are either subject to a "no-call" provision (as defined below)[25] or only provide for a premium in the event of optional redemption.[26]  In addition, all of

---

[24]  The $180 million Unsecured Notes and $250 million Unsecured Notes matured in 2006 and the $275 million Unsecured Notes will mature on July 8, 2007.  Any proposed treatment of these notes under the Debtors' Plan cannot give rise to a prepayment premium because the debt has matured, and thus, cannot be prepaid.

[25]  See $400 million Unsecured Notes due 2008; $350 million Unsecured Notes due 2009.

21

the unsecured notes have been accelerated by their own terms, and none of the acceleration clauses provide for a premium.    Consequently, the Unsecured Claimants cannot recover premiums as part of their claims.

       (a)       The $400 Million Unsecured Notes due 2008 and $350 Million Unsecured Notes due 2009 do not Contain Premium Provisions.

       The $400 million Unsecured Notes due 2008 and $350 million Unsecured Notes due 2009 contain prepayment prohibitions (the "No-Call Provisions") that purport to bar repayment of the notes.  Specifically, section 9.1 of the relevant Indentures provides that "[t]he Securities are not redeemable prior to maturity."  However, the Indentures contain acceleration clauses that state that "[i]f an Event of Default [due to bankruptcy] . . . occurs, the principal of and interest on all the Securities shall _ipso facto_ become and be immediately due and payable without any declaration or other act on the part of the Trustee or any Securityholders."[27]

       As this Court has previously held, no-call provisions are unenforceable in Chapter 11 cases.  See Memorandum Decision at 6-7.  As discussed above, the CalGen Secured Debt was subject to various no-call provisions when the Debtors filed their Refinancing Motion.  Id. at 6.  Despite these provisions, the Court authorized the Debtors to repay the CalGen Secured Debt, after noting that "[i]t would violate the purpose behind the Bankruptcy Code to deny a debtor the ability to reorganize because a creditor has contractually forbidden it."  Id. at 7.  Although the CalGen Lenders were prohibited from incorporating premiums into their allowed secured claims, the Court held that the CalGen Lenders had an unsecured claim for damages for the Debtors'

---

[26]  See $750 million Unsecured Notes due 2010; $2 billion Unsecured Notes due 2011.

[27]  See $400 million Unsecured Notes due 2008 Indenture § 5.2; $350 million Unsecured Notes due 2009 Indenture § 5.2.

"breach" of the no-call provisions. Id. at 10. The Debtors respectfully disagree with (and have appealed) the Court's damages award—and, in any event, the Debtors' proposed treatment of the Unsecured Claims is readily distinguishable from the CalGen repayment.

As an initial matter, the Debtors are required by the Bankruptcy Code to provide for treatment of the unsecured claims in their plan of reorganization. See 11 U.S.C. § 1123(a)(3). Therefore, the Debtors intend to repay the Unsecured Claims in full. Because creditors' entitlements in bankruptcy are "subject to any qualifying or contrary provisions of the Bankruptcy Code," the Debtors' proposed treatment does not constitute a breach or give rise to damages. Raleigh v. Illinois Dept. of Revenue, 530 U.S. 15, 20 (2000). To find otherwise would mean that a debtor is liable for damages every time a creditor is repaid under a plan of reorganization prior to maturity, despite the acceleration of the debt. See Hedged-Investments Assocs., 293 B.R. at 528 (holding that contract provisions are subject to Bankruptcy Code limitations).

Also, the fact that the Unsecured Debt has been accelerated renders the No-Call Provisions inapplicable. This is a well-settled legal principle that the Creditors' Committee has also asserted at various times throughout this case.[28] Indeed, the Committee has argued that any other interpretation of the Indentures "would be contrary to the most basic principles of contract interpretation." Creditors' Committee Statement ¶ 11. Because the terms of the acceleration provisions in the $400 million Unsecured Notes due 2008 and the $350 million Unsecured Notes due 2009 expressly state that only principal and interest shall "ipso facto" become due upon an

---

[28] See Qualified Statement of the Official Committee of Unsecured Creditors of Calpine Corporation, Et. Al. In Support of the Debtors' Motion for Order (I) Authorizing Debtors to Obtain Replacement Postpetition Financing to (A) Refinance Existing Postpetition Financing and (B) Repay Prepetition Debt; (II) Allowing Debtors' Limited Objection to Claims; and (III) Determining Value of Secured Claims (the "Creditors' Committee's Statement"), filed on February 16, 2007 [Docket No. 3700] ¶ 11; 2/28/07 Tr. at 197.

Event of Default, these claims should be limited to outstanding principal and accrued interest. If the noteholders also desired payment for dashed expectations upon acceleration, "such benefit could have and should have been negotiated for and expressly included in the applicable Indentures." Id. ¶ 8.

> (b)    The $750 Million Unsecured Notes due 2010 and $2 Billion Unsecured Notes due 2011 do not Provide for a Premium upon Acceleration.

Likewise, the Unsecured Claims filed in connection with the $750 million Unsecured Notes due 2010 and $2 billion Unsecured Notes due 2011 have been accelerated by the Bankruptcy Code and by their own terms and do not provide for a premium in the event of acceleration. In addition, section 3.02 of the Indentures governing these notes only requires a premium upon Calpine's optional redemption. For the reasons stated above, the Debtors' proposed repayment is not voluntary or optional, but is required as part of the Plan. Accordingly, these noteholders have no contractual entitlement to a premium upon repayment of the accelerated debt.

It is anticipated that the Unsecured Claimants will argue that the Debtors' repayment entitles them to a prepayment premium under their Indentures and in the event certain provisions of the Indentures are unenforceable, the Court should award damages. This argument is flawed, however, because the Indentures at issue allow for repayment of accelerated debt without a premium. In other words, the Debtors' proposed repayment complies precisely with the terms of the loan agreements: the debt accelerated or matured and the Debtors are repaying the debt as indicated in the acceleration provisions. The Unsecured Claimants' demands for premiums are not a matter of contract enforcement but an attempt to receive more than they are entitled to under the Indentures.

In sum, the Debtors are objecting to the Unsecured Notes to the extent that they seek amounts that the Unsecured Claimants are not entitled to under the Bankruptcy Code and the relevant Indentures. Because claims that are unenforceable against a debtor and its property are expressly disallowed by section 502(b)(1), the Debtors respectfully request that the Court grant their limited objection.

## II. Pursuant To Rule 3012, The Disputed Claims Should Be Valued Not To Include Any Amounts In Excess Of Outstanding Principal, Plus Unpaid Interest, Through The Confirmation Date Of The Plan.

It is proper for the Debtors to bring this Motion, and for this Court to decide, the value of the Disputed Claims at this time. Rule 3012 provides "[t]he court may determine the value of a claim secured by a lien on property in which the estate has an interest on motion of any party in interest and after a hearing on notice to the holder of the secured claim and any other entity as the court may direct." As stated in the Advisory Committee Note to Rule 3012, the "valuation of secured claims may become important in different contexts" in Chapter 11 cases, and debtors and creditors alike may bring a motion to determine the value of a secured claim. See AE Hotel Venture, 321 B.R. at 212 n.1; In re F.B.F. Indus., Inc., 165 B.R. 544, 546 (Bankr. E.D. Pa. 1994).

To facilitate confirmation of the Plan and to bring clarity to the issue of creditor and interestholder recovery, the Debtors must confirm the exact amounts of the Disputed Claims. The Debtors have therefore included a chart, attached hereto as Exhibit C, which indicates the outstanding principal due and owing on the Disputed Claims, according to the Debtors' books and records. The Debtors believe these proofs of claims should be limited only to such outstanding principal, plus interest at a rate to be determined by the Court prior to the Confirmation Date. More specifically, the Debtors assert that their proposed treatment of the Disputed Claims under the Plan does not trigger any premium obligation (secured or unsecured)

25

and, therefore, herein move the Court to determine, pursuant to Bankruptcy Rule 3012, the value of the Disputed Claims in amounts that do not include any asserted premiums.

## MEMORANDUM OF LAW

This Motion includes citations to the applicable authorities and a discussion of their application to this Motion. Accordingly, the Debtors respectfully submit that such citations and discussion satisfy the requirement that the Debtors submit a separate memorandum of law in support of this Motion pursuant to Rule 9013-1 of the Local Rules.

## NOTICE

Notice of this Motion has been provided to: (a) the United States Trustee for the Southern District of New York; (b) counsel to the Creditors' Committee; (c) counsel to the administrative agents for the Debtors' prepetition secured lenders; (d) counsel to the ad hoc committees; (e) the indenture trustees pursuant to the Debtors' secured indentures; (f) counsel to the Debtors' postpetition lenders; (g) the Securities and Exchange Commission; (h) the Internal Revenue Service; (i) the United States Department of Justice; (j) counsel to the Equity Committee; and (k) all parties entitled who have requested notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required. A copy of the Motion is also available on the website of the Debtors' notice and claims agent, Kurtzman Carson Consultants, at http://www.kccllc.net/calpine.

Except as otherwise noted herein, no prior application for the relief requested herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request an entry of an order, substantially in the form attached hereto as Exhibits A, granting the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated:  June 8, 2007
      New York, New York

Respectfully submitted,

 /s/ Richard. M. Cieri
Richard M. Cieri (RC 6062)
Marc Kieselstein (admitted *pro hac vice*)
David R. Seligman (admitted *pro hac vice*)
Edward O. Sassower (ES 5823)
Jeffrey S. Powell (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York  10022-4611
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

Counsel for the Debtors

**EXHIBIT A**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| Calpine Corporation, et al., | ) | |
| | ) | Case No. 05-60200 (BRL) |
| Debtors. | ) | Jointly Administered |
| | ) | |

**ORDER (I) GRANTING DEBTORS LIMITED OBJECTION TO CLAIM NUMBERS
3732, 3733, 4055 THROUGH 4062 (INCLUSIVE), 2533, 2820 THROUGH 2822
(INCLUSIVE), 2824 AND 2825; AND (II) DETERMINING THE VALUE OF THESE
CLAIMS PURSUANT TO RULE 3012 OF THE FEDERAL RULES OF BANKRUPTCY
PROCEDURE**

Upon the motion (the "Motion")[1] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") seeking entry of an Order (a) granting the Debtors' limited objection to the Disputed Claims, and (b) determining the value of the Disputed Claims pursuant to Rule 3012 of the Federal Rules of Bankruptcy Procedures [Docket No. _____]; it appearing that the relief requested is in the best interest of the Debtors' estates, their creditors and other parties in interest; it appearing that the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; it appearing that this proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); it appearing that venue of this proceeding and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; notice of this Motion and the opportunity for a hearing on this Motion were appropriate under the particular circumstances and that no other or further notice need be given; and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED

---

[1] Capitalized terms used but not otherwise defined herein shall have the meaning set forth for such terms in the Debtors' Motion.

1.    The Motion is granted in its entirety.

2.    Claim numbers 3732, 3733, 4055 through 4062 (inclusive), 2533, 2820 through 2822 (inclusive), 2824 and 2825 are hereby disallowed to the extent that such claims request amounts beyond the Repayment Amounts (as defined below).

3.    Pursuant to Rule 3012 of the Federal Rules of Bankruptcy Procedure, the value of the Disputed Claims is hereby determined as the amount of outstanding principal, plus accrued interest at a rate to be determined by the Court at the end of the Chapter 11 Cases (the "Repayment Amounts"). For the purposes of clarity, the Repayment Amounts shall not include any actual or potential claims, premiums or penalties related to (i) any "makewhole," repayment, prepayment or call provisions, (ii) any contract defaults or (iii) any contractual damages.

4.    The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

5.    The terms and conditions of this Order shall be effective and enforceable immediately upon its entry.

6.    The requirement set forth in Rule 9013-1(b) of the Local Bankruptcy Rules for the Southern District of New York that any motion or other request for relief be accompanied by a memorandum of law is hereby deemed satisfied by the contents of the Application.

7.    The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

New York, New York
Dated: _____, 2007

_____
United States Bankruptcy Judge

2

**EXHIBIT B**

DISPUTED CLAIMS SUMMARY

The Second Lien Debt

| Issuance | Alleged No-Call Clause | Alleged Premium Clause | Acceleration Clause |
|---|---|---|---|
| • $500,000,000 Second Priority Senior Secured Floating Rate Notes Due 2007 | • Any restrictions on repayment have expired. | • Section 3.07(b) *Optional Redemption:* "*After July 15, 2005*, the Company may redeem all or a part of the Notes upon not less than 30 nor more than 60 days' notice, at the redemption prices (expressed as percentages of principal amount) set forth below plus accrued and unpaid interest, if any, on the notes redeemed, to the applicable redemption date, if redeemed during the twelve-month period beginning on July 15 of the years indicated below, subject to the rights of noteholders on the relevant record date to receive interest on the relevant interest payment date." <br><br>• If 2006, and thereafter, the redemption price is 100%. | • Section 6.02 *Acceleration:* "In the case of an Event of Default [due to bankruptcy] . . . all outstanding Notes shall become due and payable immediately without further action or notice." <br><br>• "If an Event of Default occurs on or *after July 15, 2005* by reason of any willful action (or inaction) taken (or not taken) by or on behalf of the Company with the intention of avoiding payment of the premium that the Company would have had to pay if the Company then had elected to redeem the Notes pursuant to Section 3.07 hereof, then, upon acceleration of the Notes, *an equivalent premium shall also become immediately due and payable*, to the extent permitted by law, anything in this Indenture or in the Notes to the contrary notwithstanding." |
| • $1.15 billion 8.5% Second Priority Senior Secured Notes Due 2010 | • Any restrictions on repayment have expired. | • Section 3.07(b) *Optional Redemption:* "At any time *prior to July 15, 2007*, the Company may also redeem all or a part of the 2010 Notes, upon not less than 30 nor more than 60 days prior notice mailed by first-class mail to each holder's registered address, at a redemption price equal to 100% of the principal amount of the Notes redeemed plus the Applicable Premium, as of, and accrued and unpaid interest, if any, to | • Section 6.02 *Acceleration:* "In the case of an Event of Default [due to bankruptcy] . . . all outstanding Notes shall become due and payable immediately without further action or notice." <br><br>• "If an Event of Default *occurs prior to July 15, 2007* by reason of any willful action (or inaction) taken (or not taken) by or on behalf of the Company with the |

| | | |
|---|---|---|
| | the redemption date, subject to the rights of noteholders on the relevant record date to receive interest due on the relevant interest payment date." | intention of avoiding the prohibition on redemption of the Notes prior to such date, then, upon acceleration of the Notes, *an additional premium shall also become and be immediately due and payable* in an amount, for each of the years beginning on July 15 of the years set forth below, as set forth below (expressed as a percentage of the principal amount of the Notes on the date of payment that would otherwise be due but for the provisions of this sentence)."<br><br>• If 2003, 8.500%; if 2004, 7.438%; if 2005, 6.375%; if 2006, 5.313%. |
| | • Section 3.07(c): "*After July 15, 2007*, the Company may redeem all or a part of the Notes . . . at the redemption prices (expressed as percentages of principal amount) set forth below plus accrued and unpaid interest, if any, on the notes redeemed, to the applicable redemption date, if redeemed during the twelve-month period beginning on July 15 of the years indicated below, subject to the rights of noteholders on the relevant record date to receive interest on the relevant interest payment date."<br><br>• If 2007, 104.250%; if 2008, 102.125%; if 2009, and thereafter, 100.000%. | |
| • $900,000,000 8.75% Second Priority Senior Secured Notes Due 2013 | • Any restrictions on repayment have expired.<br><br>• Section 3.07(b) Optional Redemption: "At any time *prior to July 15, 2008*, the Company may also redeem all or a part of the 2013 Notes, upon not less than 30 nor more than 60 days prior notice mailed by first-class mail to each holder's registered address, at a redemption price equal to 100% of the principal amount of the Notes redeemed plus the Applicable Premium as of, and accrued and unpaid interest, if any, to the redemption date, subject to the rights of noteholders on the relevant record date to receive interest due on the relevant interest payment date." | • Section 6.02 Acceleration: "In the case of an Event of Default [due to bankruptcy] . . . all outstanding Notes shall become due and payable immediately without further action or notice."<br><br>• "If an Event of Default occurs *prior to July 15, 2008* by reason of any willful action (or inaction) taken (or not taken) by or on behalf of the Company with the intention of avoiding the prohibition on redemption of the Notes prior to such date, then, upon acceleration of the Notes, *an additional premium shall also become and be immediately due and payable* in an amount, for each of the years beginning on July 15 of the |

2

| Issuance | Alleged No-Call Clause | Alleged Makewhole Clause | Acceleration Clause |
|---|---|---|---|
| | | years set forth below, as set forth below (expressed as a percentage of the principal amount of the Notes on the date of payment that would otherwise be due but for the provisions of this sentence)." <br><br> • If 2003, 8.750%; if 2004, 7.875%; if 2005, 7.000%; if 2006, 6.125%; if 2007, 5.250%. | • Section 6.02 _Acceleration_: "In the case of an Event of Default [due to bankruptcy] . . . all outstanding Notes shall become due and payable immediately without further action or notice." |
| • $400,000,000 9.875% Second Priority Senior Secured Notes Due 2011 | • Any restrictions on repayment have expired. | • None <br><br> • Section 3.05 _Optional Redemption_: "[Reserved]" | |
| • $750,000,000 Second Priority Senior Secured Term Loans Due 2007 | • Any restrictions on repayment have expired. | • Section 2.10(b) _Voluntary Prepayments_: "Term Loans may be prepaid without prepayment premium after July 15, 2006." | • Section 7.02 _Acceleration_: "In the case of an Event of Default . . . all outstanding Term Loans shall become due and payable immediately without further action or notice." |

## The Unsecured Debt

| Issuance | Alleged No-Call Clause | Alleged Makewhole Clause | Acceleration Clause |
|---|---|---|---|
| • $180,000,000 10.5% Senior Notes Due 2006 | • Any restrictions on repayment have expired. | • Paragraph 5 of the Notes _Optional Redemption_: "[T]he Company my not redeem the Securities prior to May 15, 2001. On and after such date, the Company may redeem the Securities at any time as a whole, or from time to time in part, at the following redemption prices (expressed in percentages of principal amount), plus accrued interest at the redemption rate, if redeemed during the 12-month period | • Section 5.2 _Acceleration_: "If an Event of Default [due to bankruptcy] . . . occurs, the principal and interest on all the Securities shall _ipso facto_ become and be immediately due and payable without any declaration or other act on the part of the Trustee or any Securityholders." |

| | | | |
|---|---|---|---|
| | beginning May 15. . . ."<br><br>• If 2001, 105.250%; if 2002, 102.625%; if 2003, and thereafter, 100.000%. | | |
| • $250,000,000 7.625% Senior Notes Due 2006 | • Any restrictions on repayment have expired. | • None | • <u>Section 5.2</u>  *Acceleration*: "If an Event of Default [due to bankruptcy] . . . occurs, the principal and interest on all the Securities shall <u>ipso facto</u> become due and be immediately payable without any declaration or other act on the part of the Trustee or any Securityholder." |
| • $275,000,000 8.75% Senior Notes Due 2007 | • Any restrictions on repayment have expired. | • <u>Paragraph 5 of the Notes</u>: *Optional Redemption*: "The Company may not redeem the Securities prior to July 15, 2002. On or after such date, the Company may redeem the Securities at any time as a whole, or from time to time in part, at the following redemption prices (expressed in percentages of principal amount), plus accrued interest to the redemption date, if redeemed during the 12-month period beginning July 15. . . ."<br><br>• If 2002, 104.37500%; if 2003, 102.18750%; if 2004, and thereafter, 100.00%. | • <u>Section 5.2</u>  *Acceleration*: "If an Event of Default [due to bankruptcy] . . . occurs, the principal of and interest on all the Securities shall <u>ipso facto</u> become and be immediately due and payable without any declaration or other act on the part of the Trustee or any Securityholders." |
| • $400,000,000 7.875% Senior Notes Due 2008 | • <u>Section 9.1</u>  *Not Redeemable*: "The Securities are not redeemable prior to maturity." | • None | • <u>Section 5.2</u>  *Acceleration*: "If an Event of Default [due to bankruptcy] . . . occurs, the principal and interest on all the Securities shall <u>ipso facto</u> become and be immediately due and payable without any declaration or other act on the part of the Trustee or any Securityholders." |
| • $350,000,000 7.75% Senior Notes Due | • <u>Section 9.1</u>  *Not Redeemable*: "The Securities are not redeemable prior to maturity." | • None | • <u>Section 5.2</u>  *Acceleration*: "If an Event of Default [due to bankruptcy] . . . occurs, the principal of and interest on all the Securities shall <u>ipso facto</u> become and be |

4

| | | | immediately due and payable without any declaration or other act on the part of the Trustee or any Securityholders." |
|---|---|---|---|
| 2009 | | | |
| $750,000,000 8.625% Senior Notes Due 2010 | • None | • Paragraph 5 of the Notes *Redemption*: "The Securities of this Series are redeemable, at the option of the Company, at any time in whole or from time to time in part, on not less than 30 nor more than 60 days' prior notice to the registered Holders of Securities of this Series, on any day prior to its maturity (a "Redemption Date") at a redemption price equal to: (i) 100% of the outstanding principal amount of the Securities of this Series being redeemed; plus (ii) accrued and unpaid interest on the Securities of this Series being redeemed to, but excluding, the Redemption Date; plus (iii) a Make-Whole Premium." | • Section 5.2 *Acceleration*: "If an Event of Default [due to bankruptcy] . . . occurs, the principal of and interest on all the Securities of each Series shall ipso facto become and be immediately due and payable without any declaration or other act on the part of the Trustee or any Securityholders." |
| $2 billion 8.5% Senior Notes Due 2011 | • None | • Paragraph 5 of the Notes *Redemption*: "The Securities of this Series are redeemable, at the option of the Company, at any time in whole or from time to time in part, on not less than 30 nor more than 60 days' prior notice to the registered Holders of Securities of this Series, on any day prior to its maturity (a "Redemption Date") at a redemption price equal to: (i) 100% of the outstanding principal amount of the Securities of this Series being redeemed; plus (ii) accrued and unpaid interest on the Securities of this Series being redeemed to, but excluding, the Redemption Date; plus (iii) a Make-Whole Premium." | • Section 5.2 *Acceleration*: "If an Event of Default [due to bankruptcy] . . . occurs, the principal of and interest on all the Securities of each Series shall ipso facto become and be immediately due and payable without any declaration or other act on the part of the Trustee or any Securityholders." |

5

**EXHIBIT C**

| Proof of Claim Number | Claimant | Debtor | Debt Issuance | Type of Claim | Total Principal Amount Due as of the Petition Date | Total Interest on Principal Due as of Repayment Date* |
|---|---|---|---|---|---|---|
| 3732 | Goldman Sachs Credit Partners, L.P. as Agent | Quintana Canada Holdings, LLC | $750 million Second Lien Term Loans due 2007 | Guarantor | $733,125,000.00 | To be determined |
| 3733 | Goldman Sachs Credit Partners, L.P. as Agent | Calpine Corporation | $750 million Second Lien Term Loans due 2007 | Primary Obligor | $733,125,000.00 | To be determined |
| 4055 | Wilmington Trust Company | Calpine Corporation | $900 million Second Lien Notes due 2013 | Primary Obligor | $900,000,000.00 | To be determined |
| 4056 | Wilmington Trust Company | Quintana Canada Holdings, LLC | $900 million Second Lien Notes due 2013 | Guarantor | $900,000,000.00 | To be determined |
| 4057 | Wilmington Trust Company | Quintana Canada Holdings, LLC | $400 million Second Lien Notes due 2011 | Guarantor | $400,000,000.00 | To be determined |
| 4058 | Wilmington Trust Company | Calpine Corporation | $400 million Second Lien Notes due 2011 | Primary Obligor | $400,000,000.00 | To be determined |
| 4059 | Wilmington Trust Company | Quintana Canada Holdings, LLC | $1.15 billion Second Lien Notes due 2010 | Guarantor | $1,150,000,000.00 | To be determined |
| 4060 | Wilmington Trust Company | Calpine Corporation | $1.15 billion Second Lien Notes due 2010 | Primary Obligor | $1,150,000,000.00 | To be determined |
| 4061 | Wilmington Trust Company | Quintana Canada Holdings, LLC | $500 million Second Lien Notes due 2007 | Guarantor | $488,750,000.00 | To be determined |
| 4062 | Wilmington Trust Company | Calpine Corporation | $500 million Second Lien Notes due 2007 | Primary Obligor | $488,750,000.00 | To be determined |
| 2533 | U.S. Bank National Association as Successor Trustee | Calpine Corporation | $180 million Unsecured Notes due 2006 | Primary Obligor | $139,205,000.00 | To be determined |
| 2820 | HSBC Bank USA, National Association as Successor Trustee | Calpine Corporation | $400 million Unsecured Notes due 2008 | Primary Obligor | $173,761,000.00 | To be determined |
| 2821 | HSBC Bank USA, National Association as Successor Trustee | Calpine Corporation | $2 billion Unsecured Notes due 2011 | Primary Obligor | $682,791,000.00 | To be determined |
| 2822 | HSBC Bank USA, National Association as Successor Trustee | Calpine Corporation | $275 million Unsecured Notes due 2007 | Primary Obligor | $190,299,000.00 | To be determined |
| 2824 | HSBC Bank USA, National Association as Successor Trustee | Calpine Corporation | $350 million Unsecured Notes due 2009 | Primary Obligor | $180,602,000.00 | To be determined |
| 2825 | HSBC Bank USA, National Association as Successor Trustee | Calpine Corporation | $250 million Unsecured Notes due 2006 | Primary Obligor | $102,194,000.00 | To be determined |

\*   The Court will determine the appropriate rate of interest to apply to the Disputed Claims.