# **EXHIBIT 2**

| United States Bankruptcy Court<br>**Southern District of New York** | **PROOF OF CLAIM** | |
|---|---|---|

| In re (Name of Debtor)<br>**Calpine Corporation** | Case Number:<br>**05-60200 (BRL)** | **RECEIVED**<br><br>AUG 0 2 2006<br><br>KURTZMAN CARSON |
|---|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case.
A "request" of payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

| Name of Creditor<br>*(The person or entity to whom the debtor owes money or property)*<br><br>**HSBC Bank USA, National Association, as successor Indenture Trustee** | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. | |
|---|---|---|

| Name and Addresses Where Notices Should be Sent<br><br>**HSBC Bank USA, N.A.**          **Kelley Drye & Warren LLP**<br>**452 Fifth Avenue**              **101 Park Avenue**<br>**New York, NY 10018-2706**      **New York, New York 10178**<br>**Attn: Ms. Sandra E. Horwitz**  **Attn: David E. Retter, Esq.**<br>**Vice President**               **Christena A. Lambrianakos, Esq.**<br>**(212) 525-1358**               **(212) 808-7800** | ☐ Check box if you have never received any notices from the bankruptcy court in this case.<br><br>☒ Check box if the address differs from the address on the envelope sent to you by the court. | **Claim # 2823**<br>**USBC SDNY**<br>**Calpine Corporation**<br>**05-60200**<br><br>THIS SPACE IS FOR<br>COURT USE ONLY |
|---|---|---|

| ACCOUNT OR OTHER NUMBER BY WHICH CREDITOR IDENTIFIES DEBTOR:<br>**Amended and Restated Indenture, dated as of March 12, 2004, pursuant to which $633,775,000 aggregate principal amount of Calpine Corporation's 4.75% Contingent Convertible Notes Due 2023 were issued and remain outstanding. (See Attachment.)** | Check here if this claim: | ☐ replaces       a previously filed claim, dated: _____<br>☐ amends |
|---|---|---|

| 1. BASIS FOR CLAIM:<br>☐ Goods sold<br>☐ Services performed<br>☐ Money loaned<br>☐ Personal injury/wrongful death<br>☐ Taxes<br>☒ Other (Describe briefly) **(See Attachment.)** | ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)<br>☐ Wages, salaries, and compensations (Fill out below)<br>    Your social security number _____<br>    Unpaid compensations for services performed<br>    From _____ to _____<br>         (date)        (date) |
|---|---|

| 2. DATE DEBT WAS INCURRED: **on or about March 12, 2004** | 3. IF COURT JUDGMENT, DATE OBTAINED: |
|---|---|

4.   CLASSIFICATION OF CLAIM. Under the Bankruptcy Code all claims are classified as one or more of the following: (1) Unsecured nonpriority, (2) Unsecured Priority,
     (3) Secured.  It is possible for part of a claim to be in one category and part in another.
     CHECK THE APPROPRIATE BOX OR BOXES that best describe your claim and STATE THE AMOUNT OF THE CLAIM.

| ☐ SECURED CLAIM<br>Attach evidence of perfection of security interest.<br>Brief Description of Collateral:<br><br>☐ Real Estate  ☐ Motor Vehicle  ☐ Other (Describe briefly)<br>Amount of arrearage and other charges included in secured claim above, if any $<br><br>☒ UNSECURED NONPRIORITY CLAIM **$636,701,808.16***<br>A claim is unsecured if there is no collateral or lien on property of the debtor securing the claim or to the extent that the value of such property is less than the amount of the claim.<br>***Plus additional interest, Trustee Expenses and all other amounts due under the Indenture, the Notes, at law or in equity. (See Attachment.)** | ☐ UNSECURED PRIORITY CLAIM $_____<br><br>Specify the priority of the claim.<br><br>☐ Wages, salaries, or commissions (up to $4,300), earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier—11 U.S.C. § 507(a)(3)<br>☐ Contributions to an employee benefit plan—U.S.C. § 507(a)(4)<br>☐ Up to $1,950 of deposits toward purchase, lease, or rental of property or services of personal, family, or household use—11 U.S.C. § 507(a)(6)<br>☐ Taxes or penalties of governmental units—11 U.S.C. § 507(a)(8)<br>☐ Other—11 U.S.C. § 507(a) |
|---|---|

| 5.   TOTAL AMOUNT OF<br>CLAIM AT TIME<br>CASE FILED: | **$636,701,808.16***<br>(Unsecured) | $<br>(Secured) | $<br>(Priority) | **$636,701,808.16*** (See Attachment.)<br>(Total) |
|---|---|---|---|---|

***Plus additional interest, Trustee Expenses and all other amounts due. (See Attachment.)**
☐   Check this box if claim includes prepetition charges in addition to the principal amount of the claim. Attach itemized statement of all additional charges.

| 6.   CREDITS AND SETOFFS: The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim. In filing this claim, claimant has deducted all amounts that claimant owes to debtor.<br><br>**This claim is not subject to any setoff or counterclaim.** | THIS SPACE IS FOR<br>COURT USE ONLY |
|---|---|

7.   SUPPORTING DOCUMENTS: *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, or evidence of security interests. If the documents are not available, explain. If the documents are voluminous, attach a summary.

8.   TIME-STAMPED COPY: To receive an acknowledgement of the filing of your claim, enclose envelope and copy of this proof of claim.

| Date:<br><br>July 26, 2006 | Sign and print the name and title, if any, of the creditor or other person (attach copy of power of attorney, if any):<br><br>x *Sandra G Horwitz* _____, Sandra E. Horwitz, Vice President | 0560200060727000000000033 |
|---|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

NJ01/LAMBC/108554.1

ATTACHMENT TO PROOF OF CLAIM OF
HSBC BANK USA, AS SUCCESSOR INDENTURE TRUSTEE

1.    BASIS FOR CLAIM

HSBC Bank USA, National Association ("HSBC") is the successor Indenture Trustee, under the Amended and Restated Indenture, dated as of March 12, 2004 (the "Indenture"), between Calpine Corporation (the "Company"), as Issuer, and Wilmington Trust Company, as predecessor Indenture Trustee (the "Predecessor Indenture Trustee" and together with HSBC, collectively, the "Indenture Trustees"), pursuant to which the Company issued $900,000,000 aggregate principal amount of its 4.75% Contingent Convertible Notes Due 2023 (the "Notes"). A copy of the Indenture is annexed hereto as Exhibit A, and all provisions of the Notes and the Indenture are expressly incorporated herein by reference.

2.    TOTAL AMOUNT OF CLAIM AT TIME CASE FILED

On December 20, 2005 (the "Petition Date"), the Company filed with this Court a petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* As of the Petition Date, the Company was, and still is, indebted to HSBC, as Indenture Trustee, in the following amounts:

(a)    Principal Amount: $633,775,000.00.

(b)    Interest:

　　(i)    $2,926,808.16 accrued unpaid interest to the Petition Date;

　　(ii)    plus accrued unpaid interest from the Petition Date at the rate of interest borne by the Notes; and

　　(iii)    interest on overdue principal and interest on overdue installments of interest and other amounts owing, if any, to the extent lawful, at the rate borne by the Notes.

(c)    Trustee Expenses:

The Company is obligated to the Indenture Trustees for all amounts due and to become due to the Indenture Trustees for their compensation for services and for all reasonable disbursements, advances and expenses incurred by the Indenture Trustees, including, but not limited to, the compensation and out-of-pocket disbursements and expenses of the Indenture Trustees' agents and counsel, under Section 7.07 of the Indenture ("Trustee Expenses"), and for all other amounts, including, without limitation, indemnification obligations, due or to become due to the Indenture Trustees under Section 7.07 of the Indenture. The Indenture Trustees have incurred Trustee Expenses prior to the Petition Date and continue to incur Trustee Expenses from and after the Petition Date, which amounts are not fixed at this time but constitute a part of this claim.

    (d)    Other Unliquidated Amounts:

The Company is obligated to HSBC, as Indenture Trustee, for any and all other amounts due or to become due under the Indenture and the Notes, whether now due or hereafter arising, which amounts may, presently, be unliquidated or contingent, but may become fixed and liquidated in the future, including, but not limited to, amounts as or for interest, liquidated damages, optional or mandatory redemptions, redemption premiums, redemption prices, expenses, indemnities, compensatory, secondary and/or punitive damages, and all compensation obligations, including, but not limited to, compensation obligations to the paying agent and registrar, all present or future stamp, court, documentary, excise or property taxes, charges or similar levies, the holders' rights to require the Company to purchase the Notes in connection with a change of control and/or asset sales, and any and all payment obligations of, or relating to, any other or additional amounts, any registration obligations under the Registration Rights Agreement dated September 5, 1997, between the Company and Credit Suisse First Boston

Corporation, the Indenture covenants limiting Liens, Sale and Leaseback Transactions, and

Issuance of Additional Notes, and change of control payments, asset sales and excess proceeds,

all as defined and described in the Notes and the Indenture.

3.     INQUIRY NOTICE

This Proof of Claim serves, and is intended to serve, as notice of a claim for

any amount due or to become due under the Notes or the Indenture, the provisions each of

which are expressly incorporated herein by reference, whether or not summarized or

identified specifically in this Proof of Claim, and all interested parties are on notice of, and

advised to examine the provisions of, the Notes and the Indenture.

4.     RESERVATION OF RIGHTS

HSBC does not waive, and expressly reserves, all rights and remedies at law

or in equity that HSBC, individually or as Indenture Trustee (including the Predecessor

Indenture Trustee), has or may have against the Company and/or any of the Company's

affiliates and subsidiaries, or any other person or entity, including, without limitation, rights

against the holders of the Notes (the "Noteholders"). HSBC reserves the right to amend or

supplement this claim at any time and in any respect, including, without limitation, as

necessary or appropriate to amend, quantify or correct amounts, to provide additional detail

regarding the claims set forth herein, or to fix the amount of any contingent or unliquidated

claim.

5.     JURISDICTION

In filing the within claim, HSBC does not submit itself to the jurisdiction of

this Court for any purpose other than with respect to the allowance of this claim for any and

all amounts due under the Indenture and the Notes, and does not consent to the jurisdiction of

this Court to adjudicate any other matter relating to the Indenture or the rights and remedies of the Indenture Trustees and/or the Noteholders, including, without limitation, any adjudication concerning the charging lien and other lien rights granted to the Indenture Trustees, and/or priority in payment accorded to the Indenture Trustees, pursuant to the Indenture and related documents in connection with the issuance of the Notes described herein.

# Exhibit A

Amended and Restated Indenture, dated as of March 12, 2004

CALPINE CORPORATION

4.75% CONTINGENT CONVERTIBLE NOTES DUE 2023

AMENDED AND RESTATED

INDENTURE

Dated as of March 12, 2004

WILMINGTON TRUST COMPANY

Trustee

NY: 378358-7

## CROSS-REFERENCE TABLE*

| Trust Indenture Act Section | Indenture Section |
|---|---|
| 310(a)(1) | 7.10 |
| (a)(2) | 7.10 |
| (a)(3) | N.A. |
| (a)(4) | N.A. |
| (a)(5) | 7.10 |
| (b) | 7.10 |
| (c) | N.A. |
| 311(a) | 7.11 |
| (b) | 7.11 |
| (c) | N.A. |
| 312(a) | 2.05 |
| (b) | 12.03 |
| (c) | 12.03 |
| 313(a) | 7.06 |
| (b)(1) | 10.03 |
| (b)(2) | 7.06; 7.07 |
| (c) | 7.06;12.03 |
| (d) | 7.06 |
| 314(a) | 4.03 |
| (a)(4) | 12.05 |
| (b) | N.A. |
| (c)(3) | N.A. |
| (e) | 12.05 |
| (f) | N.A. |
| 315(a) | 7.01 |
| (b) | 7.05 |
| (c) | 7.01 |
| (d) | 7.01 |
| (e) | 6.11 |
| 316(a) (last sentence) | 2.09 |
| (a)(1)(A) | 6.05 |
| (a)(1)(B) | 6.04 |
| (a)(2) | N.A. |
| (b) | 6.07 |
| (c) | 2.12 |
| 317(a)(1) | 6.08 |
| (a)(2) | 6.09 |
| (b) | 2.04 |
| 318(a) | N.A. |
| (b) | 12.03 |
| (c) | 12.01; 12.02; 12.03 |

N.A. means not applicable.
* This Cross Reference Table is not part of this Indenture.

## TABLE OF CONTENTS

*Page*

### ARTICLE 1.
### DEFINITIONS AND INCORPORATION
### BY REFERENCE

| | | |
|---|---|---|
| Section 1.01 | Definitions. | 1 |
| Section 1.02 | Other Definitions. | 11 |
| Section 1.03 | Incorporation by Reference of Trust Indenture Act. | 12 |
| Section 1.04 | Rules of Construction. | 12 |

### ARTICLE 2.
### THE NOTES

| | | |
|---|---|---|
| Section 2.01 | Form and Dating. | 12 |
| Section 2.02 | Execution and Authentication. | 13 |
| Section 2.03 | Registrar, Paying Agent and Conversion Agent. | 13 |
| Section 2.04 | Paying Agent to Hold Money in Trust. | 14 |
| Section 2.05 | Holder Lists. | 14 |
| Section 2.06 | Transfer and Exchange. | 14 |
| Section 2.07 | Replacement Notes. | 20 |
| Section 2.08 | Outstanding Notes. | 20 |
| Section 2.09 | Treasury Notes. | 21 |
| Section 2.10 | Temporary Notes. | 21 |
| Section 2.11 | Cancellation. | 21 |
| Section 2.12 | Defaulted Interest. | 21 |

### ARTICLE 3.
### REDEMPTION AND PREPAYMENT

| | | |
|---|---|---|
| Section 3.01 | Notices to Trustee. | 22 |
| Section 3.02 | Selection of Notes to Be Redeemed or Purchased. | 22 |
| Section 3.03 | Notice of Optional Redemption. | 22 |
| Section 3.04 | Effect of Notice of Optional Redemption. | 23 |
| Section 3.05 | Deposit of Redemption or Purchase Price. | 23 |
| Section 3.06 | Notes Redeemed or Purchased in Part. | 24 |
| Section 3.07 | Optional Redemption. | 24 |
| Section 3.08 | Mandatory Redemption. | 24 |
| Section 3.09 | Purchase of Notes at Option of the Holder. | 24 |
| Section 3.10 | Purchase of Notes at Option of the Holder upon Change in Control. | 29 |
| Section 3.11 | Effect of Purchase Notice or Change in Control Purchase Notice. | 34 |
| Section 3.12 | Deposit of Purchase Price or Change in Control Purchase Price. | 35 |
| Section 3.13 | Notes Purchased in Part. | 35 |
| Section 3.14 | Covenant to Comply With Securities Laws Upon Purchase of Notes. | 35 |
| Section 3.15 | Repayment to the Company. | 36 |

### ARTICLE 4.
### COVENANTS

| | | |
|---|---|---|
| Section 4.01 | Payment of Notes. | 36 |
| Section 4.02 | Maintenance of Office or Agency. | 36 |
| Section 4.03 | Reports. | 37 |
| Section 4.04 | Compliance Certificate. | 37 |

i

Section 4.05    Taxes. ...................................................................................... 38
Section 4.06    Stay, Extension and Usury Laws. ........................................... 38
Section 4.07    [Reserved.] ............................................................................. 38
Section 4.08    [Reserved.] ............................................................................. 38
Section 4.09    [Reserved.] ............................................................................. 38
Section 4.10    [Reserved.] ............................................................................. 38
Section 4.11    [Reserved.] ............................................................................. 38
Section 4.12    Liens. ...................................................................................... 39
Section 4.13    [Reserved.] ............................................................................. 40
Section 4.14    Corporate Existence. .............................................................. 40
Section 4.15    [Reserved.] ............................................................................. 41
Section 4.16    Limitation on Sale and Leaseback Transactions. .................... 41
Section 4.17    [Reserved.] ............................................................................. 41
Section 4.18    [Reserved.] ............................................................................. 41
Section 4.19    [Reserved.] ............................................................................. 41
Section 4.20    [Reserved.] ............................................................................. 42
Section 4.21    Issuance of Additional Notes. ................................................ 42

**ARTICLE 5.**
SUCCESSORS

Section 5.01    Merger, Consolidation, or Sale of Assets. .............................. 42
Section 5.02    Successor Corporation Substituted. ....................................... 42

**ARTICLE 6.**
DEFAULTS AND REMEDIES

Section 6.01    Events of Default. ................................................................... 43
Section 6.02    Acceleration. .......................................................................... 44
Section 6.03    Other Remedies. ..................................................................... 45
Section 6.04    Waiver of Past Defaults. ........................................................ 45
Section 6.05    Control by Majority. .............................................................. 45
Section 6.06    Limitation on Suits. ................................................................ 45
Section 6.07    Rights of Holders of Notes to Receive Payment. ................... 46
Section 6.08    Collection Suit by Trustee. ..................................................... 46
Section 6.09    Trustee May File Proofs of Claim. ......................................... 46
Section 6.10    Priorities. ............................................................................... 47
Section 6.11    Undertaking for Costs. ........................................................... 47

**ARTICLE 7.**
TRUSTEE

Section 7.01    Duties of Trustee. ................................................................... 47
Section 7.02    Rights of Trustee. ................................................................... 48
Section 7.03    Individual Rights of Trustee. .................................................. 49
Section 7.04    Trustee's Disclaimer. .............................................................. 49
Section 7.05    Notice of Defaults. ................................................................. 49
Section 7.06    Reports by Trustee to Holders of the Notes. .......................... 49
Section 7.07    Compensation and Indemnity. ............................................... 50
Section 7.08    Replacement of Trustee. ........................................................ 50
Section 7.09    Successor Trustee by Merger, etc. ......................................... 51
Section 7.10    Eligibility; Disqualification. ................................................... 51
Section 7.11    Preferential Collection of Claims Against Company. ............. 52

## ARTICLE 8.
### LEGAL DEFEASANCE AND COVENANT DEFEASANCE

Section 8.01  Option to Effect Legal Defeasance or Covenant Defeasance. .................................... 52
Section 8.02  Legal Defeasance and Discharge. ..................................................................... 52
Section 8.03  Covenant Defeasance. ................................................................................... 52
Section 8.04  Conditions to Legal or Covenant Defeasance. ....................................................... 53
Section 8.05  Deposited Money and Government Securities to be Held in Trust; Other
              Miscellaneous Provisions. ......................................................................... 54
Section 8.06  Repayment to the Company. ............................................................................ 54
Section 8.07  Reinstatement. ........................................................................................... 55

## ARTICLE 9.
### AMENDMENT, SUPPLEMENT AND WAIVER

Section 9.01  Without Consent of Holders of Notes. ................................................................. 55
Section 9.02  With Consent of Holders of Notes. .................................................................... 56
Section 9.03  Compliance with Trust Indenture Act. ................................................................ 57
Section 9.04  Revocation and Effect of Consents. ................................................................... 57
Section 9.05  Notation on or Exchange of Notes. .................................................................... 57
Section 9.06  Trustee to Sign Amendments, etc. ..................................................................... 57

## ARTICLE 10.
### CONVERSION

Section 10.01  Conversion Privilege. ................................................................................ 58
Section 10.02  Conversion Procedure. ............................................................................... 60
Section 10.03  Taxes on Conversion. ................................................................................ 61
Section 10.04  Company to Provide Stock. .......................................................................... 61
Section 10.05  Adjustment of Conversion Price. .................................................................... 61
Section 10.06  When No Adjustment Required. ...................................................................... 64
Section 10.07  When Adjustment May Be Deferred. ................................................................. 65
Section 10.08  Successive Adjustments. ............................................................................. 65
Section 10.09  Notice of Adjustment. ................................................................................ 65
Section 10.10  Notice of Certain Transactions. ...................................................................... 65
Section 10.11  Effect of Reclassification, Consolidation, Merger, Share Exchange or Sale on
              Conversion Privilege. ............................................................................ 65
Section 10.12  Trustee's Disclaimer. ................................................................................ 66
Section 10.13  Voluntary Reduction. ................................................................................ 67
Section 10.14  Conversion Value of Notes Tendered. ............................................................... 67

## ARTICLE 11.
### SATISFACTION AND DISCHARGE

Section 11.01  Satisfaction and Discharge. .......................................................................... 68
Section 11.02  Application of Trust Money. .......................................................................... 69

## ARTICLE 12.
### MISCELLANEOUS

Section 12.01  Trust Indenture Act Controls. ........................................................................ 69
Section 12.02  Notices. .............................................................................................. 70
Section 12.03  Communication by Holders of Notes with Other Holders of Notes. ............................... 71
Section 12.04  Certificate and Opinion as to Conditions Precedent. ............................................... 71
Section 12.05  Statements Required in Certificate or Opinion. ..................................................... 71

iii

Section 12.06  Rules by Trustee and Agents. ...................................................................71
Section 12.07  No Personal Liability of Directors, Officers, Employees and Stockholders.....................71
Section 12.08  Governing Law. .......................................................................................72
Section 12.09  No Adverse Interpretation of Other Agreements. ..............................................72
Section 12.10  Successors. ..............................................................................................72
Section 12.11  Severability. .............................................................................................72
Section 12.12  Counterpart Originals. ...............................................................................72
Section 12.13  Table of Contents, Headings, etc. ................................................................72

EXHIBITS

Exhibit A    FORM OF NOTE
Exhibit B    FORM OF CERTIFICATE OF TRANSFER
Exhibit C    FORM OF CERTIFICATE OF EXCHANGE
Exhibit D    FORM OF CERTIFICATE OF ACQUIRING INSTITUTIONAL ACCREDITED
             INVESTOR

AMENDED AND RESTATED INDENTURE (as so amended and restated, the "*Indenture*") dated as of March 1, 2004 between Calpine Corporation (the "*Company*"), a Delaware corporation, and Wilmington Trust Company (the "*Trustee*").

WITNESSETH:

WHEREAS, the Company and the Trustee entered into an Indenture, dated as of November 14, 2003 (the "*Original Indenture*"), governing the 4.75% Contingent Convertible Notes due 2023 (the "*Notes*") for the benefit of each other and for the equal and ratable benefit of the Holders (as defined) of the Notes;

WHEREAS, pursuant to Section 9.01 of the Original Indenture, the Company has requested that the Trustee amend and restate the Original Indenture in its entirety, without the consent of the Holders, to cure certain ambiguities, omissions, defects and inconsistencies;

WHEREAS, the Trustee, upon satisfaction of the conditions set forth in Sections 9.01 and 9.06 of the Indenture (including, without limitation, the receipt of an Officer's Certificate and an Opinion of Counsel), is willing to amend and restate the Original Indenture *as hereinafter set forth*; and

WHEREAS, (i) the Original Indenture is being amended and restated pursuant to this Indenture; (ii) the Notes under the Original Indenture, as amended and restated in connection with this Indenture, will be continued under this Indenture and (iii) all obligations of the Company under the Notes and the Original Indenture will be continued, amended and restated as provided herein and will not be cancelled or discharged;

NOW THEREFORE, the Company and the Trustee agree, for the benefit of each other and for the equal and ratable benefit of the Holders of the Notes, that the Original Indenture be, and it hereby is, amended and restated in its entirety as follows:

**ARTICLE 1.**
**DEFINITIONS AND INCORPORATION**
**BY REFERENCE**

Section 1.01    *Definitions.*

"*144A Global Note*" means a Global Note substantially in the form of Exhibit A hereto bearing the Global Note Legend and the Private Placement Legend and deposited with or on behalf of, and registered in the name of, the Depositary or its nominee that shall be issued in a denomination equal to the outstanding principal amount of the Notes sold in reliance on Rule 144A.

"*Additional Notes*" means Notes (other than the Initial Notes) issued under the Original Indenture in accordance with Sections 2.02 and 4.21 hereof, as part of the same series as the Initial Notes.

"*Affiliate*" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "control," as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise; *provided* that beneficial ownership of 10% or more of the Voting Stock of a Person shall be deemed to be control. For purposes of this definition, the terms "controlling," "controlled by" and "under common control with" have correlative meanings.

1

"*Agent*" means any Registrar, co-registrar, Paying Agent, additional paying agent, Conversion Agent or additional conversion agent.

"*Applicable Procedures*" means, with respect to any transfer or transaction involving a Global Note or beneficial interests therein, the rules and procedures of the Depositary, for such Global Note, in each case to the extent applicable to such transaction and as in effect from time to time.

"*Attributable Debt*" in respect of a Sale and Leaseback Transaction means, as of the date of determination, the present value (discounted at the rate of interest set forth or implicit in terms of the lease (or, if not practicable to determine that rate, the rate of interest borne by the Notes), compounded annually) of the total obligations of the lessee for rental payments during the remaining term of the lease included in such Sale and Leaseback Transaction (including any period for which such lease has been extended).

"*Bankruptcy Law*" means Title 11, U.S. Code or any similar federal or state law for the relief of debtors.

"*Bid Solicitation Agent*" means The Bank of New York until the Company selects another bank, trust company or similar fiduciary agent, if any, to serve as Bid Solicitation Agent.

"*Board of Directors*" means:

(1) with respect to a corporation, the Board of Directors of the corporation or any committee thereof duly authorized to act on behalf of such board;

(2) with respect to a partnership, the Board of Directors of the general partner of the partnership;

(3) with respect to a limited liability company, the managing member or members or any controlling committee of managing members thereof; and

(4) with respect to any other Person, the board or committee of such Person serving a similar function.

"*Business Day*" means any day other than a Legal Holiday.

"*Capitalized Lease Obligations*" of a Person means the rental obligations under any lease of any property (whether real, personal or mixed) of which the discounted present value of the rental obligations of that Person as lessee, in conformity with GAAP, is required to be capitalized on the balance sheet of that Person. The Stated Maturity of any such lease shall be the date of the last payment of rent or any other amount due under such lease prior to the first date upon which such lease may be terminated by the lessee without payment of a penalty.

"*Capital Stock*" means:

(1) in the case of a corporation, corporate stock;

(2) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

2

(3) in the case of a partnership or limited liability company, partnership interests (whether general or limited) or membership interests; and

(4) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, but excluding from all of the foregoing any debt securities convertible into Capital Stock, whether or not such debt securities include any right of participation with Capital Stock.

*"Change in Control"* means the occurrence of any of the following:

(1)     any Person, including any syndicate or group deemed to be a "person" under Section 13(d)(3) of the Exchange Act, acquires beneficial ownership, directly or indirectly, through a purchase, merger or other acquisition transaction or series of transactions, of shares of the Company's Capital Stock entitling the Person to exercise 50% or more of the total voting power of all shares of the Company's Capital Stock that is entitled to vote generally in elections of directors, other than an acquisition by the Company, any of its Subsidiaries or any of its employee benefit plans; or

(2)     the Company merges or consolidates with or into any other Person, any merger of another Person into the Company, or the Company conveys, sells, transfers or leases all or substantially all of its assets to another Person, other than any transaction:

(a)     that does not result in any reclassification, conversion, exchange or cancellation of outstanding shares of the Company's Capital Stock,

(b)     pursuant to which the holders of the Company's Common Stock immediately prior to the transaction have the entitlement to exercise, directly or indirectly, 50% or more of the total voting power of all shares of Capital Stock entitled to vote generally in the election of directors of the continuing or surviving corporation immediately after the transaction, or

(c)     which is effected solely to change the Company's jurisdiction of incorporation and results in a reclassification, conversion or exchange or outstanding shares of the Company's Common Stock solely into shares of Common Stock of the surviving entity.

*"Common Stock"* means shares of the Company's Common Stock, $0.001 par value per share, as they exist on the date of this Indenture or any other shares of Capital Stock of the Company into which the Common Stock shall be reclassified or changed.

*"Common Stock Price"* on any date means the closing sale price per share (or if no closing sale price is reported, the average of the bid and ask prices or, if more than one in either case, the average of the average bid and the average ask prices) on such date for the Company's Common Stock as reported in composite transactions on the principal United States securities exchange on which the Company's Common Stock is traded or, if its Common Stock is not listed on a United States national or regional securities exchange, as reported by NASDAQ.

*"Company"* means Calpine Corporation, a Delaware Corporation and any and all successors thereto.

*"Consolidated Current Liabilities,"* means, as of the date of determination, the aggregate amount of consolidated liabilities of the Company and its consolidated Restricted Subsidiaries, which may

3

properly be classified as current liabilities (including taxes accrued as estimated), after eliminating (i) all inter-company items between the Company and its Subsidiaries and (ii) all current maturities of long-term Indebtedness, all as determined in accordance with GAAP.

*"Consolidated Net Tangible Assets"* means, as of the date of determination, the total amount of consolidated assets (less accumulated depreciation or amortization, allowances for doubtful receivables, other applicable reserves and other properly deductible items) under GAAP which would appear on the consolidated balance sheet of the Company and its Subsidiaries, determined in accordance with GAAP, and after giving effect to purchase accounting and after deducting therefrom, to the extent otherwise included, the amounts of:

(a) Consolidated Current Liabilities;

(b) minority interests in the Company's consolidated Restricted Subsidiaries held by Persons other than the Company or a Restricted Subsidiary;

(c) excess of cost over fair value of assets of businesses acquired, as determined in good faith by the Company's Board of Directors;

(d) any revaluation or other write-up in value of assets subsequent to December 31, 1993 as a result of a change in the method of valuation in accordance with GAAP;

(e) unamortized debt discount and expenses and other unamortized deferred charges, goodwill, patents, trademarks, service marks, trade names, copyrights, licenses, organization or developmental expenses and other intangible items;

(f) treasury stock; and

(g) any cash set apart and held in a sinking fund or other analogous fund established for the purpose of redemption or other retirement of Capital Stock to the extent such obligation is not reflected in Consolidated Current Liabilities.

*"Conversion Date"* shall have the meaning as specified in Section 10.02 hereof.

*"Conversion Price"* means $6.50 per share of Common Stock as of the date of the Original Indenture, subject to the adjustments described in Section 10.05 hereof.

*"Conversion Rate"* means an amount of shares equal to $1,000 principal amount of Notes divided by the Conversion Price, which shall be 153.8462 as of the date of the Original Indenture, subject to the adjustments described in Section 10.05 hereof.

*"Corporate Trust Office of the Trustee"* shall be at the address of the Trustee specified in Section 12.02 hereof or such other address as to which the Trustee may give written notice to the Company.

*"Custodian"* means the Trustee, as custodian with respect to the Notes in global form, or any successor entity thereto.

*"Default"* means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

4

"*Definitive Note*" means a certificated Note registered in the name of the Holder thereof and issued in accordance with Section 2.06 hereof, substantially in the form of Exhibit A hereto except that such Note shall not bear the Global Note Legend and shall not have the "Schedule of Exchanges of Interests in the Global Note" attached thereto.

"*Depositary*" means, with respect to the Notes issuable or issued in whole or in part in global form, the Person specified in Section 2.03 hereof as the Depositary with respect to the Notes, and any and all successors thereto appointed as depositary hereunder and having become such pursuant to the applicable provision of this Indenture.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Exercise Period*" means the period that is 30 calendar days from the date of the Original Indenture (or such other date as set forth in the Purchase Agreement) during which the Initial Purchasers have the right to exercise the Initial Purchaser Option.

"*Fair Market Value*" means the value that would be paid by a willing buyer to a willing seller in a transaction not involving distress or necessity of either party, determined in good faith by the Board of Directors of the Company, whose determination shall be conclusive evidence of such determination (unless otherwise provided in this Indenture).

"*GAAP*" means generally accepted accounting principles set forth in the statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as have been approved by a significant segment of the accounting profession, which are in effect and, to the extent optional, adopted by the Company, on the applicable date of determination.

"*Global Notes*" means, individually and collectively, each of the Restricted Global Notes, substantially in the form of Exhibit A hereto issued in accordance with Section 2.01 or 2.06(b)(3) hereof.

"*Global Note Legend*" means the legend set forth in Section 2.06(e)(2), which is required to be placed on all Global Notes issued under this Indenture.

"*Government Securities*" means direct obligations of, or obligations guaranteed by, the United States of America, and the payment for which the United States pledges its full faith and credit.

"*Holder*" means a Person in whose name a Note is registered.

"*IAI Global Note*" means a Global Note substantially in the form of Exhibit A hereto bearing the Global Note Legend and the Private Placement Legend and deposited with or on behalf of and registered in the name of the Depositary or its nominee that shall be issued in a denomination equal to the outstanding principal amount of the Notes sold to Institutional Accredited Investors.

"Incur" means, as applied to any obligation, to create, incur, issue, assume, guarantee or in any other manner become liable with respect to, contingently or otherwise, such obligation, and "Incurred," "Incurrence" and "Incurring" shall each have a correlative meaning; *provided, however,* that any amendment, modification or waiver of any provision of any document pursuant to which Indebtedness was previously Incurred shall not be deemed to be an Incurrence of Indebtedness as long as such amendment, modification or waiver does not (A) increase the principal or premium thereof or interest rate thereon, (B) change to an earlier date the Stated Maturity thereof or the date of any schedule or required principal payment thereon or the time or circumstances under which such Indebtedness may or shall be redeemed, (C) if such Indebtedness is contractually subordinated in right of payment to the Notes, modify

or affect, in any manner adverse to the Holders, such subordination or (D) if the Company is the obligor thereon, provide that a Restricted Subsidiary shall be an obligor and (ii) such Indebtedness would, after giving effect to such amendment, modification or waiver as if it were an Incurrence, be refinancing Indebtedness that is contractually subordinated in right of payment to the Notes to at least the same extent as the Indebtedness being refinanced.

"*Indebtedness*" of any Person means, without duplication:

(a) the principal of and premium (if any premium is then due and owing) in respect of indebtedness of such person for money borrowed;

(b) all Capitalized Lease Obligations of such person;

(c) all Obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction, other than Obligations with respect to letters of credit securing Obligations (other than Obligations described in clauses (a) and (b) above) entered into in the ordinary course of business of such Person to the extent such letters of credit are not drawn upon or, if and to the extent drawn upon, such drawing is reimbursed no later than the tenth Business Day following receipt by such Person of a demand for reimbursement following payment on the letter of credit;

(d) all Obligations of the type referred to in clauses (a) through (c) above of other Persons and all dividends of other Persons for the payment of which, in either case, that Person is responsible or liable, directly or indirectly, as obligor, guarantor or otherwise; and

(e) all Obligations of the type referred to in clauses (a) through (d) above of other Persons secured by any Lien on any property or asset of that Person (whether or not such obligation is assumed by that person), the amount of the obligation on any date of determination being deemed to be the lesser of the value of the property or assets or the amount of the obligation so secured.

The amount of Indebtedness of any Person at any date shall be, with respect to unconditional Obligations, the outstanding balance at such date of all such Obligations as described above and, with respect to any contingent Obligations at such date, the maximum liability determined by such Person's Board of Directors, in good faith, in light of the facts and circumstances existing at the time, as reasonably likely to be Incurred upon the occurrence of the contingency giving rise to such Obligation.

"*Indenture*" means this indenture, as amended or supplemented from time to time.

"*Indirect Participant*" means a Person who holds a beneficial interest in a Global Note through a Participant.

"*Initial Notes*" means the first $600,000,000 aggregate principal amount of Notes issued under the Original Indenture on the date thereof.

"*Initial Purchasers*" means Deutsche Bank Securities Inc., Credit Lyonnais Securities (USA) Inc., Harris Nesbitt Corp. and Williams Capital Group LP.

"*Initial Purchaser Option*" means the right given to Deutsche Bank Securities Inc. pursuant to the Purchase Agreement to purchase, at its election, up to $300,000,000 in aggregate principal amount of Notes.

*"Institutional Accredited Investor"* means an institution that is an "accredited investor" as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act, who are not also QIBs.

*"Legal Holiday"* means a Saturday, a Sunday or a day on which banking institutions in the City of New York or at a place of payment are authorized by law, regulation or executive order to remain closed. If a payment date is a Legal Holiday at a place of payment, payment may be made at that place on the next succeeding day that is not a Legal Holiday, and no interest shall accrue on such payment for the intervening period.

*"Lien"* means any mortgage, lien, pledge, charge, or other security interest or encumbrance of any kind (including any conditional sale or other title retention agreement and any lease in the nature thereof).

*"Liquidated Damages"* has the meaning set forth in the Registration Rights Agreement.

*"Market Price"* means the average determined by the Company of the Common Stock Price of the shares for the five Trading Date period immediately preceding and including the third Trading Date prior to (a) in the case of a redemption pursuant to Section 3.09 or 3.10, the applicable Purchase Date or Change in Control Purchase Date, as the case may be, appropriately adjusted to take into account the occurrence, during the period commencing on the first of the Trading Days during such five Trading Day period and ending on such Purchase Date or Change in Control Purchase Date, as the case may be, of any event described in Section 10.05 and (b) in the case of an adjustment to the Conversion Price or Conversion Rate pursuant to Section 10.05, the applicable date fixed for the determination of stockholders entitled to receive any distribution described in Section 10.05, appropriately adjusted to take into account the occurrence, during the period commencing on the first of the Trading Days during such five Trading Day period and ending on such determination date, of any event described in Section 10.05; subject, however, in the case of both (a) and (b), to the conditions set forth in Section 10.06 and 10.07 hereof. If the shares of Common Stock are not listed on The New York Stock Exchange, then the Market Price shall be determined by the Company by reference to the Common Stock Price as reported by the National Association of Securities Dealers Automated Quotation System ("*NASDAQ*"). In the absence of such quotations, the Company shall be entitled to determine in good faith the Market Price by reference to the Common Stock Price on any date on the basis of such quotations as it considers appropriate.

*"Note Documents"* means this Indenture and the Notes (including any Additional Notes issued under the Original Indenture).

*"Notes"* has the meaning assigned to it in the preamble to this Indenture. The Initial Notes and the Additional Notes shall be treated as a single class for all purposes under this Indenture, and unless the context otherwise requires, all references to the Notes shall include the Initial Notes and any Additional Notes.

*"Obligations"* means any principal, interest, penalties, fees, indemnifications, reimbursements, damages and other liabilities payable under the documentation governing any Indebtedness (including the Notes and this Indenture).

*"Offering Circular"* means that certain Confidential Offering Circular dated November 7, 2003, as amended by the Supplement to the Confidential Offering Circular, dated January 6, 2004, with respect to offerings of the Notes.

*"Officer"* means, with respect to any Person, the Chairman of the Board, the Chief Executive Officer, the President, the Chief Operating Officer, the Chief Financial Officer, the Treasurer, any Assistant Treasurer, the Controller, the Secretary or any Vice-President of such Person.

"*Officer's Certificate*" means a certificate signed on behalf of the Company by one Officer of the Company that meets the requirements of Section 12.05 hereof.

"*Opinion of Counsel*" means an opinion from legal counsel who is reasonably acceptable to the Trustee, that meets the requirements of Section 12.05 hereof. The counsel may be an employee of or counsel to the Company, any Subsidiary of the Company or the Trustee.

"*Participant*" means, with respect to the Depositary, a Person who has an account with the Depositary.

"*Permitted Investments*" means the following investments:

(i) any direct obligations of, or obligations fully and unconditionally guaranteed by, the United States of America, or any agency or instrumentality of the United States of America, the obligations of which are fully and unconditionally backed by the full faith and credit of the United States of America;

(ii) demand and time deposits in, certificates of deposit of, bankers' acceptances issued by, or federal funds sold by any depository institution or trust company incorporated under the laws of the United States of America or any state thereof and subject to supervision and examination by federal and/or state authorities, or incorporated under the laws of any other jurisdiction, so long as at the time of such investment or contractual commitment providing for such investment the unsecured commercial paper or other unsecured short-term debt obligations of such depository institution or trust company have credit ratings of at least P-1 (or its equivalent) or higher from Moody's and A-1 (or its equivalent) or higher from S&P;

(iii) repurchase obligations with respect to any security described in clauses (i) or (ii) above, in each case entered into with either (A) a depository institution or trust company (acting as principal) which in respect of its short-term unsecured debt has credit ratings of at least P-1 (or its equivalent) or higher from Moody's and A-1 (or its equivalent) or higher from S&P or (B) a money market fund maintained by a broker which, in respect of its short-term unsecured debt, has credit ratings of at least P-1 (or its equivalent) or higher from Moody's and A-1 (or its equivalent) or higher from S&P;

(iv) unsecured debt securities bearing interest or sold at a discount issued by any corporation incorporated under the laws of the United States of America or any state thereof which have, at the time of such investment, credit ratings of at least P-1 (or its equivalent) or higher from Moody's and A-1 (or its equivalent) or higher from S&P;

(v) unsecured commercial paper which has, at the time of such investment, credit ratings of at least P-1 (or its equivalent) or higher from Moody's and A-1 (or its equivalent) or higher from S&P; and

(vi) investments in money market funds or money market mutual funds which have, at the time of such investment, credit ratings of at least P-1 (or its equivalent) or higher from Moody's and A-1 (or its equivalent) or higher from S&P (including such funds for which the Trustee or any of its Affiliates is investment manager or advisor and for which the Trustee or any of its Affiliates may receive a fee).

"*Person*" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, limited liability company or government or other entity.

"*Private Placement Legend*" means the legend set forth in Section 2.06(e)(1) to be placed on all Notes issued under this Indenture except where otherwise permitted by the provisions of this Indenture.

*"Purchase Agreement"* means the Purchase Agreement by and between the Company and Deutsche Bank Securities Inc. as representative of the several Initial Purchasers, dated as of November 6, 2003, as may be amended from time to time.

*"QIB"* means a "qualified institutional buyer" as defined in Rule 144A.

*"Registration Rights Agreement"* means the Registration Rights Agreement, dated as of November 14, 2003, among the Company and the Initial Purchasers.

*"Restricted Definitive Note"* means a Definitive Note bearing the Private Placement Legend.

*"Restricted Global Note"* means a Global Note bearing the Private Placement Legend.

*"Restricted Subsidiary"* means any Subsidiary of a Person that is not designated an Unrestricted Subsidiary by that Person's Board of Directors.

*"Rule 144"* means Rule 144 promulgated under the Securities Act.

*"Rule 144A"* means Rule 144A promulgated under the Securities Act.

*"S&P"* means Standard & Poor's Ratings Group (or, if such entity ceases to rate the Notes for reasons outside of the control of the Company, the equivalent investment grade credit rating from any other "nationally recognized statistical rating organization" (or successor concept) within the meaning of Rule 15c3-1(c)(2)(vi)(F) under the Exchange Act (or successor provision) selected by the Company as a replacement agency).

*"Sale and Leaseback Transaction"* means an arrangement relating to property now owned or later acquired whereby a Person or one of such Person's Subsidiaries transfers that property to another Person and then leases it back from such Person, other than leases for a term of not more than 36 months or leases between such Person and a Wholly Owned Subsidiary of such Person or between such Person's Wholly Owned Subsidiaries.

*"SEC"* means the Securities and Exchange Commission.

*"Securities Act"* means the Securities Act of 1933, as amended.

*"Stated Maturity"* means, with respect to any installment of interest or principal on any series of Indebtedness, the date on which the payment of interest or principal was scheduled to be paid in the documentation governing such Indebtedness as of the date of this Indenture, and shall not include any contingent obligations to repay, redeem or repurchase any such interest or principal prior to the date originally scheduled for the payment thereof.

*"Subsidiary"* means, as applied to any Person, any corporation, limited or general partnership, trust, association or other business entity of which an aggregate of at least 50% of the outstanding Voting Stock, or an equivalent controlling interest therein, of such Person is, at the time, directly or indirectly, owned by such Person and/or one or more Subsidiaries of such Person.

*"TIA"* means the Trust Indenture Act of 1939 (15 U.S.C. §§ 77aaa-77bbbb), as amended, as in effect on the date of this Indenture, except as provided in Section 9.03 of this Indenture.

*"Trading Day"* means any regular or abbreviated trading day of The New York Stock Exchange.

9

"*Trading Price*" of the Notes on any date of determination means the average of the secondary market bid quotations per $1,000 principal amount of Notes obtained by the Bid Solicitation Agent for $5,000,000 principal amount of the Notes at approximately 3:30 p.m., New York City time, on such determination date from three independent nationally recognized securities dealers the Company selects, which may include any of the Initial Purchasers; *provided* that if at least three such bids cannot reasonably be obtained by the Bid Solicitation Agent, but two such bids are obtained, then the average of the two bids shall be used, and if only one such bid can reasonably be obtained by the Bid Solicitation Agent, this one bid shall be used. If the Bid Solicitation Agent cannot reasonably obtain at least one such bid or, in the Company's reasonable judgment, the bid quotations are not indicative of the secondary market value of the Notes, then the Trading Price of the Notes will be determined in good faith by the Bid Solicitation Agent, taking into account in such determination such factors as it, in its sole discretion after consultation with the Company, deems appropriate. The Bid Solicitation Agent shall have no obligation to determine the Trading Price of the Notes unless the Company has requested such determination in writing, and the Company shall have no obligation to make such request unless a Holder of the Notes provides the Company with reasonable evidence that the Trading Price of the Notes would be less than 95% of the product of the Common Stock Price and the Conversion Rate. At such time, the Company shall instruct the Bid Solicitation Agent in writing to determine the trading price beginning on the next Trading Day and on each successive Trading Day until the Trading Price of the Notes is greater than or equal to 95% of the product of the Common Stock Price and the Conversion Rate. The Company will notify the Trustee of the results of any Trading Price determination within a reasonable time (and, in any event, no later than three Business Days prior to the Conversion Date).

"*Trustee*" means the party named as such in the preamble to this Indenture until a successor replaces it in accordance with the applicable provisions of this Indenture and thereafter means the successor serving hereunder.

"*Unrestricted Subsidiary*" means:

(i) any Subsidiary that at the time of determination shall be designated an Unrestricted Subsidiary by a Person's Board of Directors in the manner provided below and

(ii) any Subsidiary of an Unrestricted Subsidiary.

A Person's Board of Directors may designate any Subsidiary (including any newly acquired or newly formed Subsidiary) to be an Unrestricted Subsidiary unless such Subsidiary owns any Capital Stock of, or owns or holds any Lien on any property of, such Person or any other Subsidiary of such Person that is not a Subsidiary of the Subsidiary to be so designated, so long as the Subsidiary to be designated an Unrestricted Subsidiary and all other Subsidiaries previously so designated at the time of any determination hereunder shall, in the aggregate, have total assets not greater than 5% of the Company's Consolidated Net Tangible Assets as determined based on the consolidated balance sheet of such Person as of the end of the most recent financial quarter for which financial statements are available. A Person's Board of Directors may designate any Unrestricted Subsidiary to be a Restricted Subsidiary; *provided, however*, that immediately after giving effect to that designation no Default or Event of Default under this Indenture shall have occurred and be continuing.

Any such designation by a Person's Board of Directors shall be evidenced to the Trustee by promptly filing with the Trustee a copy of the board resolution giving effect to the designation and a certificate signed by two of that Person's Officers certifying that the designation complied with these provisions. However, the failure to file the resolution and/or certificate with the Trustee shall not impair or affect the validity of the designation.

*"Voting Stock"* of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

*"Wholly Owned Subsidiary"* of any Person means a Subsidiary (other than an Unrestricted Subsidiary) of such Person all of the outstanding Capital Stock or other ownership interests of which (other than directors' qualifying shares) shall at the time be owned by such Person or by one or more Wholly Owned Subsidiaries of such Person or by such Person and one or more Wholly Owned Subsidiaries of such Person.

Section 1.02    *Other Definitions.*

| Term | Defined in Section |
|---|---|
| *"Authentication Order"* | 2.02 |
| *"Change in Control Notice"* | 3.10 |
| *"Change in Control Notice Date"* | 3.10 |
| *"Change in Control Purchase Date"* | 3.10 |
| *"Change in Control Purchase Notice"* | 3.10 |
| *"Change in Control Purchase Price"* | 3.10 |
| *"Company Notice"* | 3.09 |
| *"Company Notice Date"* | 3.09 |
| *"Conversion Agent"* | 2.03 |
| *"Conversion Date"* | 10.02 |
| *"Conversion Price"* | 10.05 |
| *"Conversion Value"* | 10.14 |
| *"Covenant Defeasance"* | 8.03 |
| *"DTC"* | 2.03 |
| *"Determination Date"* | 10.14 |
| *"Event of Default"* | 6.01 |
| *"Ex-Dividend Date"* | 10.01 |
| *"Expiration Time"* | 10.05 |
| *"Five Day Average Closing Stock Price"* | 10.14 |
| *"Legal Defeasance"* | 8.02 |
| *"Net Shares"* | 10.14 |
| *"Net Share Amount"* | 10.14 |
| *"Paying Agent"* | 2.03 |
| *"Pre-Dividend Sale Price"* | 10.05 |
| *"Principal Return"* | 10.14 |
| *"Principal Value Conversion"* | 10.01 |
| *"Purchase Date"* | 3.09 |
| *"Purchase Notice"* | 3.09 |
| *"Purchase Price"* | 3.09 |
| *"Purchased Shares"* | 10.05 |
| *"Quarter"* | 10.01 |
| *"Reference Date"* | 10.05 |
| *"Registrar"* | 2.03 |

11

Section 1.03    *Incorporation by Reference of Trust Indenture Act.*

Whenever this Indenture refers to a provision of the TIA, the provision is incorporated by reference in and made a part of this Indenture.

The following TIA terms used in this Indenture have the following meanings:

*"obligor"* on the Notes means the Company and any successor obligor upon the Notes.

All other terms used in this Indenture that are defined by the TIA, defined by TIA reference to another statute or defined by SEC rule under the TIA have the meanings so assigned to them.

Section 1.04    *Rules of Construction.*

Unless the context otherwise requires:

(1)    a term has the meaning assigned to it;

(2)    an accounting term not otherwise defined has the meaning assigned to it in accordance with GAAP;

(3)    "or" is not exclusive;

(4)    words in the singular include the plural, and in the plural include the singular;

(5)    "shall" shall be interpreted to express a command;

(6)    provisions apply to successive events and transactions; and

(7)    references to sections of or rules under the Securities Act shall be deemed to include substitute, replacement of successor sections or rules adopted by the SEC from time to time.

## ARTICLE 2.
## THE NOTES

Section 2.01    *Form and Dating.*

(a)    *General.* The Notes and the Trustee's certificate of authentication shall be substantially in the form of Exhibit A hereto. The Notes may have notations, legends or endorsements required by law, stock exchange rule or usage. Each Note shall be dated the date of its authentication. The Notes shall be in denominations of $1,000 and integral multiples thereof.

The terms and provisions contained in the Notes shall constitute, and are hereby expressly made, a part of this Indenture and the Company and the Trustee, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby. However, to the extent any provision of any Note conflicts with the express provisions of this Indenture, the provisions of this Indenture shall govern and be controlling.

(b)    *Global Notes.* Notes issued in global form shall be substantially in the form of Exhibit A attached hereto (including the Global Note Legend thereon and the "Schedule of Exchanges of Interests in

12

the Global Note" attached thereto). Notes issued in definitive form shall be substantially in the form of Exhibit A attached hereto (but without the Global Note Legend thereon and without the "Schedule of Exchanges of Interests in the Global Note" attached thereto). Each Global Note shall represent such of the outstanding Notes as shall be specified therein and each shall provide that it represents the aggregate principal amount of outstanding Notes from time to time endorsed thereon and that the aggregate principal amount of outstanding Notes represented thereby may from time to time be reduced or increased, as appropriate, to reflect exchanges and redemptions. Any endorsement of a Global Note to reflect the amount of any increase or decrease in the aggregate principal amount of outstanding Notes represented thereby shall be made by the Trustee or the Custodian, at the direction of the Trustee, in accordance with instructions given by the Holder thereof as required by Section 2.06 hereof.

Section 2.02    *Execution and Authentication.*

One Officer must sign the Notes for the Company by manual or facsimile signature.

If the Officer whose signature is on a Note no longer holds that office at the time a Note is authenticated, the Note shall nevertheless be valid.

A Note shall not be valid until authenticated by the manual signature of the Trustee. The signature shall be conclusive evidence that the Note has been authenticated under this Indenture.

The Trustee will, upon receipt of a written order of the Company signed by one Officer (an "*Authentication Order*"), authenticate (i) Initial Notes in an aggregate principal amount up to $600 million on the date of the Original Indenture and (ii) Additional Notes from time to time as permitted under this Indenture.

The Trustee may appoint an authenticating agent acceptable to the Company to authenticate Notes. An authenticating agent may authenticate Notes whenever the Trustee may do so. Each reference in this Indenture to authentication by the Trustee includes authentication by such agent. An authenticating agent has the same rights as an Agent to deal with Holders or an Affiliate of the Company.

Section 2.03    *Registrar, Paying Agent and Conversion Agent.*

The Company shall maintain an office or agency where Notes may be presented for registration of transfer or for exchange ("*Registrar*") and an office or agency where Notes may be presented for payment ("*Paying Agent*") and an office or agency where Securities may be presented for conversion ("*Conversion Agent*"). The Registrar shall keep a register of the Notes and of their transfer and exchange. The Company may appoint one or more co-registrars and one or more additional paying agents. The term "Registrar" includes any co-registrar, the term "Paying Agent" includes any additional paying agent and the term "Conversion Agent" includes any additional conversion agent. The Company may change any Conversion Agent, Paying Agent or Registrar without notice to any Holder. The Company shall notify the Trustee in writing of the name and address of any Agent not a party to this Indenture. If the Company fails to appoint or maintain another entity as Conversion Agent, Registrar, Paying Agent, the Trustee shall act as such. The Company or any of its Subsidiaries may act as Conversion Agent, Paying Agent or Registrar.

The Company initially appoints The Depository Trust Company ("*DTC*") to act as Depositary with respect to the Global Notes.

The Company initially appoints the Trustee to act as the Conversion Agent, Registrar and Paying Agent and to act as Custodian with respect to the Global Notes.

13

Section 2.04    *Paying Agent to Hold Money in Trust.*

The Company shall require each Paying Agent other than the Trustee to agree in writing that the Paying Agent shall hold in trust for the benefit of Holders or the Trustee all money held by the Paying Agent for the payment of principal, premium, if any, or interest on the Notes, and shall notify the Trustee of any default by the Company in making any such payment. While any such default continues, the Trustee may require a Paying Agent to pay all money held by it to the Trustee. The Company at any time may require a Paying Agent to pay all money held by it to the Trustee. Upon payment over to the Trustee, the Paying Agent (if other than the Company or a Subsidiary) shall have no further liability for the money. If the Company or a Subsidiary acts as Paying Agent, it shall segregate and hold in a separate trust fund for the benefit of the Holders all money held by it as Paying Agent. Upon any bankruptcy or reorganization proceedings relating to the Company, the Trustee shall serve as Paying Agent for the Notes.

Section 2.05    *Holder Lists.*

The Trustee shall preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of all Holders and shall otherwise comply with TIA § 312(a). If the Trustee is not the Registrar, the Company shall furnish to the Trustee at least seven Business Days before each interest payment date and at such other times as the Trustee may request in writing, a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of the Holders of Notes and the Company shall otherwise comply with TIA § 312(a).

Section 2.06    *Transfer and Exchange.*

(a)    *Transfer and Exchange of Global Notes.*  A Global Note may not be transferred as a whole except by the Depositary to a nominee of the Depositary, by a nominee of the Depositary to the Depositary or to another nominee of the Depositary, or by the Depositary or any such nominee to a successor Depositary or a nominee of such successor Depositary. All Global Notes shall be exchanged by the Company for Definitive Notes if:

(1)    the Company delivers to the Trustee notice from the Depositary that it is unwilling or unable to continue to act as Depositary or that it is no longer a clearing agency registered under the Exchange Act and, in either case, a successor Depositary is not appointed by the Company within 120 days after the date of such notice from the Depositary; or

(2)    the Company in its sole discretion determines that the Global Notes (in whole but not in part) should be exchanged for Definitive Notes and delivers a written notice to such effect to the Trustee.

Upon the occurrence of either of the preceding events in (1) or (2) above, Definitive Notes shall be issued in such names as the Depositary shall instruct the Trustee. Global Notes also may be exchanged or replaced, in whole or in part, as provided in Sections 2.07 and 2.10 hereof. Every Note authenticated and delivered in exchange for, or in lieu of, a Global Note or any portion thereof, pursuant to this Section 2.06 or Section 2.07 or 2.10 hereof, shall be authenticated by the Trustee pursuant to an Authentication Order and delivered in the form of, and shall be, a Global Note. A Global Note may not be exchanged for another Note other than as provided in this Section 2.06(a), however, beneficial interests in a Global Note may be transferred and exchanged as provided in Section 2.06(b), (c) or (f) hereof.

(b)    *Transfer and Exchange of Beneficial Interests in the Global Notes.*  The transfer and exchange of beneficial interests in the Global Notes shall be effected through the Depositary, in

14

accordance with the provisions of this Indenture and the Applicable Procedures. Beneficial interests in the Restricted Global Notes shall be subject to restrictions on transfer comparable to those set forth herein to the extent required by the Securities Act. Transfers of beneficial interests in the Global Notes also shall require compliance with either subparagraph (1) or (2) below, as applicable, as well as one or more of the other following subparagraphs, as applicable:

(1) *Transfer of Beneficial Interests in the Same Global Note.* Beneficial interests in any Restricted Global Note may be transferred to Persons who take delivery thereof in the form of a beneficial interest in the same Restricted Global Note in accordance with the transfer restrictions set forth in the Private Placement Legend. No written orders or instructions shall be required to be delivered to the Registrar to effect the transfers described in this Section 2.06(b)(1).

(2) *All Other Transfers and Exchanges of Beneficial Interests in Global Notes.* In connection with all transfers and exchanges of beneficial interests that are not subject to Section 2.06(b)(1) above, the transferor of such beneficial interest must deliver to the Registrar both:

(A) a written order from a Participant or an Indirect Participant given to the Depositary in accordance with the Applicable Procedures directing the Depositary to credit or cause to be credited a beneficial interest in another Global Note in an amount equal to the beneficial interest to be transferred or exchanged; and

(B) instructions given in accordance with the Applicable Procedures containing information regarding the Participant account to be credited with such increase.

(3) *Transfer of Beneficial Interests to Another Restricted Global Note.* A beneficial interest in any Restricted Global Note may be transferred to a Person who takes delivery thereof in the form of a beneficial interest in another Restricted Global Note if the transfer complies with the requirements of Section 2.06(b)(2) above and the Registrar receives the following:

(A) if the transferee shall take delivery in the form of a beneficial interest in the 144A Global Note, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (1) thereof; and

(B) if the transferee shall take delivery in the form of a beneficial interest in the IAI Global Note, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications, certificates and Opinion of Counsel required by item (2)(d) thereof, if applicable.

(4) *Transfer and Exchange of Beneficial Interests in Restricted Global Notes to Restricted Definitive Notes.* If any holder of a beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a Restricted Definitive Note or to transfer such beneficial interest to a Person who takes delivery thereof in the form of a Restricted Definitive Note, then, upon receipt by the Registrar of the following documentation:

(A) if the holder of such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a Restricted Definitive Note, a certificate from such holder in the form of Exhibit C hereto, including the certifications in item (a) thereof;

15

(B)    if such beneficial interest is being transferred to a QIB in accordance with Rule 144A, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (1) thereof;

(C)    if such beneficial interest is being transferred pursuant to an exemption from the registration requirements of the Securities Act in accordance with Rule 144, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (2)(a) thereof;

(D)    if such beneficial interest is being transferred to an Institutional Accredited Investor in reliance on an exemption from the registration requirements of the Securities Act other than those listed in subparagraphs (B) through (C) above, a certificate to the effect set forth in Exhibit B hereto, including the certifications, certificates and Opinion of Counsel required by item (2) thereof, if applicable;

(E)    if such beneficial interest is being transferred to the Company or any of its Subsidiaries, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (2)(b) thereof; or

(F)    if such beneficial interest is being transferred pursuant to an effective registration statement under the Securities Act, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (2)(c) thereof,

the Trustee shall cause the aggregate principal amount of the applicable Global Note to be reduced accordingly pursuant to Section 2.06(f) hereof, and the Company shall execute and the Trustee shall authenticate, upon receipt of an Authentication Order, and deliver to the Person designated in such Authentication Order a Definitive Note in the appropriate principal amount. Any Definitive Note issued in exchange for a beneficial interest in a Restricted Global Note pursuant to this Section 2.06(b) shall be *registered in such name or names* and in such authorized denomination or denominations as the holder of such beneficial interest shall instruct the Registrar through instructions from the Depositary and the Participant or Indirect Participant. The Trustee shall deliver such Definitive Notes to the Persons in whose names such Notes are so registered. Any Definitive Note issued in exchange for a beneficial interest in a Restricted Global Note pursuant to this Section 2.06(b) shall bear the Private Placement Legend and shall be subject to all restrictions on transfer contained therein.

(c)    *Transfer and Exchange of Definitive Notes for Beneficial Interests.*

(1)    *Restricted Definitive Notes to Beneficial Interests in Restricted Global Notes.*  If any Holder of a Restricted Definitive Note proposes to exchange such Note for a beneficial interest in a Restricted Global Note or to transfer such Restricted Definitive Notes to a Person who takes delivery thereof in the form of a beneficial interest in a Restricted Global Note, then, upon receipt by the Registrar of the following documentation:

(A)    if the Holder of such Restricted Definitive Note proposes to exchange such Note for a beneficial interest in a Restricted Global Note, a certificate from such Holder in the form of Exhibit C hereto, including the certifications in item (b) thereof;

(B)    - if such Restricted Definitive Note is being transferred to a QIB in accordance with Rule 144A, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (1) thereof;

(C)     if such Restricted Definitive Note is being transferred pursuant to an exemption from the registration requirements of the Securities Act in accordance with Rule 144, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (2)(a) thereof;

(D)     if such Restricted Definitive Note is being transferred to an Institutional Accredited Investor in reliance on an exemption from the registration requirements of the Securities Act other than those listed in subparagraphs (B) through (C) above, a certificate to the effect set forth in Exhibit B hereto, including the certifications, certificates and Opinion of Counsel required by item (2)(d) thereof, if applicable;

(E)     if such Restricted Definitive Note is being transferred to the Company or any of its Subsidiaries, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (2)(b) thereof; or

(F)     if such Restricted Definitive Note is being transferred pursuant to an effective registration statement under the Securities Act, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (2)(c) thereof,

the Trustee shall cancel the Restricted Definitive Note, increase or cause to be increased the aggregate principal amount of, in the case of clause (A) above, the appropriate Restricted Global Note, in the case of clause (B) above, the 144A Global Note, and in all other cases, the IAI Global Note.

(d)     *Transfer and Exchange of Definitive Notes for Definitive Notes.* Upon request by a Holder of Definitive Notes and such Holder's compliance with the provisions of this Section 2.06(d), the Registrar shall register the transfer or exchange of Definitive Notes. Prior to such registration of transfer or exchange, the requesting Holder must present or surrender to the Registrar the Definitive Notes duly endorsed or accompanied by a written instruction of transfer in form satisfactory to the Registrar duly executed by such Holder or by its attorney, duly authorized in writing. In addition, the requesting Holder must provide any additional certifications, documents and information, as applicable, required pursuant to the following provisions of this Section 2.06(d).

(1)     *Restricted Definitive Notes to Restricted Definitive Notes.* Any Restricted Definitive Note may be transferred to and registered in the name of Persons who take delivery thereof in the form of a Restricted Definitive Note if the Registrar receives the following:

(A)     if the transfer shall be made pursuant to Rule 144A under the Securities Act, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (1) thereof; and

(B)     if the transfer shall be made pursuant to any other exemption from the registration requirements of the Securities Act, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications, certificates and Opinion of Counsel required by item (2) thereof, if applicable.

17

(e)   *Legends.*   The following legends shall appear on the face of all Global Notes and Definitive Notes issued under this Indenture unless specifically stated otherwise in the applicable provisions of this Indenture.

      (1)   Private Placement Legend.

      (A)   Each Global Note and each Definitive Note (and all Notes issued in exchange therefor or substitution thereof) shall bear the legend in substantially the following form:

"THE NOTES EVIDENCED HEREBY HAVE NOT BEEN AND SHALL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT (A)(1) TO A PERSON WHO THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A, (2) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT PROVIDED BY RULE 144 THEREUNDER (IF AVAILABLE), (3) TO AN INSTITUTIONAL ACCREDITED INVESTOR IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OR (4) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND (B) IN ACCORDANCE WITH ALL APPLICABLE SECURITIES LAWS OF THE STATES OF THE UNITED STATES AND OTHER JURISDICTIONS."

      (2)   *Global Note Legend.*   Each Global Note shall bear a legend in substantially the following form:

"THIS GLOBAL NOTE IS HELD BY THE DEPOSITARY (AS DEFINED IN THE INDENTURE GOVERNING THIS NOTE) OR ITS NOMINEE IN CUSTODY FOR THE BENEFIT OF THE BENEFICIAL OWNERS HEREOF, AND IS NOT TRANSFERABLE TO ANY PERSON UNDER ANY CIRCUMSTANCES EXCEPT THAT (1) THE TRUSTEE MAY MAKE SUCH NOTATIONS HEREON AS MAY BE REQUIRED PURSUANT TO SECTION 2.06 OF THE INDENTURE, (2) THIS GLOBAL NOTE MAY BE EXCHANGED IN WHOLE BUT NOT IN PART PURSUANT TO SECTION 2.06(a) OF THE INDENTURE, (3) THIS GLOBAL NOTE MAY BE DELIVERED TO THE TRUSTEE FOR CANCELLATION PURSUANT TO SECTION 2.11 OF THE INDENTURE AND (4) THIS GLOBAL NOTE MAY BE TRANSFERRED TO A SUCCESSOR DEPOSITARY WITH THE PRIOR WRITTEN CONSENT OF THE COMPANY.

UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR NOTES IN DEFINITIVE FORM, THIS NOTE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY.   UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY (55 WATER STREET, NEW YORK, NEW YORK) ("DTC"), TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC

(AND ANY PAYMENT IS MADE TO CEDE & CO. OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN."

(f)     *Cancellation and/or Adjustment of Global Notes.*  At such time as all beneficial interests in a particular Global Note have been exchanged for Definitive Notes or a particular Global Note has been redeemed, repurchased or canceled in whole and not in part, each such Global Note shall be returned to or retained and canceled by the Trustee in accordance with Section 2.11 hereof.  At any time prior to such cancellation, if any beneficial interest in a Global Note is exchanged for or transferred to a Person who shall take delivery thereof in the form of a beneficial interest in another Global Note or for Definitive Notes, the principal amount of Notes represented by such Global Note shall be reduced accordingly and an endorsement shall be made on such Global Note by the Trustee or by the Depositary at the direction of the Trustee to reflect such reduction; and if the beneficial interest is being exchanged for or transferred to a Person who shall take delivery thereof in the form of a beneficial interest in another Global Note, such other Global Note shall be increased accordingly and an endorsement shall be made on such Global Note by the Trustee or by the Depositary at the direction of the Trustee to reflect such increase.

(g)     *General Provisions Relating to Transfers and Exchanges.*

(1)     To permit registrations of transfers and exchanges, the Company shall execute and the Trustee shall authenticate Global Notes and Definitive Notes upon receipt of an Authentication Order in accordance with Section 2.02 or at the Registrar's request.

(2)     No service charge shall be made to a Holder of a Global Note or to a Holder of a Definitive Note for any registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any transfer tax or similar governmental charge payable in connection therewith (other than any such transfer taxes or similar governmental charge payable upon exchange or transfer pursuant to Sections 2.10, 3.06, 3.09, 3.10 and 9.05 hereof).

(3)     The Registrar shall not be required to register the transfer of or exchange any Note selected for redemption in whole or in part, except the unredeemed portion of any Note being redeemed in part.

(4)     All Global Notes and Definitive Notes issued upon any registration of transfer or exchange of Global Notes or Definitive Notes shall be the valid obligations of the Company, evidencing the same debt, and entitled to the same benefits under this Indenture, as the Global Notes or Definitive Notes surrendered upon such registration of transfer or exchange.

(5)     The Company shall not be required:

(A)     to issue, to register the transfer of or to exchange any Notes during a period beginning at the opening of business 15 days before the day of any selection of Notes for redemption under Section 3.02 hereof and ending at the close of business on the day of selection;

(B)     to register the transfer of or to exchange any Note selected for redemption in whole or in part, except the unredeemed portion of any Note being redeemed in part; or

19

(C)    to register the transfer of or to exchange a Note between a record date and the next succeeding interest payment date.

(6)    Prior to due presentment for the registration of a transfer of any Note, the Trustee, any Agent and the Company may deem and treat the Person in whose name any Note is registered as the absolute owner of such Note for the purpose of receiving payment of principal of and interest on such Notes and for all other purposes, and none of the Trustee, any Agent or the Company shall be affected by notice to the contrary.

(7)    The Trustee shall authenticate Global Notes and Definitive Notes in accordance with the provisions of Section 2.02 hereof.

(8)    All certifications, certificates and Opinions of Counsel required to be submitted to the Registrar pursuant to this Section 2.06 to effect a registration of transfer or exchange may be submitted by facsimile.

Section 2.07    *Replacement Notes.*

If any mutilated Note is surrendered to the Trustee or the Company and the Trustee receives evidence to its satisfaction of the destruction, loss or theft of any Note, the Company shall issue and the Trustee, upon receipt of an Authentication Order, shall authenticate a replacement Note if the Trustee's requirements hereunder are met. If required by the Trustee or the Company, an indemnity bond must be supplied by the Holder that is sufficient in the judgment of the Trustee and the Company to protect the Company, the Trustee, any Agent and any authenticating agent from any loss that any of them may suffer if a Note is replaced. The Company may charge the applicable Holder for its expenses in replacing a Note.

Every replacement Note is an additional obligation of the Company and shall be entitled to all of the benefits of this Indenture equally and proportionately with all other Notes duly issued hereunder.

Section 2.08    *Outstanding Notes.*

The Notes outstanding at any time are all the Notes authenticated by the Trustee except for those canceled by it, those delivered to it for cancellation, those reductions in the interest in a Global Note effected by the Trustee in accordance with the provisions hereof, and those described in this Section as not outstanding. Except as set forth in Section 2.09 hereof, a Note does not cease to be outstanding because the Company or an Affiliate of the Company holds the Note.

If a Note is replaced pursuant to Section 2.07 hereof, it ceases to be outstanding unless the Trustee receives proof satisfactory to it that the replaced Note is held by a protected purchaser.

If the principal amount of any Note is considered paid under Section 4.01 hereof, it ceases to be outstanding and interest on it ceases to accrue.

If the Paying Agent (other than the Company, a Subsidiary or an Affiliate of any thereof) holds, on a redemption date or maturity date, money sufficient to pay Notes payable on that date, then on and after that date such Notes shall be deemed to be no longer outstanding and shall cease to accrue interest.

Section 2.09    *Treasury Notes.*

In determining whether the Holders of the required principal amount of Notes have concurred in any direction, waiver or consent, Notes owned by the Company, or by any Person directly or indirectly controlling or controlled by or under direct or indirect common control with the Company, shall be considered as though not outstanding, except that for the purposes of determining whether the Trustee shall be protected in relying on any such direction, waiver or consent, only Notes that the Trustee knows are so owned shall be so disregarded.

Section 2.10    *Temporary Notes.*

Until certificates representing Notes are ready for delivery, the Company may prepare and the Trustee, upon receipt of an Authentication Order, shall authenticate temporary Notes. Temporary Notes shall be substantially in the form of certificated Notes but may have variations that the Company considers appropriate for temporary Notes and as may be reasonably acceptable to the Trustee. Without unreasonable delay, the Company shall prepare and the Trustee shall, upon receipt of an Authentication Order, authenticate definitive Notes in exchange for temporary Notes.

Holders of temporary Notes shall be entitled to all of the benefits of this Indenture.

Section 2.11    *Cancellation.*

The Company at any time may deliver Notes to the Trustee for cancellation. The Registrar and Paying Agent shall forward to the Trustee any Notes surrendered to them for registration of transfer, exchange or payment. The Trustee and no one else shall cancel all Notes surrendered for registration of transfer, exchange, payment, replacement or cancellation and shall destroy canceled Notes in accordance with its customary practices (subject to the record retention requirement of the Exchange Act). Certification of the destruction of all canceled Notes shall be delivered to the Company. The Company may not issue new Notes to replace Notes that it has paid or that have been delivered to the Trustee for cancellation.

Section 2.12    *Defaulted Interest.*

If the Company defaults in a payment of interest on the Notes, it shall pay the defaulted interest in any lawful manner plus, to the extent lawful, interest payable on the defaulted interest, to the Persons who are Holders on a subsequent special record date, in each case at the rate provided in the Notes and in Section 4.01 hereof. The Company shall notify the Trustee in writing of the amount of defaulted interest proposed to be paid on each Note and the date of the proposed payment. The Company shall fix or cause to be fixed each such special record date and payment date, *provided* that no such special record date may be less than 10 days prior to the related payment date for such defaulted interest. At least 15 days before the special record date, the Company (or, upon the written request of the Company, the Trustee in the name and at the expense of the Company) shall mail or cause to be mailed to Holders a notice that states the special record date, the related payment date and the amount of such interest to be paid.

## ARTICLE 3.
### REDEMPTION AND PREPAYMENT

Section 3.01    *Notices to Trustee.*

If the Company elects to redeem the Notes pursuant to the optional redemption provisions of Section 3.07 hereof, it must furnish to the Trustee, at least 30 days but not more than 60 days before a redemption date, an *Officer's Certificate* setting forth:

    (1)    the clause of this Indenture pursuant to which the redemption shall occur;

    (2)    the redemption date;

    (3)    the principal amount of Notes to be redeemed; and

    (4)    the redemption price.

Section 3.02    *Selection of Notes to Be Redeemed or Purchased.*

If less than all of the Notes are to be redeemed or purchased in an offer to purchase at any time, the Trustee shall select Notes for redemption or purchase as follows:

    (1)    if the Notes are listed on any national securities exchange, in compliance with the requirements of the principal national securities exchange on which the Notes are listed; or

    (2)    if the Notes are not listed on any national securities exchange, on a *pro rata* basis, by lot or by such method as the Trustee shall deem fair and appropriate.

In the event of partial redemption or purchase by lot, the particular Notes to be redeemed or purchased shall be selected, unless otherwise provided herein, not less than 30 nor more than 60 days prior to the redemption or purchase date by the Trustee from the outstanding Notes not previously called for redemption or purchase.

The Trustee shall promptly notify the Company in writing of the Notes selected for redemption or purchase and, in the case of any Note selected for partial redemption or purchase, the principal amount thereof to be redeemed or purchased. Notes and portions of Notes selected shall be in amounts of $1,000 or whole multiples of $1,000; except that if all of the Notes of a Holder are to be redeemed or purchased, the entire *outstanding amount of Notes* held by such Holder, even if *not a multiple of $1,000,* shall be redeemed or purchased. Except as provided in the preceding sentence, provisions of this Indenture that apply to Notes called for redemption or purchase also apply to portions of Notes called for redemption or purchase.

Section 3.03    *Notice of Optional Redemption.*

At least 30 days but not more than 60 days before a redemption date, the Company shall mail or cause to be mailed, by first class mail, a notice of redemption to each Holder whose Notes are to be redeemed at its registered address, except that redemption notices may be mailed more than 60 days prior to a redemption date if the notice is issued in connection with a defeasance of the Notes or a satisfaction and discharge of this Indenture pursuant to Articles 8 or 11, respectively, of this Indenture.

The notice shall identify the Notes to be redeemed and shall state:

    (1)    the redemption date;

    (2)    the redemption price;

    (3)    if any Note is being redeemed in part, the portion of the principal amount of such Note to be redeemed and that, after the redemption date upon surrender of such Note, a new Note or Notes in principal amount equal to the unredeemed portion shall be issued upon cancellation of the original Note;

    (4)    the name and address of the Paying Agent;

    (5)    that Notes called for redemption must be surrendered to the Paying Agent to collect the redemption price;

    (6)    that, unless the Company defaults in making such redemption payment, interest on Notes called for redemption ceases to accrue on and after the redemption date;

    (7)    the paragraph of the Notes and/or Section of this Indenture pursuant to which the Notes called for redemption are being redeemed; and

    (8)    that no representation is made as to the correctness or accuracy of the CUSIP number, if any, listed in such notice or printed on the Notes.

At the Company's request, the Trustee shall give the notice of redemption in the Company's name and at its expense; *provided, however,* that the Company has delivered to the Trustee, at least 45 days prior to the redemption date, an Officer's Certificate requesting that the Trustee give such notice and setting forth the information to be stated in such notice as provided in the preceding paragraph.

Section 3.04    *Effect of Notice of Optional Redemption.*

Once notice of redemption is mailed by the Company in accordance with Section 3.03 hereof, Notes called for redemption become irrevocably due and payable on the redemption date at the redemption price. A notice of redemption may not be conditional.

Section 3.05    *Deposit of Redemption or Purchase Price.*

Not less than one Business Day prior to the redemption or purchase price date, the Company shall deposit with the Trustee or with the Paying Agent money sufficient to pay the redemption or purchase price of and accrued interest on all Notes to be redeemed or purchased on that date. The Trustee or the Paying Agent shall promptly return to the Company any money deposited with the Trustee or the Paying Agent by the Company in excess of the amounts necessary to pay the redemption or purchase price of, and accrued interest on, all Notes to be redeemed or purchased.

If the Company complies with the provisions of the preceding paragraph, on and after the redemption or purchase date, interest shall cease to accrue on the Notes or the portions of Notes called for redemption or purchase. If a Note is redeemed or purchased on or after an interest record date but on or prior to the related interest payment date, then any accrued and unpaid interest (and Liquidated Damages, if any) shall be paid to the Person in whose name such Note was registered at the close of business on such record date. If any Note called for redemption or purchase is not so paid upon surrender for

redemption or purchase because of the failure of the Company to comply with the preceding paragraph, interest shall be paid on the unpaid principal, from the redemption or purchase date until such principal is paid, and to the extent lawful on any interest not paid on such unpaid principal, in each case at the rate provided in the Notes and in Section 4.01 hereof.

Section 3.06    *Notes Redeemed or Purchased in Part.*

Upon surrender of a Note that is redeemed or purchased in part, the Company shall issue and, upon receipt of an Authentication Order, the Trustee shall authenticate for the Holder at the expense of the Company a new Note equal in principal amount to the unredeemed or unpurchased portion of the Note surrendered.

Section 3.07    *Optional Redemption.*

At any time on or after November 22, 2009, the Company may redeem the Notes, in whole at any time, or in part from time to time, at a price equal to 100% of the aggregate principal amount of the Notes being redeemed plus accrued and unpaid interest (and Liquidated Damages, if any) up to but not including the date of redemption, payable to the Holders in cash. Any redemption pursuant to this Section 3.07 shall be made pursuant to the provisions of Section 3.01 through 3.06 hereof.

Section 3.08    *Mandatory Redemption.*

The Company shall not be required to make mandatory redemption or sinking fund payments with respect to the Notes.

Section 3.09    *Purchase of Notes at Option of the Holder.*

(a)    *General.* All or any portion of the Notes held by any Holder shall be purchased by the Company at the option of the Holder on November 15, 2009, November 15, 2013 and November 15, 2018 (each a "*Purchase Date*"), at a price equal to 100% of the aggregate principal amount of the Notes being purchased plus accrued and unpaid interest (and Liquidated Damages, if any) to the applicable Purchase Date (the "*Purchase Price*"). Purchases of Notes hereunder shall be made, at the option of the Holder thereof, upon:

(1)    delivery to the Paying Agent by the Holder of a written notice of purchase (a "*Purchase Notice*") at any time from the opening of business on the date that is 20 Business Days prior to a Purchase Date until the close of business on the last Business Day prior to such Purchase Date stating:

(a)    if certificated Notes have been issued, the certificate number of the Note which the Holder will deliver to be purchased, or if not certificated, the notice must comply with the Applicable Procedures,

(b)    the portion of the principal amount of the Note which the Holder will deliver to be purchased, which portion must be in principal amounts of $1,000 or an integral multiple thereof,

(c)    that such Note shall be purchased as of the Purchase Date pursuant to the terms and conditions specified in this Section 3.09, and

24

(d)    in the event the Company elects, pursuant to Section 3.09(b), to pay the Purchase Price, in whole or in part, in shares of Common Stock but such portion of the Purchase Price shall ultimately be payable to such Holder entirely in cash because any of the conditions to payment of the Purchase Price in shares of Common Stock is not satisfied prior to the close of business on the Purchase Date, as set forth below, whether such Holder elects (x) to withdraw such Purchase Notice as to some or all of the Notes to which such Purchase Notice relates (stating the principal amount and certificate numbers, if any, of the Notes as to which such withdrawal shall relate), or (y) to receive cash in respect of the entire Purchase Price for all Notes (or portions thereof) to which such Purchase Notice relates; and

(2)    delivery of such Note to the Paying Agent prior to, on or after the Purchase Date (together with all necessary endorsements) at the offices of the Paying Agent, such delivery being a condition to receipt by the Holder of the Purchase Price therefor; *provided, however*, that such Purchase Price shall be so paid pursuant to this Section 3.09 only if the Note so delivered to the Paying Agent shall conform in all respects to the description thereof in the related Purchase Notice, as determined by the Company. If Global Notes are outstanding, such notice and tender of such Notes must comply with Applicable Procedures.

If a Holder, in such Holder's Purchase Notice and in any written notice of withdrawal delivered by such Holder pursuant to the terms of Section 3.11, fails to indicate such Holder's choice with respect to the election set forth in clause (d) of Section 3.09(a)(1), such Holder shall be deemed to have elected to receive cash in respect of the entire Purchase Price for all Notes subject to such Purchase Notice in the circumstances set forth in such clause (d).

The Company shall purchase from the Holder thereof, pursuant to this Section 3.09, a portion of a Note if the principal amount of such portion is $1,000 or an integral multiple of $1,000. Provisions of this Indenture that apply to the purchase of all of a Note also apply to the purchase of such portion of such Note.

Any purchase by the Company contemplated pursuant to the provisions of this Section 3.09 shall be consummated by the delivery of the consideration to be received by the Holder promptly following the later of (x) the Purchase Date and (y) the time of delivery of the Note.

Notwithstanding anything herein to the contrary, any Holder delivering to the Paying Agent the Purchase Notice contemplated by this Section 3.09(a) shall have the right to withdraw such Purchase Notice at any time prior to the close of business on the Business Day preceding the Purchase Date by delivery of a written notice of withdrawal to the Paying Agent in accordance with Section 3.11.

The Paying Agent shall promptly notify the Company of the receipt by it of any Purchase Notice or written notice of withdrawal thereof.

(b)    *Company's Right to Elect Manner of Payment of Purchase Price for Payment.*  The Notes to be purchased on any Purchase Date pursuant to Section 3.09(a) may be paid for, at the election of the Company, in cash or shares of Common Stock, or in any combination of cash and shares of Common Stock, subject to the conditions set forth in Section 3.09(c). The Company shall designate, in the Company Notice delivered pursuant to Section 3.09(d), which shall be sent to Holders (and to beneficial owners as required by applicable law) not less than 20 Business Days prior to the Purchase Date (the "*Company Notice Date*"), whether the Company will purchase the Notes for cash or shares of Common Stock, or, if a combination thereof, the percentages of the Purchase Price of Notes in respect of which it will pay in cash and shares of Common Stock; *provided, however*, that the Company will pay cash for fractional shares of Common Stock.  For purposes of determining the existence of potential

25

fractional shares, all Notes subject to purchase by the Company held by a Holder shall be considered together (no matter how many separate certificates are to be presented). Each Holder whose Notes are purchased pursuant to this Section 3.09 shall receive the same percentage of cash or shares of Common Stock in payment of the Purchase Price for such Notes, except (i) as provided in Section 3.09(c) with regard to the payment of cash in lieu of fractional shares of Common Stock and (ii) in the event that the Company is unable to purchase the Notes of a Holder or Holders for shares of Common Stock because any necessary qualifications or registrations of the shares of Common Stock under applicable state securities laws cannot be obtained, the Company may purchase the Notes of such Holder or Holders for cash. The Company may not change its election with respect to the consideration (or components or percentages of components thereof) to be paid once the Company has given its Company Notice to Holders of Notes except pursuant to this Section 3.09(b) or pursuant to Section 3.09(c) in the event of a failure to satisfy, prior to the close of business on the Purchase Date, any condition to the payment of the Purchase Price, in whole or in part, in Common Stock.

At least three Business Days before the Company Notice Date, the Company shall deliver an Officer's Certificate to the Trustee specifying:

> (1)     the manner of payment selected by the Company;

> (2)     the information required by Section 3.09(d);

> (3)     if the Company elects to pay the Purchase Price, or a specified percentage thereof, in Common Stock, that the conditions to such manner of payment set forth in Section 3.09(c) have been or will be complied with; and

> (4)     whether the Company desires the Trustee to give the Company Notice required by Section 3.09(d).

Simultaneously with the delivery of the Company Notice to Holders, the Company shall, or, if the Company has requested that Trustee deliver the Company Notice to Holders pursuant to this Section 3.09(b), shall cause the Trustee to, at the Company's expense and in the Company's name, disseminate a press release through any of Dow Jones & Company, Inc., Business Wire, Bloomberg Business News or Reuters (or if such organizations are not in existence at the time of issuance of such press release, such other news or press organization as is reasonably calculated to broadly disseminate the relevant information to the public) containing this information, and the Company shall publish the information on the Company's Web site on the World Wide Web or through such other public medium as the Company may use at that time.

(c)     *Payment by Issuance of Shares of Common Stock.*  At the option of the Company, the Purchase Price of Notes in respect of which a Purchase Notice pursuant to Section 3.09(a) has been given, or a specified percentage thereof, may be paid by the Company by the issuance of a number of shares of Common Stock equal to the quotient obtained by dividing (i) the amount of cash to which the Holders of Notes would have been entitled had the Company elected to pay all or such specified percentage, as the case may be, of the Purchase Price of such Notes in cash by (ii) the Market Price of one share of Common Stock, subject to the next succeeding paragraph.

The Company will not issue a fractional shares of Common Stock in payment of the Purchase Price. Instead the Company will pay cash for the current Market Price of the fractional share. The current Market Price of a fraction of a share shall be determined by the Company by multiplying the Market Price by such fraction and rounding the product to the nearest whole cent with one-half cent being rounded

upward. It is understood that if a Holder elects to have more than one Note purchased, the number of shares of Common Stock shall be based on the aggregate amount of Notes to be purchased.

If the Company elects to purchase the Notes by the issuance of shares of Common Stock, the Company Notice, as provided in Section 3.09(d), shall be sent to the Holders (and to beneficial owners as required by applicable law) not later than the Company Notice Date.

The Company's right to exercise its election to purchase Notes through the issuance of shares of Common Stock shall be conditioned upon:

(1)    the Company's not having given its Company Notice of an election to pay entirely in cash and its giving of timely Company Notice of election to purchase all or a specified percentage of the Notes with shares of Common Stock as provided herein;

(2)    the registration of such shares of Common Stock under the Securities Act, or the Exchange Act, in each case, if required;

(3)    such shares of Common Stock having been listed on the principal national securities exchange (currently The New York Stock Exchange) on which the Common Stock is listed;

(4)    any necessary qualification or registration under applicable state securities laws or the availability of an exemption from such qualification and registration; and

(5)    the receipt by the Trustee of an Officer's Certificate stating that (A) the terms of the issuance of the shares of Common Stock are in conformity with this Indenture and (B) the shares of Common Stock to be issued by the Company in payment of the Purchase Price in respect of Notes have been duly authorized and, when issued and delivered pursuant to the terms of this Indenture in payment of the Purchase Price in respect of the Notes, will be validly issued, fully paid and non-assessable and free from preemptive rights, and stating that the conditions above and the condition set forth in the second succeeding sentence have been satisfied.

Such Officer's Certificate shall also set forth (i) the number of shares of Common Stock to be issued for each $1,000 principal amount of Notes, (ii) the Common Stock Price on each Trading Day during the period commencing on the first Trading Day of the period during which the Market Price is calculated and ending on the third Business Day prior to the applicable Purchase Date and (iii) the Market Price of the Common Stock. The Company may pay the Purchase Price (or any portion thereof) in shares of Common Stock only if the information necessary to calculate the Market Price is published in a daily newspaper of national circulation or is otherwise publicly available (e.g., by dissemination on the World Wide Web or by other public means). If the foregoing conditions are not satisfied with respect to a Holder or Holders prior to the close of business on the Purchase Date and the Company has elected to purchase the Notes pursuant to this Section 3.09 through the issuance of shares of Common Stock, the Company shall pay the entire Purchase Price of the Notes of such Holder or Holders in cash.

Upon determination of the actual number of shares of Common Stock to be issued for each $1,000 principal amount of Notes, not later than the second Business Day prior to the relevant Purchase Date, the Company will disseminate a press release through any of Dow Jones & Company, Inc., Business Wire, Bloomberg Business News or Reuters (or if such organizations are not in existence at the time of issuance of such press release, such other news or press organization as is reasonably calculated to broadly disseminate the relevant information to the public) containing this information and publish the

27

information on the Company's Web site on the World Wide Web or through such other public medium as the Company may use at that time.

(d)       *Notice of Election.*  In connection with any purchase of Notes pursuant to this Section 3.09, the Company shall give notice to Holders setting forth information specified in this Section 3.09(d) (the "*Company Notice*").

In the event the Company has elected to pay the Purchase Price (or a specified percentage thereof) with shares of Common Stock, the Company Notice shall:

(1)       state that each Holder will receive shares of Common Stock with a Market Price determined as of a specified date prior to the Purchase Date equal to such specified percentage of the Purchase Price of the Notes held by such Holder (except any cash amount to be paid in lieu of fractional shares);

(2)       set forth the method of calculating the Market Price of the shares of Common Stock; and

(3)       state that because the Market Price of shares of Common Stock will be determined prior to the Purchase Date, Holders will bear the market risk with respect to the value of the shares of Common Stock to be received from the date such Market Price is determined to the Purchase Date.

In any case, each Company Notice shall include a form of Purchase Notice to be completed by a Holder of Notes and shall state:

(1)       the Purchase Price and the Conversion Price;

(2)       the name and address of the Paying Agent and the Conversion Agent;

(3)       that Notes as to which a Purchase Notice has been given may be converted if they are otherwise convertible only in accordance with Article 10 hereof and Paragraph 9 of the Notes if the applicable Purchase Notice has been withdrawn in accordance with the terms of this Indenture;

(4)       that Notes must be surrendered to the Paying Agent to collect payment;

(5)       that the Purchase Price for any security as to which a Purchase Notice has been given and not withdrawn will be paid promptly following the later of (x) the Purchase Date and (y) the time of surrender of such Note as described in (4);

(6)       the procedures the Holder must follow to exercise its rights under Section 3.09 and a brief description of those rights;

(7)       briefly, the conversion rights of the Notes;

(8)       the procedures for withdrawing a Purchase Notice (including, without limitation, for a conditional withdrawal pursuant to the terms of Section 3.09(a)(1)(d) or Section 3.11);

28

(9)    that, unless the Company defaults in making payment on Notes for which a Purchase Notice has been submitted, interest on such Notes will cease to accrue on the Purchase Date; and

(10)    the CUSIP number of the Notes.

At the Company's request, the Trustee shall give such Company Notice in the Company's name and at the Company's expense; *provided, however*, that, in all cases, the text of such Company Notice shall be prepared by the Company.

(e)    *Covenants of the Company.* All shares of Common Stock delivered upon purchase of the Notes shall be newly issued shares or treasury shares, shall be duly authorized, validly issued, fully paid and nonassessable, and shall be free from preemptive rights and free of any lien or adverse claim.

(f)    *Procedure upon Purchase.* The Company shall deposit cash (in respect of cash purchases under this Section 3.09 or for fractional shares, as applicable) or shares of Common Stock in respect of payment by issuance of shares of Common Stock under Section 3.09(c), except for fractional shares, or a combination thereof, as applicable, at the time and in the manner as provided in Section 3.12, sufficient to pay the aggregate Purchase Price of all Notes to be purchased pursuant to this Section 3.09. As soon as practicable after the Purchase Date, the Company shall deliver to each Holder entitled to receive shares of Common Stock through the Paying Agent a certificate for the number of full shares of Common Stock issuable in payment of the Purchase Price and cash in lieu of any fractional shares. The person in whose name the certificate for shares of Common Stock is registered shall be treated as a holder of record of Common Stock on the Business Day following the Purchase Date. No payment or adjustment will be made for dividends on the shares of Common Stock the record date for which occurred on or prior to the Purchase Date.

(g)    *Taxes.* If a Holder of a purchased Note (pursuant to this Section 3.09 or Section 3.10) is paid in shares of Common Stock, the Company shall pay any documentary, stamp or similar issue or transfer tax due on such issue of Common Stock. However, the Holder shall pay any such tax which is due because the Holder requests the Common Stock to be issued in a name other than the Holder's name. The Paying Agent may refuse to deliver the certificates representing the shares of Common Stock being issued in a name other than the Holder's name until the Paying Agent receives a sum sufficient to pay any tax which will be due because the shares of Common Stock are to be issued in a name other than the Holder's name. Nothing herein shall preclude any income tax withholding required by law or regulations.

Section 3.10    *Purchase of Notes at Option of the Holder upon Change in Control.*

(a)    If a Change in Control occurs, a Holder of Notes will have the right, at its option, to require the Company to repurchase all of its Notes, or any portion of the principal amount thereof at a purchase price equal to (1) the issue price plus any accrued and unpaid interest (and Liquidated Damages, if any) or (2) at the option of the Company, a number of shares of Common Stock as calculated below (the "*Change in Control Purchase Price*"), as of the date that is 45 days after the date of the Change in Control Notice (as defined below) delivered by the Company (the "*Change in Control Purchase Date*"), subject to satisfaction by or on behalf of the Holder of the requirements set forth in Section 3.10(c).

Notwithstanding the foregoing provisions of this Section 3.10, a Change in Control shall not be deemed to have occurred if:

(1)    the Common Stock Price on The New York Stock Exchange for any five Trading Days within the period of 10 consecutive Trading Days ending immediately after the later of the

29

event, that, but for this provision, would constitute a Change in Control or the public announcement of such event, in the case of a Change in Control relating to an acquisition of Capital Stock, or the period of 10 consecutive Trading Days ending immediately before such event, in the case of Change in Control relating to a merger, consolidation or asset sale, equals or exceeds 105% of the Conversion Price of the Notes in effect on each of those Trading Days; or

(2)    all of the consideration (excluding cash payments for fractional shares and cash payments made pursuant to dissenters' appraisal rights) in a merger or consolidation otherwise constituting a Change in Control above consists of shares of common stock traded on a national securities exchange or quoted on the Nasdaq National Market (or will be so traded or quoted immediately following the merger or consolidation) and as a result of the merger or consolidation the Notes become convertible into such common stock.

For purposes of this Section 3.10,

(x) the Conversion Price is equal to $1,000 divided by the Conversion Rate,

(y) whether a person is a "beneficial owner" shall be determined in accordance with Rule 13d-3 under the Exchange Act; and

(z) "person" includes any syndicate or group that would be deemed to be a "person" under Section 13(d)(3) of the Exchange Act.

If the shares of Common Stock are not listed on The New York Stock Exchange at the relevant time, closing prices and Trading Days shall be calculated as reported by the NASDAQ.

At the option of the Company, the Change in Control Purchase Price of Notes in respect of which a Change in Control Purchase Notice pursuant to Section 3.10(c) has been given may be paid by the Company by the issuance of a number of shares of Common Stock equal to the quotient obtained by dividing (i) the product of (A) the amount of cash to which the Holders of Notes would have been entitled had the Company elected to pay all of the Change in Control Purchase Price of such Notes in cash and (B) 0.95, by (ii) the Market Price of shares of Common Stock, subject to the next succeeding paragraph.

The Company will not issue fractional shares of Common Stock in payment of the Change in Control Purchase Price. Instead the Company will pay cash for the current Market Price of the fractional share. The current Market Price of a fraction of a share shall be determined by multiplying the Market Price by such fraction and rounding the product to the nearest whole cent, with one-half cent being rounded upward. It is understood that if a Holder elects to have more than one Note purchased, the number of shares of Common Stock shall be based on the aggregate amount of Notes to be purchased.

In the event that the Company is unable to purchase the Notes of a Holder or Holders for shares of Common Stock because any necessary qualifications or registrations of the shares of Common Stock under applicable state securities laws cannot be obtained, the Company may purchase the Notes of such Holder or Holders for cash.

The Company may not change its election with respect to the consideration to be paid once the Company has given its Change in Control Notice to Holders of Notes except pursuant to this Section 3.10(a) or pursuant to Section 3.10(b) in the event of a failure to satisfy, prior to the close of business on the Change in Control Purchase Date, any condition to the payment of the Change in Control Purchase Price in Common Stock.

At least three Business Days before the Change in Control Notice Date (as defined below), the Company shall deliver an Officer's Certificate to the Trustee specifying:

      (i)      the manner of payment selected by the Company;

      (ii)      the information required by Section 3.10(b);

      (iii)      if the Company elects to pay the Change in Control Purchase Price in Common Stock, that the conditions to such manner of payment set forth in this Section 3.10(a) have been or will be complied with; and

      (iv)      whether the Company desires the Trustee to give the Change in Control Notice required by Section 3.10(b).

The Company's right to exercise its election to purchase Notes through the issuance of shares of Common Stock shall be conditioned upon:

      (i)      the Company's giving of timely Change in Control Notice to purchase all of the Notes with shares of Common Stock as provided herein;

      (ii)      the registration of such shares of Common Stock under the Securities Act or the Exchange Act, in each case, if required;

      (iii)      such shares of Common Stock having been listed on the principal national securities exchange (currently The New York Stock Exchange) on which the Common Stock is listed;

      (iv)      any necessary qualification or registration under applicable state securities laws or the availability of an exemption from such qualification and registration; and

      (v)      the receipt by the Trustee of an Officer's Certificate stating that (A) the terms of the issuance of the shares of Common Stock are in conformity with this Indenture and (B) the shares of Common Stock to be issued by the Company in payment of the Change in Control Purchase Price in respect of Notes have been duly authorized and, when issued and delivered pursuant to the terms of this Indenture in payment of the Change in Control Purchase Price in respect of the Notes, will be validly issued, fully paid and non-assessable and free from preemptive rights, and stating that the conditions above and the condition set forth in the second succeeding sentence have been satisfied.

Such Officer's Certificate shall also set forth (i) the number of shares of Common Stock to be issued for each $1,000 principal amount of Notes, (ii) the Common Stock Price on each Trading Day during the period commencing on the first Trading Day of the period during which the Market Price is calculated and ending on the third Business Day prior to the Change in Control Purchase Date and (iii) the Market Price of the Common Stock.

The Company may pay the Change in Control Purchase Price in shares of Common Stock only if the information necessary to calculate the Market Price is published in a daily newspaper of national circulation or is otherwise publicly available (e.g., by dissemination on the World Wide Web or by other public means). If the foregoing conditions are not satisfied with respect to a Holder or Holders prior to the

close of business on the Change in Control Purchase Date and the Company has elected to purchase the Notes pursuant to this Section 3.10 through the issuance of shares of Common Stock, the Company shall pay the entire Purchase Price of the Notes of such Holder or Holders in cash.

(b)     No later than 30 days after the occurrence of a Change in Control, the Company shall mail a written notice of the Change in Control (the "*Change in Control Notice*" the date of such mailing, the "*Change in Control Notice Date*") by first-class mail to the Trustee and to each Holder (and to beneficial owners to the extent required by applicable law). The notice shall include a form of Change in Control Purchase Notice to be completed by the Holder that wishes to exercise rights under this Section 3.10 and shall state:

(1) briefly, the events causing a Change in Control and the date of such Change in Control;

(2) the date by which the Change in Control Purchase Notice pursuant to this Section 3.10 must be given;

(3) the Change in Control Purchase Date;

(4) the Change in Control Purchase Price;

(5) the name and address of the Paying Agent and the Conversion Agent;

(6) the Conversion Rate and any adjustments thereto;

(7) that Notes must be surrendered to the Paying Agent to collect payment;

(8) that the Change in Control Purchase Price for any Note as to which a Change in Control Purchase Notice has been duly given will be paid promptly following the later of (x) the Change in Control Purchase Date and (y) the time of surrender of such Note as described in (7);

(9) briefly, the procedures the Holder must follow to exercise rights under this Section 3.10;

(10) briefly, the conversion rights, if any, of the Notes;

(11) that, unless the Company defaults in making payment of such Change in Control Purchase Price, interest on Notes surrendered for purchase by the Company will cease to accrue on and after the Change in Control Purchase Date; and

(12) the CUSIP numbers of the Notes.

In the event the Company has elected to pay the Change in Control Purchase Price with shares of Common Stock, the Change in Control Notice shall:

(1) state that the Company will pay the Change in Control Purchase Price with shares of Common Stock;

(2) set forth the method of calculating the number of shares of Common Stock to be paid; and

(3) state that because the Market Price of shares of Common Stock will be determined prior to the Change in Control Purchase Date, Holders will bear the market risk with respect to the value of the shares of Common Stock to be received from the date such Market Price is determined to the Change in Control Purchase Date.

Simultaneously with the delivery of the Change in Control Notice to Holders, the Company shall, or, if the Company has requested that Trustee deliver the Company Notice to Holders pursuant to Section 3.10(a), shall cause the Trustee to, at the Company's expense and in the Company's name, disseminate a press release through any of Dow Jones & Company, Inc., Business Wire, Bloomberg Business News or Reuters (or if such organizations are not in existence at the time of issuance of such press release, such other news or press organization as is reasonably calculated to broadly disseminate the relevant information to the public) containing this information, and the Company shall publish the information on the Company's Web site on the World Wide Web or through such other public medium as the Company may use at that time.

(c)    A Holder may exercise its rights specified in Section 3.10(a) upon delivery of an irrevocable written notice of purchase (a "*Change in Control Purchase Notice*") to the Paying Agent at any time on or prior to the 30th day after the Company delivers its Change in Control Notice, stating:

(1)    the certificate number of the Note which the Holder will deliver to be purchased;

(2)    the portion of the principal amount of the Note which the Holder will deliver to be purchased, which portion must be $1,000 or an integral multiple thereof; and

(3)    that such Note shall be purchased pursuant to the terms and conditions specified in this Section 3.10.

The delivery of such Note to the Paying Agent with the Change in Control Purchase Notice (together with all necessary endorsements) at the offices of the Paying Agent shall be a condition to the receipt by the Holder of the Change in Control Purchase Price therefor; *provided, however*, that such Change in Control Purchase Price shall be so paid pursuant to this Section 3.10 only if the Note so delivered to the Paying Agent shall conform in all respects to the description thereof set forth in the related Change in Control Purchase Notice.

The Company shall purchase from the Holder thereof, pursuant to this Section 3.10, a portion of a Note if the principal amount of such portion is $1,000 or an integral multiple of $1,000. Provisions of this Indenture that apply to the purchase of all of a Note also apply to the purchase of such portion of such Note. Any purchase by the Company contemplated pursuant to the provisions of this Section 3.10 shall be consummated by the delivery of the consideration to be received by the Holder on the Change in Control Purchase Date.

(d)    All shares of Common Stock delivered upon purchase of the Notes shall be newly issued shares or treasury shares, shall be duly authorized, validly issued, fully paid and nonassessable, and shall be free from preemptive rights and free of any lien or adverse claim.

(e)    The Company shall deposit cash (in respect of a cash purchases under Section 3.10 or for fractional shares of Common Stock, as applicable) or shares of Common Stock, or a combination thereof, as applicable, at the time and in the manner as provided in Section 3.12, sufficient to pay the aggregate Change in Control Purchase Price of all Notes to be purchased pursuant to this Section 3.10. As soon as practicable after the Change in Control Purchase Date, the Company shall deliver to each Holder entitled

33

to receive shares of Common Stock through the Paying Agent a certificate for the number of full shares of Common Stock issuable in payment of the Change in Control Purchase Price and cash in lieu of any fractional shares. The person in whose name the certificate for shares of Common Stock is registered shall be treated as a holder of record of Common Stock on the Business Day following the Change in Control Purchase Date. No payment or adjustment will be made for dividends on the shares of Common Stock the record date for which occurred on or prior to the Change in Control Purchase Date.

Section 3.11    *Effect of Purchase Notice or Change in Control Purchase Notice.*

Upon receipt by the Paying Agent of the Purchase Notice specified in Section 3.09(a) or Change in Control Purchase Notice specified in Section 3.10(c), as applicable, the Holder of the Note in respect of which such Purchase Notice or Change in Control Purchase Notice, as the case may be, was given shall (unless, in the case of the Purchase Notice, such Purchase Notice is withdrawn as specified in the following two paragraphs) thereafter be entitled to receive solely the Purchase Price or Change in Control Purchase Price, as the case may be, with respect to such Note. Such Purchase Price or Change in Control Purchase Price shall be paid to such Holder, subject to receipts of funds and/or securities by the Paying Agent, promptly following the later of (x) the Purchase Date or the Change in Control Purchase Date, as the case may be, with respect to such Note (provided the conditions in Section 3.09(a) or Section 3.10(c), as applicable, have been satisfied) and (y) the time of delivery of such Note to the Paying Agent by the Holder thereof in the manner required by Section 3.09(a) or Section 3.10(c), as applicable. If the Paying Agent holds money or securities sufficient to pay the Purchase Price or Change in Control Purchase Price of the Notes on the Business Day following the Purchase Date or Change in Control Purchase Date, then:

(1) the Notes will cease to be outstanding;

(2) interest (and Liquidated Damages, if any) will cease to accrue; and

(3) all other rights of the Holder of the Notes will terminate.

This will be the case whether or not book-entry transfer of the Notes is made or whether or not the Notes are delivered to the Paying Agent.

Notes in respect of which a Purchase Notice or Change in Control Purchase Notice has been given by the Holder thereof may not be converted pursuant to the provisions hereof on or after the date of the delivery of such Purchase Notice or Change in Control Purchase Notice, unless, in the case of the Purchase Notice, such Purchase Notice has first been validly withdrawn as specified in the following two paragraphs.

A Purchase Notice may be withdrawn by means of a written notice of withdrawal delivered to the office of the Paying Agent in accordance with the Purchase Notice at any time prior to the close of business on the last Business Day prior to the Purchase Date, specifying:

(1)    the certificate number, if any, of the Note in respect of which such notice of withdrawal is being submitted,

(2)    the principal amount of the Note with respect to which such notice of withdrawal is being submitted, and

(3)    the principal amount, if any, of such Note which remains subject to the original Purchase Notice, and which has been or will be delivered for purchase by the Company.

34

A written notice of withdrawal of a Purchase Notice may be in the form set forth in the preceding paragraph or may be in the form of (i) a conditional withdrawal contained in a Purchase Notice pursuant to the terms of Section 3.09(a)(1)(d) or (ii) a conditional withdrawal containing the information set forth in Section 3.09(a)(1)(d) and the preceding paragraph and contained in a written notice of withdrawal delivered to the Paying Agent as set forth in the preceding paragraph.

There shall be no purchase of any Notes pursuant to Section 3.09 or 3.10 if there has occurred (prior to, on or after, as the case may be, the giving, by the Holders of such Notes, of the required Purchase Notice or Change in Control Purchase Notice, as the case may be) and is continuing an Event of Default (other than a default in the payment of the Purchase Price or Change in Control Purchase Price, as the case may be, with respect to such Notes). The Paying Agent will promptly return to the respective Holders thereof any Notes (x) with respect to which a Purchase Notice has been withdrawn in compliance with this Indenture, or (y) held by it during the continuance of an Event of Default (other than a default in the payment of the Purchase Price or Change in Control Purchase Price, as the case may be, with respect to such Notes) in which case, upon such return, the Purchase Notice or Change in Control Purchase Notice with respect thereto shall be deemed to have been withdrawn.

Section 3.12    *Deposit of Purchase Price or Change in Control Purchase Price.*

Prior to 10:00 a.m. (local time in the City of New York) on the Purchase Date or the Change in Control Purchase Date, as the case may be, the Company shall deposit with the Trustee or with the Paying Agent (or, if the Company or a Subsidiary or an Affiliate of either of them is acting as the Paying Agent, shall segregate and hold in trust as provided in the Indenture) an amount of cash (in immediately available funds if deposited on such Business Day) or Common Stock, if permitted hereunder, sufficient to pay the aggregate Purchase Price or Change in Control Purchase Price, as the case may be, of all the Notes or portions thereof which are to be purchased as of the Purchase Date or Change in Control Purchase Date, as the case may be.

Section 3.13    *Notes Purchased in Part.*

Any certificated Note which is to be purchased only in part shall be surrendered at the office of the Paying Agent (with, if the Company or the Trustee so requires, due endorsement by, or a written instrument of transfer in form satisfactory to the Company and the Trustee duly executed by, the Holder thereof or such Holder's attorney duly authorized in writing) and the Company shall execute and the Trustee shall authenticate and deliver to the Holder of such Note, without service charge, a new Note or Notes, of any authorized denomination as requested by such Holder in aggregate principal amount equal to, and in exchange for, the portion of the principal amount of the Note so surrendered which is not purchased.

Section 3.14    *Covenant to Comply With Securities Laws Upon Purchase of Notes.*

When complying with the provisions of Section 3.09 or 3.10 hereof (*provided* that such offer or purchase constitutes an "issuer tender offer" for purposes of Rule 13e-4 (which term, as used herein, includes any successor provision thereto) under the Exchange Act at the time of such offer or purchase), the Company shall (i) comply with Rule 13e-4 and Rule 14e-1 (or any successor provision) under the Exchange Act, (ii) file the related Schedule TO (or any successor schedule, form or report) under the Exchange Act, and (iii) otherwise comply with all Federal and state securities laws *so as to permit the* rights and obligations under Sections 3.09 and 3.10 to be exercised in the time and in the manner specified in Sections 3.09 and 3.10.

Section 3.15    *Repayment to the Company.*

The Trustee and the Paying Agent shall return to the Company any cash or shares of Common Stock that remain unclaimed, together with interest or dividends, if any, thereon held by them for the payment of the Purchase Price or Change in Control Purchase Price, as the case may be; *provided, however,* that to the extent that the aggregate amount of cash or shares of Common Stock deposited by the Company pursuant to Section 3.12 exceeds the aggregate Purchase Price or Change in Control Purchase Price, as the case may be, of the Notes or portions thereof which the Company is obligated to purchase as of the Purchase Date or Change in Control Purchase Date, as the case may be, then, unless otherwise agreed in writing with the Company, promptly after the Business Day following the Purchase Date or Change in Control Purchase Date, as the case may be, the Trustee shall return any such excess to the Company together with interest or dividends, if any, thereon. Prior to such return, any such excess funds held by the Paying Agent shall be invested in cash or Permitted Investments as may be directed by the Company from time to time.

**ARTICLE 4.**
COVENANTS

Section 4.01    *Payment of Notes.*

The Company shall pay or cause to be paid the principal of, premium, if any, and interest on the Notes on the dates and in the manner provided in the Notes. Principal, premium, if any, and interest shall be considered paid on the date due if the Paying Agent, if other than the Company or a Subsidiary thereof, holds as of 10:00 a.m. Eastern Time on the due date money deposited by the Company in immediately available funds and designated for and sufficient to pay all principal, premium, if any, and interest then due.

The Company shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue principal at the rate equal to 1% per annum in excess of the then applicable interest rate on the Notes to the extent lawful; it shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue installments of interest (without regard to any applicable grace period) at the same rate to the extent lawful.

Section 4.02    *Maintenance of Office or Agency.*

The Company shall maintain in the Borough of Manhattan, the City of New York, an office or agency (which may be an office of the Trustee or an affiliate of the Trustee, Registrar or co-registrar) where Notes may be surrendered for registration of transfer or for exchange and where notices and demands to or upon the Company in respect of the Notes and this Indenture may be served. The Company shall give prompt written notice to the Trustee of the location, and any change in the location, of such office or agency. If at any time the Company fails to maintain any such required office or agency or fails to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the Corporate Trust Office of the Trustee.

The Company may also from time to time designate one or more other offices or agencies where the Notes may be presented or surrendered for any or all such purposes and may from time to time rescind such designations; *provided, however,* that no such designation or rescission shall in any manner relieve the Company of its obligation to maintain an office or agency in the Borough of Manhattan, the City of New York for such purposes. The Company shall give prompt written notice to the Trustee of any such designation or rescission and of any change in the location of any such other office or agency.

36

The Company hereby designates the Corporate Trust Office of the Trustee as one such office or agency of the Company in accordance with Section 2.03 hereof.

Section 4.03     *Reports.*

(a)     Whether or not required by the SEC's rules and regulations, so long as any Notes are outstanding, the Company shall furnish to the Trustee and the Holders of Notes, within the time periods specified in the SEC's rules and regulations:

(1)     all quarterly and annual reports that would be required to be filed with the SEC on Forms 10-Q and 10-K if the Company were required to file such reports; and

(2)     all current reports that would be required to be filed with the SEC on Form 8-K if the Company were required to file such reports.

(b)     All such reports shall be prepared in all material respects in accordance with all of the rules and regulations applicable to such reports. Each annual report on Form 10-K shall include a report on the Company's consolidated financial statements by the Company's certified independent accountants. In addition, the Company shall file a copy of each of the reports referred to in clauses (1) and (2) in Section 4.03(a) above with the SEC for public availability within the time periods specified in the rules and regulations applicable to such reports (unless the SEC shall not accept such a filing) and make such information available to securities analysts and prospective investors upon request.

(c)     If, at any time, the Company is no longer subject to the periodic reporting requirements of the Exchange Act for any reason, the Company shall nevertheless continue filing the reports specified in Section 4.03(a) with the SEC within the time periods specified above unless the SEC shall not accept such a filing. The Company agrees that it shall not take any action for the purpose of causing the SEC not to accept any such filings. If, notwithstanding the foregoing, the SEC shall not accept the Company's filings for any reason, the Company shall post the reports referred to in Section 4.03(a) on its website within the time periods that would apply if the Company were required to file those reports with the SEC.

(d)     If the Company has designated any of its Subsidiaries as Unrestricted Subsidiaries, then the quarterly and annual financial information required by Section 4.03(a) shall include a reasonably detailed presentation, either on the face of the financial statements or in the footnotes thereto, and in Management's Discussion and Analysis of Financial Condition and Results of Operations, of the financial condition and results of operations of the Company and its Restricted Subsidiaries separate from the financial condition and results of operations of the Unrestricted Subsidiaries of the Company.

(e)     In addition, the Company agrees that, for so long as any Notes remain outstanding, at any time it is not required to file the reports required by Section 4.03(a) with the SEC, it shall furnish to the Holders and to securities analysts and prospective investors, upon their request, the information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act.

Section 4.04     *Compliance Certificate.*

(a)     The Company shall deliver to the Trustee, within 90 days after the end of each fiscal year, an Officer's Certificate prescribed by the TIA stating that a review of the activities of the Company and its Subsidiaries during the preceding fiscal year has been made under the supervision of the signing Officers with a view to determining whether the Company has kept, observed, performed and fulfilled its obligations under this Indenture, and further stating, as to each such Officer signing such certificate, that to the best of his or her knowledge the Company has kept, observed, performed and fulfilled each and

37

every covenant contained in this Indenture and is not in default in the performance or observance of any of the terms, provisions and conditions of this Indenture (or, if a Default or Event of Default has occurred, describing all such Defaults or Events of Default of which he or she may have knowledge and what action the Company is taking or proposes to take with respect thereto) and that to the best of his or her knowledge no event has occurred and remains in existence by reason of which payments on account of the principal of or interest, if any, on the Notes is prohibited or if such event has occurred, a description of the event and what action the Company is taking or proposes to take with respect thereto.

(b)     So long as not contrary to the then current recommendations of the American Institute of Certified Public Accountants, the year-end financial statements delivered pursuant to Section 4.03(a) above shall be accompanied by a written statement of the Company's independent public accountants (who shall be a firm of established national reputation) that in making the examination necessary for certification of such financial statements, nothing has come to their attention that would lead them to believe that the Company has violated any provisions of Article 4 or Article 5 hereof or, if any such violation has occurred, specifying the nature and period of existence thereof, it being understood that such accountants shall not be liable directly or indirectly to any Person for any failure to obtain knowledge of any such violation.

(c)     So long as any of the Notes are outstanding, the Company shall deliver to the Trustee, forthwith upon any Officer becoming aware of any Default or Event of Default, an Officer's Certificate specifying such Default or Event of Default and what action the Company is taking or proposes to take with respect thereto.

Section 4.05     *Taxes.*

The Company shall pay, and shall cause each of its Subsidiaries to pay, prior to delinquency, all material taxes, assessments, and governmental levies except such as are contested in good faith and by appropriate proceedings or where the failure to effect such payment is not adverse in any material respect to the Holders of the Notes.

Section 4.06     *Stay, Extension and Usury Laws.*

The Company covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law wherever enacted, now or at any time hereafter in force, that may affect the covenants or the performance of this Indenture; and the Company (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it shall not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Trustee, but shall suffer and permit the execution of every such power as though no such law has been enacted.

Section 4.07     [Reserved.]

Section 4.08     [Reserved.]

Section 4.09     [Reserved.]

Section 4.10     [Reserved.]

Section 4.11     [Reserved.]

Section 4.12    *Liens.*

The Company shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, incur any Lien upon any of its properties or assets (including Capital Stock), whether owned at the date of issuance of the Notes or thereafter acquired, in each case to secure Indebtedness of the Company or any Restricted Subsidiary, without effectively providing that the Notes shall be secured equally and ratably with (or prior to) that Indebtedness, so long as that Indebtedness shall be so secured.

This restriction on Liens will not, however, apply to:

 (1) Liens:

  (a) on assets or property incurred by the Company or any of its Restricted Subsidiaries to secure Indebtedness Incurred by the Company or such Restricted Subsidiary to finance the exploration, drilling, development, construction or purchase of or by, or repairs, improvements or additions to, property or assets of the Company or such Restricted Subsidiary, as the case may be, which Liens may include Liens on the Capital Stock of such Restricted Subsidiary or

  (b) incurred by any Restricted Subsidiary that does not own, directly or indirectly, at the time of such original incurrence of such Lien under this clause (1)(b) any operating properties or assets securing Indebtedness Incurred to finance the exploration, drilling, development, construction or purchase of or by or repairs, improvements or additions to, property or assets of any Restricted Subsidiary that does not, directly or indirectly, own any operating properties or assets at the time of such original incurrence of such Lien, which Liens contemplated by this clause (1)(b) may include Liens on the Capital Stock of one or more Restricted Subsidiaries that do not, directly or indirectly, own any operating properties or assets at the time of such original incurrence of such Lien, *provided, however,* that the Indebtedness secured by any such Lien may not be issued more than 365 days after the later of the exploration, drilling, development, completion of construction, purchase, repair, improvement, addition or commencement of full commercial operation of the property or assets being so financed;

 (2) Liens existing on the date of issuance of the Notes, other than Liens relating to Indebtedness or other obligations being repaid or Liens that are otherwise extinguished with the proceeds of the Notes;

 (3) Liens on property, assets or shares of stock of a Person at the time that Person becomes a Subsidiary of the Company; *provided, however,* that any such Lien may not extend to any other property or assets owned by the Company or any of its Restricted Subsidiaries;

 (4) Liens on property or assets existing at the time that the Company or one of its Subsidiaries acquires the property or asset, including any acquisition by means of a merger or consolidation with or into the Company or one of its Subsidiaries; *provided, however,* that such Liens are not incurred in connection with, or in contemplation of, that merger or consolidation; and *provided, further,* that the Lien may not extend to any other property or asset owned by the Company or any of its Restricted Subsidiaries;

 (5) Liens securing Indebtedness or other obligations of one of the Company's Subsidiaries that is owing to the Company or any of its Restricted Subsidiaries, or Liens securing the Indebtedness or other Obligations of the Company that are owing to one of the Company's Subsidiaries;

(6)     Liens incurred on assets that are the subject of a Capitalized Lease Obligation to which the Company or any of its Subsidiaries is a party, which shall include Liens on the stock or other ownership interest in one or more of the Company's Restricted Subsidiaries leasing such assets;

(7)     Liens to secure any refinancing, refunding, extension, renewal or replacement (or successive refinancings, refundings, extensions, renewals or replacements) as a whole, or in part, of any Indebtedness secured by any Lien referred to in clauses (1), (2), (3), (4) or (6) above; *provided, however*, that (a) such new Lien shall be limited to all or part of the same property or assets that secured the original Lien (plus repairs, improvements or additions to such property or assets and Liens on the stock or other ownership interest in one or more Restricted Subsidiaries beneficially owning that property or assets) and (b) the amount of Indebtedness secured by such Lien at such time (or, if the amount that may be realized in respect of such Lien is limited, by contract or otherwise, such limited lesser amount) is not increased, other than by an amount necessary to pay fees and expenses, including premiums, related to the refinancing, refunding, extension, renewal or replacement of such Indebtedness; and

(8)     Liens by which the Notes are secured equally and ratably with other Indebtedness pursuant to this Section 4.12;

*provided, however*, the Company or any of its Restricted Subsidiaries may incur other Liens to secure Indebtedness as long as the sum of:

(x) the lesser of:

(a)     the amount of outstanding Indebtedness secured by Liens Incurred pursuant to this proviso (or, if the amount that may be realized in respect of such Lien is limited, by contract or otherwise, such limited lesser amount) and

(b)     the fair value (as determined by the Company's Board of Directors) of the property securing that item of Indebtedness, plus

(y) the Attributable Debt with respect to all Sale and Leaseback Transactions entered into pursuant to the proviso in Section 4.16

does not exceed 15% of Consolidated Net Tangible Assets as determined based on the consolidated balance sheet of the Company as of the end of the most recent fiscal quarter for which financial statements are available.

Section 4.13     [Reserved.]

Section 4.14     *Corporate Existence.*

Subject to Article 5 hereof, the Company shall do or cause to be done all things necessary to preserve and keep in full force and effect:

(1)     its corporate existence, and the corporate, partnership or other existence of each of its Subsidiaries, in accordance with the respective organizational documents (as the same may be amended from time to time) of the Company or any such Subsidiary; and

40

(2)    the rights (charter and statutory), licenses and franchises of the Company and its Subsidiaries; *provided, however*, that the Company shall not be required to preserve any such right, license or franchise, or the corporate, partnership or other existence of any of its Subsidiaries, if the Board of Directors shall determine that the preservation thereof is no longer desirable in the conduct of the business of the Company and its Subsidiaries, taken as a whole, and that the loss thereof is not adverse in any material respect to the Holders of the Notes.

Section 4.15    [Reserved.]

Section 4.16    *Limitation on Sale and Leaseback Transactions.*

The Company shall not, and shall not permit any of its Restricted Subsidiaries to, enter into any Sale and Leaseback Transaction unless:

(1) the Company or such Restricted Subsidiary would be entitled to create a Lien on the property or asset subject to the Sale and Leaseback Transaction securing Indebtedness in an amount equal to the Attributable Debt with respect to such transaction without equally and ratably securing the Notes pursuant to Section 4.12 hereof; or

(2) the net proceeds of the sale are at least equal to the fair value (as determined by the Board of Directors) of the property or asset subject to the Sale and Leaseback Transaction and the Company, or the Restricted Subsidiary, applies or causes to be applied, within 180 days of the effective date of the Sale and Leaseback Transaction, an amount in cash equal to the net proceeds of the sale to the retirement of Indebtedness of the Company, or any Restricted Subsidiary;

*provided, however*, in addition to the transactions permitted pursuant to the clauses (1) and (2) above, the Company or any of its Restricted Subsidiaries may enter into a Sale and Leaseback Transaction as long as the sum of:

(x) the Attributable Debt with respect to such Sale and Leaseback Transaction and all other Sale and Leaseback Transactions entered into pursuant to this proviso, plus

(y) the amount of outstanding Indebtedness secured by Liens Incurred pursuant to the final proviso of Section 4.12 hereof,

does not exceed 15% of Consolidated Net Tangible Assets as determined based on the consolidated balance sheet of the Company as of the end of the most recent fiscal quarter for which financial statements are available. In addition, any Restricted Subsidiary may enter into a Sale and Leaseback Transaction with respect to property or assets owned by that Restricted Subsidiary so long as the proceeds of that Sale and Leaseback Transaction are used to explore, drill, develop, construct, purchase, repair, improve or add to property or assets of any Restricted Subsidiary, or to repay (within 365 days of the commencement of full commercial operation of any such property or assets) Indebtedness Incurred to explore, drill, develop, construct, purchase, repair, improve or add to property or assets of any Restricted Subsidiary.

Section 4.17    [Reserved.]

Section 4.18    [Reserved.]

Section 4.19    [Reserved.]

41